```
 1              IN THE UNITED STATES DISTRICT COURT

 2         MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION

 3    ------------------------------------------------------------

 4    UNITED STATES OF AMERICA,     )

 5                  PLAINTIFF,      )

 6                                  )

 7    V.                            )  CASE NO. 3:10-00009

 8                                  )

 9    JEREMY SETH TUMMINS,          )

10                  DEFENDANT.      )

11    ------------------------------------------------------------

12

13                     TRANSCRIPT OF PROCEEDINGS

14

15    ------------------------------------------------------------

16    DATE:              APRIL 15, 2011

17    TIME:              1:30 P.M.

18    BEFORE:            HONORABLE WILLIAM J. HAYNES, JR.

19    ------------------------------------------------------------

20

21

22    COURT REPORTER:    PEGGY G. TURNER
                         OFFICIAL COURT REPORTER
23                       801 BROADWAY, ROOM A-837
                         NASHVILLE, TENNESSEE 37203
24                       PHONE:  (615)726-4893
                         PEGGY_TURNER@TNMD.USCOURTS.GOV
25
```

1

```
 1                    A P P E A R A N C E S:

 2   FOR THE PLAINTIFF:  MATT EVERETT
                         ASSISTANT U.S. ATTORNEY
 3                       NASHVILLE, TN

 4   FOR THE DEFENDANT:  TIMOTHY POTTER
                         HILLARY DUKE
 5                       ATTORNEYS AT LAW
                         NASHVILLE, TN
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                   W I T N E S S E S:

2    JOHN PATTERSON

3    DIRECT EXAMINATION BY MR. EVERETT        PAGE    6

4    CROSS EXAMINATION BY MR. POTTER          PAGE   28

5    REDIRECT EXAMINATION BY MR. EVERETT      PAGE   48

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      P R O C E E D I N G S

 2          THE CLERK:  WE'RE HERE IN THE MATTER OF UNITED STATES

 3   OF AMERICA V. JEREMY SETH TUMMINS, CASE NUMBER 3:10-00009.

 4   COUNSEL, PLEASE ANNOUNCE WHO IS HERE AND ON WHOSE BEHALF.

 5          MR. POTTER:  TIM POTTER AND HILLARY DUKE, YOUR HONOR,

 6   FOR THE DEFENDANT.

 7          MR. EVERETT:  GOOD AFTERNOON, YOUR HONOR.  MATT EVERETT

 8   FOR THE UNITED STATES.

 9          THE COURT:  GOOD AFTERNOON.  ANY PRELIMINARY MATTERS

10   BEFORE WE GET STARTED, EITHER SIDE?

11          MR. POTTER:  I THINK THERE IS ONE PRELIMINARY MATTER,

12   YOUR HONOR, MAY IT PLEASE THE COURT.  AND THAT IS THE DEFENSE

13   FILED A MOTION TO SUPPRESS, THE MOTION THAT IS BEFORE YOU TODAY.

14   AND THIS ARISES FROM AN ALLEGED CUSTODIAL INTERROGATION THAT'S

15   THE ISSUE IN DISPUTE.  BUT WE DID NOT ATTACH TO OUR MOTION A

16   COURT REPORTER TRANSCRIPT.  THIS ENTIRE EVENT WAS AUDIOTAPED.

17   THE GOVERNMENT FILED A RESPONSE AND PREPARED A TRANSCRIPT.

18          IN PREPARING FOR THIS HEARING, THE LAST COUPLE OF DAYS

19   WE LOOKED AT THEIR TRANSCRIPT AND SAW THAT THERE ARE SOME

20   DIFFERENCES IN THEIR TRANSCRIPT FROM THE COURT REPORTER

21   TRANSCRIPT THAT WE HAVE.  AND SO WE FILED THIS MORNING A COPY OF

22   OUR COURT REPORTER TRANSCRIPT.  I THINK THE GOVERNMENT OBJECTED

23   TO THAT BECAUSE THEY GOT IT TODAY.  I WOULD RESPECTFULLY ASK

24   THAT IT BE ADMITTED, AND YOUR HONOR CAN DETERMINE, IN TAKING A

25   LOOK AT THESE TRANSCRIPTS, WHICH ONES YOUR HONOR WANTS TO RELY
```

```
 1    ON.
 2              THE COURT:  I THINK THE OBJECTION IS THAT THEY JUST
 3    DIDN'T HAVE AMPLE TIME TO REVIEW.  THIS IS A MATTER THAT WILL
 4    PROBABLY BE TAKEN UNDER ADVISEMENT, SO I THINK WITH -- IS THERE
 5    ANY OBJECTION, MR. EVERITT, TO JUST RESERVING THIS?  AND THEN IF
 6    YOU HAVE ANY OBJECTIONS, YOU ALL CAN -- IF YOU HAVE HAD
 7    ADDITIONAL TIME TO REVIEW IT?
 8              MR. EVERETT:  I THINK THAT WOULD BE APPROPRIATE, YOUR
 9    HONOR.  MY OBJECTION, AS HE SAID, IS THAT IT'S 109 PAGES.  AND
10    IT CAME IN THIS MORNING.
11              THE COURT:  YEAH, I UNDERSTAND.
12              MR. EVERETT:  YES, SIR.
13              THE COURT:  WELL, I WILL JUST RESERVE RULING ON THE
14    MOTION TO STRIKE AND GIVE THE GOVERNMENT ADEQUATE TIME TO REVIEW
15    THE TRANSCRIPT AND CHALLENGE ANY INACCURACIES.
16              MR. EVERETT:  THANK YOU.
17              THE COURT:  ANY OTHER MATTERS?
18              MR. POTTER:  THAT'S THE ONLY PRELIMINARY MATTER, YOUR
19    HONOR.
20              THE COURT:  THE GOVERNMENT MAY CALL ITS FIRST WITNESS.
21              MR. EVERETT:  YOUR HONOR, THE UNITED STATES CALLS
22    DETECTIVE JOHN PATTERSON.
23              THE COURT:  MR. PATTERSON, IF YOU WILL COME AROUND,
24    PLEASE, SIR.
25              (WITNESS SWORN.)
```

```
 1            COURT REPORTER:  STATE YOUR FULL NAME AND SPELL YOUR
 2   LAST NAME, PLEASE.
 3            THE WITNESS:  JOHN LYLE PATTERSON, P-A-T-T-E-R-S-O-N.
 4   DIRECT EXAMINATION
 5   BY MR. EVERETT:
 6        Q.    GOOD AFTERNOON, DETECTIVE PATTERSON.
 7        A.    GOOD AFTERNOON.
 8        Q.    HOW ARE YOU CURRENTLY EMPLOYED?
 9        A.    I'M A DETECTIVE WITH THE DICKSON COUNTY
10   SHERIFF'S OFFICE.
11        Q.    HOW LONG HAVE YOU BEEN IN LAW ENFORCEMENT?
12        A.    APPROXIMATELY 22 YEARS.
13        Q.    AND HOW LONG HAVE YOU BEEN IN DICKSON COUNTY?
14        A.    ABOUT 21 YEARS.
15        Q.    NOW, YOU SAID YOU ARE CURRENTLY A DETECTIVE; IS
16   THAT RIGHT?
17        A.    THAT'S CORRECT.
18        Q.    AS A DETECTIVE, WHAT KIND OF WORK ARE YOU TASKED
19   WITH?
20        A.    I WORK ALL SORTS OF CRIMES, EVERYTHING FROM
21   SIMPLE VANDALISMS TO HOMICIDES.  AND I HAVE BEEN ALSO WORKING
22   WITH THE CYBERCRIME UNIT.
23        Q.    IN YOUR WORK WITH THE CYBERCRIME UNIT, DO YOU
24   WORK WITH DETECTIVE LEVASSEUR?
25        A.    I DO.
```

1       Q.      AND DO YOU SOMETIMES INVESTIGATE CYBERCRIMES

2   INVOLVING INAPPROPRIATE IMAGES OF CHILDREN ON COMPUTERS?

3       A.      YES, SIR.

4       Q.      OKAY.  NOW, WERE YOU DOING THAT KIND OF WORK ON

5   MAY 18, 2009?

6       A.      YES, SIR.

7       Q.      YOU WERE WORKING WITH A CYBERCRIMES TASK FORCE?

8       A.      YES, SIR; I WAS.

9       Q.      OKAY.  AND ON OR ABOUT MAY 18, DID YOU GO WITH

10  DETECTIVE LEVASSEUR TO A RESIDENCE FOR PURPOSES EXECUTING A

11  SEARCH WARRANT?

12      A.      I DID.

13      Q.      WHOSE RESIDENCE?

14      A.      THE TUMMINS RESIDENCE.

15      Q.      YOU WENT THERE TO EXECUTE A VALID SEARCH

16  WARRANT?

17      A.      YES, SIR.

18      Q.      WHAT DID THE SEARCH WARRANT GENERALLY AUTHORIZE

19  YOU TO SEARCH FOR?

20      A.      COMPUTER-RELATED ITEMS.

21      Q.      WAS THAT BASED ON AN INVESTIGATION THAT

22  DETECTIVE LEVASSEUR HAD DONE INVOLVE SOMETHING INTERNET CHILD

23  PORNOGRAPHY?

24      A.      YES, SIR.

25      Q.      WHEN YOU WENT TO THE RESIDENCE, WHERE WAS THAT

1    RESIDENCE LOCATED?  JUST ROUGHLY?

2           A.    IT'S IN THE CITY LIMITS OF DICKSON, I BELIEVE,

3    IN DICKSON COUNTY, 46 SOUTH.

4           Q.    DID YOU UNDERSTAND THAT TO BE THE HOME OF

5    MR. TUMMINS, THE DEFENDANT IN THIS CASE?

6           A.    YES, SIR; I DID.

7           Q.    OKAY.  AND YOU SAID YOU WENT THERE ON MAY 18TH

8    OF 2009; IS THAT CORRECT?

9           A.    YES, SIR.

10          Q.    OKAY.  ON THE NIGHT THAT -- ON THE DAY THAT YOU

11   WENT TO EXECUTE THIS WARRANT, WHO WAS WITH YOU AND DETECTIVE

12   LEVASSEUR?

13          A.    JUST THE TWO OF US.

14          Q.    OKAY.  THERE WASN'T A TEAM OF AGENTS OR OFFICERS

15   THERE TO EXECUTE THE WARRANT?

16          A.    NO, SIR.

17          Q.    JUST TWO DICKSON COUNTY SHERIFF'S DEPARTMENT

18   DETECTIVES; IS THAT RIGHT?

19          A.    THAT'S CORRECT.

20          Q.    HOW WERE YOU DRESSED?

21          A.    WE WERE IN CIVILIAN CLOTHES.  I WAS PROBABLY

22   WEARING BLUE JEANS AND MAYBE A POLO SHIRT.

23          Q.    WERE YOU WEARING BODY ARMOR?

24          A.    NO, SIR.

25          Q.    WERE YOU WEARING A HELMET AND GOGGLES?

8

```
1          A.    NO, SIR.

2          Q.    WERE YOU CARRYING A HELMET, A SHOTGUN?

3          A.    NO, SIR.

4          Q.    WHAT WERE YOU CARRYING?

5          A.    CARRYING GLOCK SIDEARMS.

6          Q.    WHERE WAS THAT LOCATED DURING THE WHOLE

7   INTERACTION WITH THE DEFENDANT ON THE 18TH?

8          A.    THEY WERE HOLSTERED ON OUR HIPS.

9          Q.    IS THAT PURSUANT TO REGULATIONS WHERE YOU ARE

10  SUPPOSED TO CARRY THAT WEAPON?

11         A.    YES, SIR.

12         Q.    IN GETTING READY FOR TODAY'S HEARING, DID YOU

13  REVIEW SOME ITEMS RELATED BACK TO THE EXECUTION OF THAT SEARCH

14  WARRANT?

15         A.    I DID.

16         Q.    AND IS ONE OF THE ITEMS THAT YOU REVIEWED AN

17  AUDIO RECORDING OF YOUR AND DETECTIVE LEVASSEUR'S DISCUSSIONS

18  WITH MR. TUMMINS AND MR. TUMMINS' WIFE?

19         A.    YES, SIR.

20         Q.    DID YOU ALSO REVIEW A TRANSCRIPT OF THAT AUDIO

21  RECORDING?

22         A.    I DID.

23         Q.    IS THE AUDIO RECORDING GENERALLY CONSISTENT WITH

24  YOUR MEMORY OF WHAT TRANSPIRED MAY 18 OF 2009?

25         A.    THE AUDIO RECORDING -- YES, SIR.
```

1    Q.    IT'S GENERALLY CONSISTENT WITH WHAT HAPPENED

2  DURING THE EXECUTION OF THAT WARRANT; IS THAT RIGHT?

3         A.    YES, SIR.

4         Q.    IS THE TRANSCRIPT GENERALLY CONSISTENT WITH THE

5  AUDIO RECORDINGS AND WITH WHAT YOU REMEMBER HAPPENING DURING THE

6  EXECUTION OF THE WARRANT?

7         A.    GENERALLY.

8         Q.    IT'S POSSIBLE THERE ARE SOME WORDS THAT ARE NOT

9  EXACT -- EXACTLY AS THEY APPEAR ON THE DISK, BUT IT'S GENERALLY

10 CONSISTENT; IS THAT FAIR TO SAY?

11        A.    YES, SIR.

12        Q.    ALL RIGHT.  NOW, WHEN YOU WENT TO THE

13 DEFENDANT'S RESIDENCE ON MAY 18, WHAT KIND OF VEHICLE WERE YOU

14 IN?

15        A.    WE WERE IN DETECTIVE LEVASSEUR'S UNMARKED PATROL

16 CAR.

17        Q.    WAS IT DAYTIME OR NIGHTTIME?

18        A.    DAYTIME, IN THE EVENING.

19        Q.    AT THAT TIME OF YEAR IT'S STILL LIGHT OUT

20 RELATIVELY LATE IN THE DAY; IS THAT CORRECT?

21        A.    YES.

22        Q.    IN MAY?

23        A.    YES, SIR.

24        Q.    YOU WERE IN AN UNMARKED POLICE VEHICLE?

25        A.    YES, SIR.

```
 1              Q.    DOES IT HAVE ANY LIGHTS OR EQUIPMENT ON THE ROOF
 2    OF THE CAR?
 3              A.    NO, SIR.
 4              Q.    DOES IT HAVE ONE OF THOSE BARS ON THE FRONT YOU
 5    CAN USE TO PUSH VEHICLES OUT OF THE ROAD?
 6              A.    NO, SIR.
 7              Q.    WHAT KIND IS IT?  IS IT JUST A SEDAN?
 8              A.    IT'S A CROWN VICTORIA FOUR-DOOR SEDAN; YES, SIR.
 9              Q.    OKAY.  AND WHEN YOU ARRIVED AT THE DEFENDANT'S
10    RESIDENCE, DID YOU USE BLUE LIGHTS?
11              A.    NO, SIR.
12              Q.    TO ALERT PEOPLE OF YOUR PRESENCE?
13              A.    NO, SIR.
14              Q.    DID YOU ACTIVATE A SIREN?
15              A.    NO, SIR.
16              Q.    DID YOU USE A BULLHORN OR OTHER AMPLIFICATION
17    DEVICE TO ANNOUNCE THAT POLICE WERE AT THE RESIDENCE TO EXECUTE
18    A SEARCH WARRANT?
19              A.    NO, SIR.
20              Q.    NOW, HAVE YOU EVER SEEN THAT DONE DURING THE
21    EXECUTION OF SEARCH WARRANTS?
22              A.    MANY TIMES.
23              Q.    OKAY.  BUT YOU DIDN'T DO THAT THIS TIME; IS THAT
24    RIGHT?
25              A.    THAT'S CORRECT.
```

```
 1          Q.    OKAY.  HOW DID YOU AND DETECTIVE LEVASSEUR

 2   ENGAGE WITH THE PEOPLE IN THE DEFENDANT'S RESIDENCE ON THAT DAY?

 3          A.    WE JUST WALKED UP TO FRONT DOOR AND MET THEM AT

 4   THE FRONT DOOR.

 5          Q.    DID YOU KNOCK ON THE FRONT DOOR?

 6          A.    I BELIEVE SO.

 7          Q.    AND YOU WERE STILL IN YOUR PLAIN CLOTHES AT THAT

 8   POINT; IS THAT CORRECT?

 9          A.    YES.

10          Q.    WHO ANSWERED THE DOOR, DETECTIVE PATTERSON?

11          A.    I BELIEVE BOTH MR. AND MRS. TUMMINS, I BELIEVE.

12          Q.    OKAY.  AND AT SOME POINT DID ONE OR BOTH OF THEM

13   INVITE YOU INTO THE HOUSE?

14          A.    YES, SIR.

15          Q.    OKAY.  AND DID YOU AND DETECTIVE LEVASSEUR ENTER

16   THE RESIDENCE?

17          A.    WE DID.

18          Q.    NOW, THIS WAS THE BEGINNING APPROXIMATELY OF AN

19   INTERACTION BETWEEN YOU, DETECTIVE LEVASSEUR, AND MR. AND MRS.

20   TUMMINS?  IS THAT FAIR TO SAY?

21          A.    YES, SIR.

22          Q.    APPROXIMATELY HOW LONG DID THAT INTERACTION

23   LAST?

24          A.    BY LOOKING AT THE TAPE, I BELIEVE IT WAS ABOUT

25   TWO HOURS AND NINE MINUTES.
```

```
 1          Q.     OKAY.  DID MOST, IF NOT ALL, OF THAT INTERACTION

 2   OCCUR WITHIN THE TUMMINS' HOME?

 3          A.     YES, SIR.

 4          Q.     OKAY.  AT ANY TIME DID YOU PUT MR. TUMMINS IN

 5   THE BACK OF THE POLICE CRUISER?  IN THE BACK OF THE POLICE CAR?

 6          A.     NO, SIR.

 7          Q.     DID YOU PUT HIM IN A VAN OR POLICE VEHICLE OR

 8   OTHERWISE TAKE HIM OUT OF THE HOUSE BY FORCE?

 9          A.     NO, SIR.

10          Q.     SO THIS WHOLE INTERACTION HAPPENED WITHIN THE

11   RESIDENCE; IS THAT CORRECT?

12          A.     YES, SIR.

13          Q.     OKAY.  WHO WAS PRESENT DURING THIS APPROXIMATELY

14   TWO HOUR INTERACTION BETWEEN YOU AND MR. TUMMINS AND DETECTIVE

15   LEVASSEUR?

16          A.     DETECTIVE LEVASSEUR, MYSELF, MR. TUMMINS AND

17   MRS. TUMMINS.

18          Q.     JUST THE FOUR OF YOU?

19          A.     YES, SIR.

20          Q.     THERE WAS NO OTHER TEAM OF AGENTS COMING AND

21   GOING FROM THE HOUSE?

22          A.     NO, SIR.

23          Q.     OKAY.  NOW, YOU SAID A MINUTE AGO THAT THIS

24   INTERACTION TOOK ROUGHLY TWO HOURS.  THAT'S BASED ON YOUR REVIEW

25   OF THE RECORDING; IS THAT RIGHT?
```

1    A.    YES, SIR.

2    Q.    BUT THAT'S ALSO CONSISTENT WITH YOUR MEMORY; IS

3    THAT ALSO CORRECT?

4    A.    YES, SIR.

5    Q.    WHY DID IT TAKE TWO HOURS TO GET IN AND OUT OF

6    THE HOUSE?

7    A.    IF MEMORY SERVES CORRECT, WE COLLECTED A LOT OF

8    EVIDENCE FROM THE RESIDENCE.  DETECTIVE LEVASSEUR ALSO DID A

9    FORENSIC PREVIEW OF ONE OF THE COMPUTERS, I BELIEVE.  PLUS,

10   MR. AND MRS. TUMMINS HAD A LOT OF QUESTIONS FOR US.  WE STAYED

11   THERE UNTIL A LOT OF THE QUESTIONS WERE ANSWERED.

12   Q.    OKAY.  AND SO PART OF THE REASON WHY YOU WERE IN

13   THE HOUSE IS YOU WERE ANSWERING QUESTIONS THAT MR. AND MRS.

14   TUMMINS ASKED OF YOU?

15   A.    YES, SIR.

16   Q.    AND IS THAT GENERALLY REFLECTED ON THE RECORDING

17   AND IN THE TRANSCRIPT?

18   A.    YES, SIR.

19   Q.    OKAY.  IS IT YOUR VIEW THAT YOU WOULD HAVE BEEN

20   OUT OF THERE MORE QUICKLY IF YOU HADN'T STAYED TO ANSWER

21   QUESTIONS?

22   A.    OH, YES, SIR.

23   Q.    NOW, DURING THIS FORENSIC PREVIEW, DETECTIVE

24   LEVASSEUR HAD TO DO SOME WORK ON THE COMPUTERS; IS THAT RIGHT?

25   A.    YES, SIR.

```
1    Q.    AND DID HE HAVE TO TAKE THE COMPUTER APART AND
2  LOOK AT IT AND EXAMINE IT, THINGS OF THAT NATURE?
3    A.    YES, SIR.  HE TOOK A HARD DRIVE OUT OF ONE
4  COMPUTER.
5    Q.    OKAY.  YOU ALSO SAID YOU COLLECTED A LOT OF
6  EVIDENCE.  WHAT DO YOU ALL HAVE TO DO WHEN YOU COLLECT EVIDENCE
7  DURING THE SEARCH WARRANT EXECUTION?
8    A.    WE HAVE TO FILL OUT AN INVENTORY OR A CHAIN OF
9  CUSTODY FORM.  AND WHAT THAT ENTAILS IS LABELING THE ITEM, AS IT
10 WAS FOUND, NUMBER ONE BEING THE FIRST ITEM FOUND.  WE HAVE TO
11 DOCUMENT THE ITEM.  IF IT'S A COMPUTER, WE WILL LIST THE MAKE,
12 MODEL AND SERIAL NUMBER.  WE ALSO HAVE TO INDICATE WHERE IT WAS
13 FOUND AND WHO LOCATED IT.
14   Q.    OKAY.  AND THAT TAKES TIME AS WELL, DOESN'T IT?
15   A.    YES, SIR.  WE FILL THAT OUT BY HAND.
16   Q.    OKAY.  DURING YOUR TIME IN THE TUMMINS
17 RESIDENCE, DID YOU AND DETECTIVE LEVASSEUR VERBALLY ENGAGE
18 MR. AND MRS. TUMMINS?
19   A.    YES, SIR.
20   Q.    WAS THERE A VERBAL EXCHANGE OF WORDS BETWEEN YOU
21 AND THE TUMMINSES?
22   A.    YES, SIR.
23   Q.    DURING THAT DIALOGUE, DID YOU DISPLAY YOUR
24 HANDCUFFS?
25   A.    NO, SIR.
```

```
 1          Q.     DID YOU TELL ANYONE YOU WERE GOING TO PUT THEM

 2   IN HANDCUFFS?

 3          A.     NO, SIR.

 4          Q.     DID YOU DISPLAY A WEAPON?

 5          A.     MY WEAPON WAS VISIBLE, BUT I DIDN'T EVER -- I

 6   NEVER UNHOLSTERED IT.

 7          Q.     YOU NEVER UNHOLSTERED YOUR WEAPON?

 8          A.     NO, SIR.

 9          Q.     WAS THERE ANY EFFORT TO SURROUND MR. TUMMINS

10   PHYSICALLY WITH THE BODIES OF YOU AND DETECTIVE LEVASSEUR?

11          A.     NO, SIR.

12          Q.     DID ANYBODY GET UP IN MR. TUMMINS' FACE, CLOSE

13   UP IN HIS FACE, TO ASK HIM QUESTIONS?

14          A.     NO, SIR.

15          Q.     APPROXIMATELY HOW FAR AWAY WERE YOU AND

16   DETECTIVE LEVASSEUR PHYSICALLY FROM MR. AND MRS. TUMMINS DURING

17   THIS INTERACTION?

18          A.     WELL, INITIALLY IT STARTED UPSTAIRS IN THE BONUS

19   ROOM.  AND DETECTIVE LEVASSEUR WAS AT A COMPUTER, AND I WAS

20   SITTING BEHIND DETECTIVE LEVASSEUR, MAYBE FIVE OR SIX FEET.  AND

21   THEN MRS. TUMMINS WAS NEXT TO ME.  AND THEN MR. TUMMINS, I

22   BELIEVE, WAS ON ANOTHER CHAIR.  SO IT PROBABLY OCCURRED WITHIN,

23   I WOULD SAY, 15 FEET MAYBE, TOTAL.

24          Q.     THAT'S AN ESTIMATE?

25          A.     THAT'S AN ESTIMATE.
```

```
 1         Q.     AND DO I UNDERSTAND YOU TO SAY THAT DURING THIS
 2    BONUS ROOM INTERACTION -- AND IS THE BONUS ROOM WHERE THE
 3    COMPUTERS WERE LOCATED, OR ONE OF THE COMPUTERS WAS LOCATED?
 4         A.     ONE OF THEM WAS; YES, SIR.
 5         Q.     OKAY.  DURING THIS BONUS ROOM INTERACTION, WAS
 6    MRS. TUMMINS BETWEEN YOU ADN DETECTIVE LEVASSEUR AND MR.
 7    TUMMINS?
 8         A.     YES, SIR.
 9         Q.     AND WOULD YOU DESCRIBE THE DISTANCES BETWEEN
10    YOUR PERSONS AS CONVERSATION DISTANCES, DISTANCES THAT YOU MIGHT
11    BE AWAY FROM SOMEBODY, SAY, SITTING AROUND COFFEE TABLE HAVING A
12    CONVERSATION?
13         A.     PROBABLY A LITTLE BIT MORE THAN THAT, BUT
14    ROUGHLY, YES, SIR.
15         Q.     OKAY.  NOW, DURING THIS, I THINK YOU SAID A
16    MINUTE AGO THAT THERE WAS A VERBAL EXCHANGE.  THERE WERE
17    QUESTIONS ASKED AND ANSWERED BY BOTH YOU AND DETECTIVE
18    LEVASSEUR, AS WELL AS MR. AND MRS. TUMMINS; IS THAT CORRECT?
19         A.     YES, SIR.
20         Q.     AND BASED ON YOUR REVIEW OF THE TAPE, YOUR
21    REVIEW OF THE TRANSCRIPT AND YOUR OWN RECOLLECTION, DO YOU
22    REMEMBER WHO ASKED QUESTIONS DURING THIS EXCHANGE?
23         A.     I BELIEVE EVERYBODY ASKED QUESTIONS.
24         Q.     OKAY.  AND THAT WOULD INCLUDE YOU?
25         A.     YES, SIR.
```

```
1      Q.    THAT WOULD INCLUDE DETECTIVE LEVASSEUR?

2      A.    YES, SIR.

3      Q.    THAT WOULD INCLUDE MR. TUMMINS?

4      A.    YES, SIR.

5      Q.    AND THAT WOULD INCLUDE MRS. TUMMINS; IS THAT

6  FAIR TO SAY?

7      A.    YES, SIR.

8      Q.    OKAY.  WHAT WAS THE TONE -- WHAT WAS THE GENERAL

9  TONE OF THE QUESTIONS THAT YOU AND DETECTIVE LEVASSEUR ASKED OF

10 MR. TUMMINS AND MRS. TUMMINS WHEN YOU WERE INTERACTING WITH

11 THEM?

12     A.    IT WAS BASICALLY, YOU KNOW, TRYING TO DETERMINE,

13 YOU KNOW, WHO HAD ACCESS TO THE COMPUTERS AND THINGS LIKE THAT.

14     Q.    OKAY.  NOW, AT SOME POINT -- YOU HAVE KNOWN

15 DETECTIVE LEVASSEUR FOR A WHILE; IS THAT RIGHT?

16     A.    YES, SIR; I HAVE.

17     Q.    AT SOME POINT, DID DETECTIVE LEVASSEUR'S TONE

18 GET A LITTLE BIT MORE AGGRESSIVE IN THE QUESTIONING?  WAS THERE

19 A CHANGE IN HIS TONE?

20     A.    THERE WAS AT ONE POINT; YES, SIR.

21     Q.    OKAY.  DO YOU KNOW WHY THAT HAPPENED?

22     A.    YES, SIR.

23     MR. POTTER:  OBJECT, YOUR HONOR.  SPECULATION.

24     THE COURT:  WELL, WHAT DID YOU OBSERVE AT THE TIME HE

25 BECAME AGGRESSIVE?
```

```
 1              THE WITNESS:  I JUST OBSERVED THE WAY THAT HE WAS

 2   TALKING, HIS MANNERISMS AND HIS VOICE GETTING LOUDER.

 3              MR. EVERETT:  YOUR HONOR, I WILL TRY IT A DIFFERENT

 4   WAY.

 5   BY MR. EVERETT:

 6         Q.    DURING THE INTERVIEW WITH MR. AND MRS. TUMMINS,

 7   DID YOU LEARN THAT MR. TUMMINS WAS A SCHOOLTEACHER?

 8         A.    I DID.

 9         Q.    BY VIRTUE OF THAT, DID YOU CONCLUDE THAT HE WAS

10   IN CLOSE PROXIMITY TO SCHOOL-AGE CHILDREN?

11         A.    YES, SIR.

12         Q.    DID YOU ALSO DETERMINE DURING THAT CONVERSATION

13   THAT THERE WERE IMAGES OF SCHOOL-AGE CHILDREN ON THE COMPUTER

14   THAT -- ON ONE OR MORE OF THE COMPUTERS THAT YOU WERE THERE TO

15   COLLECT?

16         A.    YES, SIR.

17         Q.    NOW, YOU SAID THAT YOU WORK ON THE TASK FORCE;

18   IS THAT CORRECT?

19         A.    THAT'S CORRECT.

20         Q.    AND YOU SAID THAT YOU INVESTIGATE INTERNET

21   CRIMES AGAINST CHILDREN; IS THAT CORRECT?

22         A.    YES, SIR.

23         Q.    AND IN THE CONTEXT OF INVESTIGATING THOSE

24   CRIMES, DO YOU HAVE EXPERIENCE WITH BOTH INTERNET CRIMES AGAINST

25   CHILDREN AND ALSO HANDS-ON OFFENSES AGAINST CHILDREN?
```

A.     I DO.

        Q.     IN YOUR EXPERIENCE, IS THERE SOMETIMES A

CONNECTION BETWEEN INTERNET CRIMES AGAINST CHILDREN AND HANDS-ON

CRIMES AGAINST CHILDREN?

        A.     SOMETIMES THERE IS; YES, SIR.

        Q.     AND IN INVESTIGATING INTERNET CRIMES AGAINST

CHILDREN, WHEN YOU DETERMINE THAT SOMEONE HAS CLOSE PROXIMITY OR

CONTACT WITH CHILDREN, DO YOU TAKE CERTAIN STEPS?

        A.     TO MAKE SURE THERE'S NO HANDS-ON CONTACT?  YES,

SIR; WE DO.  SURE.

        Q.     OKAY.  AND DO YOU TAKE STEPS TO MAKE SURE THAT

IF THERE IS A HANDS-ON PROBLEM, THAT IT STOPS AS SOON AS

POSSIBLE?

        A.     YES, SIR.

        Q.     WHY DO YOU TAKE THOSE STEPS?

        A.     THAT'S FOR THE SAFETY OF THE CHILDREN.

        Q.     OKAY.  NOW, AT SOME POINT, IT CAME TIME FOR YOU

AND DETECTIVE LEVASSEUR TO COLLECT WHAT YOU CAME FOR AND LEAVE;

IS THAT CORRECT?

        A.     YES, SIR.

        Q.     DID DETECTIVE LEVASSEUR SAY OR DO ANYTHING TO

ACCOMMODATE MR. AND MRS. TUMMINS WITH RESPECT TO THE COMPUTERS

THAT HAD TO LEAVE THE RESIDENCE?

        A.     YES, SIR.

        Q.     OKAY.  AND CAN YOU PLEASE TELL US WHAT THAT WAS?

1    A.    I REMEMBER THAT MR. TUMMINS SAID THAT HE DID

2    SOME PHOTOGRAPHY, AND I BELIEVE HE HAD SOME PHOTOGRAPHS ON THE

3    COMPUTER.  AND HE ASKED IF HE COULD GET THOSE BACK.  AND I

4    REMEMBER DETECTIVE LEVASSEUR SAID, WELL, IF IT CONTAINS

5    CONTRABAND, YOU CAN'T, BUT IF IT DOES, THEN I WILL DOWNLOAD THE

6    PHOTOGRAPHS AND GET THOSE TO YOU.  AND I BELIEVE MRS. TUMMINS

7    SAID SOMETHING ABOUT USING HERS FOR SCHOOL MAYBE.  SO DETECTIVE

8    LEVASSEUR SAID HE WOULD GO AHEAD AND LOOK AT THAT ONE FIRST, AND

9    IF IT WAS OKAY, HE WOULD GO AHEAD AND RETURN THAT.  AND I ALSO

10   BELIEVE HE SAID THE SAME THING ABOUT AN IPHONE, MAYBE.

11        Q.    NOW, WHEN YOU WERE EXECUTING ONE OF THESE

12   WARRANTS FOR ELECTRONIC MEDIA, LIKE A COMPUTER, DO YOU HAVE TO

13   DO WHAT DETECTIVE LEVASSEUR OFFERED TO DO?

14        A.    TO LIKE DOWNLOAD PHOTOGRAPHS FOR THEM?  NO, SIR.

15        Q.    DO YOU HAVE TO MAKE AN EFFORT TO REVIEW THE

16   ITEMS IN AN ORDER THAT WOULD BE MOST CONVENIENT FOR THE

17   DEFENDANT?

18        A.    NO, SIR.

19        Q.    DO YOU HAVE TO LOOK AT THE IPHONE OR THE SCHOOL

20   COMPUTER FIRST SO THE DEFENDANT OR HIS WIFE CAN HAVE THAT BACK

21   AND CONTINUE ON WITH THEIR LIFE?

22        A.    WE DON'T HAVE TO; NO, SIR.

23        Q.    OKAY.  SO WAS THIS AN ACCOMMODATION THAT

24   DETECTIVE LEVASSEUR OFFERED TO MAKE?

25        A.    I BELIEVE SO.

1    Q.    OKAY.  NOW, DURING YOUR INTERACTION WITH THE

2    DEFENDANT, DID YOU ALSO DISCUSS, OR DID DETECTIVE LEVASSEUR

3    DISCUSS, WITH THE DEFENDANT AND MRS. TUMMINS THE DISTRICT

4    ATTORNEY?

5         A.    YES, SIR.

6         Q.    OKAY.  AND WHAT'S YOUR GENERAL RECOLLECTION

7    ABOUT WHAT THAT PIECE OF THE CONVERSATION WAS ABOUT?

8         A.    I BELIEVE MR. TUMMINS WAS TALKING ABOUT HE

9    WANTED SOMEBODY TO HEAR HIS SIDE, OR -- AND UNDERSTAND HIS

10   MOTIVATION.  AND DETECTIVE LEVASSEUR TOLD HIM THAT HE COULD TALK

11   TO THE DISTRICT ATTORNEY BEFORE CHARGES WERE FILED.

12        Q.    OKAY.  AND BEAR WITH ME FOR JUST A MINUTE.

13   DURING THE DISCUSSION REGARDING THE DISTRICT ATTORNEY, DO YOU

14   RECALL THE DEFENDANT, MR. TUMMINS, USING WORDS TO THIS EFFECT:

15        WOULD -- WILL -- WILL THEY JUST NOT UNDERSTAND 'CAUSE

16   WE WON'T HAVE A CONVERSATION LIKE WE'VE HAD HERE?

17        A.    YES, SIR.

18        Q.    NOW, THAT MAY NOT BE AN EXACT QUOTE, BUT DID HE

19   SAY SOMETHING TO THAT EFFECT?

20        A.    WORDS TO THAT EFFECT; YES, SIR.

21        Q.    OKAY.  AND THAT HAD TO DO WITH GOING IN AND

22   TALKING TO THE D.A. WHEN CHARGES WERE FILED?

23        A.    YES, SIR.  THAT'S WHAT WE WERE TALKING ABOUT AT

24   THAT TIME.

25        Q.    NOW, AS A POLICE OFFICER, ARE YOU AWARE OF AN

1    OBLIGATION TO ALLOW SUBJECTS OF A SEARCH WARRANT OR SUBJECTS OF

2    AN INVESTIGATION TO TALK TO A D.A. BEFORE CHARGES ARE FILED?

3         A.    I'M NOT AWARE OF AN OBLIGATION; NO, SIR.

4         Q.    OKAY.  HAVE YOU BEEN INVOLVED IN CASES BEFORE

5    WHERE THE DEFENDANT DIDN'T GET A CHANCE TO TALK TO THE D.A.

6    BEFORE CHARGES WERE FILED?

7         A.    YES, SIR.

8         Q.    OKAY.  IS THIS ANOTHER EXAMPLE OF AN

9    ACCOMMODATION THAT YOU AND DETECTIVE LEVASSEUR MADE THAT DAY?

10        A.    I WOULD SAY SO; YES, SIR.

11        Q.    DURING YOUR INTERACTION WITH MR. AND MRS.

12   TUMMINS, DID YOU DO ANYTHING, OR DID DETECTIVE LEVASSEUR -- DID

13   YOU SEE DETECTIVE LEVASSEUR DO ANYTHING TO PHYSICALLY RESTRICT

14   MR. TUMMINS' OR MRS. TUMMINS' FREEDOM OF MOVEMENT IN THEIR HOME?

15        A.    THE ONLY THING I SAW IS ONE -- WELL, MAYBE MORE

16   THAN ONCE, MAYBE TWO OR THREE TIMES, MR. TUMMINS REACHED FOR HIS

17   COMPUTER, AND DETECTIVE LEVASSEUR TOLD HIM NOT TO TOUCH THE

18   COMPUTER.  BUT OTHER THAN THAT, NO, SIR.

19        Q.    OKAY.  YOU DIDN'T SAY, SIT ON THE COUCH AND STAY

20   THERE?

21        A.    NO, SIR.

22        Q.    DID YOU HEAR DETECTIVE LEVASSEUR DO OR SAY

23   ANYTHING LIKE THAT?

24        A.    NO, SIR; I DIDN'T.

25        Q.    DID YOU HEAR OR SEE ANYBODY -- DID YOU HEAR

1   DETECTIVE LEVASSEUR OR DID YOU TELL ANYBODY, DON'T GO IN THE

2   ROOM WITH THE COMPUTERS, OR DON'T LEAVE THE ROOM WITH THE

3   COMPUTERS?  WAS THERE ANY KIND OF COMMENT LIKE THAT MADE THAT

4   YOU CAN RECALL?

5           A.    NO, SIR.

6           Q.    NOW, BASED ON YOUR RECOLLECTION OF THAT

7   INTERACTION, THE PHYSICAL ASPECT OF IT, WERE PEOPLE MOVING

8   AROUND THE HOME WHILE YOU WERE IN THE RESIDENCE?

9           A.    WE ALL WERE; YES, SIR.

10          Q.    OKAY.  EXPLAIN THAT TO ME, PLEASE, DETECTIVE

11  PATTERSON.

12          A.    YES, SIR.  DETECTIVE LEVASSEUR LEFT SEVERAL

13  TIMES TO TAKE ITEMS OUT TO THE CAR.  ME AND MRS. TUMMINS WENT

14  DOWNSTAIRS AT ONE TIME, BECAUSE IT WAS EXTREMELY HOT UPSTAIRS IN

15  THE BONUS ROOM, IF I REMEMBER CORRECTLY.  AND I BELIEVE MR.

16  TUMMINS WAS UP THERE ALONE.  AND THEN DETECTIVE LEVASSEUR AND

17  MR. TUMMINS CAME DOWN.  SO THERE WAS A LOT OF ACTION,

18  INTERACTION AND MOVING AROUND.

19          Q.    OKAY.  SO AS BEST YOU CAN RECALL, THERE WAS AT

20  LEAST ONE POINT WHERE MR. TUMMINS WAS LEFT UNATTENDED IN THE

21  HOUSE?

22          A.    YES, SIR.

23          Q.    HE WASN'T IN THE COMPANY OF ANY POLICE OFFICER?

24          A.    YES, SIR.

25          Q.    IS THAT YOUR TESTIMONY?

1          A.    YES, SIR.

2          Q.    OKAY.  NOW, IS THAT -- DO YOU DO THAT EVERY TIME

3    YOU EXECUTE A SEARCH WARRANT?  IS THAT COMMON OR UNCOMMON TO

4    JUST LEAVE SOMEBODY ALONE WHEN YOU ARE EXECUTING A WARRANT?

5          A.    IT REALLY DEPENDS ON THE WARRANT -- A WARRANT.

6    WE'VE DONE IT BEFORE, BUT WE DON'T ALWAYS DO IT.

7          Q.    OKAY.  SO WAS THERE SOMETHING ABOUT THE NATURE

8    OF THIS SEARCH WARRANT AND YOUR INTERACTION WITH THE TUMMINSES

9    THAT MADE YOU THINK THAT THAT WAS OKAY?

10         A.    YES, SIR.  IT WAS LOW KEY, THEY WERE

11   COOPERATIVE, IT WAS NOT A HOSTILE ENVIRONMENT.

12         Q.    OKAY.  WOULD YOU HAVE DONE THAT IF YOU WERE

13   EXECUTING A WARRANT FOR NARCOTICS?

14         A.    NO, SIR.

15         Q.    WOULD YOU HAVE DONE THAT IF YOU WERE EXECUTING A

16   WARRANT FOR FIREARMS OR EXPLOSIVES?

17         A.    DEFINITELY NOT; NO, SIR.

18         Q.    NOW, WHEN MR. TUMMINS WAS LEFT ALONE IN THAT

19   ROOM OR AT ANY TIME DURING THE INTERACTION, WAS HE EVER PUT IN A

20   ROOM, AND WAS THE DOOR LOCKED OR BARRED BY AN OFFICER?

21         A.    NO, SIR.  I DON'T BELIEVE A DOOR WAS EVER

22   CLOSED, EXCEPT FOR THE FRONT DOOR.

23         Q.    AT ANY TIME DID YOU OR DETECTIVE LEVASSEUR, THAT

24   YOU SAW, MAKE AN EFFORT TO PHYSICALLY CUT OFF MR. TUMMINS FROM

25   MRS. TUMMINS?

1        A.      NO, SIR.

2        Q.      YOU DIDN'T GET BETWEEN THEM?

3        A.      NO.

4        Q.      YOU DIDN'T MAKE MRS. TUMMINS LEAVE THE ROOM?

5        MR. POTTER:  OBJECT TO THE LEADING, YOUR HONOR.

6        THE COURT:  RESTATE YOUR QUESTION.

7        MR. EVERETT:  I'M SORRY, YOUR HONOR?

8        THE COURT:  RESTATE YOUR QUESTION.

9  BY MR. EVERETT:

10        Q.      DID YOU OR DETECTIVE LEVASSEUR PHYSICALLY

11  SEPARATE MRS. TUMMINS FROM MR. TUMMINS?

12        A.      NO, SIR.

13        Q.      NOW, DURING THIS INTERACTION WITH MR. TUMMINS,

14  DID ANYBODY SAY ANYTHING ABOUT ANYONE BEING UNDER ARREST?

15        A.      NO, SIR.

16        Q.      DID YOU OR DETECTIVE LEVASSEUR AFFIRMATIVELY

17  TELL THE DEFENDANT HE WAS NOT UNDER ARREST?

18        A.      DETECTIVE LEVASSEUR DID.

19        Q.      DID THAT HAPPEN MORE THAN ONCE?

20        A.      I'M SURE AT LEAST ONCE, AND POSSIBLY MORE.

21        Q.      DID YOU EXPLAIN THE PURPOSE FOR YOUR VISIT TO

22  THE TUMMINS HOME?

23        A.      DETECTIVE LEVASSEUR DID; YES, SIR.

24        Q.      DO YOU RECALL WHAT HE SAID?

25        A.      YES, SIR.  HE SAID WE WERE THERE TO EXECUTE A

```
 1  SEARCH WARRANT ON THE COMPUTERS.
 2          Q.    DURING THIS INTERACTION, DO YOU RECALL WHETHER
 3  OR NOT ANYONE TOLD THE DEFENDANT HE DIDN'T HAVE TO ANSWER
 4  QUESTIONS?
 5          A.    YES, SIR.
 6          Q.    WHO SAID THAT?
 7          A.    DETECTIVE LEVASSEUR DID.
 8          Q.    NOW, AT THE END OF YOUR INTERACTION WITH THE
 9  TUMMINSES, WAS THERE A PHYSICAL INTERACTION BETWEEN DETECTIVE
10  LEVASSEUR AND MRS. TUMMINS?  WAS THERE ANY CONTACT INTERACTION
11  BETWEEN THOSE TWO?
12          A.    AT THE VERY END; YES, SIR.
13          Q.    CAN YOU PLEASE TELL US ABOUT THAT?
14          A.    MR. TUMMINS WAS UPSET.  I REMEMBER DETECTIVE
15  LEVASSEUR ASKED HIM SOMETHING LIKE, YOU ARE NOT GOING TO DO
16  ANYTHING STUPID, ARE YOU?  AND MR. TUMMINS SAID, NO.  WHEN WE
17  WERE GETTING READY TO LEAVE, DETECTIVE LEVASSEUR LOOKED AT MRS.
18  TUMMINS AND SAID, WATCH HIM.  HE MOUTHED, WATCH HIM.  BUT THAT
19  WAS IT.
20          MR. EVERETT:  MAY I HAVE JUST A MINUTE, YOUR HONOR?
21          THE COURT:  I'M SORRY, I WANT TO MAKE SURE I
22  UNDERSTAND.  THE LAST STATEMENT WAS, THE DEFENDANT'S WIFE SAID
23  WHAT?
24          THE WITNESS:  HE MOUTHED -- OR, NO, SIR, NOT THE WIFE,
25  BUT DETECTIVE LEVASSEUR MOUTHED TO MS. TUMMINS, WATCH HIM.  HE
```

Case 3:10-cr-00009  Document 68  Filed 08/23/11  Page 27 of 60 PageID #: 518

1    DIDN'T ACTUALLY SAY IT, BUT I COULD SEE, WATCH HIM, WITH HIS

2    LIPS.

3    BY MR. EVERETT:

4         Q.    IN YOUR MIND, WAS THAT LINKED UP TO THE "DON'T

5    DO ANYTHING STUPID" COMMENT?

6         A.    THAT'S WHAT TOOK IT AS.

7         MR. EVERETT:  JUST A MINUTE, YOUR HONOR.

8         THE COURT:  ALL RIGHT.

9         MR. EVERETT:  YOUR HONOR, I WILL TENDER THE WITNESS.

10        THANK YOU, SIR.

11        THE COURT:  YOU MAY CROSS EXAMINE.

12   CROSS EXAMINATION

13   BY MR. POTTER:

14        Q.    DETECTIVE PATTERSON, GOOD AFTERNOON.

15        A.    GOOD AFTERNOON, MR. POTTER.

16        Q.    I BELIEVE YOU KNOW ME.  I REPRESENT, OBVIOUSLY,

17   MR. TUMMINS.

18        A.    YES, SIR.

19        Q.    LET ME ASK YOU A FEW FOLLOW-UP QUESTIONS IN

20   CROSS.  AT THE TIME THAT YOU AND OFFICER PATTERSON -- OFFICER

21   LEVASSEUR, EXCUSE ME, WENT TO THE TUMMINS' HOME, YOU KNEW THAT

22   YOU WERE INVESTIGATING A POSSIBLE CHILD PORNOGRAPHY CASE; IS

23   THAT RIGHT?

24        A.    I DID.

25        Q.    YOU ALSO KNEW AT THAT TIME, WHEN YOU ENTERED THE

HOME, THAT THE POTENTIAL SUSPECT WAS JEREMY SETH TUMMINS; IS
THAT RIGHT?

A.     WELL, NO, SIR, NOT REALLY.  WE HAD AN IDEA -- I
MEAN, THERE WAS ONLY TWO PEOPLE LIVING IN THE RESIDENCE.  SO
THERE WERE OTHER EXPLANATIONS.  THAT'S WHY WE DIDN'T REALLY GO
IN FORCEFULLY AT THE BEGINNING, IF THAT MAKES ANY SENSE.

Q.     WHAT INVESTIGATION, IF ANY, HAD YOU DONE ABOUT
WHO RESIDED AT THE HOME BEFORE YOU WENT TO THE HOME?

A.     WE USED SEVERAL POLICE RESOURCES, THE LOCAL
SHERIFF'S OFFICE RMS, WHICH IS A DATABASE OF CALLS AND STUFF.
WE RAN DRIVER'S LICENSE AND CHECKED REGISTRATION.  AND MR.
POTTER, USUALLY I CALL THE ELECTRIC SERVICE.  I PROBABLE DID
THAT ON THAT CASE AS WELL.

Q.     YOU CHECKED HIS EMPLOYMENT?

A.     NO, SIR.

Q.     YOU DIDN'T KNOW WHERE HE WORKED WHEN YOU WENT TO
THE HOUSE?

A.     I DON'T REMEMBER.  I DON'T BELIEVE I DID WHEN WE
WENT TO THE HOUSE.

Q.     DID MR. LEVASSEUR EXPRESS TO YOU THAT HE KNEW
WHERE MR. TUMMINS WORKED?

A.     I DON'T REMEMBER.  I KNOW WE TALKED ABOUT IT
THERE, BUT I DON'T REMEMBER WE KNEW BEFORE WE GOT THERE OR NOT.

Q.     WHEN YOU ENTERED THE HOME, WHAT TIME OF DAY WAS
IT?

1      A.    I DON'T REMEMBER THE EXACT TIME.  IT WAS IN THE

2  EVENING.

3      Q.    EVENING TIME?

4      A.    YES, SIR.

5      Q.    YOU ARRIVED AT THE HOME.  YOU BOTH ENTERED THE

6  HOME, WENT INTO HIS HOME; IS THAT RIGHT?

7      A.    YES, SIR; WE DID.

8      Q.    AND IN THE HOME, WERE YOU PRESENT THE ENTIRE

9  TIME WHEN OFFICER LEVASSEUR WAS QUESTIONING OR TALKING TO

10 MR. TUMMINS?

11     A.    I WAS IN THE RESIDENCE, BUT I WAS NOT WITH THEM;

12 NO, SIR.

13     Q.    YOU WEREN'T IN THE ROOM WITH OFFICER LEVASSEUR

14 THE ENTIRE TIME?

15     A.    NO, SIR; I WAS NOT.

16     Q.    ON OCCASION, OFFICER LEVASSEUR WOULD BE WITH

17 MR. TUMMINS, THE DEFENDANT IN THIS CASE, AND YOU WOULD BE IN A

18 DIFFERENT PART OF THE HOUSE WITH MRS. TUMMINS; IS THAT RIGHT?

19     A.    THAT'S CORRECT; YES, SIR.

20     Q.    AND ON OCCASION, ALL FOUR OF YOU WOULD BE

21 TOGETHER; IS THAT RIGHT?

22     A.    YES, SIR.

23     Q.    NOT LONG AFTER YOU AND MRS. TUMMINS WENT INTO

24 THE HOME, YOU AND MRS. TUMMINS WENT INTO A SEPARATE AREA OF THE

25 HOME; IS THAT RIGHT?

```
 1          A.    YES, SIR.

 2          Q.    AND SO MUCH OF THE EXCHANGE THAT YOU HAVE HEARD

 3   ON THIS AUDIOTAPE WOULD HAVE BEEN AN EXCHANGE THAT YOU HAVE

 4   HEARD FOR THE FIRST TIME; IS THAT RIGHT?

 5          A.    ON THE AUDIOTAPE; YES, SIR.

 6          Q.    AND THAT PRIMARILY WOULD BE THE EXCHANGE BETWEEN

 7   OFFICER LEVASSEUR AND MR. TUMMINS?

 8          A.    THAT'S CORRECT; YES, SIR.

 9          Q.    AT SOME POINT IN TIME, WHILE YOU WERE IN THIS

10   HOME, NO DOUBT, MR. TUMMINS BECAME YOUR CHIEF SUSPECT; IS THAT

11   CORRECT?

12          A.    YES, SIR.

13          Q.    HE BECAME THE CHIEF SUSPECT AFTER IT WAS

14   DETERMINED THAT THERE WAS NO WIRELESS INTERNET CONNECTION; IS

15   THAT RIGHT?

16          A.    WELL, AT THAT POINT WE NARROWED IT DOWN

17   SPECIFICALLY TO THE TWO OF THEM, YES, SIR.  OUR LIST OF SUSPECTS

18   BEGAN TO SHRINK.

19          Q.    AND YOUR FOCUS OF YOUR INVESTIGATION WAS NOT

20   MRS. LAURA TUMMINS?

21          A.    THAT'S CORRECT.

22          Q.    SO THAT LEAVES MR. JEREMY SETH TUMMINS; CORRECT?

23          A.    YES, SIR.

24          Q.    NOW, DURING THE TIME THAT YOU WERE IN THE HOME,

25   MR. TUMMINS WAS BEING QUESTIONED REPEATEDLY ABOUT WHY CERTAIN
```

1    IMAGES WERE FOUND ON HIS COMPUTER; IS THAT RIGHT?

2              A.    HE WAS; YES, SIR.

3              Q.    AND THE PURPOSE OF THAT QUESTIONING WOULD HAVE

4    BEEN TO GATHER EVIDENCE; RIGHT?

5              A.    YES, SIR.

6              Q.    REPEATEDLY, OFFICER LEVASSEUR QUESTIONED

7    MR. TUMMINS ABOUT WHY CHILD PORNOGRAPHY WAS FOUND ON HIS

8    COMPUTER; IS THAT RIGHT?

9              A.    YES, SIR.

10             Q.    REPEATEDLY, OFFICER LEVASSEUR QUESTIONED

11   MR. TUMMINS ABOUT WHETHER OR NOT HE WAS AN PEDOPHILE; IS THAT

12   TRUE?

13             A.    SEVERAL TIMES -- I WOULDN'T SAY REPEATEDLY, BUT

14   I BELIEVE AT LEAST ONE OCCASION, AND MAYBE TWO THAT I CAN

15   RECALL.  BUT YES, SIR, HE DID.

16             Q.    YOU DO RECALL OFFICER LEVASSEUR MORE THAN ONCE

17   TELLING MR. TUMMINS THAT HE IS GOING TO HAVE TO PROVIDE HIM WITH

18   A SATISFACTORY EXPLANATION ABOUT WHY HE IS NOT A PEDOPHILE?

19             A.    YES, SIR.

20             Q.    YOU REMEMBER REPEATEDLY OFFICER LEVASSEUR

21   TELLING MR. TUMMINS THAT THE IMAGES THAT WERE FOUND ON HIS

22   COMPUTER WERE IMAGES THAT WOULD LEAD HIM TO BELIEVE THAT HE MAY

23   HAVE PERP'D ON KIDS.

24             Q.    NO, SIR.  I DON'T REMEMBER HIM EVER SAYING THAT

25   HE BELIEVED HE PERP'D ON KIDS.

```
 1          Q.    ASKED HIM FOR EXPLANATION WHY HE HAS NOT PERP'D

 2    ON KIDS.

 3          THE COURT:  WHY HE HAS NOT WHAT?

 4          MR. POTTER:  PERP'D.  PERPETRATE, IS WHAT I'M TRYING TO

 5    ASK.

 6    BY MR. POTTER:

 7          Q.    BUT THAT'S THE WORD THAT OFFICER LEVASSEUR WAS

 8    USING, PERP; IS THAT RIGHT?

 9          A.    PERP; YES, SIR.

10          Q.    PERP MEANING PERPETRATE?

11          A.    PERPETRATED; YES, SIR.

12          Q.    AND REPEATEDLY ASKED MR. TUMMINS, LOOK, YOU'RE

13    GOING TO HAVE TO PROVIDE ME WITH SOME EXPLANATION THAT'S GOING

14    TO CONVINCE ME THAT YOU HAVE NOT PERP'D ON KIDS; RIGHT?

15          A.    HE DID SAY THAT; YES, SIR.

16          Q.    AND AT SOME POINT IN TIME DURING THE

17    CONVERSATION, MR. TUMMINS EXPRESSED TO MR. LEVASSEUR:  LOOK, I

18    WOULDN'T HAVE DONE THAT; I AM A SCHOOLTEACHER.  CORRECT?

19          A.    YES, SIR.

20          Q.    AND AT THAT POINT IN TIME, OFFICER LEVASSEUR

21    SAID, YEAH, THAT'S WHAT'S CONFUSING ME.  CORRECT?

22          A.    YES, SIR.

23          Q.    NO DOUBT OFFICER LEVASSEUR HAD EXPRESSED TO YOU

24    PRIOR TO THIS QUESTIONING THAT HE KNEW THAT MR. TUMMINS WAS A

25    SCHOOLTEACHER?
```

```
 1              A.    I DON'T RECALL HIM TELLING ME THAT.

 2              Q.    OKAY.  NOW, DURING THE COURSE OF THE

 3    QUESTIONING, OFFICER LEVASSEUR TOLD MR. TUMMINS THAT HE HAD AN

 4    OPTION OF PROSECUTING HIM FEDERALLY OR IN STATE COURT; IS THAT

 5    RIGHT?

 6              A.    YES, SIR; HE DID.

 7              Q.    IN FACT, HE TOLD MR. TUMMINS THAT, IF YOU ARE

 8    NOT HONEST WITH ME, THIS CAN GO HIGHER THAN IT NORMALLY WOULD;

 9    RIGHT?

10              A.    I DON'T BELIEVE HE SAID NORMALLY WOULD, BUT HE

11    SAID SOMETHING ABOUT IF HE DIDN'T COOPERATE, THAT IT COULD GO

12    HIGHER; YES, SIR.

13              MR. POTTER:  MAY IT PLEASE THE COURT, IF I COULD PASS

14    TO THE WITNESS A TRANSCRIPT.

15              THE COURT:  BEFORE WE GET INTO THIS TRANSCRIPT --

16              MR. POTTER:  YES, SIR.

17              THE COURT:  IS THERE ANY DISPUTE ABOUT WHAT'S BEING

18    HANDED THE WITNESS?

19              MR. POTTER:  COUNSEL HAS A COPY OF IT.

20              THE COURT:  I WANT TO KNOW IF THERE IS A DISPUTE ABOUT

21    IT.  I WANT TO RESOLVE THAT FIRST.

22              MR. EVERETT:  YOUR HONOR, I HAVE NOT HAD AN OPPORTUNITY

23    TO DO THE SAME DETAILED REVIEW OF MR. POTTER'S TRANSCRIPT THAT I

24    THINK HE HAS DONE OF MINE.  AND SO I HAVE NO IDEA IF IT'S

25    ACCURATE OR WHERE --
```

```
 1        THE COURT:  WELL, WHY DON'T YOU GIVE HIM THE PAGE
 2   NUMBER, AND THEN YOU CAN LOOK AT THE PAGE NUMBER HE WANTS TO
 3   REFER TO ON YOURS, AND WE'LL SEE IF THERE IS A DISPUTE OR NOT.
 4        MR. POTTER:  I WILL DO THAT, YOUR HONOR.  WHAT I
 5   INTENDED TO DO WAS HAND HIM THE TRANSCRIPT AND REFER HIM TO A
 6   PARTICULAR PAGE.
 7        THE COURT:  THERE HAS BEEN AN EVIDENTIARY ISSUE ABOUT
 8   THIS.  BEFORE THE WITNESS STARTS TO TESTIFY, I WANT TO MAKE SURE
 9   THAT THERE IS NO DISPUTE ABOUT WHAT YOU ARE GOING TO ASK.  DO
10   YOU WANT TO GIVE HIM THE PAGE NUMBER AND THE LINE?
11        MR. POTTER:  THAT'S WHAT I'M LOOKING FOR, YOUR HONOR.
12   THE PARTICULAR PAGE NUMBER.
13        THE COURT:  MR. MARSHAL, DO YOU WANT TO GIVE THE
14   TRANSCRIPT BACK TO HIM?
15        MR. POTTER:  PAGE 14.  LET ME MAKE SURE I UNDERSTAND
16   WHAT YOU ARE DOING.  YOU WANT ME TO LET COUNSEL LOOK AT THAT
17   PAGE BEFORE THE WITNESS LOOKS AT THE PAGE?
18        THE COURT:  YES, BECAUSE THERE IS A MOTION TO STRIKE.
19   THERE IS AN OBJECTION.
20        MR. POTTER:  I UNDERSTAND.  THE TOP OF PAGE 14.
21        MR. EVERETT:  I DON'T HAVE AN OBJECTION TO A REFERENCE
22   TO THAT PAGE, YOUR HONOR.
23        THE COURT:  YOU MAY IT PASS IT TO THE WITNESS.
24   BY MR. POTTER:
25        Q.    TURN TO PAGE 14 OF THAT TRANSCRIPT, IF YOU
```

WOULD, DETECTIVE PATTERSON.

          A.    YES, SIR.

          Q.    ACTUALLY, IT WOULD BE AT THE BOTTOM.  THE
SENTENCE BEGINS ON THE BOTTOM OF PAGE 13.

          A.    YES, SIR.

          Q.    IT'S DETECTIVE LEVASSEUR TALKING AND SAYING:

          WHEN IT COMES TO CASES LIKE THIS, I CAN TAKE IT
FEDERALLY OR STATE.

          A.    YES, SIR.

          Q.    DID I READ THAT CORRECTLY?

          A.    YOU DID.

          Q.    DO YOU RECALL OFFICER LEVASSEUR SAYING THOSE
WORDS?

          A.    I DO.

          Q.    PEOPLE THAT COOPERATE WITH ME AND TELL ME THE
TRUTH, AND SOME PEOPLE, YOU KNOW, I'M GOING TO BE STRAIGHT WITH
YOU, UP WITH YOU.  SOME PEOPLE HAVE DONE IT BY MISTAKE AND THAT
IS FOUND OUT, BUT I DO A COMPLETE AND FULL FORENSIC EXAM.  DO
YOU REMEMBER OFFICER LEVASSEUR SAYING THOSE WORDS?

          A.    I DO.

          MR. POTTER:  TO PAGE 86, COUNSEL.

          MR. EVERETT:  OKAY.

          THE COURT:  PAGE 86, DID YOU SAY?

          MR. POTTER:  YES, SIR.

          MR. EVERETT:  THE TOP?

1      MR. POTTER:  I'M SORRY, IT'S NOT PAGE 86.  PAGE 28.

2      THE COURT:  DO YOU ALL WANT A BRIEF RECESS SO YOU CAN

3  GO OVER THE PAGES, MR. EVERITT?

4      MR. POTTER:  THAT WOULD BE GREAT.

5      THE COURT:  PARDON?

6      MR. EVERETT:  YES, YOUR HONOR.

7      THE COURT:  WHY DON'T YOU GIVE HIM THE -- DESIGNATE THE

8  PAGES YOU WANT TO REVIEW WITH THE WITNESS, AND YOU ALL REVIEW

9  THOSE PAGES DURING THE BREAK.  WE'LL SEE IF THERE IS AN

10  OBJECTION.  WE'RE IN RECESS.

11      (RECESS.)

12      THE COURT:  ARE YOU READY?

13      MR. EVERETT:  I APPRECIATE THE COURT'S PATIENCE IN

14  ALLOWING US TO DO THAT.

15  BY MR. POTTER:

16      Q.    DETECTIVE PATTERSON, I PASSED YOU A TRANSCRIPT.

17  COUNSEL FOR THE GOVERNMENT HAS HAD A CHANCE TO LOOK AT THAT.  I

18  WANT TO ASK YOU ABOUT CERTAIN PAGES IN THAT TRANSCRIPT; IS THAT

19  OKAY?

20      A.    YES, SIR.

21      Q.    IF YOU WOULD TAKE A LOOK, PLEASE, AT PAGE 5 OF

22  THE TRANSCRIPT.

23      A.    OKAY.

24      Q.    TAKE A MOMENT TO REVIEW PAGE 5, IF YOU WOULD.

25  PARTICULARLY I'M LOOKING AT LINE 7 OF PAGE 5.

1      A.    YES, SIR.

2      Q.    SEE AT LINE 7 OF PAGE 5 WHERE DETECTIVE --

3  LIEUTENANT LEVASSEUR REQUESTED THAT THE DEFENDANT HAVE A SEAT?

4      A.    YES, SIR.

5      Q.    IF YOU WOULD TAKE A LOOK AT PAGE 13 OF THE

6  TRANSCRIPT.

7      A.    YES, SIR.

8      Q.    LINE 20.  AT LINE 20 DO YOU SEE WHERE LIEUTENANT

9  LEVASSEUR STATED:  IF YOU ARE HONEST WITH ME AND YOU COOPERATE,

10 THINGS CAN WORK AT A LESS THAN HIGHER LEVEL THAN NORMALLY WILL.

11 I HAVE TWO OPTIONS?

12     A.    I DO.

13     Q.    AND THEN MR. TUMMINS SAYS:  UH-HUH.

14     AND MR. LEVASSEUR GOES ON TO SAY:  WHEN IT COMES TO

15 CASES LIKE THIS, I CAN TAKE IT FEDERALLY OR STATE.

16     DO YOU SEE WHERE LIEUTENANT LEVASSEUR SAYS THAT?

17     A.    YES, SIR.

18     Q.    IF YOU WOULD, PLEASE, LOOK AT PAGE 20.  AND AS

19 YOU ARE DOING THAT, DO YOU RECALL LIEUTENANT LEVASSEUR MAKING

20 THOSE STATEMENTS?

21     A.    YES, SIR; I BELIEVE SO.  WORDS TO THAT EFFECT.

22 I HAVEN'T HAD A CHANCE TO COMPARE THIS WHILE LISTENING TO THE

23 AUDIO, BUT ROUGHLY, GENERALLY, I BELIEVE SO; YES, SIR.

24     Q.    OKAY.  PAGE 20.

25     A.    YES, SIR.

1          Q.    TAKE A LOOK, PLEASE, AT LINE 18.

2          A.    YES, SIR.

3          Q.    LIEUTENANT LEVASSEUR AT THAT POINT IN TIME IS

4    TALKING TO MR. TUMMINS AND STATES:  IT ALL DEPENDS IF YOU ARE

5    HONEST WITH ME OR NOT, I'M GOING TO TELL YOU.  IF YOU'RE NOT

6    HONEST WITH ME, AND YOU ARE LYING TO ME, AND I DO A FORENSIC

7    EXAM, AND FIND OUT THAT YOU WERE LYING TO ME, I'M GOING TO

8    PROSECUTE YOU TO THE FULLEST EXTENT OF THE LAW.

9          A.    YES, SIR.

10          Q.    YOU DO RECALL LIEUTENANT LEVASSEUR MAKING THAT

11    COMMENT?

12          A.    I DO.

13          Q.    TAKE A LOOK, PLEASE, AT PAGE 23.

14          A.    YES, SIR.

15          Q.    AGAIN AT LINE 19.  LIEUTENANT LEVASSEUR ASKED

16    MR. TUMMINS TO, MOVE OVER HERE?

17          A.    YES, SIR.

18          Q.    PHYSICALLY DIRECTING WHERE HE SHOULD MOVE TO; IS

19    THAT RIGHT?

20          A.    IT APPEARS SO; YES, SIR.

21          Q.    OKAY.  TAKE A LOOK THEN, PLEASE, AT PAGE 28.

22          A.    YES, SIR.

23          Q.    LIEUTENANT LEVASSEUR AT THE TOP OF PAGE 28?

24          A.    YES, SIR.

25          Q.    LIEUTENANT LEVASSEUR IS TALKING TO MR. TUMMINS,

1    EXPLAINING TO HIM THAT HE THINKS THIS IS MORE THAN A

2    ONE-TIME EVENT, AND TELLING HIM THAT, YOU HAVE GOT TO GIVE ME A

3    BETTER EXPLANATION THAN WHAT YOU GAVE; IS THAT CORRECT?

4         A.    YES, SIR.

5         Q.    ESSENTIALLY DIRECTING HIM TO GIVE HIM AN

6    EXPLANATION; IS THAT RIGHT?

7         A.    YES, SIR.

8         Q.    IF YOU WOULD TAKE A LOOK, PLEASE, AT PAGE 29?

9         A.    YES, SIR.

10         Q.    PAGE 29, LINE 4.  OFFICER LEVASSEUR SAID,

11    BECAUSE I'M GOING TO BE TRYING TO FIGURE OUT IF SOMEBODY WHO

12    DOWNLOADS CHILD PORN IS ALSO A PEDOPHILE?

13         A.    YES, SIR.

14         Q.    DO YOU SEE WHERE HE SAYS THAT?

15         A.    YES, SIR.

16         Q.    AND AT THE BOTTOM OF PAGE 29, OFFICER LEVASSEUR

17    LEVASSEUR PROCEEDS TO SAY:  I DON'T WANT TO -- YOU'VE GOT TO

18    UNDERSTAND SOMETHING.  I DON'T WANT TO TELL YOU WHAT THE TRUTH

19    IS.  I NEED YOU TO TELL ME WHAT THE TRUTH IS.

20         A.    YES, SIR.

21         Q.    AND OBVIOUSLY, THAT IS AN EXCHANGE THAT WENT ON

22    FOR SOMETIME; RIGHT?

23         A.    YES, SIR.

24         Q.    THROUGHOUT THAT TWO HOUR PERIOD, OFFICER

25    LEVASSEUR IS TELLING MR. TUMMINS THAT HE NEEDS HIM TO TELL HIM

1    THE TRUTH; IS THAT RIGHT?

2         A.    THAT'S CORRECT.

3         Q.    TAKE A LOOK, PLEASE, AT PAGE 43.

4         A.    OKAY.

5         Q.    LINE 16.  AGAIN, THIS IS MORE OF THAT EXCHANGE,

6    BUT OFFICER LEVASSEUR SAYING:  I'M NOT SAYING YOU HAVE TO LISTEN

7    TO ME NOW, I'M NOT SAYING YOU ARE --

8         THE COURT:  WHOA, WHOA, WAIT.  WHAT PAGE?

9         MR. POTTER:  43, I'M SORRY.

10        Q.    LINE 16, OFFICER LEVASSEUR SAYING:  I'M NOT

11   SAYING YOU HAVE TO LISTEN TO ME, NOW.  I'M NOT SAYING YOU ARE A

12   PEDOPHILE, BUT YOU HAVE TO GIVE ME SOME TYPE OF EXPLANATION AS

13   TO WHY YOU WOULD KNOWINGLY DOWNLOAD A FILE THAT IS SAYING IT'S

14   CHILD PORN AND THEN WATCH IT AND THEN DELETE IT.  YOU'VE GOT TO

15   EXPLAIN TO ME -- YOU HAVE TO MAKE ME BELIEVE THAT, A, YOU ARE

16   NOT A PEDOPHILE, AND YOU ARE NOT GOING TO DO THAT WITH THE

17   EXPLANATION THAT YOU ARE GIVING.

18        IS THAT RIGHT?

19        A.    THAT'S CORRECT.

20        Q.    AND THAT'S CONSISTENT WITH WHAT YOU HEARD

21   OFFICER LEVASSEUR SAY TO MR. TUMMINS, BOTH THERE AND ON THE

22   AUDIOTAPE THAT YOU REVIEWED; IS THAT CORRECT?

23        A.    WITHOUT GOING WORD FOR WORD, YES, SIR, I BELIEVE

24   THAT'S THE CONTEXT.

25        Q.    IF YOU WOULD, PLEASE, TAKE A LOOK AT PAGE 44.

1    A.    YES, SIR.

2    Q.    HERE IT LOOKS LIKE OFFICER LEVASSEUR IS MAYBE

3  SPEAKING TO MRS. TUMMINS IN THE MIDDLE OF THAT PAGE.  THERE WERE

4  OCCASIONS WHEN ALL FOUR OF YOU WERE PRESENT; IS THAT RIGHT?

5    A.    YES, SIR; THERE WERE.

6    Q.    LOOKS LIKE MRS. TUMMINS MAKES THE STATEMENT:

7  YES, AT LINE 9.  AND THEN AT LINE 10 ON PAGE 44, OFFICER

8  LEVASSEUR SAYS, MOST PEOPLE THAT DOWNLOAD CHILD PORNOGRAPHY HAVE

9  AN INTEREST IN KIDS.  HE'S A SCHOOLTEACHER.  I WANT HIM TO

10  CONVINCE ME THAT HE IS NOT -- IS THAT -- I MEAN, IS THAT ASKING

11  TOO MUCH?

12    A.    YES, SIR.

13    Q.    AND THAT'S CONSISTENT WITH WHAT YOU HEARD

14  OFFICER LEVASSEUR SAY THAT EVENING; IS THAT RIGHT?

15    A.    YES, SIR.

16    Q.    AND THEN MR. TUMMINS SPEAKS IMMEDIATELY AFTER

17  THAT IN RESPONSE; IS THAT RIGHT?

18    A.    YES, HE DID.

19    Q.    LET'S TAKE A LOOK AT PAGE 45.  THE BOTTOM OF

20  PAGE 45, LINE 23.

21    A.    YES, SIR.

22    Q.    AGAIN, OFFICER LEVASSEUR TALKING.  WHAT I REALLY

23  NEED, OKAY?  I'M NOT GOING TO GET ANYMORE, BUT WHAT I REALLY

24  NEED IS WHAT YOU CAN REMEMBER.  I NEED YOU --

25    AND THE TOP OF PAGE 46.

1    -- TO GIVE ME A BALLPARK ESTIMATE OF HOW MANY TIMES YOU

2    HAVE DOWNLOADED CHILD PORN TO THE BEST OF YOUR RECOLLECTION, AND

3    EXPLAIN TO ME, GIVE ME AN EXPLANATION AS TO WHY, BECAUSE ONE

4    EXPLANATION THAT I'M LOOKING AT IS THAT YOU ARE INTO KIDS, AND

5    I'M GOING TO HAVE TO INVESTIGATE THAT.  MA'AM, YOU ARE SHAKING

6    YOUR HEAD.

7         THAT IS OFFICER LEVASSEUR TALKING; CORRECT?

8         A.    YES, SIR.

9         Q.    AND THAT'S CONSISTENT WITH WHAT YOU HEARD

10   OFFICER LEVASSEUR SAY; IS THAT RIGHT?

11        A.    ROUGHLY SO; YES, SIR.

12        Q.    LET'S TAKE A LOOK AT PAGE 55.  PAGE 55, LINE 16.

13   OFFICER LEVASSEUR IS TALKING AGAIN TO MR. TUMMINS AND SAYS:

14   I'VE GOT YOU DEAD TO RIGHTS FOR THIS, THIS CHILD PORN, BUT I

15   NEED YOU TO MAKE ME BELIEVE THAT YOU ARE NOT A DANGER TO

16   CHILDREN.

17        A.    YES, SIR.

18        Q.    INSTRUCTING MR. TUMMINS TO GIVE HIM AN

19   EXPLANATION; IS THAT RIGHT?

20        A.    YES, SIR.

21        Q.    TURN OVER, IF YOU WOULD, PLEASE, TO PAGE 64,

22   LINE 3.  THIS IS AN EXCHANGE BACK AND FORTH.  IF YOU WILL READ

23   THROUGH THAT DOWN TO ABOUT LINE 16, EXCHANGE BETWEEN MR. TUMMINS

24   AND THE DEFENDANT -- EXCUSE ME, MR. LEVASSEUR AND THE DEFENDANT.

25   FOLLOW ALONG WITH ME, IF YOU CAN.

```
1              A.     YES, SIR.

2              Q.     TELL ME IF THIS IS ACCURATE.

3         WELL, I NEED YOU TO LOOK AT ME IN THE FACE,

4         MR. TUMMINS:  OKAY.  ALL RIGHT.

5         OFFICER LEVASSEUR:  STRAIGHT AS YOU CAN, DON'T CLOSE

6    YOUR EYES, DON'T BLINK, DON'T DO ANYTHING.  HAVE YOU EVER

7    MOLESTED ANY KIDS?

8         MR. TUMMINS:  ABSOLUTELY NOT.

9         MR. LEVASSEUR:  WOULD YOU BE WILLING TO TAKE A LIE

10   DETECTOR TEST?

11        DID I READ THAT CORRECTLY?

12             A.     YES, SIR; YOU DID.  WITH THE EXCEPTION OF LINE

13   7.  I BELIEVE DETECTIVE LEVASSEUR SAID, DON'T CLOSE YOUR EYES.

14   AND YOU SAID THAT, BUT IT'S NOT IN HERE.

15             Q.     AND THAT'S WHAT COUNSEL AND I DISCUSSED AT

16   BREAK.

17             A.     I DIDN'T HEAR THAT, I'M SORRY.

18             Q.     DON'T CLOSE YOUR EYES.  IN FACT, WHAT OFFICER

19   LEVASSEUR WAS SAYING TO HIM AT THAT POINT IN TIME WAS, LOOK AT

20   ME AS STRAIGHT AS -- BASICALLY, LOOK AT ME IN THE FACE, DON'T

21   CLOSE YOUR EYES, DON'T BLINK, DON'T DO NOTHING.  HAVE YOU EVER

22   MOLESTED ANY KIDS; IS THAT RIGHT?

23             A.     YES, SIR.

24             Q.     INSTRUCTING HIM TO STAND THERE AND ANSWER THIS

25   QUESTION?
```

1           A.    YES, SIR.

2           Q.    AT NO TIME DURING THE TIME THAT YOU WERE IN THE

3     HOME, DID YOU EVER OVERHEAR OFFICER LEVASSEUR TELL MR. TUMMINS

4     THAT HE HAD A RIGHT TO AN ATTORNEY?  IS THAT CORRECT?

5           A.    THAT'S CORRECT.

6           Q.    AT NO TIME DID YOU EVER HEAR OFFICER LEVASSEUR

7     MIRANDIZE MR. TUMMINS; IS THAT CORRECT?

8           A.    YES, SIR.

9           Q.    WHEN I SAY MIRANDIZE, OBVIOUSLY, YOU KNOW WHAT

10    THAT MEANS?

11          A.    I DO.

12          Q.    READING SOMEONE THEIR MIRANDA RIGHTS?

13          A.    YES, SIR; THAT'S CORRECT.

14          Q.    AT NO TIME WHILE THEY WERE THERE, DID YOU HEAR

15    MR. LEVASSEUR, OFFICER LEVASSEUR, TELL MR. TUMMINS THAT HE HAD

16    THE RIGHT NOT TO SPEAK, TO SIMPLY REMAIN SILENT?

17          A.    THAT'S CORRECT.

18          Q.    ON MORE THAN ONE OCCASION, YOU DID HEAR OFFICER

19    LEVASSEUR INSTRUCT MR. TUMMINS TO MOVE TO DIFFERENT PARTS OF THE

20    HOUSE.  IS THAT RIGHT?

21          A.    YES, SIR.  LIKE SIT HERE OR -- YES, SIR.  IS

22    THAT WHAT YOU ARE --

23          Q.    FOLLOW ME UPSTAIRS?

24          A.    YES, SIR.

25          Q.    SIT HERE?

```
 1          A.    THAT WAS IN THERE; YES, SIR.

 2          Q.    MOVE OVER HERE?

 3          A.    YES, SIR.

 4          Q.    DON'T DO ANYTHING?

 5          A.    YOU'RE TALKING ABOUT THE BLINKING AND STUFF?

 6          Q.    YES, SIR.

 7          A.    YES, SIR.

 8          Q.    DON'T CLOSE YOUR EYES?

 9          A.    YES, SIR.

10          Q.    DON'T TOUCH THE COMPUTER?

11          A.    YES, SIR.

12          Q.    AND THEN OFFICER LEVASSEUR WROTE A STATEMENT

13    THAT I BELIEVE HE ADMITS WAS A PARAPHRASING OF MR. TUMMINS; IS

14    THAT RIGHT?

15          A.    THAT'S CORRECT.

16          Q.    AND THEN HAD MR. TUMMINS SIGN THAT STATEMENT; IS

17    THAT RIGHT?

18          A.    YES, SIR.

19          Q.    MR. TUMMINS WAS VISIBLY UPSET; IS THAT TRUE?

20          A.    I WOULD SAY HE WAS, YES, SIR.

21          Q.    HE WAS CRYING?

22          A.    I BELIEVE AT THAT POINT, YES, SIR.

23          Q.    IN FACT, AT ONE TIME OFFICER LEVASSEUR TOLD HIM

24    TO MAN UP, BE A MAN, STOP CRYING; IS THAT RIGHT?

25          A.    THAT'S IN THE TRANSCRIPT; YES, SIR.
```

1    Q.    AT ONE POINT IN TIME, HE TOLD MR. TUMMINS HE WAS
2    GOING TO HAVE TO TAKE RESPONSIBILITY?
3    A.    I BELIEVE THAT WAS IN THAT SAME TIME FRAME, YES,
4    SIR.
5    Q.    IN FACT, HE SAID THAT HE WAS GOING TO -- HE
6    WANTED MR. TUMMINS TO ACCOMPANY HIM OUT TO HIS PATROL CAR TO
7    WRITE THIS STATEMENT; IS THAT RIGHT?
8    A.    HE DID; YES, SIR.
9    MR. POTTER:  THAT'S ALL I HAVE.
10   THE WITNESS:  MR. POTTER, I HAVE SOMETHING -- YOUR
11   HONOR, I'M SORRY, I TOLD YOU SOMETHING INCORRECTLY.  WHEN WE
12   TOOK A BREAK, I RECALLED IT.  YOU HAD ASKED HOW WE VERIFIED WHO
13   LIVED IN THE HOUSE.  WHEN I CALLED THE ELECTRIC COMPANY, THEY
14   DID TELL ME MR. TUMMINS WORKED FOR THE SCHOOL SYSTEM.  THEY
15   DIDN'T SAY HE WAS A TEACHER, BUT, YOU KNOW, YOU HAD ASKED ME
16   THAT QUESTION.  I TOLD YOU I DIDN'T KNOW.  I DO BELIEVE HE
17   WORKED FOR THE SCHOOL SYSTEM.
18   MR. POTTER:  I APPRECIATE YOUR HONESTY.  THANK YOU.
19   MR. EVERETT:  YOUR HONOR, JUST A MOMENT.
20   THE COURT:  ALL RIGHT.
21   MR. EVERETT:  YOUR HONOR, I WOULD JUST LIKE THE RECORD
22   TO REFLECT THAT DETECTIVE PATTERSON AND I DID NOT DISCUSS HIS
23   TESTIMONY WHILE WE WERE IN RECESS.  AND THAT RECOLLECTION IS
24   BASED ON HIS OWN RECOLLECTION AND NOT A CONVERSATION WITH
25   COUNSEL.

1        THE COURT:  THE COURT ACCEPTS THAT.

2        MR. EVERETT:  THANK YOU, SIR.  YOUR HONOR, I HAVE JUST

3   A FEW QUESTIONS.

4        THE COURT:  ALL RIGHT.

5   REDIRECT EXAMINATION

6   BY MR. EVERETT:

7        Q.    LET'S START AT THE END OF THE CROSS EXAMINATION

8   ABOUT THE GOING OUT TO THE -- THE REQUEST TO GO OUT TO THE

9   PATROL CAR TO DO A STATEMENT.

10       A.    YES, SIR.

11       Q.    DID YOU HEAR OR SEE ANYTHING ABOUT WHY DETECTIVE

12  LEVASSEUR MADE THAT REQUEST?

13       A.    NO, SIR.  I JUST GATHERED IT WAS BECAUSE MR.

14  TUMMINS WAS TALKING MORE FREELY WITHOUT BEING IN FRONT OF HIS

15  WIFE, IS WHAT I ASSUMED.

16       Q.    WAS IT VERY HOT IN THE HOUSE THAT DAY?

17       A.    UPSTAIRS WAS TERRIBLY HOT.  DOWNSTAIRS WAS

18  FAIRLY COMFORTABLE.  I DON'T KNOW ABOUT WHERE THEY HAD BEEN,

19  BECAUSE I NEVER WENT TO WHERE THEY HAD BEEN.

20       Q.    OKAY.  NOW, WHILE THE INTERACTIONS BETWEEN

21  MR. TUMMINS AND DETECTIVE LEVASSEUR WAS HAPPENING, WAS DETECTIVE

22  LEVASSEUR ONLY QUESTIONING MR. TUMMINS, OR WAS HE DOING OTHER

23  STUFF, AS FAR AS YOU KNOW?

24       A.    HE WAS DOING OTHER STUFF.

25       Q.    WAS HE DOWN ON HIS KNEES WHILE HE WAS DOING

1    OTHER STUFF?

2          A.    YES, SIR.

3          Q.    WAS HE DOWN ON HIS KNEES THE WAY AN ELECTRICIAN

4    OR PLUMBER MIGHT BE DOWN ON THEIR KNEES WHILE WORKING ON

5    SOMETHING?

6          A.    HE WAS.

7          Q.    OKAY.  AND SO WHILE HE WAS DISCUSSING MR.

8    TUMMINS' SITUATION WITH MR. TUMMINS, HE WAS ALSO DOWN ON HIS

9    KNEES WORKING ON THE COMPUTER?  IS THAT YOUR TESTIMONY?

10         A.    IT IS.

11         Q.    OKAY.  LETS GO TO PAGE 5 OF THE TRANSCRIPT THAT

12   MR. POTTER ASKED YOU ABOUT.  NOW, THIS IS WHERE MR. POTTER

13   ASKED YOU, ABOUT LINES 7 AND 8.

14         WELL, NO, GO AHEAD AND HAVE A SEAT, IF YOU WOULD.

15         DO YOU REMEMBER THAT QUESTION?

16         A.    YES, SIR.

17         Q.    COULD YOU PLEASE READ PAGE -- CAN YOU PLEASE

18   READ LINES 17 AND 18 OF PAGE 5?

19         A.    YES, SIR.

20         MR. TUMMINS:  LAURA, CAN YOU COME UP?  THIS SEEMS

21   PRETTY SERIOUS.

22         Q.    ALL RIGHT.  WHO IS TALKING THERE?

23         A.    MR. TUMMINS.

24         Q.    WHO IS HE TALKING TO?

25         A.    MRS. TUMMINS.

1    Q.    AND WHAT IS HE ASKING HER TO DO?

2    A.    SHE WAS DOWNSTAIRS AT THAT POINT.  IT WAS

3    INITIALLY JUST ME AND DETECTIVE LEVASSEUR, MR. TUMMINS UPSTAIRS.

4    HE WAS ASKING HER TO COME UP AS WELL.

5    Q.    AND IS THIS AN INSTANCE OF MRS. TUMMINS BEING

6    ALLOWED TO MOVE FREELY ABOUT THE HOME?

7    A.    YES, SIR.

8    Q.    LET'S GO TO PAGE 23.  NOW, I BELIEVE MR. POTTER

9    ASKED YOU A QUESTION ABOUT LINES 19 AND 20.  COULD YOU PLEASE

10   READ WHAT THAT SAYS?

11   A.    LEVASSEUR:  COULD I GET TO YOU MOVE OVER HERE.

12   Q.    WERE YOU THERE, AS BEST YOU CAN RECALL, WHEN

13   THAT WAS SAID BY DETECTIVE LEVASSEUR?

14   A.    YES, SIR, I WAS, BECAUSE THIS IS WHEN DETECTIVE

15   LEVASSEUR READ PART OF THE SEARCH WARRANT.  I WAS THERE FOR

16   THIS.

17   Q.    DO YOU KNOW WHY OR WHAT HE WAS ASKING

18   MR. TUMMINS TO MOVE FOR?

19   A.    I DON'T RECALL.

20   Q.    OKAY.  IS IT POSSIBLE HE WAS ASKING HIM TO MOVE

21   AWAY FROM THE COMPUTERS SO THAT HE COULD INSPECT THEM?

22   MR. POTTER:  OBJECT TO SPECULATION, YOUR HONOR.

23   THE COURT:  SUSTAINED.

24   BY MR. EVERETT:

25   Q.    LET'S GO TO PAGE 28 OF THE TRANSCRIPT, PLEASE.

1    A.    YES, SIR.

2    Q.    COULD YOU PLEASE READ LINES 8 THROUGH 11?

3    A.    YES, SIR.

4    MR. TUMMINS:  I'M --

5    Q.    I'M SORRY, LINE 8, PLEASE.

6    A.    LINE 8?

7    Q.    YES, LINE 8.

8    A.    ON PAGE 28?

9    Q.    ON PAGE 28.

10   A.    YES, SIR.  IT STARTS WITH MR. TUMMINS.

11   Q.    CHECK CLOSELY AT THE BEGINNING OF LINE 8.  ON

12   PAGE 28?

13   A.    OH, I'M SORRY.

14   MRS. TUMMINS:  HOW MANY TIMES ARE YOU TALKING ABOUT?

15   LIEUTENANT LEVASSEUR:  ARE YOU ASKING ME OR ASKING HIM?

16   Q.    NOW, IS THIS AN INSTANCE OF MRS. TUMMINS ASKING

17   QUESTIONS OF DETECTIVE LEVASSEUR?

18   A.    YES, SIR.

19   Q.    COULD YOU PLEASE GO TO PAGE 43.  COULD YOU

20   PLEASE READ LINES 3 THROUGH 5.

21   A.    YES, SIR.

22   MRS. TUMMINS:  WHAT IF YOU TYPE IN THE WORD, LIKE YOU

23   SAID, IF YOU TYPE IN THE WORD ANAL?  I MEAN, IS IT GOING TO

24   BRING UP CHILD PORNOGRAPHY?

25   Q.    IS THAT ANOTHER INSTANCE OF MRS. TUMMINS ASKING

QUESTIONS?

A.    YES, SIR; SHE WAS ASKING DETECTIVE LEVASSEUR

THAT.

Q.    WOULD YOU PLEASE GO TO PAGE 45.

A.    YES, SIR.

Q.    COULD YOU PLEASE START READING AT LINE 3 AND GO

ALL THE WAY DOWN TO LINE 22.

A.    TO LINE 22?

Q.    YES.

A.    YES, SIR.  STARTING WITH LINE 3.

MRS. TUMMINS:  DID YOU DOWNLOAD CHILD PORN?

MR. TUMMINS:  I'VE SEEN THAT BEFORE, YES.

MRS. TUMMINS:  DID YOU DOWNLOAD IT?

MR. TUMMINS:  YES.  WHEN YOU CLICK ON IT.  AND THAT'S

WHAT HAPPENS WHEN YOU CLICK ON IT.

MRS. TUMMINS:  IT DOWNLOADS?

MR. TUMMINS:  YOU SEE THE NAME AND DOWNLOAD IT.

INAUDIBLE, 11 YEAR OLD'S WHATEVER SISTER.

MRS. TUMMINS:  WHY, INAUDIBLE.

MR. TUMMINS:  INAUDIBLE.

MRS. TUMMINS:  INAUDIBLE.

MR. TUMMINS:  I DON'T KNOW.

MRS. TUMMINS:  ONCE?  TWICE?

MR. TUMMINS:  MORE THAN ONCE.

MRS. TUMMINS:  IT WAS TWICE?

1          MR. TUMMINS:

2          Q.    I'M SORRY, WILL YOU STOP THERE?

3          A.    YES, SIR.

4          Q.    ON LINE 20, I THINK YOU MAY HAVE HAD A MIS-READ.

5          A.    WAS IT TWICE?

6          Q.    GO AHEAD.

7          A.    MR. TUMMINS:  INAUDIBLE.

8          MRS. TUMMINS:  INAUDIBLE.

9          Q.    IS THAT ANOTHER EXAMPLE OF MRS. TUMMINS ASKING

10    QUESTIONS?

11          A.    YES, SIR, TO MR. TUMMINS AT THIS TIME.

12          Q.    SHE IS QUESTIONING MR. TUMMINS.  IS THAT FAIR TO

13    SAY?

14          A.    YES, SIR.

15          Q.    COULD YOU PLEASE GO TO PAGE 55?

16          A.    YES, SIR.

17          Q.    I THINK YOU SEE YOUR NAME THERE; IS THAT RIGHT,

18    DETECTIVE PATTERSON?

19          A.    I DO.

20          Q.    PLEASE READ LINES 6 AND 7.

21          A.    LINE 6 STARTS:

22          DETECTIVE PATTERSON:  SETH, IF YOU HAVE ANYTHING TO

23    TELL HIM, NOW WOULD BE THE TIME.

24          Q.    NOW, DO YOU REMEMBER SAYING SOMETHING TO THAT

25    EFFECT?

1          A.    I DO.

2          Q.    OKAY.  IS THAT SOMETHING THAT YOU SAY FROM TIME

3  TO TIME WHEN YOU ARE INVESTIGATING CASES?

4          A.    YES, SIR.

5          Q.    WHY DO YOU SAY THINGS LIKE THAT?

6          A.    JUST TO ENCOURAGE THEM.  AND IF YOU HAVE

7  SOMETHING YOU NEED TO TELL HIM, WE'RE GETTING READY TO LEAVE,

8  YOU NEED TO GO AHEAD AND TELL HIM.  HE HAS TAKEN THE STUFF, HE

9  HAS PUT IT IN THE CAR.  GO AHEAD AND BE HONEST WITH HIM.

10         MR. EVERETT:  JUST A MINUTE, YOUR HONOR.

11         THE COURT:  ALL RIGHT.

12  BY MR. EVERETT:

13         Q.    NOW, WITH RESPECT TO THE PATROL CAR, DID

14  MR. TUMMINS EVER GO TO THE PATROL CAR?

15         A.    HE DID NOT.

16         Q.    DID HE EVER GET IN THE PATROL CAR?

17         A.    NO, SIR.

18         MR. EVERETT:  OKAY.  NO FURTHER QUESTIONS, YOUR HONOR.

19  THANK YOU.

20         THE COURT:  ANY REDIRECT?

21         MR. POTTER:  NO, SIR.

22         THE COURT:  YOU MAY STEP DOWN.

23         CALL YOUR NEXT WITNESS.

24         MR. EVERETT:  JUST A MINUTE, IF YOUR HONOR PLEASE.

25  YOUR HONOR, THE GOVERNMENT WILL REST.

```
 1          THE COURT:  YOU MAY CALL ANY PROOF ON BEHALF OF THE
 2   DEFENDANT.
 3          MR. POTTER:  NO, SIR.
 4          THE COURT:  DO YOU ALL WANT TO MAKE PROPOSED FINDINGS
 5   OF FACT?  DO YOU WANT TO ARGUE?  WHAT DO YOU WANT TO DO?
 6          MR. EVERETT:  YOUR HONOR, I'M NOT -- GIVEN THAT WE HAVE
 7   A TRANSCRIPT, I'M NOT SURE WHAT PROPOSED FINDINGS OF FACT WOULD
 8   ENTAIL.
 9          THE COURT:  NO, I JUST GIVE LAWYERS THE OPTION.
10   WHATEVER THE LAWYERS FEEL WOULD BE EFFECTIVE FOR THEIR
11   REPRESENTATION OF THEIR CLIENT, I DEFER TO THEM.
12          MR. EVERETT:  MAY I DISCUSS WITH MR. POTTER, SIR?
13          THE COURT:  ALL RIGHT.
14          MR. EVERETT:  YOUR HONOR, MR. POTTER CAN SPEAK FOR
15   HIMSELF IF HE DISAGREES, BUT I THINK THE PARTIES DON'T THINK ANY
16   FURTHER BRIEFING IS NECESSARY UNLESS YOUR HONOR WANTS TO REQUEST
17   IT.
18          THE COURT:  NO, I WILL LEAVE THAT TO YOU ALL.
19          MR. EVERETT:  I THINK I'M SATISFIED WITH THE RECORD AS
20   IT STANDS.  AND I UNDERSTAND MR. POTTER IS ALSO SATISFIED.
21          THE COURT:  IS THAT YOUR VIEW, MR. POTTER?
22          MR. POTTER:  THAT IS MY VIEW; YES, SIR.
23          THE COURT:  DOES ANYBODY WANT TO ARGUE?
24          MR. POTTER:  YOUR HONOR, THE GOVERNMENT HAS, I THINK,
25   RESERVED SO I COULD GO FIRST.  I WANT TO MAKE A COUPLE OF
```

1    CLOSING STATEMENTS, IF I COULD.

2          THE LAW IS VERY CLEAR, AND YOUR HONOR IS FAMILIAR WITH

3    IT, SO I WON'T BELABOR WHAT THE LAW IS.  BUT NO DOUBT

4    MR. TUMMINS WAS A SUSPECT, NO DOUBT THAT HE WAS INTERROGATED,

5    MULTIPLE QUESTIONS WERE ASKED IN AN EFFORT TO ELICIT

6    INCRIMINATING INFORMATION.  AND SO THE PIVOTAL QUESTION IS GOING

7    TO BE WHETHER OR NOT HE WAS IN CUSTODY.  OBVIOUSLY, THE COURT

8    RECOGNIZES THAT'S THE ISSUE.

9          AND THE CASE LAW IS CLEAR THAT IF A PERSON IS NOT UNDER

10   A FORMAL ARREST, THE ISSUE IS GOING TO BE WHETHER OR NOT THEY

11   WERE RESTRAINED IN ANY SIGNIFICANT WAY, THEIR MOVEMENT WAS

12   RETRAINED IN ANY SIGNIFICANT WAY.

13         ALSO, I THINK THE SIXTH CIRCUIT EMPLOYS TOTALITY OF

14   CIRCUMSTANCES TESTS IN THESE TYPES OF SITUATIONS.  AND ONE OF

15   THE THINGS THAT THE COURT LOOKS AT IS WHAT A REASONABLE PERSON

16   IN MR. TUMMINS'S POSITION WOULD HAVE FELT THAT HE WAS FREE TO

17   LEAVE.  MORE THAN ONE TIME THE TRANSCRIPT WILL BEAR OUT, IF YOUR

18   HONOR REVIEWS THOSE, AND ALSO FROM THE TESTIMONY OF

19   MR. PATTERSON, IT'S CLEAR THAT MR. TUMMINS WAS, AFTER TWO HOURS

20   OF QUESTIONING, REPEATEDLY TOLD THAT HE COULD BE PROSECUTED

21   FEDERALLY IF HE DIDN'T TELL THE TRUTH.  SO THERE WAS A HAMMER

22   THERE, HE'S NOT TALKING.

23         ALSO, HE WAS TOLD THAT HE NEEDED TO RESTRAIN HIS

24   MOVEMENT, IN THE SENSE THAT HE WAS TOLD TO MOVE HERE OR MOVE

25   THERE, FOLLOW ME, DON'T BLINK, DON'T CLOSE YOUR EYES, LOOK ME

STRAIGHT IN THE FACE, ANSWER MY QUESTIONS. YOU HAVE TO BE
HONEST WITH ME. ALL OF THOSE -- THE TOTALITY OF ALL OF THOSE
QUESTIONS TOGETHER WOULD LEAD ANY REASONABLE PERSON TO BELIEVE
IN MR. TUMMINS' SHOES THAT HE HAD TO FOLLOW THESE OFFICERS'
INSTRUCTIONS. AND SO WE RESPECTFULLY ASK THAT THE COURT GRANT
OUR MOTION.

      THE COURT: FOR THE GOVERNMENT?

      MR. EVERETT: YOUR HONOR, I THINK THAT MR. POTTER IS
CORRECT WHEN SAYS THE LAW IS CLEAR ON THIS ISSUE. IT IS A
TOTALITY OF THE CIRCUMSTANCES. AND THE COURT IS DIRECTED BY THE
SIXTH CIRCUIT TO LOOK AT THE OBJECTIVE CIRCUMSTANCES OF THE
SITUATION TO DETERMINE HOW A REASONABLE PERSON WOULD HAVE GAUGED
HIS FREEDOM OF ACTION.

      SOME FACTORS THAT THE SIXTH CIRCUIT SAID THE COURT
COULD LOOK TO IS THE LOCATION OF THE INTERACTION, THE LENGTH AND
MANNER OF ANY QUESTIONING, FREEDOM OF MOVEMENT, AND STATEMENTS
BY THE OFFICERS THAT HE WAS NOT REQUIRED TO ANSWER QUESTIONS AND
NOT UNDER ARREST.

      I THINK, BASED ON THE TESTIMONY OF DETECTIVE PATTERSON,
EACH OF THOSE FACTORS WEIGHS IN FAVOR OF FINDING A NONCUSTODIAL
INTERROGATION. I HESITATE TO EVEN CALL IT AN INTERROGATION -- A
NONCUSTODIAL INTERVIEW. MR. TUMMINS WAS IN HIS OWN HOME.
MR. TUMMINS WAS WITH HIS WIFE WHILE THE QUESTIONING DID GO ON
FOR TWO HOURS. THAT WAS, AS THE COURT HAS HEARD, BECAUSE OF
QUESTIONS BACK FROM MR. AND MRS. TUMMINS.

PEOPLE WERE MOVING ABOUT THE HOUSE DURING THE INTERACTION. AND THE OFFICERS TOLD MR. TUMMINS AT LEAST TWICE, FROM WHAT I CAN TELL IN THIS RECORDING, THAT HE WAS NOT UNDER ARREST, AND THAT THEY WERE THERE FOR THE COMPUTERS.

YOUR HONOR, IF YOU SHOULD YOU FIND THAT THIS INTERVIEW AT SOME POINT BECAME CUSTODIAL, I RESPECTFULLY REQUEST THAT THE COURT REVIEW THE TRANSCRIPT AND MAKE A DETERMINATION AS TO WHEN THAT HAPPENED. AND ANY STATEMENTS ELICITED BY MR. TUMMINS OR MADE BY MR. TUMMINS PRE-CUSTODY OR PRE-LIMITATION ON HIS FREEDOM OF MOVEMENT SHOULD NOT BE SUPPRESSED UNDER THE DEFENDANT'S MOTION.

AND I THINK IF YOU LOOK AT OUR BRIEF, YOUR HONOR, THERE IS SUPPORT FOR THE PROPOSITION THAT PRE-CUSTODY STATEMENTS CAN BE ADMITTED. ONLY THE UNMIRANDIZED POST-CUSTODY STATEMENTS NEED BE SUPPRESSED IF THERE WAS, IN FACT, A VIOLATION OF THE FIFTH AMENDMENT.

THE COURT: LET ME ASK YOU, IS THERE A TAPE THAT WAS THE BASIS FOR THIS TRANSCRIPT AVAILABLE?

MR. EVERETT: I HAVE ONE IN THE COURTROOM.

THE COURT: IF THERE IS SOME ISSUE THAT -- IF THERE IS A --

MR. EVERETT: MR. POTTER, DO YOU HAVE ANY OBJECTION TO ME TENDERING THE CD TO THE COURT?

MR. POTTER: NO, SIR; I DON'T.

THE COURT: WHY DON'T YOU ALL JUST FILE THAT AS A JOINT

1    EXHIBIT, THEN.

2          MR. EVERETT:  YES, SIR.  SHALL WE DO THAT WITH THE

3    COURT CLERK AFTER PROCEEDINGS TODAY?

4          THE COURT:  YES.

5          MR. EVERETT:  DO YOU HAVE ANY QUESTIONS FOR ME, SIR?

6          THE COURT:  NO, I THINK YOU HAVE RECOGNIZED WHAT THEY

7    ARE.

8          MR. EVERETT:  THANK YOU, SIR.

9          THE COURT:  WE'RE ADJOURNED.

10                          *  *  *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

I, PEGGY G. TURNER, OFFICIAL COURT REPORTER FOR THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE, WITH OFFICES AT NASHVILLE, DO HEREBY CERTIFY:

THAT I REPORTED ON THE STENOGRAPH MACHINE THE PROCEEDINGS HELD IN OPEN COURT ON APRIL 15, 2011, IN THE MATTER OF USA V. TUMMINS, CASE NO. 3:10-00009; THAT SAID PROCEEDINGS IN CONNECTION WITH THE HEARING WERE REDUCED TO TYPEWRITTEN FORM BY ME; AND THAT THE FOREGOING TRANSCRIPT, PAGES 1 THROUGH 59, IS A TRUE AND ACCURATE RECORD OF SAID PROCEEDINGS.

THIS THE 23RD DAY OF AUGUST, 2011.

_____
S/PEGGY G. TURNER, RPR
OFFICIAL COURT REPORTER