```
1              IN THE UNITED STATES DISTRICT COURT

2         MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION

3    ------------------------------------------------------------

4    UNITED STATES OF AMERICA,      )

5                   Plaintiff,      )

6                                   )

7    v.                             )  CASE NO. 3:10-00009

8                                   )

9    JEREMY SETH TUMMINS,           )

10                  Defendant.      )

11   ------------------------------------------------------------

12

13                   TRANSCRIPT OF PROCEEDINGS

14                         VOLUME I

15   ------------------------------------------------------------

16   DATE:              February 24, 2015

17   TIME:              9:00 A.M.

18   BEFORE:            HONORABLE WILLIAM J. HAYNES, JR.

19                      And a Jury

20   ------------------------------------------------------------

21

22

23   COURT REPORTER:    PEGGY G. TURNER
                        OFFICIAL COURT REPORTER
24                      801 BROADWAY, ROOM A-837
                        NASHVILLE, TENNESSEE 37203
25                      PHONE:  (615)726-4893
                        Peggy_Turner@tnmd.uscourts.gov
```

```
1                          A P P E A R A N C E S:

2      For the Plaintiff:   Carrie Daughtrey
                            Lynne Ingram
3                           Assistant U.S. Attorneys
                            Nashville, TN
4
       For the Defendant:   Jennier Thompson
5                           Attorney at Law
                            Nashville, TN
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    W I T N E S S E S:

2    SCOTT LEVASSEUR

3    Direct Examination by Ms. Daughtrey          Page 10

4    Voir Dire Examination by Ms. Thompson        Page 22

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2            THE COURT:  Any preliminary matters before we get

3     started?

4            MS. DAUGHTREY:  Yes, Your Honor.  Once opening

5     statements are done and the proof begins, the government has

6     notebooks for each of the jurors.  Because the child pornography

7     is a little sensitive, we have prepared identical books for

8     everybody so that they -- so that we don't have to put it up on

9     the screen and require them to look at it there.  We have done

10    this in many other cases.  We did it in a case that Ms. Thompson

11    had with us a year ago.  And it just helps to reduce the

12    discomfort that the jurors have for it.

13           So once I start introducing exhibits, to be able to

14    pass --

15           THE COURT:  Are there going to be any issues of

16    admissibility?

17           MS. DAUGHTREY:  Typically what I do, Your Honor, is

18    have Your Honor --

19           THE COURT:  I don't have any problem with the notebooks

20    as long as there are no admissibility issues.  I don't want some

21    notebook to be passed and then it turns out that there is an

22    objection to it.

23           MS. DAUGHTREY:  Right.  And what I would do is, for

24    each exhibit, ask Your Honor permission to enter it into

25    evidence and permission for the jurors to flip to that tab so

1    that they wouldn't able to flip to it prior --

2         THE COURT:  Now, is there any objection to any of the

3    exhibits in the notebook?

4         MS. THOMPSON:  Yes, Your Honor.  My objections that I

5    had earlier regarding video versus images.  My next objection

6    is --

7         THE COURT:  I'm not sure I understand video versus

8    images.  What is it about the pictures in the notebook that

9    poses a problem?  If it's an issue about whether it's the same

10   dimensions or there is reliability, you all can present expert

11   proof on that, you can cross examine witnesses about that.  But

12   is there any other issue about admissibility of exhibits in the

13   notebook?  The government says it's not introducing videos.

14        MS. THOMPSON:  When I saw them before, they said,

15   warning, child --

16        THE COURT:  Let's deal with the exhibits that are

17   before the Court.

18        MS. THOMPSON:  What's the number?

19        MS. DAUGHTREY:  24.

20        MS. THOMPSON:  Your Honor, there is a cover page to

21   Exhibit 24, and it says, warning, Sexually Explicit Image.  And

22   I disagree with it saying, Warning, Sexually Explicit Image on

23   the front page.  I think that doesn't need to be there.  It's

24   additional information.

25        THE COURT:  Well, the question is, is that what was on

1    the computer, isn't it?  Whether it needs to be there or not, if

2    it's what was on the computer, that's the question, isn't it,

3    for authenticity?

4          MS. THOMPSON:  Well, this right here, this page that

5    they have in there, was not on the computer.  And I object to

6    this page right here.

7          THE COURT:  They say Exhibit 24 wasn't on the computer,

8    Ms. Daughtrey.

9          MS. THOMPSON:  And this image --

10        THE COURT:  Wait a minute, counsel, if you would,

11    please.  Is Exhibit 24 from the computer?

12        MS. DAUGHTREY:  No, Your Honor.  This a cover page for

13    the child pornography that follows.  And all it says is, Exhibit

14    24, thumbnail image and video screen shots.  And there will be

15    testimony as to that.

16        THE COURT:  Did it come off the defendant's computer?

17        MS. DAUGHTREY:  No, Your Honor.  It did not come off

18    the computer.

19        THE COURT:  Where did it come from?

20        MS. DAUGHTREY:  In preparing the exhibit, it's just a

21    cover page that the government produced for it that just

22    warns --

23        THE COURT:  A cover page from where?  Is it the

24    manufacturer's cover?  Is it the distributor's cover?  Was it

25    commercially available?  Was it inside his house?  Where was it?

1    MS. DAUGHTREY: No, Your Honor. If I may approach and

2    just hand it to you, I think it might help you understand what

3    it is. It's not meant to be part of the exhibit. It's just

4    meant to identify it as being Exhibit 24.

5    THE COURT: Well, I will sustain the objection. If we

6    don't need it, I don't see the point in introducing it. That's

7    commentary on the exhibit, is what it is.

8    MS. THOMPSON: My next objection, Your Honor, we still

9    have issues with the authenticity of the two thumbnail videos.

10   But I believe we're going to be able to check those.

11   THE COURT: Is the government's expert going to be able

12   to testify that these came off the defendant's computer?

13   MS. DAUGHTREY: Yes. That is correct, Your Honor.

14   THE COURT: Well, you can cross examine them about it.

15   If they say this came off the computer, it came off the

16   computer. And if it didn't, you can question them about it, or

17   your expert can challenge them on it.

18   MS. THOMPSON: Yes, Your Honor.

19   THE COURT: With that comment, the objections to --

20   substantive Exhibits 24 and 25 are admitted without objection.

21   Are admitted with objections noted.

22   MS. THOMPSON: And then I have additional objections,

23   Your Honor. That Page 3 --

24   THE COURT: What is Page 3, ma'am? What is the

25   objection to Page 3, and what is it?

1    MS. THOMPSON:  So I have objections to these items as

2    they are not exactly what was on the computer, Your Honor.

3    THE COURT:  Is this the same objection as with 24 and

4    25?

5    MS. THOMPSON:  This the objection -- it's all one

6    collective exhibit.  But this objection is that these still

7    photographs were not on my client's computer.  They are --

8    THE COURT:  Hold on a minute.  What exhibit number is

9    this?

10   MS. THOMPSON:  It's all the same exhibit.

11   MS. DAUGHTREY:  It's Exhibit 24.  There will be

12   testimony about where those screen shots came from, Your Honor.

13   And they originated from a video that was on the defendant's

14   computer.  I think it's proper for cross examination, but all

15   this material came from his computer.  And that's what the

16   testimony will be.

17   THE COURT:  So these images -- all the images in

18   Exhibit 24 come from the defendant's computer, were on it, and

19   downloaded from it?

20   MS. DAUGHTREY:  There are two thumbnail images that we

21   have discussed and three videos.  Rather than playing the

22   videos, what the forensic examiner did -- instead of playing it

23   for the jurors and having them have to watch it, what he did is

24   he took parts of the video, and that's the exhibit.  So it's

25   part of the video, but it's not the full video.  It's not every

1    screen shot in the video.  It's just a very limited number of

2    screen shots that come from the video.

3          THE COURT:  But the expert is going to testify that

4    these -- the remaining portions of Exhibit 24 came from the

5    defendant's computer?

6          MS. DAUGHTREY:  That is correct.

7          MS. THOMPSON:  My objection would be, Your Honor, that

8    they were created with a different software, they are screen --

9          THE COURT:  Well, you can cross examine the witness on

10   those grounds.

11         MS. THOMPSON:  Yes.  And Your Honor, may my expert sit

12   up here so that I may consult with him?

13         THE COURT:  Yes, that's fine.

14         All right.  Any other objections to the exhibits in the

15   government's notebook?

16         MS. DAUGHTREY:  If I may have one moment, please.

17         THE COURT:  All right.

18         MS. DAUGHTREY:  I believe that's all, Your Honor.

19         THE COURT:  All right.  After -- when you introduce the

20   first exhibit, I will allow to you present the notebooks.

21         MS. DAUGHTREY:  Thank you, Your Honor.

22         THE COURT:  I'm going to give a short preliminary

23   instruction.  It takes about ten minutes.  You can bring the

24   jury in.

25         (Jury in.)

THE COURT:  You may be seated.  Good afternoon, ladies and gentlemen of the jury.  The Court apologizes for the brief delay in getting started, but I think we've got things organized to make the rest of the trial maybe go a little bit more efficiently.

(Whereupon, a charge was given to the jurors and opening statements were held, after which the following proceedings were had, to wit:)

THE COURT:  The government may call your first witness.

MS. DAUGHTREY:  Thank you, Your Honor.  The government calls Scott Levasseur.

(Witness sworn.)

THE CLERK:  Please state your name for the record and spell it.

THE WITNESS:  Scott Lee Levasseur.  L-e-v-a-s-s-e-u-r.

DIRECT EXAMINATION

BY MS. DAUGHTREY:

Q.     What is your occupation, your profession?

A.     I work at Dickson County Sheriff's Office as a computer forensic examiner and Internet Crimes Against Children investigator.

Q.     How long have you been employed by the Dickson County Sheriff's Office?

A.     Since 1998.

Q.     And what is your primary work at this point in

1    time?

2         A.    My primary work is computer forensic

3    examinations.  And I'm in charge of the Internet Crimes Against

4    Children Task Force.

5         Q.    Can you explain what the Internet Crimes Against

6    Children Task Force is?

7         A.    It derives from the Department of Justice, and

8    it's all across the country.  In Tennessee the lead organization

9    is Knoxville.  And then we're sister agencies to Knoxville.

10   They get the grant money, and we get our training through them.

11   And basically we investigate child pornography crimes on the

12   Internet and solicitation crimes of children like undercover

13   chat operations and stuff like that.

14        Q.    And this Internet Crimes Against Children is

15   often -- about it used as an acronym ICAC; is that correct?

16        A.    Yes.

17        Q.    What hours do you typically work?

18        A.    Typically I work six in the morning until two in

19   the afternoon, but it all depends on what I'm doing.  It changes

20   quite often.

21        Q.    How long have you been doing the forensic exam

22   work and the on-line child exploitation investigations?

23        A.    I started with computer forensics in the end of

24   2006 and started with ICAC I believe in 2007.

25        Q.    Have you received specialized training for these

1    areas?

2          A.    Yes, ma'am.

3          Q.    Okay.  How much training have you received?

4          A.    I believe it's over a thousand hours of training

5    for computer forensics and ICAC training together.

6          Q.    Are you certified in any special areas?

7          A.    I'm certified -- it's called a CFCE, certified

8    forensic computer examiner, through IACIS.  And IACIS is an

9    organization, an international organization.  It's called the

10   International Association of Computer Investigative Specialists.

11   And I am certified through ICAC to instruct other law

12   enforcement officers on peer-to-peer operations.

13         Q.    Do you ever train other law enforcement

14   officers?

15         A.    I do.

16         Q.    And what kind of training do you provide?

17         A.    I provide computer forensic training, cyber

18   crime training for regular detectives, fraud.  Any kind of

19   computer-related crime, I've done classes on those.  And also

20   evidence handling, digital evidence handling.  And I also

21   instruct peer-to-peer investigations.

22         Q.    Have you received any recognition for your

23   computer forensics work or your ICAC work?

24         A.    I received a few letters of recognition from

25   different district attorneys and law enforcement officials.

1        Q.    How many computer systems would you estimate

2  that you have analyzed in a forensic manner?

3        A.    Over 500.

4        Q.    And how many computer crime investigations have

5  you conducted or participated in?

6        A.    Over 200.

7        Q.    What types of crimes have you investigated --

8  computer-type crimes have you investigated?

9        A.    We investigated child pornography crimes, child

10  solicitation crimes.  I do computer forensic exams for all of

11  that, plus any other type cases that is requested of me to do.

12        Q.    Is the majority of your work with the child

13  exploitation?

14        A.    About 80 percent of it; yes, ma'am.

15        Q.    And about how many child exploitation cases do

16  you think you have been involved with over the course of your

17  career?

18        A.    Over 200.

19        Q.    Have you ever been recognized in a court of law

20  as an expert witness in computer forensics?

21        A.    Yes.

22        Q.    Is that in state or federal court?

23        A.    Both.

24        Q.    And have you testified, then, about computer

25  forensics in court?

1          A.     Yes, ma'am.

2          MS. DAUGHTREY:  Your Honor, at this time the government

3     would move to have Scott Levasseur declared an expert in the

4     field of computer forensics and online child exploitation

5     investigations.

6          MS. THOMPSON:  Well, Your Honor, I object to him being

7     an expert in the field --

8          THE COURT:  Approach the bench please.

9          (Whereupon, a bench conference was held, out of the

10    hearing of the jury, to wit:)

11         THE COURT:  What is your objection?

12         MS. THOMPSON:  I'm sorry, did you say and in child

13    investigations?

14         MS. DAUGHTREY:  Yes, child exploitation investigations.

15         MS. THOMPSON:  Yes, I object to that, Your Honor.  I

16    haven't -- when we were here before, I specifically said I

17    objected to him testifying to anything else.  And it was my

18    understanding that he was only going to have him be a computer

19    forensic expert.  Now the government is saying they want him to

20    be certified as something else, child --

21         MS. DAUGHTREY:  I'm not asking him to be certified.  He

22    is an expert because he's got all the experience in the child

23    exploitation --

24         THE COURT:  Well, I didn't hear that much child

25    expert --

1        MS. DAUGHTREY:  I'm sorry?

2        THE COURT:  How many years?

3        MS. DAUGHTREY:  Since 2007.

4        MS. THOMPSON:  But this occurred in 2009.  So any

5   expertise that he would have had when he was doing these

6   reports, you know, that's all over -- I'm not prepared for this.

7   This why I specifically had raised this earlier.  The government

8   said they were only going to have him certified as a computer

9   forensic expert, and he would be a fact witness.  He can be a

10  fact witness, but I object to him coming in -- I didn't hear

11  anything that would make me think that he specifically -- I

12  don't even know what this field is, this computer --

13       MS. DAUGHTREY:  What he's going to be testifying to as

14  his experience in child exploitation are things like the

15  training that he has gotten, information about search terms,

16  what they mean, certain series of child pornography.

17       THE COURT:  I don't recall hearing that yet.

18       MS. DAUGHTREY:  Yeah, that's correct.

19       THE COURT:  Without that, he can't be declared an

20  expert.  He is not accredited yet.  He has specialized

21  knowledge, he established it on computers.  But I don't know if

22  he established it on this particular discipline.  I sustain the

23  objection.

24       MS. DAUGHTREY:  All right.

25       THE COURT:  Why don't we send the jury out, and we will

1    go over this so we don't have to have these bench conferences.

2         (Conclusion of bench conference.)

3         THE COURT:  Ladies and gentlemen of the jury, I'm going

4    to excuse you for a few minutes.  Please don't discuss the case

5    amongst yourselves until you receive all of the evidence, the

6    argument of counsel and the charge of the Court.  Hopefully it

7    will be a brief recess.  Okay?  Thank you.  You can leave your

8    pads on your chairs.  The Marshal will look after them.

9         (Jury out.)

10        THE COURT:  I will allow to you voir dire on the

11   predicate for why this witness is an expert in child

12   pornography.

13        MS. DAUGHTREY:  Okay.

14   EXAMINATION

15   BY MS. DAUGHTREY:

16        Q.    Detective Levasseur, how many hours of training

17   have you received as part of your -- as part of -- being a part

18   of ICAC, the Internet Crimes Against Children?

19        A.    I didn't separate the totals, but if I'm

20   thinking correctly, it's over a thousand hours total for

21   computer forensics and ICAC training.  And I'm thinking it's

22   pretty much 50/50.  So 400, 500 hours for each field.

23        THE COURT:  What is ICAC?

24   BY MS. DAUGHTREY:

25        Q.    Can you explain what ICAC means?

1     A.     Internet Crimes Against Children.

2     Q.     Okay.  And in those Internet Crimes Against

3  Children trainings that you have been to, what kind of

4  information -- what are you being trained on?  What are you

5  learning?

6     A.     Different subjects.  I have had training in

7  peer-to-peer, online chat investigations, just general topic

8  ICAC training for different things, to include upcoming

9  technologies and just a vast array of different things dealing

10  with ICAC investigations.

11     Q.     What is the purpose of those ICAC trainings?

12     A.     To keep us up to date and train us on how to do

13  the investigations and how to stay within the legal boundaries.

14     Q.     Do you -- are you specifically learning how to

15  do those investigations, then?

16     A.     Some classes, yes.  If it's a peer-to-peer

17  class, then your -- that class is about peer-to-peer.  And

18  there's several different peer-to-peer classes.  And they teach

19  you basically the same stuff, but it's different because it's a

20  different technique or a different network.  For example,

21  undercover chat would be -- I have been to a couple of those

22  because things change through the years, and they update the

23  class, and you learn new things, new techniques.  And then just

24  the yearly training that we get.  We get like two yearly

25  trainings.  It's like for a three day period, and it's just a

1    vast array of different topics that you learn about.

2          THE COURT:  The question here concerns child

3    pornography.  Could you quantify what that is?

4          THE WITNESS:  I can't hear you, Judge.

5          THE COURT:  This case is -- she is asking to certify

6    you as an expert on child pornography.  Could you quantify what

7    amount of your yearly training involves child pornography?

8          THE WITNESS:  I'm tasked with performing child

9    pornography examinations for a vast array of departments, to

10   include federal, state and --

11         THE COURT:  I mean the question is, you testified about

12   how much training you get yearly.

13         THE WITNESS:  Yes, sir.

14         THE COURT:  How much of that -- what percentage of that

15   training is on child pornography?

16         THE WITNESS:  I couldn't give a -- I couldn't give an

17   hour -- an hour number on it.

18         THE COURT:  Just a rough estimate on the percentage.

19         THE WITNESS:  I would guess maybe a hundred hours out

20   of the total 400 hours for ICAC would be specific to the

21   peer-to-peer investigations, because peer-to-peer investigations

22   are nothing but child pornography.  That's what you are

23   investigating.

24         THE COURT:  As I understood you earlier, you said you

25   had about a thousand hours of training, and you estimated that

1    half of it was ICAC; is that right?

2         THE WITNESS: I'm having problems hearing you, Your

3    Honor.

4         THE COURT: I understood you to testify earlier that

5    you had about a thousand hours of training?

6         THE WITNESS: Yes, sir.

7         THE COURT: And that half of that was ICAC?

8         THE WITNESS: About -- yes, sir.

9         THE COURT: You then testified that you get yearly

10   training. And my question to you was, how much of your yearly

11   training is on child pornography?

12        THE WITNESS: I don't believe any, sir.

13        THE COURT: You can't estimate a percentage of how much

14   of your yearly training is on child pornography?

15        THE WITNESS: The yearly ICAC training that I'm

16   referring to is a class that Knoxville puts on here yearly, and

17   they cover different topics to do with ICAC investigations, but

18   nothing specific to child pornography.

19        THE COURT: How much of your training is on ICAC?

20   Yearly training is on ICAC?

21        THE WITNESS: I would guesstimate about 400 hours.

22        THE COURT: Yearly?

23        THE WITNESS: No, no, no. That's since I started.

24        THE COURT: In 2009, how many hours did you have in?

25        THE WITNESS: Oh, not much. I just had one class in

1    2009.

2    BY MS. DAUGHTREY:

3         Q.    In 2009, had you had a class in peer-to-peer

4    investigations and how to run those?

5         A.    I had been trained and licensed to operate

6    peer-to-peer investigations, yes.

7         Q.    What do you mean by you had to be trained and

8    licensed?

9         A.    To use the software provided by ICAC and

10   everything, you have to have a license.  When you complete

11   training, they give you a license number.  Everything is

12   Internet based.  And in order to get the software from ICAC,

13   you've got to have a license.  In order to operate the software

14   and get the information from ICAC, you've got to have a license.

15   So that's why I say you are licensed.  Once you complete the

16   training, you are licensed, and you are allowed to investigate.

17        Q.    And as part of the training for your

18   investigation that you had received up to that point, had you

19   received any training about search terms or child pornography

20   series?

21        A.    In that class that I took for peer-to-peer

22   investigations, yes, ma'am.

23        Q.    Okay.  And can you tell us a little bit more

24   about what that is or what the purpose of the search -- learning

25   about the search terms and the --

1          A.     Back then, in 2009, the software and everything

2     we used was -- any investigations we did were more manual.  So

3     in trying to find targets in your jurisdiction, you would type

4     in search terms and look for the IP addresses that correlate to

5     your jurisdiction that were trafficking in child porn.  So

6     search terms were very important to try to find child porn

7     files, one, and people within our jurisdiction trafficking in

8     child porn files.  So that's why we receive training on search

9     terms.

10          Q.     Okay.  And as part of those search terms, does

11     that include child pornography series?

12          A.     Excuse me?

13          Q.     Does that include child pornography series

14     names?

15          A.     Some of those search terms, yes.

16          Q.     And what is a child pornography series?

17          A.     A series is one victim, a child, that's in

18     numerous different either images or videos.  It's the same

19     child, but it may be a totally different day, different year,

20     different time.  And they are known by a particular name.  Like

21     the Vicky series.  That's not her name.  Somebody named the

22     series Vicky somewheres along the way.  And that's -- that name

23     stuck and followed through, years and years through.

24          Q.     And so all of the material that involves that

25     particular girl is known as the Vicky series?

         A.    Correct.

         MS. DAUGHTREY:  Okay.  Perhaps the better request by

the government is to have him declared as an expert in

peer-to-peer investigations rather than just a generic child

pornography investigator.

         THE COURT:  Any voir dire cross examination?

         MS. THOMPSON:  Yes, Your Honor.

VOIR DIRE CROSS EXAMINATION

BY MS. THOMPSON:

         Q.    Okay.  You said that peer-to-peer investigation

is only about child pornography?

         A.    Yes, ma'am.

         Q.    Okay.  So if you were trying to find people that

were downloading movies that were pirated and copyrighted, a lot

of that sharing is done by peer-to-peer also, isn't it?

         A.    We don't do that, ma'am.

         Q.    Okay.  But you said peer-to-peer was just about

child pornography?

         A.    Yes, ma'am.

         Q.    And peer-to-peer can be used for other things

also; is that right?

         A.    As it refers to ICAC, the Internet Crimes

Against Children, that's all we deal with is child pornography.

         Q.    Okay.  And you did this investigation and

created this report in 2009; is that correct?  The one in this

1  case?

2         A.    Correct.

3         Q.    And that is in April, May and June of 2009?

4         A.    Correct.

5         Q.    Okay.  And in order to do that investigation,

6  you did fill out a state search warrant that you used to go into

7  Mr. Tummins' house; is that correct?

8         A.    Correct.

9         Q.    And in your state search warrant, in your

10 affidavit supporting it, paragraph two, you actually put down

11 what kind of training you had had at that time; is that correct?

12        A.    Correct.  I haven't read that search warrant in

13 a long time, so I'm assuming --

14        A.    Okay.  And so at that time, a lot of your

15 initial training had been simply how to get forensic information

16 off of computers; is that right?

17        A.    I would have to read the search warrant to tell

18 you what it says.

19        Q.    Well, if you looked at the search warrant, would

20 that refresh your memory?

21        A.    Yes, ma'am.

22        Q.    Okay.

23        A.    Yes, ma'am.  At that time most of my training

24 was forensics.

25        Q.    Okay.  So one of the classes you listed here was

1    Cybercop 101 Basic Data Recovery and Acquisition put on by the

2    National White Collar Center Computer Crimes Section?

3            A.      Yes, ma'am.

4            Q.      So you would agree with me that that didn't have

5    anything to do with child pornography at that time?

6            A.      No, ma'am.

7            Q.      And then you went to Cybercop 201, Intermediate

8    Data Recovery and Analysis with the National White Crime

9    Computer Center.  You would agree that that has nothing to do

10   with -- ?

11           A.      That's -- no.

12           Q.      And then you took a certification in Electronics

13   Evidence Collection Specialist at IACIS 2007.  And that's just

14   about collecting data; is that right?

15           A.      No, it's about collecting the physical evidence.

16           Q.      Physical evidence?

17           A.      The computers and the hard drives and stuff.

18           Q.      Okay.  And then you had a University of

19   Tennessee Law Enforcement Innovation Center Cyber Crime Training

20   Investigation 2007.  But that's not specifically related to

21   child pornography?

22           A.      It touched on it, but not in depth.

23           Q.      Then you did a boot camp in Access Data

24   Forensics.  And Access Data for Windows Forensics in 2007.  And

25   that's not related to child pornography.  And then you did

1    another Access Data Vista Forensics.  And that's just related to

2    an operating software and not related to child pornography.

3    Okay.

4          And then you did another Computer Forensic Examiner and

5    that's put on by IACIS, International Association of Computer

6    Forensic Specialists.  That was in 2008.  Does that sound right?

7          A.    Yes, ma'am.

8          Q.    And again, that's just about computer forensics.

9    That's not related to child pornography?

10         A.    No, ma'am.

11         Q.    And you did another training with them about the

12   black bag technology for Macintosh computer and FTK; is that

13   right?

14         A.    Yes, ma'am.

15         Q.    Not related to child pornography?

16         A.    No, ma'am.

17         Q.    Okay.  So then it looks like you had a class,

18   this ICAC class, that was in 2008 in Columbus, Ohio>?

19         A.    In 2007 I had intern training at Knoxville

20   Police Department ICAC unit on undercover and peer-to-peer

21   operations.

22         Q.    Is that listed in the search warrant?

23         A.    That's in the search warrant.  And then right

24   after it, it says in 2008 I received peer-to-peer undercover

25   training from Knoxville ICAC, again in 2009.  In 2007, 2008 and

1    2009 in Knoxville.

2          Q.    Okay.  But that was further down.  I hadn't

3    gotten there yet.

4          A.    Okay.

5          Q.    Is that right?  Okay.  But this other thing that

6    you did, the Advance Windows Forensic -- I'm sorry.  The on-line

7    child crimes and advance computer forensics at Safe Project --

8    at Project Safe Childhood -- that was related to cyber crimes

9    and children; is that right?

10         A.    Correct.

11         Q.    Okay.  And that's your first one that we've

12   gotten to.  So do you say there is one from 2007 also?

13         A.    Yes, ma'am.

14         Q.    The next line.  So it's out of date order.  And

15   it was on undercover peer-to-peer operations?

16         A.    Correct.

17         Q.    And then you had gone to one more.  So you had

18   three peer-to-peer classes you had done in that time out of all

19   that other training?

20         A.    Correct.

21         Q.    Okay.  So that the class that you took in 2008,

22   the ICAC class and Project Safe Neighborhood -- those classes

23   were less than a week long; right?  None of those classes were

24   like a week-long training session?

25         A.    Not the Project Safe Childhood classes, no.

1      Q.    And the ICAC class, though, that you took in

2  2007 and 2008, they were not week-long classes?

3      A.    I believe they were -- I believe they were four

4  days.

5      Q.    Okay.  Four-day classes.  All right.  So at this

6  point you had had two four-day classes?  Is that fair to say?

7      A.    According -- according to my affidavit, it's

8  three classes for peer-to-peer.

9      Q.    Okay.  And your memory is that they would have

10 been four days?

11     A.    I believe they were, yes.

12     Q.    And certainly at that time you weren't teaching

13 anybody anything, though; is that right?

14     A.    No, no.

15     Q.    So you were just beginning to learn, yourself?

16     A.    Yes.

17     Q.    Okay.  And you had only been working in this

18 area since October of 2007; is that right?

19     A.    In ICAC?

20     Q.    Yes.  Well, yeah, just in the area of Internet

21 crimes in Children's Task Force?

22     A.    Yeah, it was in 2007/ I don't remember which

23 month.

24     Q.    Well, if it says in your affidavit on the first

25 page October of 2007, you wouldn't think that would be

1    incorrect, would you?

2          A.    Well, actually that's a type-o, because it says

3    here:  Affiant has been employed by Dickson County Sheriff's

4    Office -- oh, no, I'm sorry, since 1998.  Since October 2007,

5    yes.  Okay.  That's correct.

6          Q.    And when we're talking about an expert in

7    peer-to-peer technology, what exactly would that mean you would

8    be qualified to testify about?

9          A.    Well, I'm just assuming that being an instructor

10   for peer-to-peer means that I probably know more about it than

11   the average person.

12         Q.    But that would be now, currently; is that right?

13         A.    Yes.

14         Q.    And certainly was not the case back in 2009 when

15   you did the report or did this investigation?

16         A.    No.

17         MS. THOMPSON:  No further questions.

18         MS. DAUGHTREY:  Your Honor, if I may.

19         THE COURT:  All right.

20         MS. DAUGHTREY:  I'm not trying to establish him as

21   having been a peer-to-peer investigator expert back at the time

22   he did this.  I'm asking that he be declared an expert today on

23   the stand.  He clearly had a lot of training back then.  But if

24   you will look -- his CV has been included for your -- in one of

25   the government's filings.  It's Docket Entry Number 113.  And in

1    that, not only are there all of these classes that he is talking

2    about, but there's lots more over the years that he continued

3    since then.

4         And I'm not asking that he be declared as an expert as

5    of the time that he did this.  I'm asking that he be able to

6    testify as an expert today on the stand about what peer-to-peer

7    investigations are, what these search terms mean, that kind of

8    thing, related to the investigation of child pornography on

9    peer-to-peer networks.

10        MS. THOMPSON:  Your Honor, I strongly object to this,

11   because this was the specific point of my motion in limine that

12   I had filed earlier.  The government said at that time he was

13   only going to be certified as a computer forensic specialist or

14   expert.  And so now the government is trying to throw in

15   something about children crimes, peer-to-peer.  And Your Honor,

16   I object to that.  My very motion had said I didn't want him

17   testifying as to what these terms meant or things like that.  I

18   object to now them changing -- I don't have an expert to match

19   this, Your Honor.  And I would at least like to take some type

20   of break so I can go do some research as to what it is they are

21   wanting him to testify regarding search terms, things like that.

22        I have an expert here who is listening to him testify

23   regarding computer forensics.  My expert is a computer forensics

24   expert.  He is here to listen to what Scott Levasseur says, and

25   then provide me with any type of information I need to

1    effectively cross examine him.

2         THE COURT:  Anything else?

3         MS. DAUGHTREY:  Your Honor, may I be heard just

4    briefly.  In the government's responses to Ms. Thompson's

5    motions in limine, each one of those says -- the government's

6    position is he is qualified to testify about these search terms

7    and their meaning because of his experience as an investigator

8    of child exploitation crimes.  I think it was very clear

9    throughout those filings that that was the basis upon which the

10   government he would be able to testify about those things.

11        THE COURT:  I think some issues arose because of the

12   report that was submitted as the expert report is a 2009 report.

13        MS. DAUGHTREY:  Which includes all of those search

14   terms and that kind of thing.  So she was put on notice that he

15   would be testifying about those things.

16        THE COURT:  If you don't mind letting me finish.

17        MS. DAUGHTREY:  I'm sorry, Your Honor.  I'm very sorry.

18        THE COURT:  The Court believes that the best

19   characterization of this witness is what was in the government's

20   response.  That he is an experienced investigator of online

21   child exploitation and computer forensic analyst.  The Court

22   will allow him to testify as a person with specialized

23   knowledge.  The problems arose because of his 2009 report.

24   Since he has since 2009 received adequate experiences and

25   training to testify as to what terms mean.  And the 2009 report

1    actually just contains files that are listed under certain

2    names.  And based on his subsequent experiences and training, he

3    will be allowed to relay to the jury what he learned those terms

4    to mean that you referred to.

5          You can bring the jury in.

6          MS. DAUGHTREY:  Thank you, Your Honor.

7          (Jury in.)

8          THE COURT:  You may be seated.  Once again, ladies and

9    gentlemen of the jury, I want to apologize for these

10   interruptions.  I can assure you that these conferences are

11   necessary to make sure we don't make any mistake that requires

12   us to do this all over again.  Some of you may be old enough to

13   remember the pogo stick.  There will be occasions during this

14   trial where you may feel like you are on a pogo stick.  But I

15   assure you that these are necessary, and if you have any

16   frustrations, take them out on the Court, not counsel and the

17   parties.

18         MS. DAUGHTREY:  Your Honor, I believe when we broke,

19   the government --

20         THE COURT:  Do you want to ask your next question?

21         MS. DAUGHTREY:  Okay.  Thank you, Your Honor.

22   BY MS. DAUGHTREY:

23         Q.    Detective Levasseur, --

24         THE COURT:  Ladies and gentlemen of the jury, the Court

25   will allow this witness to testify as a person with specialized

1  knowledge as an experienced investigator of child exploitation

2  as a forensic computer analyst.

3  BY MS. DAUGHTREY:

4      Q.     In talking about your specialized training,

5  Detective Levasseur, you mentioned something about conducting

6  peer-to-peer investigations.  Can you explain what is meant by

7  peer-to-peer?

8      A.     Peer-to-peer is a network that piggybacks on the

9  Internet.  And you have to have software on your computer to

10  utilize it.  And you connect to other computers across the

11  Internet that are using the same type network to share files.

12  Any types of files, basically.

13     Q.     And what are these peer-to-peer networks, or

14  file-sharing networks, typically used for?

15     A.     Most what everybody recognizes file-sharing

16  mostly is music.  They download music off peer-to-peer file

17  sharing, but very -- used an awful lot for pornography and child

18  pornography, program files, video games, any type of file that

19  can be transmitted digitally.

20     Q.     Have you prepared some slides that help explain

21  what a peer-to-peer network is?

22     A.     I have.

23     Q.     If I may approach and hand what is marked as

24  Government Exhibit Number 3, which has previously been provided

25  to the defense.  Do you recognize -- ?

1    A.    Yes, ma'am.  I made these.

2    Q.    Okay.  Your Honor, at this time this is a

3  demonstrative exhibit, and I would ask permission to publish it

4  to the jury via this overhead projector.

5    THE COURT:  Without objection, you may do so.

6  BY MS. DAUGHTREY:

7    Q.    It takes a moment for that to focus in.  So what

8  is this top picture of, this server based?  What does that mean?

9    A.    It's just a visual depiction to help explain a

10  peer-to-peer network versus a server based network.  A server

11  based network, I can explain it to you like Facebook.  When you

12  get on the computer and go on to Facebook, you are accessing

13  Facebook's server.  And all of the pictures and comments and

14  everything that you see on Facebook are on a server,

15  centralized.  In a peer-to-peer network, there is no centralized

16  server.  The software that you download to your computer allows

17  to you connect to other computers that have the same software.

18  And files are seen and transferred, uploaded and downloaded

19  directly from computer to computer, and not through a server.

20    Q.    Does this peer-to-peer network require somebody

21  to use the Internet?

22    A.    Yeah, you have to have the Internet in order to

23  use this network.  It piggybacks on another network.  And

24  another explanation.  When you are on Facebook and you go to

25  your mother's page on Facebook, you are not actually on your

mother's computer; you are on the server.  In a peer-to-peer
network, when you go to somebody's shared folder, you are
actually in on their shared folder.

      Q.    So you are in that other person's computer?

      A.    Correct.

      Q.    All right.  I'm going turn to the second slide
here.  Can you explain what this represents?

      A.    This is a visual depiction to help explain how
people search for and receive files.  But the top computer would
be your computer that you are sitting at.  And let's just say
that you wanted to download a MP-3 file called Billie Jean.  You
would type in the key word, search, then you would type in
Billie Jean and click Search for music, and it would go out on
the Gnutella network and hit an alter peer, who would send that
request out to a bunch of other peers.  And peers are nothing
more than other computers, just like yours.  And it spider webs
it out.  And it requests that anybody having a file with the
name Billie Jean in it, mp3, we want it, so tell us that you've
got it.  And if your neighbor had that file, a file with the
name Billie Jean in it, it would respond -- its software would
respond to your software and say, hey, I've got that file, and
here it is.  And everybody else who has that file would say,
here it is.

      And that's how the peer-to-peer network works.
You send out a request for a certain file, you get responses

1    back saying, I have it.  And then you can choose who you want to

2    get it from or which one you want to click on to get.

3            Q.      Now, you are talking about, when you are doing a

4    search, putting in a file name.  Is it required that you put a

5    file name in?

6            A.      Yes, ma'am.  Well, not a file name.  A search

7    term.

8            Q.      Explain that.

9            A.      Well, let's just say you were wanting to

10   download a song named Billie Jean.  You wouldn't type in Song

11   and search for Song, because you would get hit with any file

12   that had the name Song in it.  Any file name out there that it's

13   searching with the name Song in it.  So you have to try to be

14   specific for what you are searching for.  So if you wanted the

15   Billie Jean mp3 you would type in Billie Jean.  Now, just

16   because you typed in Billie Jean mp3 the results you get, it

17   doesn't mean that that's going to be the mp3 you are looking

18   for, because it's just going to give you hits for all the file

19   names out there that have Billie Jean in them.

20           So you may get what you are looking for, and you may

21   not.  But you have to choose what you want to download after you

22   get your results in the result page.

23           Q.      So if I wanted to look for Taylor Swift songs, I

24   could just type in Taylor Swift?

25           A.      Correct.

1    Q.    I wouldn't have to type in TaylorSwift.mp3;

2  correct?

3    A.    If you typed in Taylor Swift, you would get any

4  file that had Taylor Swift's name in it.  So if you want to be

5  more specific -- I don't know Taylor Swift's songs, but you type

6  in a song's name, and you would have a better chance of finding

7  what you are looking for by narrowing down what exactly you are

8  looking for.

9    Q.    So like in Google, the more specific you are in

10  your search, the more specific you get?

11    A.    Correct.

12    Q.    So once you do a search, do you get -- do you

13  get a list of files?  Or what comes back?  What do you see?

14    A.    You get a list of files from computers from

15  wherever they are.  They could be anywheres in the world,

16  reporting back to you that they have a file with that key word

17  that you typed in, key word or words that you typed in, and

18  showing back to you.  If you type in more than one word, you're

19  going to get hits on either both of the words together or one

20  singular.  Like if you type in Fast Car, well, you will get

21  results back for files that had Fast in it, Fast Car in it, or

22  just Car.  So --

23    Q.    You get all three?

24    A.    You can get all three.

25    Q.    What do you actually see?  It sounds like you

1   see the file name; is that correct?

2          A.    When you request -- do a search, you are given

3   back, and you see the file name, the file type, whether it's

4   like an ABI file, mpeg, picture file or a music file.  And you

5   see the size of the file.  And then, depending on how your

6   software is set up, you can see what type of connection you have

7   with the other computer.

8          Q.    Can you see the content of the file?

9          A.    No, you cannot see the content.

10         Q.    How do you get to see the content?

11         A.    In order to see the content of the files that

12  they are reporting back to you, you have to download them.

13         Q.    So when someone searching for something, and

14  they get this list of files that has their search term in it,

15  how do they actually do the download?

16         A.    Depending on what software you are using, most

17  of them allow you to -- you can use your mouse to click on a

18  particular file and highlight it.  If you click once, it will

19  highlight it, and then you can go to the radio button and click

20  download.  Or you can double click to download it.  Or you can

21  right click on it and then choose download.  There's about three

22  different ways.  But you have to click on it at least twice to

23  get it to download.

24         Q.    Do you pick a specific computer that you

25  download the file from?

1    A.    As police, we normally do.

2    Q.    I'm talking about just your average user.

3    A.    Anybody using, like let's say LimeWire, you can

4    you're going to get a -- whoever returns searches to you that

5    says, hey, I've got a file with Billie Jean in it, if you click

6    on that file, highlight it, if it's available, you can browse

7    that computer, that file, by clicking the browse host.  If they

8    allow you to do it.  If the settings are set for them to allow

9    to you browse.

10   So a browse means nothing more than, hey, let me see --

11   you've got the Billie Jean file.  Let me see what other files

12   you've got that I might be interested in.  So then it displays

13   to you all the files they have available for upload.

14   Q.    Where on a computer -- if you are, for example,

15   looking on my computer and you see that I have a Billie Jean

16   file, where would that file from your perspective be on my

17   computer?

18   A.    It would be in whatever was designated as the

19   share folder.  If you install any file sharing application, they

20   have a default set up.  They default to certain settings.  They

21   put the program file -- when you install it, it puts the program

22   file somewheres, and it puts a system file somewheres.  And they

23   will put a shared folder and an incomplete folder wherever their

24   default is.  And it varies with different versions of the

25   software.

1   But when you install it, you can choose where you want
2   that to be.  You can choose -- if you want to add other folders
3   to share, you can choose -- if you want to share your whole
4   computer, your whole C drive, you can configure it however you
5   want.  So there is really no set place, because that can be
6   anywheres on the computer.
7           Q.    And when somebody is accessing a computer and
8   looking at their shared -- someone else's shared folder, they
9   are doing that through a peer-to-peer program; is that correct?
10          A.    Excuse me, ma'am?
11          Q.    If someone is looking at a shared folder on
12  another computer, they have to use a file sharing program or
13  peer-to-peer?
14          A.    Yes, ma'am.  You have to be on the same network
15  and have the software.
16          Q.    All right.  I would like to turn to the third
17  slide.  What is that?
18          A.    These are just icons showing examples of the
19  typical peer-to-peer software clients that are available out.
20  You have different networks like BitTorrent and Gnutella and
21  Shareaza.  Morpheus is in there.  EMule is a different network.
22  But they all -- they are all file-sharing applications.
23          Q.    Okay.  Thank you.  Turning to your investigative
24  role, generally speaking, how it is that you conduct an
25  undercover peer-to-peer investigation?  And I'm going to go

1    ahead and put up the fourth slide for your discussion of that.

2         A.    Well, back in 2009, I would utilize a law

3    enforcement software to monitor and crawl the Gnutella network,

4    searching for IP addresses that were trafficking in child

5    pornography.  And it would send me hits on IP addresses in my

6    jurisdiction that were trafficking in child pornography.  When I

7    would find one of those IP addresses that it would hit on and

8    show me that it was, then I would utilize a program called Phex,

9    which is a peer-to-peer file sharing software.  It's open

10   source, which means anybody can modify it.  And it's freely

11   available, and you can modify it.

12        And ICAC had modified Phex to prevent just -- well, to

13   do two things, basically.  To prevent any possible way of us

14   accidentally sharing a file off of our computer and uploading a

15   file.  So they coded it so it would be impossible to do that.

16   And then made it so it was very easy for us to do a single

17   source download.

18        And a single source download basically is, we would

19   type in the IP address of the suspect that we had in our

20   jurisdiction, and connect to his computer, look at his shared

21   folder, see what he had.  And then if we wanted to download some

22   files to see what they were, we would do a single source

23   download, which meant we only downloaded from his computer.

24   Because typically, in peer-to-peer applications, when a regular

25   user clicks to download a file, it downloads it from the

original person that they are asking for, and then everybody else that can get it, and downloads it from multiple sources at the same time. That's a speed factor. So it downloads faster.

Well, as you can imagine, as police we don't want the file from a whole bunch of different people. We want it from our suspect. So they modified the software to just do a single source download, so when we download from that particular IP address, we're getting the whole file from that computer. And it takes longer to download than a regular Schwarm does.

Q. I have several questions to follow up with you. First is, how does a computer know -- when just an average user is downloading a file, how does a computer know where to go to download it for multiple users?

A. When the user clicks on -- now, we're talking non-police, just regular software peer-to-peer -- when you click on a file that showed in your result screen and it has the name Billie Jean mp3, well, it wants to Schwarm that file, download it faster.

Well, just because Billie Jean was in the file name doesn't mean the next file is named Billy Jean is the same file. So they do what's called hatching. Each file has a Shaw value, a hash value, associated with it. So no two Shaws can be alike. So it's a digital fingerprint. The computer systems takes the Billie Jean mp3 file and it runs a computer algorithm against it. And it says, okay, here's your identifying number. And

1    it's a long cluster of characters, and it's called a Shaw value.

2           Well what the file sharing network does then -- what

3    the software does is says, okay, we know he wants this file with

4    this Shaw.  Go out there and get everybody else that has that

5    same Shaw value, and let's start downloading it.  So even though

6    the file name is different, it doesn't care about the file name.

7    The software does not care about the file name.  It cares about

8    the Shaw.  So then that's how they get their downloads.

9           Q.    Are the Shaw values unique?

10          A.    Yeah. Shaw values are very unique.  I don't

11   believe there is any known file that's ever been shown to have

12   the same Shaw for two different files.  And I believe they say

13   the standard is even greater -- it's better than DNA, so --

14          Q.    You have been talking about an IP address.  And

15   maybe some of us know what an IP address is, but maybe some of

16   us don't.  Can you explain that?

17          A.    An IP address is basically just a telephone

18   number for your -- your computer at home.  Everybody -- you

19   know, nowadays they have, you know, some kind of high speed

20   Internet Comcast modem.  Well, Comcast will assign you an IP

21   address for your modem.  And that's what's broadcast out --

22   broadcast out to the websites you visit, it's broadcast out

23   different programs you use.  And that's how your system is

24   identified.

25          But that's the external IP address.  If you have a

1   laptop that's connected to the router or desktop, and you use

2   your iPhone, well, all three of those have their own private IP

3   addresses that are given to them by the router.  The modem or

4   the router.  But the external IP address that's provided by,

5   let's say Comcast -- that's a unique number for your Internet

6   connection so they can keep track of who owns what.

7           Q.    And you indicated before that using the ICAC

8   server and database, that you are able to focus your

9   investigation on a certain geographical area?

10          A.    Correct.  Back then the way it was done -- and

11  it's all changed now, but I would have the ICAC software that

12  would crawl with Gnutella network to click known IP addresses,

13  trafficking in child porn.  And it would save it to the ICAC

14  server.  And every other officer all across the country and

15  across the world that's utilizing the same software, law

16  enforcement software, it would send back to populate the ICAC

17  server.  So I can say, is there anybody in Dickson, while I was

18  gone for the weekend, that may have been trafficking to look for

19  something that geo-located to Dickson.  So I didn't have to be

20  sitting at the computer at the time to get it because somebody

21  else may have done it and populated it.  And that's what the

22  server base stuff was for ICAC.

23          Q.    So when somebody else is populating it, do you

24  mean other police officers around the country who are doing the

25  undercover investigations?

1    A.    Correct.

2    Q.    What are you looking for when you do an

3 undercover investigation like that?  How do you know what to

4 look for?

5    A.    How do we know it's child porn?

6    Q.    Right.  How do you look for it?  I mean, what

7 are you doing as part of your undercover work?

8    A.    Well, the software, the law enforcement

9 software, would crawl the Gnutella network searching for Shaw

10 values, the same Shaw values that the network uses to download

11 from several different people.  Well, child pornography files

12 have Shaw values.  And ICAC knows what those Shaw values are, so

13 it searches for child pornography files.  So we're not searching

14 for Hollywood movies.  We're not searching for music.  We're

15 just searching for child porn.  So it will search for all of the

16 child porn files that have the known Shaw values.

17    Q.    And what do those files look like -- the file

18 names look like for those kinds of files?

19    A.    For child pornography files, the file names get

20 pretty descriptive and pretty long.  They go into explicit

21 sexual detail about what you can expect to see when you open the

22 file.  They get longer and longer as people add to them.  And

23 there's a lot of key words in those file names that we search

24 for.

25    Q.    And how do you know what key words to search

with?

     A.    Well, initially in my training we were taught, you know, what key words to use to find child porn.  Back, you know, if I remember, they taught us about PTHC was a key word that we would use to search for child porn.  And I learned that PTHC stood for preteen hard core.

     We would search for Vicky.  And Vicky is a well-known series of child pornography with one particular girl.  The people that traffic in child pornography, somebody gave her the name Vicky.  And then that name followed around on all the new files and different files that came out.  And we call that a series, because it's multiple images, different images, different movies of the same child.  And then we just call it the Vicky series.

     And then there's other key word searches like -- a big one is -- a key word search for is incest; pedo, which is p-e-d-o.  Some people say pedo, some say peedo.  It's short for pedophile.  A lot of times they search for particular ages. They type in 9YO, which stand for nine years old.  You see a lot of searches like that.  And that picks up a lot of files.  There's just hundreds and hundreds of key word searches that we use to search for child porn files on the Internet.

     Q.    And are those the same terms that people who are interested in child pornography typically use?

     A.    It is.  And as an investigator, I learn more and

1    more search terms.  By the more and more downloads that I did,

2    with the new file names coming up, I saw things that I had never

3    seen before.  So you get a conglomerate of letters like -- Ray

4    Gold would be not meaningful to anybody, but if you type Ray

5    Gold in, peer-to-peer, pull the files, download some, look at

6    them.  And they are a particular series of child pornography.

7         So you learn.  The more you work, the more you

8    download, the more you learn.  And it's the same way with people

9    that are just actually collecting child pornography.

10        Q.    Thank you.  I want to turn your attention to the

11   initiation of this investigation.  Were you conducting one of

12   these undercover peer-to-peer investigations on April 21 of

13   2009?

14        A.    I was.

15        Q.    And what specifically did you do that day as a

16   part of that investigation?

17        A.    I saw where my law enforcement software

18   indicated to me that an IP address of 98.193.204.170,

19   geo-locating in Dickson County, had been trafficking in child

20   pornography.  So I -- when I got in, in the morning, I fired up

21   my peer-to-peer software Phex and typed in that IP address, and

22   hit connect, and I was able to get a connection to the computer.

23        Q.    Let me step back for just a moment if I could.

24        A.    Okay.

25        Q.    What software -- what program were you using

1  that helped you to discover that there was somebody out there in

2  your area?

3         A.    GnuWatch.

4         Q.    What is GnuWatch?

5         A.    GnuWatch is a law enforcement software for ICAC.

6         MS. THOMPSON:  I'm sorry, Your Honor.  I just didn't

7  hear what he said.

8         THE WITNESS:  GnuWatch.

9  BY MS. DAUGHTREY:

10         Q.    Could you spell it please?

11         A.    G-n-u-w-a-t-c-h, I believe.

12         Q.    All right.

13         THE COURT:  It's an acronym for what?

14         THE WITNESS:  What's that, sir?

15         THE COURT:  It's an acronym for what?

16         THE WITNESS:  GnuWatch is the name of the software.

17  And I believe they meant to call it after the Gnutella network.

18  BY MS. DAUGHTREY:

19         Q.    If I may approach with what has been marked as

20  Government's Exhibit Number 4.  Do you recognize this?

21         A.    Yes, ma'am.

22         Q.    Okay.  And what is it?

23         A.    These are screen shots, screen captures, that I

24  took on the morning that I was doing the investigation.

25         Q.    And is that using the software GnuWatch?

1      A.      Correct.

2          MS. DAUGHTREY:  Your Honor, at this time I would ask

3   that the government be allowed to hand out the notebooks that

4   have exhibits in them and have the jurors to turn to Exhibit 4

5   or Tab 4 in those notebooks.

6          THE COURT:  You may do so.

7          MS. DAUGHTREY:  Thank you, Your Honor.  Your Honor, at

8   this time I would ask that Exhibit 4 be entered into evidence

9   and the jurors be allowed to turn to Tab 4 only.

10         THE COURT:  You may do so.  It will be admitted.

11  BY MS. DAUGHTREY:

12     Q.      Looking at that first page of the GnuWatch, what

13  is in the upper part of the screen?

14     A.      The upper part of the screen is showing current

15  browses.  This software would show current connections, actual

16  physical connections, between the software and the suspect

17  computer.  And it would also show the browse, what was available

18  in the share folder.  It would do that on its own.

19     Q.      And is that what's in the bottom half of that

20  screen shot?

21     A.      The bottom of that screen is the result that the

22  software got from the suspect computer, in this case

23  Mr. Tummins' computer, showing the file names, the file sizes,

24  and the Shaw value for the files that reside in the shared

25  folder.

1      Q.      So these files were located on his computer?

2      A.      Correct.

3      Q.      And you have one file highlighted on the first

4   page and another one highlighted on the second page.  What is

5   the significance of that?

6      A.      The software identified those files as suspect

7   child pornography files.  And the highlighting is indicating to

8   me that those are my files of interest that I needed to try to

9   download.

10      Q.      Did you actually download those files?

11      A.      I did, but not in GnuWatch, because GnuWatch

12   doesn't do that.  It's just a monitoring software.  I did it

13   through Phex.

14      Q.      All right.  So GnuWatch will not allow you to

15   download?

16      A.      No.

17      Q.      All right.  Is every child pornography file out

18   there one that has been identified?  Or are there many that have

19   not been identified?

20      A.      No.  Many, many have not.  When -- when the

21   software would hit on a known child porn file, a known file

22   means that the victim has been identified.  That's a known child

23   porn file.  Then you have your suspect child porn files, which

24   is obviously child pornography but the victim has not been

25   identified or not known.

1      Q.      So you said that once you identified those two

2   items, you then used Phex?

3      A.      I used Phex; yes, ma'am.

4      Q.      And Phex is the file sharing program or

5   peer-to-peer program you talked about earlier?

6      A.      Correct.

7      Q.      One that has been modified for law enforcement

8   use for you all?

9      A.      Correct.

10     Q.      If I may approach and hand you what has been

11  marked as Government's Exhibit 5.  Do you recognize the document

12  there?

13     A.      Yes, ma'am.

14     Q.      And what is that?

15     A.      That's a screen capture I made of my Phex

16  software when I connected to Mr. Tummins' computer.

17     Q.      And was that the same morning?

18     A.      Correct.

19     Q.      Would it have been shortly after you had

20  accessed his computer through GnuWatch?

21     A.      Correct.

22     MS. DAUGHTREY:  Your Honor, at this time I would ask

23  that Exhibit 5 be entered as an exhibit, admitted into evidence,

24  and that jurors will be allowed to turn to Tab 5.

25     THE COURT:  Exhibit 5 will be admitted, and jurors will

1    be allowed to turn to Tab 5.

2          MS. DAUGHTREY:  Thank you, Your Honor.

3    BY MS. DAUGHTREY:

4          Q.    Looking at that screen shot, it looks a little

5    bit different than GnuWatch?

6          A.    Yes, ma'am.

7          Q.    Is this what it would look like in a typical

8    file sharing program?

9          A.    Yes, ma'am.

10         Q.    The images or the filings that are listed there

11   -- are those the same that were listed in GnuWatch?

12         A.    Yes, ma'am.

13         Q.    And does that include the two images that you

14   actually were talking about earlier that were highlighted in the

15   GnuWatch pages?

16         A.    Yes, ma'am.

17         Q.    Was it at that point that you downloaded those

18   files?

19         A.    Yes, ma'am.

20         Q.    All right.

21         THE COURT:  Would counsel approach the bench?

22         (Whereupon, a bench conference was held, out of the

23   hearing of the jury, to wit:)

24         THE COURT:  This witness has been accepted as one with

25   specialized knowledge.  You have been leading him for the last

1    15 to 20 minutes.  I think you need to not lead.  Who, what,

2    when, where.

3                 MS. DAUGHTREY:  Thank you, Your Honor.

4                 (Conclusion of bench conference.)

5    BY MS. DAUGHTREY:

6         Q.    Once you downloaded those files, did you

7    actually view them?

8         A.    Yes, ma'am.

9         Q.    And generally, what was the nature of the

10   content?

11        A.    They had pornographic sexual content of children

12   involved in sexual activities.

13        Q.    Once you discovered that, did you make any

14   effort to determine where that computer was located?

15        A.    Yes, ma'am.  After I completed downloads and

16   viewed the files, I applied for a subpoena from a judge to

17   subpoena Comcast to determine who owned that IP address at that

18   date and time.

19        Q.    Okay.  And were you able to determine who that

20   was?

21        A.    Comcast returned on my subpoena, and the

22   subpoena led me to Jeremy Seth Tummins on Saddle Creek Circle in

23   Dickson.

24        Q.    Okay.  Did you make any effort to find out

25   anything about that person?

1          A.     Yes, ma'am.  Typically in these investigations,

2    after we get a return from the service provider, Comcast, as to

3    who owned that IP cast at that date and time, I will do

4    surveillance on the house, I will check with the utility

5    companies, do database searches in law enforcement to see if

6    they have criminal history, criminal record, try to figure out

7    who is living in the house.  Do searches just on Google trying

8    to find any information I can about the occupants of the house.

9          Q.     And was there anything significant that you

10   found?

11         A.     I discovered that Jeremy Seth Tummins was a

12   middle school teacher in Dickson.

13         Q.     After finding out who was leasing that IP

14   address, what steps did you take in your investigation?

15         A.     After that part of the investigation was over,

16   then I applied for a search warrant with a judge to search the

17   residence and any other computer devices in the residence.

18         Q.     And that process of obtaining and serving search

19   warrants -- is that something that most law enforcement officers

20   do?

21         A.     Most of the time it's investigators that do

22   search warrants.  Patrol rarely does search warrants.  Usually

23   it's just investigators.

24         Q.     But this area of the testimony that we're about

25   to enter in -- that doesn't require any specialized knowledge

1    about peer-to-peer or computer forensics; is that correct?

2    A.    No.

3    Q.    All right.  So turning to the fact part of this,

4    was the search warrant that you got from the judge -- was that

5    for a specific residential address?

6    A.    Correct.

7    Q.    Okay.  And who was it that lived at that

8    address?

9    A.    Jeremy Seth Tummins and his wife.

10   Q.    And can you tell us the street and the city?

11   Not the street address, just the street.

12   A.    Saddle Creek Circle in Dickson.

13   Q.    And when did you serve that search warrant?

14   A.    On May 18th.

15   Q.    And was that 2009?

16   A.    Correct.

17   Q.    And were you by yourself or with another law

18   enforcement officer?

19   A.    I had another detective with me, Detective

20   Patterson.

21   Q.    What was his first name?

22   A.    John.

23   Q.    So was it the two of you that went there?

24   A.    Correct.

25   Q.    And is John Patterson still with the Dickson

1　County Sheriff's Office?

2　　　　A.　　No, ma'am.　He left law enforcement to go be a

3　school teacher.

4　　　　Q.　　Okay.　All right.　So getting back to executing

5　the search warrant, what kind of car did you go in?

6　　　　A.　　It was an unmarked I believe Crown Victoria.

7　　　　Q.　　And did you all -- were you wearing a police

8　uniform of any sort?

9　　　　A.　　I believe we were wearing khaki pants and some

10　kind of polo shirt.　I did have a weapon on our side and a badge

11　on our belt, but other than -- not a patrol uniform or anything

12　like that.

13　　　　Q.　　Okay.　Do you typically wear your firearm in the

14　course of your duties?

15　　　　A.　　Yes, ma'am.

16　　　　Q.　　Who was home when you arrived at that residence?

17　　　　A.　　Mr. Tummins and his wife.

18　　　　Q.　　Do you remember what time of day it was?

19　　　　A.　　It was about 6:30 in the evening.

20　　　　Q.　　And did you explain why you were there?

21　　　　A.　　When I first made contact, I introduced

22　ourselves and told him that I was with the Sheriff's Office, and

23　that we were doing a -- that we were there from the cyber crime

24　unit, and that we were doing an investigation and asked if we

25　could talk.　And that's how it got started.

Q.    Okay.  And what were the first questions that you asked him?

A.    Well, the first questions I asked him was how he was connected to the Internet, which was important to me as an investigator.  If they have an open wireless, it's possible that somebody could be piggybacking on their open wireless, and the people in the house don't have any child porn.  So I wanted to find out how he was connected.  He told me he was connected by a modem, a hard wired modem for Comcast, and took me up to the bonus room to show me how it was connected.

Q.    Did you tell him what kind of investigation you were conducting?

A.    In the beginning I told him we were with the cyber crime unit.  After I was able to determine that he didn't have an open wireless, I told him that we were doing a child pornography investigation.

Q.    Is a child pornography investigation considered a cyber crime?

A.    Yes, ma'am.

Q.    Did you ask him -- you indicated that he showed you a modem.  Did you ask about any computers in the house?

A.    Yes.  Eventually.  It wasn't right then at that moment.  But I asked where the computers were.  He said they had the desktop, which was new.  And his wife said she had a laptop downstairs that was hers.  And he said he had a laptop that was

1    his.  It was up underneath an end table by the computer tower.

2         Q.    Okay.  And what did you discuss with him once

3    you got in there and told him you were with the ICAC?

4         A.    I told him that we had -- that I had downloaded

5    a child pornography file from a computer in his house.  I asked

6    him if he knew -- if he had LimeWire.  And he said, well, I did.

7    And I said, so you know what it is.  And he was like, yes.

8         We discussed the files that I had downloaded.  I read

9    the file names of one of the files that I had downloaded.  He

10   wasn't really forthcoming in the beginning.

11        MS. THOMPSON:  Your Honor, may we approach?

12        THE COURT:  Yes.

13        (Whereupon, a bench conference was held, out of the

14   hearing of the jury, to wit:)

15        MS. THOMPSON:  I guess this whole conversation is

16   recorded.  And I would object to them going ahead and having

17   Levasseur testify to what it is that he said at the time.

18   That's hearsay.  Even though he's in court, when he repeats back

19   a conversation that he had earlier, that's hearsay, Your Honor.

20   It's on her recording.  They can play the recording.  It's just

21   a much better -- he is getting ready to summarize right now

22   about whether or not my client was evasive or was not

23   forthcoming.  And I object to those type of characterizations.

24   Let them play it for the jury, and let the jury hear what he has

25   to say.

1  MS. DAUGHTREY:  Your Honor, the government is permitted

2  to put on the proof in the way they want to.  If there is cross

3  examination that Ms. Thompson wants to do, that's perfectly

4  fine.  I think all of the statements that Levasseur is making

5  right now are party admissions and discussions in an interview

6  that he had.

7  THE COURT:  Some things may be party admissions, but

8  the last one is not an admission.  It's his characterization of

9  what he observed.

10  MS. DAUGHTREY:  All right.

11  MS. THOMPSON:  Your Honor, does the Court agree that

12  when Mr. Levasseur --

13  THE COURT:  Well, she can ask him to summarize, but I

14  think characterizations are a separate issue.

15  (Conclusion of bench conference.)

16  BY MS. DAUGHTREY:

17  Q.    Mr. Levasseur, or Detective Levasseur, the Court

18  has instructed you not to do any characterizations, so we can

19  summarize what happened that day.

20  THE COURT:  I haven't instructed him on anything.  I

21  asked you about your questions.

22  MS. DAUGHTREY:  I'm sorry, Your Honor.

23  BY MS. DAUGHTREY:

24  Q.    Did you ask the defendant whether or not he had

25  downloaded the child pornography?

```
 1              A.     I did.

 2              Q.     And what was his response?

 3              A.     He stated that he did.

 4              Q.     He stated that he --

 5              A.     That he did.

 6              Q.     That he did.  Did he tell you that right away?

 7              A.     Within a few minutes.

 8              Q.     How long were you there at the house?

 9              A.     Approximately two hours.

10              Q.     Okay.  And what were you doing during that two

11     hour period?

12              A.     The initial contact of about ten minutes was the

13     introductions, why we're there, reading of the search warrant.

14     Then I started a forensic preview of the desktop, which I

15     removed the hard drive and hooked to a right blocker and to my

16     forensic laptop.  And while I was doing that, we were talking.

17     And then --

18              Q.     What is the purpose of doing a preview?

19              A.     I was just looking for -- it was to benefit me.

20     I was looking for files that I was looking for.  I was looking

21     for child pornography files.  It just makes interviewing a whole

22     lot better when you have the file sitting there on the screen.

23              Q.     Is that something that you commonly do?

24              A.     Something -- it depend on the circumstances.

25     Back then I did.  Now not so much.
```

1    Q.    So you said that you did a review and talked

2    with him.  Did you do other things while you were there?

3    A.    Yeah.  I was, you know, collecting and logging,

4    cataloguing the computers, all the external hard drives.  There

5    was four or five USB drives and phones and other devices, iPods

6    and stuff.  I had to get all the serial numbers and write, you

7    know, a property receipt for all of that.  And while I was doing

8    all of that, we were talking.

9    Q.    Is that why it took two hours?

10   A.    We could have been out probably in about an hour

11   and a half.  And about the last half hour were just questions

12   from Mr. Tummins and his wife.  They were asking us all kinds of

13   questions.

14   Q.    Turning back to the computers, you first talked

15   about a desktop.  Where was that desktop?

16   A.    The best way I can describe it is a bonus room,

17   like a split level home.  There was a short stairway to go up,

18   and then there was like a big room.  It was up in that room.

19   Q.    Okay.  And were there any other computers that

20   were located in that room?

21   A.    The laptop, the compact laptop, was located in

22   that room.  And then all of the -- most of the external hard

23   drives were located in that room too.

24   Q.    Okay.  All right.  If I may approach and hand

25   you what has been marked as -- actually, I'm sorry.  Did you, in

1    fact, collect those two computers?

2            A.      Excuse me, ma'am?

3            Q.      Did you collect those two computers?

4            A.      Yes, ma'am.

5            Q.      If I may approach and hand you this exhibit.

6            THE COURT:  It would be helpful if you identify the

7    exhibit number.

8    BY MS. DAUGHTREY:

9            Q.      This is Government's Exhibit 1.  Do you

10   recognize this?

11           A.      Yes, ma'am.

12           Q.      What is that?

13           A.      It's a computer that I collected out of Mr.

14   Tummins' home.

15           Q.      And I would like to approach with Exhibit Number

16   2.  Do you recognize that?

17           A.      Yes, ma'am.  It's a laptop I took out of the

18   bonus room with the desktop.

19           Q.      And may I approach with Exhibit 6.  Do you

20   recognize that?

21           A.      Yes, ma'am.

22           Q.      What is that?

23           A.      Pictures I took.

24           Q.      Of what?

25           A.      Pictures of inside the bonus room of Mr.

1    Tummins' home, of the computer.

2            MS. DAUGHTREY:  Your Honor, at this time I would ask

3    that Exhibits 1, 2 and 6 be entered into evidence.

4            THE COURT:  Without objection, it will be admitted.

5            MS. DAUGHTREY:  And that the jurors be allowed to turn

6    to Tab Number 6.

7            THE COURT:  The jurors may do so.

8    BY MS. DAUGHTREY:

9            Q.    On the first page, there are two pictures.  Can

10   you tell us what that first top picture is?

11           A.    The first picture is standing away from the

12   computer desk, just showing the computer screen and the mouse.

13           Q.    All right.  And the second picture?

14           A.    The second picture shows the computer tower, the

15   Gateway, down in the little space for it down there, I guess the

16   little cubby.

17           Q.    And is that the Exhibit 1 that you have right

18   there?

19           A.    Correct.

20           Q.    And turning to the second page, what is that top

21   picture?

22           A.    The computer sitting on the stand here.

23           Q.    Okay.  And where was that picture taken?

24           A.    In the computer forensics lab.

25           Q.    Is that where you do your work?

```
 1              A.      Yes, ma'am.

 2              Q.      And that second picture -- what is that of?

 3              A.      A picture of a laptop.

 4              Q.      And is that in his home or in your lab?

 5              A.      Say again, ma'am?

 6              Q.      Is that picture taken in his home or in your

 7     laboratory?

 8              THE COURT:  Why don't you say --

 9              THE WITNESS:  That picture is incorrect.

10     BY MS. DAUGHTREY:

11              Q.      Oh.

12              A.      The picture on the paper is the wife's laptop.

13     And the picture on the desk here is the one that was up in the

14     bonus room.

15              Q.      Okay.  Where did you find the wife's laptop?

16              A.      It was down in the kitchen, dining area of the

17     house, down -- not far from the bonus room.

18              Q.      Okay.  And did you ask about who used that

19     laptop?

20              A.      Ms. Tummins volunteered that the laptop down

21     there was hers, and she used it for her school work and stuff

22     like that.  Mr. Tummins stated that they both used the tower.

23     And he said that this computer was his old -- the laptop was his

24     old computer that he had back when he was going to Austin Peay

25     when he was in college.  He said it got viruses on it and shut
```

1    down on him.  He referred to it as his old computer.

2         MS. DAUGHTREY:  Your Honor, if I may ask for the

3    computer to be set down on the floor in another location.  I'm

4    not sure if that's blocking the jurors' view.

5         THE COURT:  You may.

6         MS. DAUGHTREY:  Thank you, sir.

7    BY MS. DAUGHTREY:

8         Q.    So did you ask the defendant how long he had

9    been looking at child pornography?

10        A.    I did numerous times.  And he told me that he

11   remembered downloading child pornography back to when he was in

12   college.  And that would have put it in a -- about a three year

13   time frame, because he was -- he had just got hired on as a

14   teacher, he graduated from college the year prior to that.  So

15   it was about a 2006 to 2009 time frame, is what he told me when

16   I was at his house.

17        Q.    Okay.  And did he tell you what he was doing

18   specifically?

19        A.    He said that he downloaded child pornography

20   because he wanted to see what was out there.  I pressed him as

21   to -- once he admitted that he downloaded child pornography, I

22   asked him why, why did you download child pornography.  There's

23   got to be a reason why.  And he said that he downloaded child

24   pornography because he wanted to see what was out there in the

25   world, and that he -- he couldn't believe what he was seeing.

1       At one point in the conversation he described a child

2   pornography file that he said they were young children, and he

3   described what was going on, and he said it was just horrid.

4   Then later on he described another child pornography movie file

5   that he had downloaded and watched.  And he said that it was so

6   bad that he watched it again later on because he didn't believe

7   that people actually did that.

8       And I believe there were three occasions where he

9   described child pornography video files that he had downloaded

10  and watched that I wasn't able to recover off his computer.

11      Q.    Did he tell you what he would do with them after

12  he watched them?

13      A.    He said he would delete them.

14      Q.    Did you ask Ms. Tummins if she had been involved

15  with child pornography?

16      A.    I did.  She stated that she didn't download any

17  child pornography, she didn't know anything about child

18  pornography.  She stated she used the computer, but denied any

19  knowledge of child pornography.

20      Q.    Ms. Thompson said something in opening statement

21  about your getting training to get people to confess.  Do you

22  have any training in interviewing witnesses?

23      A.    No, ma'am.

24      Q.    Do you, in your investigations, ever attempt to

25  get written statements from defendants or suspects?

1          A.      Yes, ma'am.

2          Q.      Okay.  Does your organization encourage you to

3    do that?

4          A.      Yes, ma'am.

5          Q.      Do they have a policy about how they want you to

6    do that?

7          A.      Yes, ma'am.

8          Q.      And can you tell us about that?

9          A.      The policy at Dickson County Sheriff's

10   Department is the officer writes the statement for the person

11   that's giving the statement, and then we have them -- we read

12   the statement to them, and then we have them read it to ensure

13   that it's totally what they are wanting to say, and then they

14   sign it saying that it's a true and accurate statement.

15         Q.      Did you do something like that in this case?

16         A.      Yes, ma'am.

17         Q.      If I may approach and hand the witness what has

18   been marked as Government's Exhibit 7.  Thank you.  Do you

19   recognize this document?

20         A.      Yes, ma'am.

21         Q.      What is it?

22         A.      It's the statement that I wrote out for

23   Mr. Tummins, and he signed it.

24         MS. DAUGHTREY:  Your Honor, at this time I would ask

25   that this be entered into evidence as Government's Exhibit 7 and

1  that the jury be allowed to flip to Tab 7.

2      THE COURT:  Exhibit 7 will be admitted.  And the jury

3  may do so.

4  BY MS. DAUGHTREY:

5      Q.    Where did you get the information that you

6  included in the statement when you wrote it?

7      A.    Through all of the conversation that we had,

8  prior to me asking him if he would give me a written statement,

9  it was an hour and -- about an hour and a half that we had

10 talked.

11     Q.    Did you talk to him about the statement as you

12 were writing it, the content of it?

13     A.    Yes, ma'am.

14     Q.    Okay.  And --

15     A.    I told him that -- when I was writing the

16 statement, I said, you know, I like to surmise on statements and

17 just put hard facts, bullet points.  But I don't want to put

18 anything in your mouth.  I'm going to write it out, and you tell

19 me if that's what want to say from the stuff we talked about

20 earlier.  And I wrote it out.  A couple of times I quoted to him

21 what I was going to write.  And he was like, no, that's not what

22 I meant.  So then we reworded it and redid it to what he wanted,

23 and finished it out, and I read it to him, and then I had him

24 read it and sign it.

25     Q.    So you went over the content with him as you

1  wrote it?

2          A.      Correct.

3          Q.      And who signed the statement at the bottom by

4  the X?

5          A.      Detective John Patterson.

6          Q.      And above that, whose signature is there?

7          A.      Mr. Tummins'.  He signed it J. S. Tummins.

8          Q.      And were you present when he signed it?

9          A.      I couldn't hear you, ma'am.

10         Q.      Were you present when he signed it?

11         A.      Yes, ma'am.

12         Q.      You are hard of hearing, aren't you?

13         A.      Yes, ma'am.  I have a hearing aid, but sometimes

14  they don't do that good.

15         Q.      All right.  I would like to turn your attention

16  back to your expertise as a computer forensic analyst and

17  working as a child exploitation investigator.  What did you do

18  with the computers after you seized them from his house?

19         A.      I returned them back to my computer forensics

20  lab and removed the hard drives from the computers, and attached

21  them to a write blocker to prevent any data being written to the

22  hard drive so no changes are made to it from the state that it

23  was in.  And making a forensic copy of the hard drive for me to

24  work with.  Once the forensic copy is made, then I put the

25  original hard drive back in the computer and put the computer in

1    the evidence room.  And then I do all of my examination off of

2    my copy.

3          Q.    What is the reason for doing that?

4          A.    So we don't alter anything that's on the

5    suspect's computer, change any files or any data, and don't

6    damage it in any way to preserve it for evidence.

7          Q.    Okay.  What about the preview that he did at his

8    -- that you did at his house?

9          A.    The preview at his house, I -- I was very

10   distracted on talking to him and it wasn't very -- I didn't come

11   up with anything because of where the files were.  And I didn't

12   go look in that particular spot.  So it was -- it didn't help me

13   doing a preview at the house.

14         Q.    Did you make any changes to the computer while

15   you did that preview?

16         A.    No, because doing a preview, I did the same

17   thing.  I connected it to a physical write blocker so that no

18   data can be changed on the suspect drive.

19         Q.    What does it mean to make a forensic image of a

20   computer or a hard drive?

21         A.    A forensic image is different than making a copy

22   of your computer.  A lot of people know they make a back-up copy

23   of their computer, or they clone their drive so that -- they

24   clone their drive to another hard drive.  Well, those are all

25   logical, and it copies the files and everything that's live on a

 1    system.  And not the deleted space, not the free space.

 2    Unallocated space.

 3         A forensic copy, it copies a hard drive.  Every bit,

 4    every one and every zero from the beginning of the hard drive to

 5    the end of the hard drive, it copies it out.  And it makes it --

 6    it's in a forensic format.  So after the copy is made, you

 7    couldn't plug the forensic copy into the computer and boot the

 8    computer up, because that's not what it does.  It puts it in a

 9    format.  It chunks it out into chunks the way I do it so it can

10    compress it some.

11         And then you have to use some type of software to mount

12    the image to access it.  So it's just forensic computer geek

13    stuff.

14         Q.    Okay.  How do you know that it's an exact copy

15    of the computer that you took from the home?

16         A.    The Shaw values that we were talking about, the

17    hash values, saying that no two are alike.  We use -- in

18    computer forensics it's called MD-5 hash values.  It's the same

19    concept as a Shaw-1 value.  The software that you are using to

20    copy the drive will run a hash across the entire hard drive that

21    you are going to be copying and gets the value.  And it copies

22    the hard drive onto your hard drive that you are using.  And

23    once the transfer is complete, it hashes it again over on yours.

24         And in order for it to be an identical match, the hash

25    values need to match.  So if the hash values didn't match, it

1    means something changed on that drive while it was being imaged.

2    Which is possible, but typical with a write blocker, a physical

3    write blocker, you are not going to have that problem.

4         Q.    And did you verify the hash values?

5         A.    The hash values were verified; yes, ma'am.

6         Q.    You mentioned something about using some kind of

7    forensic software to look at the forensic image?

8         A.    Yes, ma'am.

9         Q.    Can you tell us what you used?

10        A.    There's numerous types, but back then on this

11   case I used FTK.  It's short for Forensic Tool Kit by a company

12   called Access Data.  And it's called a forensic suite.  It has a

13   bunch of tools in it to parcel out data for you to assist you in

14   doing your examination.

15        Q.    And when did you do this examination of these

16   computers?

17        A.    My report is dated in June 19th.  So that would

18   be when I finished the exams.

19        Q.    All right.  And June 19 of 2009?

20        A.    Correct.

21        Q.    Okay.  How long does it take to analyze this

22   kind of evidence?

23        A.    It depends.  It really depends on a lot of

24   factors.  It depends on the size of the hard drive.  For

25   instance, a laptop I believe was only a 60 gigabyte hard drive.

So the desktop was 640 gigabytes.  So it takes longer to examine
a bigger hard drive versus a smaller one.  Like all of the
external hard drives that I collected, they all contained
photographs, belonging to Mr. Tummins.  He's like -- there is a
-- photography is a hobby or semipro.  They were filled with
digital photographs.  Something like that is real easy to
eliminate as not having evidence.  So it doesn't take long to do
that.

       Kind of like Ms. Tummins' computer, if there is no
child pornography on it, then it's a typical, you know, two day
-- two day job to examine it, and then it's done.  A computer
that has child pornography on it, it takes a considerable longer
time because then you have to find the metadata to find out who
is responsible for the child porn.

       Q.    What do you mean by metadata?

       A.    Metadata is data about data.  Just looking for
data on the computer to link a particular person to the illegal
files.

       Q.    Did you find any pornography of any kind on the
laptop computer that the defendant's wife had used?

       A.    None.

       Q.    Okay.  What did you do with that computer once
discovered there was no child pornography?

       A.    I returned all of the devices as quick as I got
done with them.  I believe the iPods or iPhones and the external

1    hard drives and her computer I returned as soon as I got done

2    with them.  I don't remember exactly when that was, but it would

3    have been a couple of weeks probably.

4         Q.    Okay.  I would like to turn first to the Gateway

5    tower computer, the Exhibit 1 that we have already talked about.

6    When you did your forensic exam, did you determine when that

7    computer had been manufactured?

8         A.    Yes.  It was manufactured in 2008, sometime in

9    the spring of 2008.

10        Q.    And did you determine when the operating

11   software -- operating system software was installed?

12        A.    Windows Vista was installed back in November --

13   November 15, 2008.

14        Q.    So how long was that before you arrived at the

15   house and took the computer?

16        A.    It was about five months.

17        Q.    Were you able to tell whether or not that

18   computer was used on a regular basis?

19        A.    Yes, it was.

20        Q.    Was there an owner, any kind of information

21   about an owner for the computer?

22        A.    The user profile that was used to access the

23   computer was default as owner.

24        Q.    So when you are doing an examination of a

25   computer in a child pornography case, how do you start your

1     examination?

2         A.      The first thing I do is, of course, create the

3     image. And then I use a Forensic Tool Kit to index the drive

4     for me. What that means basically is it indexes all of the

5     files on the computer, regardless of where they are at. If they

6     have been deleted, if they are in an unallocated space, if they

7     are in folders, files. And it separates out different files for

8     me. It will throw all of the images found on the computer in

9     one bucket for me, and all the videos in another bucket, and all

10     the Word documents in another. And so it's easy for me to go in

11     and look for certain files.

12         And I will go in, in a child pornography case, and I

13     will look at all of the image files on the computer looking for

14     child pornography and then look at all of the videos on the

15     computer, looking for child pornography. That's how it starts.

16         THE COURT: Ladies and gentlemen, we're going to take

17     our afternoon break. You have been sitting a while. We had a

18     little bit of a break without a hearing. So it will be about a

19     ten minute recess. Please don't discuss the case amongst

20     yourselves until you receive all of the evidence, the argument

21     of counsel, and the charge of the Court. You can leave your

22     pads on your seats. The Marshal will look out for them. Thank

23     you.

24         (Jury out.)

25         THE COURT: We're in recess.

1              (Recess.)

2              THE COURT:  You may be seated.  You can bring the jury

3      in.

4              (Jury in.)

5              THE COURT:  You may be seated.  All right, ladies and

6      gentlemen of the jury.  We'll continue with the examination of

7      this witness.

8              Counsel?

9      CONTINUED DIRECT EXAMINATION

10     BY MS. DAUGHTREY:

11             Q.    Detective Levasseur, just before the break, you

12     were discussing the beginnings of your examination of the

13     computer.  And you mentioned deleted space and unallocated

14     space.  Is there a difference between those two?

15             A.    No, it's just the terminology that I use.

16     Unallocated space is space that's available to be used.

17             Q.    And after those files are put into the folders

18     that you were talking about, what do you do after that?

19             A.    Are you talking about my forensic software?

20             Q.    Yes.

21             A.    I look at all of the image files on the computer

22     and determine, you know, if there's any suspect files.  And then

23     all of the video files, play all of the video files to see if

24     there is any child porn.

25             Q.    Okay.  And do you do anything else with those

1    files if you think that they might be problematic?

2         A.    I do what's called bookmarking.  If I find a

3    suspect child pornography file, I bookmark it in my forensic

4    software.  It's just like a place holder.  And that way I can

5    come back to it later and it's easy to find.

6         Q.    And you mentioned metadata earlier in your

7    testimony.  Do you do any work with metadata at this point?

8         A.    Well, after I get the child pornography files,

9    there is -- each exam is different, how I navigate through,

10   start -- it all depends on what I find in the beginning.  But

11   typically, after I find child pornography files, then I try to

12   find out who is responsible for the child pornography file.

13   Even if I have a confession, I want to go in and make sure that

14   the confession was legitimate.  So I start looking at overall

15   computer use of the computer and if those particular files that

16   I bookmarked were manipulated in any way, like being viewed, or

17   transferred from one device to another, or something like that.

18        Q.    Okay.  We talked about when you initiated this

19   investigation, it was a peer-to-peer investigation.  Did you

20   find any peer-to-peer software on either of these two computers?

21        A.    On both of them.

22        Q.    And I guess focusing on the Gateway tower, what

23   kind of file sharing or peer-to-peer software did you find?

24        A.    It was the -- it was LimeWire system files that

25   I found on there.  If I remember correctly, the actual

executable file had been deleted, but the folder structure was
still there, and I was able to get property files for LimeWire
out of unallocated space, showing the installation and other
stuff like that.

      If I remember correctly, I found some traces of
BitTorrent and Morpheus on the tower.

      Q.    Are all of those file sharing programs?

      A.    Different file sharing applications, yes.

      Q.    You said something about the executable had been
deleted. What do you mean by that?

      A.    The actual program itself. I'm not a hundred
percent sure if it was deleted, but if my memory serves me, I
think it was. And I think Mr. Tummins told me that he deleted
it.

      Q.    Are there different versions of LimeWire?

      A.    Yeah, there's a lot of different versions of
LimeWire. I mean, it dates back. There's just numerous
different versions.

      Q.    Why are there different versions of something?

      A.    LimeWire would just upgrade or change the code
and update stuff, and then it be a different version. And if
they had -- you know, like Windows gets bugs in them, then
Windows will put out a patch to patch your windows, well,
LimeWire would just issue a new version of its software.

      Q.    Were you able to tell what version of LimeWire

1   had been on that computer?

2       A.   I was.  I found a properties file showing that

3   the last known good version was 4.8 -- I think it was 4.8.  I

4   think it was 4 -- 4.18.1.

5       Q.   How is it that somebody gets something like

6   LimeWire onto their computer?

7       A.   You need to download it.

8       Q.   Have you prepared some slides to help show how

9   to download and set up LimeWire?

10       A.   Yes, I have.

11       Q.   If I may hand you what has been marked as

12   Government's Exhibit 8.  The slides that you prepared -- were

13   they for the specific version of LimeWire that you found on

14   Mr. Tummins' computer?

15       A.   It is.

16       Q.   Okay.  Do you recognize that document?

17       A.   Do I recognize what, ma'am?

18       Q.   Do you recognize that document?

19       A.   Yes, ma'am.

20       Q.   Okay.  And what is that?

21       A.   I made an exhibit by -- I downloaded LimeWire

22   4.18.18 and installed it.  And as the installation progress

23   happened, I took screen captures that you need to take to

24   download and install LimeWire.

25       Q.   And what period of time did you do that?  When

1    did you do that?

2            A.    I think last week.

3            MS. DAUGHTREY:  Your Honor, at this time I would ask

4    that -- the government has marked as an exhibit for

5    identification, it's a demonstrative exhibit, and I would ask

6    that we be given permission to show the jurors the slides and

7    put them up on the overhead.

8            THE COURT:  What is the exhibit number, please?

9            MS. DAUGHTREY:  It's Exhibit 8.

10           THE COURT:  Without objection, Exhibit 8 will be

11   admitted.  The jury may so do.

12           MS. DAUGHTREY:  Thank you, Your Honor.

13   BY MS. DAUGHTREY:

14           Q.    Okay.  And this is the first slide.  Will you

15   explain what this?  Walk us through this.

16           A.    After you would download LimeWire, if you went

17   to your download location and clicked on it, double clicked on

18   it, this installation box would pop up.

19           Q.    Okay.  And what is second slide?

20           A.    It asks you to select a language.  And then it

21   tells you thank you for choosing LimeWire, the most advanced

22   file sharing program on the planet.  LimeWire basic is a free

23   product.  If you paid for this, you have been scammed.  Please

24   download LimeWire at the official website.  And then you've got

25   a Next button or a Cancel button.

1    Q.    This next slide?

2    A.    This slide shows where it wants to default, load

3    the file.  It's showing that it wants to send it to program

4    files X-86 in LimeWire folder.  And this on -- I installed this

5    on a Windows 7 machine.  So Windows Vista would be the same, but

6    XP would be different.  As far as the by-86 location.  And it

7    says:

8    Setup will install LimeWire in the following folder.

9    To install it in a different folder, click browse and select

10   another folder, click install, and start the installation.

11   So it tells you that's where it's going to install it,

12   but you can install it somewheres else.

13   This capture shows after you click Next, it starts

14   unpacking the executable and loading the file.

15   The next one shows you that you are done.  It says:

16   Thank you for installing LimeWire.  The Run LimeWire

17   box is checked.  You can uncheck it and click Finish, and then

18   it would just go away.  But if click Finish with the Run click,

19   then LimeWire would start.

20   So clicking Next with the folder -- I mean, the box

21   checked, it would come up to Save Folders and Share Folders.  It

22   says:  Please choose a folder where you would like your files to

23   be downloaded.  You can also choose folders you would like to

24   share with other users running LimeWire.  And it fills in a

25   default location, where if you just click Use Default, it will

1  use a default, or you can browse and choose whichever location

2  you want. And then you can click Next.

3  The next screen shows miscellaneous settings. It says:

4  Below are several options that affect the performance of

5  LimeWire.

6  It wants you to choose your network speed, whether you

7  are broadband or dial-up. It wants to know if you want it to

8  start automatically when your computer turns on. And it also:

9  Content filtering, LimeWire can filter files that copyright

10  owners request not be shared by enabling filtering. You are

11  telling LimeWire to confirm all files you download or share with

12  a list of removed content. You can change this at any time.

13  It's not checked by default. You would have to check

14  it. Then you click Next. And then it showed sharing

15  extensions. It asks you to select type files that you want to

16  share using LimeWire, in default they are all checked, and you

17  can go in there and uncheck certain files you didn't want to

18  share. And then you click Next.

19  And the screen says: State your intent. One more

20  thing. You are almost done. State your intent below and start

21  using LimeWire. LimeWire Basic and LimeWire Pro are

22  peer-to-peer programs for sharing authorized files only.

23  Installing and using either program does not constitute a

24  license for obtaining or distributing unauthorized content.

25  And then you have to click the radio button there that

1    says:  I will not use LimeWire for copyright infringement.  And

2    once you click and fill that circle in, then the next button

3    will appear.  And then LimeWire actually opens up in the

4    application and starts.  And that's -- when you start LimeWire,

5    minus the pop-up box in the center, that's what you would see.

6         Q.    Can you explain what this slide is about?

7         A.    This slide is an example of, after a search term

8    was typed in, what would happen.  And the search term example is

9    the Terminator.  And it's up where the red arrow is.  And it's

10   showing that it has 109 hits from other computers saying, I have

11   a file with the name Terminator in it.  And then you look in the

12   results window.  And it shows the file name, the file type, the

13   file size.  So you can look in there.  So if you were looking

14   for Terminator the movie, you could highlight where it's

15   highlighted in blue, Movie the Terminator, and either double

16   click on that to start the download, or highlight it and click

17   the download button in the mid-page, and the file would start to

18   download.  And you can see the progress of it downloading down

19   at the bottom of the screen.

20        Q.    I believe this the last slide.

21        A.    The last one showing the search screen.  On the

22   left-hand side you have -- you can select individual file types

23   like audio files, video files, or programs, or images, or

24   documents, or all.  And in the block, you type in your key word

25   that you want to search for.  And after you get your key word or

1    key words typed in, you click search, and that would bring you

2    to that page that we were just on a second ago.

3           Q.    You've got a third word there at the bottom.

4    What is that?

5           A.    I can't hear you, ma'am.

6           Q.    You've got the third red arrow at the bottom.

7    What is that?

8           A.    The arrow at the bottom is showing -- it says,

9    view my zero shared files.  So if you had files that you were

10   sharing, if you had ten of them, it would say, view my ten

11   shared files.  And also right below it, the red button would

12   give the number of files that you are sharing in that button.

13   So every time that you are on LimeWire, you can see right there

14   on the screen that you are actually sharing the files, how many

15   files you are sharing.

16          Q.    Thank you.  Can you search for file names or

17   search terms on LimeWire?

18          A.    Search terms?  You can type anything that you

19   want on LimeWire.  I mean, --

20          Q.    When you put in the search terms on that last

21   page that we had, are those saved anywhere in LimeWire?

22          A.    Some versions yes, some versions no.  Older

23   versions of LimeWire saved them real beautiful.  And you could

24   collect them.  The newer versions of LimeWire didn't, and you

25   had to go scrounge through unallocated space to get them.  The

1    actual search terms themselves in this version of LimeWire are

2    not saved pretty in a file.  You have to go get them.

3            Q.      What do you mean by go get them?

4            A.      They are in an unallocated space.  They have

5    been -- they are either in an unallocated space or in a page

6    file, and you go -- as a computer examiner, you are searching

7    for the search terms that somebody used to search for.

8            Q.      Okay.  Did you find any search terms on the

9    Gateway computer that were put into LimeWire?

10           A.      I did.

11           Q.      If I may approach and hand you what has been

12   marked as Exhibit 9.  Do you recognize that?

13           A.      I do.

14           Q.      What is that?

15           A.      It's the search terms that I recovered off the

16   computer.

17           Q.      And there is a second page to that.  Is that

18   part of the same --

19           A.      The second page shows just the raw data,

20   including the search term, with the raw data that comes right

21   off the computer.

22           MS. DAUGHTREY:  All right.  Your Honor, at this time I

23   would ask permission to enter Exhibit 9 into evidence and to

24   allow the jurors to turn to that tab.

25           THE COURT:  Exhibit 9 will be admitted, and the jurors

1  may do so.

2  BY MS. DAUGHTREY:

3         Q.     So you have two different set of search terms

4  here.  Can you explain what that is?

5         A.     In searching for the search terms in unallocated

6  space, I'm getting chunks of data from the LimeWire application,

7  and it will explain that they were searching for a video.  So a

8  key word search was used to search for video, or a key word

9  search was used to search for an image.  And it's just

10  different.  On the top of the page you've got the video

11  searches.  On the bottom of the page you've got the image

12  searches.

13        Q.     In the second page, can you explain what that

14  shows in the first example?

15        A.     That's the data that I pulled out of the

16  suspect's computer showing the correlation between the LimeWire

17  program and showing a video title that was searched for equals

18  daughter or PTHC or school girl or mom pedo or preteen boys.

19        Q.     So that's for several of them, but not all?

20        A.     Correct.  That's --

21        Q.     What is Mafia sex?

22        A.     Mafia sex is a well-known series like we talked

23  about before, of child pornography.

24        Q.     And there's also some unfamiliar things in

25  there, Masha, Dee and Desi.  What are those things?

1        A.      Masha is also a series, it's a particular child.

2   Dee and Desi is another, two girls that are always in films

3   together being abused.  But that's a series.  And the others are

4   generalized terms like the years, school girl.  There are some

5   in there that are not indicative to child pornography, but those

6   were just all the terms that I pulled out.

7        Q.      And what is PTHC?

8        A.      Preteen hard core.

9        Q.      And then there is something toward the bottom of

10  the page, LSM?

11       A.      LSM is a -- it's actually a series.  It's a

12  Russian series.  And I think, if memory serves me correctly, it

13  stands for Lolita Super Models, something like that.

14       Q.      When you examined this computer, did you see any

15  of the files that you had downloaded on April 21, 2009 when you

16  were doing your undercover work?

17       A.      Yes.

18       Q.      Okay.  And where did you find those?

19       A.      The video files that I downloaded I located in

20  the recycle bin.

21       Q.      Were you able to tell how those files had gotten

22  onto that computer?  How do these files that you had downloaded

23  get onto the computer that you were examining?

24       A.      From LimeWire.

25       Q.      If I may approach and hand you Government's

1    Exhibits Number 10 and 11.  And turning first to Exhibit 10, do

2    you recognize that information?

3            A.      I do.

4            Q.      And what was that?

5            A.      These are sample files downloaded using LimeWire

6    that were found in the recycle bin.

7            Q.      And what kind of files were they?

8            A.      They are all pornography files.

9            Q.      Are they image files?  Video files?

10           A.      They are video files.

11           MS. DAUGHTREY:  Your Honor, at this time I would ask

12   Exhibit 10 to be admitted and the jurors be permitted to look at

13   Tab 10.

14           THE COURT:  Exhibit 10 will be admitted.  The jurors

15   may do so.

16   BY MS. DAUGHTREY:

17           Q.      When somebody has a video file and they delete

18   it, what happens to that file?

19           A.      When they delete it, it goes in the recycle bin.

20   Not much of anything.  It just sits in the recycle bin.  When

21   they empty the recycle bin, it goes out, and it doesn't actually

22   go anywhere.  But the space that it was residing in becomes

23   available for use from the operating system.

24           And video files are rather large, and they don't

25   typically get saved on the same location on the hard drive.  So

1   once they are totally deleted, if any part of them gets

2   overwritten a little bit, getting it to play back is next to

3   impossible.  So they are really hard to recover.

4          Q.     Looking at Exhibit 10, within which of the files

5   are the ones that you downloaded on April 21?

6          A.     In Exhibit 10, the one that I downloaded I

7   believe is going to be the second file down called Family

8   Sex-13YO Brother Fucks 11YO Sister And Sperm Inside.mpeg.  And

9   the other file would be the first one on the page, and -- well,

10  it would have been the last one on the page, because it was

11  fully downloaded.  And that would be Lolita Sex Movie-Best

12  Teens-Marianna-Danish Teen, 14YO Fucked Outside-Holland Porno

13  One, full minute 16 second Lolita Network NL.npeg.

14         Q.     Is that on Page 1 or Page 2 of that exhibit?

15         A.     It would be on Page 2.  There is a file name

16  that has the same file name, but you can see it was deleted from

17  the incomplete folder.  And you can't download from an

18  incomplete folder, so that's not going to -- even though it has

19  the same file name, that's not the file that I downloaded.  I

20  downloaded the file on the last page.

21         Q.     What does it mean when something was in an

22  incomplete folder?

23         A.     Say again?

24         Q.     What does it mean when something was in an

25  incomplete folder?

1    A.    LimeWire -- how it works, when you install

2    LimeWire on your computer, it makes two folders -- either a

3    saved or a shared folder or an incomplete folder.  And when you

4    tell it to download a file, it downloads a file from somebody

5    else or a bunch of other people, and it downloads it into the

6    incomplete folder to start with.  And once the file is

7    completely downloaded, then it transfers it from the incomplete

8    folder to your saved or your shared folder for your use.

9    The reason for that is, if you lose Internet

10   connection, or the person that you are downloading from gets off

11   the network, you can't download any more from them, so it stops

12   that file download.  Well, it saves that file in the incomplete

13   folder, and it just continually waits until it can find somebody

14   out there that has that file.  When it finds it, then it

15   continues to download it.  And then once it's complete, it puts

16   it in the save folder.

17   Now, as a user, you can go into the incomplete folder

18   and look at the files that are there, and you may be able to

19   view videos, depending on how much of the video is downloaded

20   and it's not that corruptible.  So you have access as a user to

21   the incomplete folder.  But once file is completed downloaded,

22   LimeWire moves it to your save or your share folder.

23   Q.    Looking at this exhibit, at the first file that

24   you downloaded -- which is the second one on this list; is that

25   correct?

1        A.     Exhibit 10?

2        Q.     Yes.

3        A.     The second one down?

4        Q.     The second one down.

5        A.     Yes.

6        Q.     There is information about a file name, an

7 original name, extension creation date, modification date.  Can

8 you explain what each of those -- ?

9        A.     That's stuff my forensic software gave me.  The

10 file name is what Windows renamed it when it went to the recycle

11 bin.  And that file name is the recycle bin name, basically.

12 And then it shows the original location and the original file

13 name that the file was.  And shows an extension that it's an

14 .mpeg, it's a movie file.  It shows a creation date, then a

15 modified date.  And from the recycle bin, the user would just

16 simply have to click on it and click restore to put it back in

17 its original state.  That's why all this information is kept.

18        Q.     Is there any significance here to the creation

19 and modification date?

20        A.     The creation date is significant in that that's

21 when the file was downloaded.  The modification date is going to

22 be when the download completed, more than likely.  Dates and

23 times, they are what they are.  But typically, the creation date

24 is the date that the file started to download.  And the modified

25 date will be the time that it completed its download.

1          Q.    Turning to Exhibit Number 11, what is that?  Do

2  you recognize that?

3          A.    These are additional files found within the

4  recycle bin on the tower.

5          Q.    They don't have all that information?

6          A.    No.

7          Q.    Were they in the same place as those other ones

8  were?

9          A.    Just a different format, how I pulled it out.

10        MS. DAUGHTREY:  Your Honor, at this time I would ask

11  that Exhibit 11 be entered into evidence and that the jurors be

12  allowed to turn to that tab.

13        THE COURT:  Without objection, Exhibit 11 will be

14  admitted.  The jury may do so.

15  BY MS. DAUGHTREY:

16          Q.    And where do most of these files originate from?

17          A.    The files are showing original file passed from

18  the LimeWire folders, the incomplete and the save folder.  Some

19  of them came from just different folders -- document folder,

20  downloads folder.  But the vast majority of them from the

21  LimeWire folder.

22          Q.    Were you able to look at any of these videos?

23          A.    Say again?

24          Q.    Were you able to look at any of these videos?

25          A.    Yes.

1    Q.    And what was the content of those videos?

2    A.    Pornography.

3    Q.    And were all these files found in the recycle

4    bin?

5    A.    That's correct.

6    Q.    Is it unusual, in your experience investigating

7    these cases, to find files like that, that get deleted?

8    A.    No, ma'am.

9    Q.    Why not?

10   A.    In my experience, I see mainly two types of

11   people with --

12   MS. THOMPSON:  Your Honor, I object.  May we approach?

13   THE COURT:  All right.

14   (Whereupon, a bench conference was held, out of the

15   hearing of the jury, to wit:)

16   MS. THOMPSON:  I object to him and the direction this

17   is going without further foundation.  He says there's only two

18   types of people, and that's -- it's categorizing things.

19   THE COURT:  Well, I will allow him to testify as to the

20   extent of his experience only.

21   (Conclusion of bench conference.)

22   BY MS. DAUGHTREY:

23   Q.    I had asked you about whether it was unusual to

24   see pornography files deleted.  And I asked is that unusual and

25   asked you why.

1     A.     Because they are not --

2           THE COURT:  No, sir.  In your experience with respect

3     to files that are deleted and the cases you worked on, what does

4     it reflect?

5           THE WITNESS:  The exams that I performed, Your Honor?

6           THE COURT:  Yes.  In your experience.

7           THE WITNESS:  In my experience?  Are you talking about

8     what do I find in my experience?

9           THE COURT:  What do they reflect?

10          THE WITNESS:  I can't hear Your Honor.

11          THE COURT:  What do they reflect?  That was the

12    question.  In your experience, when they delete files like that,

13    what does that mean?

14          THE WITNESS:  Concealment.

15          THE COURT:  Next question.

16    BY MS. DAUGHTREY:

17          Q.     Okay.  Those files that were in the recycle bin,

18    could anyone have accessed them?

19          A.     Anybody can access the recycle bin.  But in

20    order to look at the files, you would have to unrecycle them.

21    You would have to restore them back to the computer.

22          Q.     How many files like these did you find on this

23    computer?  How many file names?

24          A.     Several.  I mean, they are all listed.

25          Q.     Okay.  If somebody were to log onto that

1    computer right now, would they be able to find child pornography

2    on that computer?

3            A.      I mean, just as a normal user?

4            Q.      Yes.

5            A.      No, they would have to go in the recycle bin and

6    restore the files that are in the recycle bin.

7            Q.      Did the user of this computer do any Google

8    searches on the computer?

9            A.      Yes, ma'am.

10           Q.      And were you able to determine what kind of

11   search terms were used?

12           A.      Yes, ma'am.

13           Q.      If I may approach, I hand you -- let me hand you

14   three exhibits -- 12, 13 and 14.  And I would like to start with

15   Exhibit 12.  Do you recognize that?

16           A.      Yes, ma'am.

17           Q.      What is that?

18           A.      Those are the search terms that were typed into

19   the -- into Google.

20           MS. DAUGHTREY:  Your Honor, at this time I would ask

21   that Exhibit 12 be entered into evidence and for the jurors to

22   be allowed to look at Tab 12.

23           THE COURT:  Without objection, Exhibit 12 will be

24   admitted.  The jurors may do so.

25   BY MS. DAUGHTREY:

1        Q.     And what is on the first page specifically?

2        A.     It's a list of search terms:  Accidental

3 Cheerleader Flash, Accidental Cheerleader Nudity, High School

4 Basketball Cheerleader, High School Cheerleader, High School

5 Cheerleader Nudity, Tight Panties, Alien Sex, Small Penis Sex,

6 Ass Crack Sex, Young Teen Sex.

7        Q.     And what does Page 2 of that exhibit represent?

8        A.     Page 2 is just showing the raw data where I

9 located those search terms at.  Most of them came from the page

10 file, .sys file.  It just shows that it -- like if you look in

11 the middle of the paper, it says images.  That's going to be

12 html code, I think.  It says equals, and, and safe equals off.

13 Google has safe search where you can put safe search on so you

14 don't see any nudity or anything like that.  Well, that was off,

15 so obviously, if you are searching for young teen sex, safe

16 search would be off.  The query, the search, was Young Teen Sex.

17 And it adds that plus sign in between the terms.  The coding

18 does that.  Not the user.

19        Q.     So what would the user have specifically typed

20 for that search term?

21        A.     Young teen sex.  Young Space teen space sex.

22        Q.     You mentioned something about page file that is

23 on that page.  What is page file?

24        A.     Page file is just -- it's like a temporary space

25 allocated on your hard drive.  You have RAM on your computer.

```
1    And RAM is Random Access Memory that keeps everything that you
2    are using pretty much now available for you for speed-wise.  And
3    that RAM gets filled up and dumped off onto your hard drive into
4    a part of your hard drive.  Windows provide it.  And you can
5    adjust it as a user.  It provides a certain amount of space to
6    access as memory, as random access memory, on the hard drive
7    itself.  So you find a lot of browser Internet traffic, stuff
8    like that, in the page file.sys.
9         Q.    And turning to -- I'm going to skip Exhibit 13
10   for a moment and looking at Exhibit 14, do you recognize that?
11        A.    Number 13, you said?
12        Q.    14.
13        A.    14?  Yes, ma'am.
14        Q.    And what is that?
15        A.    These are samples of file names recovered out of
16   the page file.sys.
17        Q.    So that's the file you were just talking about?
18        A.    Yes, ma'am.
19        Q.    And what is the implication of these?
20        A.    These are all file names that are indicative of
21   child pornography.
22        Q.    Where did they come from?
23        A.    They are showing the file paths and the file
24   names.  And the file paths are showing LimeWire, save folders,
25   and basically coming from the LimeWire application.
```

1          Q.    Let me turn you back to -- let me ask one more
2     question.  Is this all of the page file.sys?
3          A.    No, ma'am.  I just pulled out examples.  There's
4     lots, lots more.
5          Q.    How much more?
6          A.    A lot more than this.  I couldn't give you a
7     page count of how much.
8          Q.    Turning back to Exhibit 13, do you recognize
9     that exhibit?
10         A.    Yes, ma'am.
11         Q.    And what is that?
12         A.    I was able to go into Windows registry and
13    extract out the recently viewed files for Media Player.  Windows
14    saves the last eight files that Media Player plays, as a record.
15    And if you play another one, then the last one drops off.  So we
16    only get the last eight files.
17         MS. DAUGHTREY:  Your Honor, at this time I would like
18    to ask to enter Exhibit 13 and allow the jurors to turn to that
19    tab.
20         THE COURT:  Without objection, Exhibit 13 will be
21    admitted, and the jurors may do so.
22    BY MS. DAUGHTREY:
23         Q.    What exactly is Windows Media Player?
24         A.    Windows Media Player is just a video or a music
25    player that is native to Windows.

1      Q.      Can you tell when these videos were watched?

2      A.      All eight of these videos were played on Media

3   Player.

4      Q.      But do you know when they were played?

5      A.      I don't know.

6      Q.      Does the file give you that information?

7      A.      No, ma'am.

8      Q.      Okay.  And where were these files located when

9   they were watched?

10     A.      The first four of them are showing that they

11  were in a LimeWire -- the first two were in the LimeWire saved

12  folder.  The third one was in the incomplete folder.  The fourth

13  one was in the save solder.  Five, six and seven are going to be

14  files that were played from a temp directory.  And then the last

15  two are from the LimeWire save folder.

16     Q.      Thank you.  I want to talk to you about how this

17  computer was used.  Is it possible that these file names got on

18  to this computer by accident?

19     A.      No, ma'am.

20     Q.      Why not?

21     A.      Because you have to download them from LimeWire.

22     Q.      If someone were looking for adult porn, would

23  you expect to find these file names and files on this computer?

24     A.      No, ma'am.

25     Q.      Was this computer used for other things than

1  viewing pornography?

2          A.      Yes, ma'am.

3          Q.      What kind of things were done with this

4  computer?

5          A.      There was daily activity on the Internet.  There

6  was -- it was used -- a lot of that photography that Mr. Tummins

7  was into.  There was -- I believe it had some documents

8  pertaining to his sixth grade.  It was used just as a general

9  use computer.

10          Q.      How did you know that Mr. Tummins was interested

11  in photography?

12          A.      Well, one, he told me.  And two, I found, I

13  mean, all of his work.

14          Q.      If I may approach and hand you Exhibit 15.  Do

15  you recognize this document?

16          A.      Yes, ma'am.

17          Q.      What is it?

18          A.      It's an exhibit I made showing some of the

19  documents and other things I extracted off his computer.

20          Q.      And can you tell us what each of these

21  documents --

22          A.      The first one appears --

23          Q.      I'm sorry.  Let me interrupt you.  Your Honor, I

24  would ask that this be entered into evidence as Exhibit 15 and

25  allow the jurors to turn the tab.

1        THE COURT:  Without objection, Exhibit 15 may be

2 admitted.  The jurors may do so.

3 BY MS. DAUGHTREY:

4        Q.     My apologies for interrupting.  Can you tell us

5 what each of these documents are?

6        A.     The first one is an open Office document.  And

7 it appears to be some kind of test for sixth grade language

8 arts, which is the class that Mr. Tummins taught.

9        The second one down there is a -- some type of little

10 program that I found that's called Family Tree Maker.  And there

11 is a database file within that program that says Tummins Auto

12 Backup.

13        The next one on the second page was part of an email

14 that I extracted out showing -- it said, Dear Jeremy Tummins,

15 Seth Tummins, your payment was successfully made.  And it's

16 showing a payment of $350 for a 10 by 10 booth at a Firefly Fine

17 Arts Festival.

18        Then on the bottom, I found another document that was

19 written, and it appears to be about a first person account of

20 Mr. Tummins -- part of his life.

21        On the next page is part of an email from Hotmail,

22 where he writes:  My name is Jeremy Seth Tummins, and I'm a

23 registered user.  So it shows that.  I was able to pull out some

24 of those Hotmail fragments.  And below that showing Wells Fargo

25 online, a Jeremy S. Tummins.  And that's going to be part of his

1    Hotmail account, too.

2         And then on the last page, part of the email for the

3    Firefly Fine Art Festival, he types:  I thought I missed a

4    deadline.  And is the extended email, or am I just really late?

5    Then he signed it JST, Jeremy Seth Tummins.

6         Q.    Where were these materials located?

7         A.    Some of the materials were located in folders,

8    you know, My Documents folder or whatever.  The email I pulled

9    out of the page file or unallocated space.  The documents and

10   the Family Tree and stuff were in like the My Documents folder

11   area.

12        Q.    I'm going to ask you just a couple of final

13   questions about this computer.  Did you find anything with

14   Mrs. Tummins' name on it?

15        A.    Just a tax return.  Some tax return documents.

16   As far as any other type document on there, I didn't.

17        Q.    Was it a single tax return or a joint tax

18   return?

19        A.    Joint.

20        Q.    Who appeared to be the primary user of this

21   computer?

22        A.    Mr. Tummins.

23        Q.    And what do you base this conclusion on?

24        A.    All the Internet activity on a daily basis

25   that's got to do with photography and art and the stuff that he

1   was into.  And there was a little bit of other activity that I

2   could see a woman doing rather than a man, but it was pretty

3   consistent.

4           Q.    Like what?

5           MS. THOMPSON:  Your Honor, I object.

6           THE COURT:  Sustained.

7   BY MS. DAUGHTREY:

8           Q.    So the only use you could find that Ms. Tummins

9   used might have been an Internet?

10          A.    Correct.

11          Q.    And were you able to determine -- in your

12  opinion, examining this computer, would an ordinary user have

13  been able to tell that anyone had used this computer to download

14  or view child pornography?

15          A.    Can you say that again, ma'am?

16          Q.    I'm sorry.  After examining this computer, would

17  an ordinary user have been able to tell that anyone had used the

18  computer to download or view child pornography?

19          A.    No, ma'am.

20          MS. DAUGHTREY:  Your Honor, I'm happy to continue.

21  This a good breaking point if you would like to break for the

22  day.

23          THE COURT:  No, ma'am.  You can continue.

24          MS. DAUGHTREY:  All right.

25  BY MS. DAUGHTREY:

1    Q.    All right.  The next thing I would like to do is

2    continue to the Compaq laptop computer.  And could you tell us

3    again where that computer was found?

4    A.    In the same bonus room where the desktop was

5    located.

6    Q.    Where in the bonus room was it?

7    A.    It was underneath a wooden end table that was

8    right beside the other computer.

9    Q.    Okay.  Did you examine this computer in the same

10   way that you did the other computer?

11   A.    I did.

12   Q.    All right.  And when was the operating system

13   software last installed on the Compaq computer?

14   A.    November 17, 2008.

15   Q.    How does that relate to when the operating

16   system on the desktop computer -- ?

17   A.    Within a couple of days of each other.  The

18   desktop was November 15th, and the laptop was November 17th.

19   Q.    And could you tell whether or not this

20   installation was an initial installation or was a

21   reinstallation?

22   A.    It was a reinstallation.

23   Q.    What's the difference between those?

24   A.    Reinstallation is somebody takes the Windows

25   disk, puts it in a computer, and says, Install Windows.  And it

1   will install it over the top of the old Windows.

2          Q.     What is the effect on the computer?  What is the

3   effect on the files on the computer?

4          A.     Well, some files get overwritten, but most of

5   the files will be available in unallocated space.  But that

6   happened a little differently on this one.

7          Q.     And what do you mean by that?

8          A.     Well, from my exam, it appears that the computer

9   had issues, and somebody took all the files off the computer and

10  reinstalled Windows on the 17th.  And after the installation was

11  complete, then they transferred all the files back at one time

12  into one location on the computer, because you've got thousands

13  of files with the same exact creation time.  So that's logically

14  what happened.

15         Q.     In your experience, why would somebody do a

16  reinstallation on their computer?

17         A.     Most of the times you reinstall Windows because

18  your computer has froze up or a virus caused it to seize up.

19  That's the first thought that you get as to why people install

20  Windows.  People install Windows to get rid of things and just

21  start fresh or to hide evidence.  But in this case I believe

22  there was a virus that caused the computer to hose up, and

23  Windows files were extracted and put on an external device,

24  Windows was installed fresh, and then the files were moved back

25  on.

1        Q.      Is it possible -- I retract that.

2        Were you able to tell how often the computer had been

3   used after this reinstallation?

4        A.      It wasn't used very much.  It was used

5   sporadically after the reinstall of Windows.

6        Q.      Was there a registered owner on this computer?

7        A.      The current user was default owner.  But the

8   prior user profile was called Seth.

9        Q.      All right.  So I'm going to turn and talk about

10  what was found on the laptop computer.  Were there any file

11  sharing programs on that computer?

12       A.      There were.

13       Q.      And which specific peer-to-peer or file-sharing

14  programs were there?

15       A.      One that gleaned the most data was Morpheus.

16  But I found remnants of LimeWire folders and BitTorrent also.

17       Q.      How does Morpheus compare to LimeWire?

18       A.      It's just another type of file-sharing

19  application.

20       Q.      Is it similar to LimeWire?

21       A.      Yes.  It works the same concept.

22       Q.      Were you able to determine whether or not there

23  were any key word searches that were used with Morpheus on that

24  computer?

25       A.      Yes, ma'am.

1          Q.     All right.  If I may approach and hand you
2     Government's Exhibit 16.  Do you recognize -- ?
3          A.     Yes, ma'am.
4          Q.     And what is that?
5          A.     These are the Morpheus search terms that I got
6     off the laptop computer.
7          MS. DAUGHTREY:  Your Honor, at this time I would ask
8     permission to enter Exhibit 16 into evidence and request that
9     the jurors be allowed to turn to the tab.
10          THE COURT:  Without objection, Government Exhibit 16
11     will be admitted, and the jurors may do so.
12     BY MS. DAUGHTREY:
13          Q.     This exhibit looks a little bit different than
14     the last one.  Can you explain what this is?
15          A.     Morpheus is different than LimeWire.  And I'm
16     not -- this coding from -- I got this in unallocated space.
17     This is coding from the Morpheus.  And it's showing --
18     apparently the program writes down in human readable format key
19     word search for -- you know, like for example, high school,
20     finish with 52 results.  And it gives a hit like that for its
21     program.  So I was able to get this out of unallocated space and
22     associate it with the Morpheus program.
23          Q.     What do the 52 results mean?
24          A.     I would -- I don't know for sure, but it would
25     be obvious to me that he did a search, and he got -- like in

1  LimeWire, when you get back your results, you have 109 files for

2  terminator.  This would be 52 results showed up for High School.

3        Q.    Do you know why the key word search for Youth

4  would finish with zero results, or key word search for Sex would

5  finish with zero results?

6        THE COURT:  Are those search terms on that laptop

7  computer?

8        MS. DAUGHTREY:  Yes, Your Honor.

9        THE COURT:  Well, it's the witness who answers,

10 counsel.

11       MS. DAUGHTREY:  I'm sorry.  I'm sorry.

12 BY MS. DAUGHTREY:

13       Q.    If you could read nine -- or ten lines down.

14       A.    Yes, ma'am.

15       Q.    And could you read that out loud, please, for

16 the record?

17       A.    Key word search for Youth, finish with zero

18 results.

19       Q.    And there are others like that, too; is that

20 correct?

21       A.    Correct.

22       Q.    What is that about?

23       A.    They got zero results on that search term.

24       Q.    Okay.  All right.  Did you find that any files

25 had been downloaded using the Morpheus file sharing program?

1          A.     Yes, ma'am.

2          Q.     If I may approach with Exhibit 17 for the

3     witness.  Thank you.  Do you recognize this exhibit?

4          A.     I do, ma'am.

5          Q.     And what is that?

6          A.     Files downloaded using Morpheus on the Compaq

7     laptop computer.  And this actually going to be an extraction of

8     the thumbs database file, showing the file names and file times

9     of all the files that were in that folder.

10         Q.     What is a thumbs DB?

11         A.     A thumbs database file -- if you log into your

12    computer and you got to the -- let's say you go to My Pictures

13    folder.  And you open My Pictures folder.  You are going to see

14    little representations of all your pictures so you can visually

15    look to see what picture you want to open up.  And it's the same

16    with movie files.  There is a little visual representation as to

17    what the little movie is.  That's called a thumbnail.  It's a

18    Windows system file, and it's its own little database file.

19         And it keeps a record of the files that are put into

20    that particular location, when they were put there, and the file

21    name of the file.  So that thumbs DB database holds the actual

22    visual representation of the file plus the metadata about the

23    time file.  But it's a system hidden file.  You, as a user, you

24    don't see it in there.

25         If you were to change your computer settings to show

1    all hidden and system files, and then you go into your My
2    Pictures folder, on Windows XP you would see a little obscured
3    thumbs DB database file.  It's hidden from the user, but it
4    contains and keeps a log of everything that goes into that
5    directory.
6            So it logs the file name and the last modified time,
7    which is the creation time, and it keeps a record of it.  So
8    let's just say you have 50 pictures in your My Pictures folder,
9    and you looked at them in thumbnail view, and then you
10   highlighted them all and said Delete, and you deleted all the
11   pictures.  Well, all of those representations of those pictures,
12   and all the information about them, are still in your My
13   Pictures folder in a thumbs database file.  So even though they
14   got deleted, we can still tell that they were there, and we can
15   tell what they were.
16           MS. DAUGHTREY:  Your Honor, at this time I would ask
17   that Exhibit 17 be entered into evidence and that the jurors be
18   allowed to turn to the tab.
19           THE COURT:  Without objection, Government's Exhibit 17
20   will be admitted.  The jurors may do so.
21   BY MS. DAUGHTREY:
22           Q.    Are these all of the files that were found in
23   this database?
24           A.    Yes, ma'am.
25           Q.    Were there associated thumbnail files with them?

1          A.      Yes, ma'am.

2          Q.      You stated earlier that with LimeWire a user has

3    to click something to download a file.  Is that also true for

4    Morpheus?

5          A.      Yes, ma'am.

6          Q.      Okay.  And when a user is looking at -- using

7    Morpheus and doing a search, what do they see once the search is

8    complete?

9          A.      File names.  Similar to LimeWire.

10         Q.      Okay.  Similar.  So would the person who was

11   using this computer had to have picked and chosen these files to

12   download?

13         A.      Yes, ma'am.

14         Q.      Is it possible they could have downloaded

15   accidentally?

16         A.      No, ma'am.

17         Q.      Where were the files located on the computer?

18         A.      The video files were located in the Morpheus

19   shared/downloads directory, which would have been Document and

20   Settings folder, Owner folder, My Documents folder, and then

21   inside that, Morpheus Shared, and then inside Morpheus Shared,

22   Downloads folder.

23         Q.      Is that a normal place for Morpheus files to be

24   located?

25         A.      Yes, ma'am.

1          Q.     Okay.  I would like to approach with Exhibit

2     Number 18.  Do you recognize this document?

3          A.     Yes, ma'am.

4          Q.     What is it?

5          A.     It's additional files located on a laptop Compaq

6     computer.

7          Q.     Where did you find this information?

8          A.     I want to say -- give me just a second.  I got

9     those from the My Documents folder.  There was a shared folder

10    inside of the My Documents folder.

11         Q.     So were these files actually on that computer?

12         A.     Yes.

13         Q.     Okay.  And do you know what the shared folder

14    means?

15         A.     It comes from -- it could have been user

16    created, but more likely than not it was created by LimeWire or

17    another type file-sharing application.  It's not in a typical

18    directory that it normally would be.  If it was belonging to an

19    application, it would be with that application, but it could

20    have been moved.  That shared directory is not default in the My

21    Documents folder.  So it's either user created or a user moved

22    it there from somewheres else.

23         Q.     Okay.  Is there any significance to the dates

24    that are there -- the creation date, modification date, act

25    date?

         A.    Well, it's part of the mass file transfer that I
was talking about before.  All the files were moved back onto
the computer all at once after Windows was installed on
11/17/2008.  Because all of the creation times for all these
files are all the same for that date.  But if you look at the
modified time of the file, they are different, they are all
different.  Well, the modified time would actually be the
original creation date of the file.  And the creation time is
the new creation time when it got moved back onto the computer.

         MS. DAUGHTREY:  Your Honor, I'm not certain if I asked
that that be entered into evidence.  If not, I ask that it be
entered into evidence at this time.

         THE COURT:  Which exhibit?

         MS. DAUGHTREY:  I'm sorry, Exhibit 18.

         THE COURT:  Without objection, Government's Exhibit 18
will be admitted.

BY MS. DAUGHTREY:

         Q.    I would like to hand you Exhibit 19.  Do you
recognize this?

         A.    Yes, ma'am.

         Q.    What is it?

         A.    It's the most recent files viewed using Windows
Media Player on the Compaq laptop.

         Q.    Is that similar to the exhibit we saw for the
Gateway computer?

1          A.     Yes, ma'am.

2          Q.     And what does that represent?

3          A.     It represents the last eight files that were

4    played in Media Player.

5          MS. DAUGHTREY:  At this time I would like to ask that

6    Exhibit 19 be admitted into evidence and that the jurors be

7    allowed to turn to that.

8          THE COURT:  Exhibit 19 will be admitted.  And the

9    jurors may do so.

10   BY MS. DAUGHTREY:

11         Q.     If I may approach and hand you Exhibit 20 and

12   ask if you recognize this.

13         A.     Yes, ma'am.

14         Q.     What is that?

15         A.     It's a list of files found in unallocated space

16   on the Compaq laptop.

17         MS. DAUGHTREY:  Your Honor, I would ask that this be

18   entered into evidence as Exhibit 20 and published to the jury by

19   allowing them to turn to the tab.

20         THE COURT:  Exhibit 20 will be admitted.  And the jury

21   may do so.

22   BY MS. DAUGHTREY:

23         Q.     Were these files that were on the computer?

24         A.     Yes, ma'am.

25         Q.     And if you could read the first line of the

1   data, about halfway through.

2           A.      The first one?

3           Q.      Yes.

4           A.      It's the file -- it says:  Failed to share file,

5   Illegal Pedo Kiddie, Fuck Kiddie, Child Sex, Relief Porn.

6           Q.      I'll stop you there.  What does that fail to

7   share mean?

8           A.      I believe that the sharing capabilities on

9   Morpheus were disabled --

10          MS. THOMPSON:  Your Honor, he said I believe.  As long

11  as it's something he knows and it's not speculating.

12          THE COURT:  Sustained.  Sustained.

13          MS. THOMPSON:  Ladies and gentlemen of the jury, we're

14  going to call it a day.  We lost about a half an hour with out

15  of court conferences, so we're going to try to make up for that.

16  If you will turn your pads in to the Marshal, he will take

17  custody of them until you return tomorrow.  Your seat number is

18  on the back of your pad.  Please don't discuss the case amongst

19  yourselves until you receive all of the evidence, the argument

20  of counsel, and the charge of the Court.  Please do not engage

21  in any type of electronic research or communications concerning

22  this case or any of the persons involved in the case.

23          If you will come back shortly before 9:00, we'll try to

24  get started promptly.  You are free to go.  You can leave your

25  exhibits books in the jury room.  They will lock it up.

1        (Jury out.)

2        THE COURT:  We're in recess.

3   (Conclusion of proceedings on February 24, 2015.)

4                          *  *  *  *  *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

    I, Peggy G. Turner, Official Court Reporter for the United States District Court for the Middle District of Tennessee, with offices at Nashville, do hereby certify:

    That I reported on the Stenograph machine the proceedings held in open court on February 24, 2015, in the matter of USA v. JEREMY SETH TUMMINS, Case No. 3:10-00009; that said proceedings in connection with the hearing were reduced to typewritten form by me; and that the foregoing transcript, Pages 1 through 115, is a true and accurate record of said proceedings.

    This the 7th day of April, 2015.




                    *Peggy G. Turner*
                    S/Peggy G. Turner, RPR
                    Official Court Reporter