```
 1              IN THE UNITED STATES DISTRICT COURT

 2         MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION

 3    ------------------------------------------------------------

 4    UNITED STATES OF AMERICA,      )

 5                  Plaintiff,       )

 6                                   )

 7    v.                             )   CASE NO. 3:10-00009

 8                                   )

 9    JEREMY SETH TUMMINS,           )

10                  Defendant.       )

11    ------------------------------------------------------------

12

13                     TRANSCRIPT OF PROCEEDINGS

14                           VOLUME II

15    ------------------------------------------------------------

16    DATE:             February 25, 2015

17    TIME:             9:00 A.M.

18    BEFORE:           HONORABLE WILLIAM J. HAYNES, JR.

19                      And a Jury

20    ------------------------------------------------------------

21

22

23    COURT REPORTER:   PEGGY G. TURNER
                         OFFICIAL COURT REPORTER
24                       801 BROADWAY, ROOM A-837
                         NASHVILLE, TENNESSEE 37203
25                       PHONE:  (615)726-4893
                         Peggy_Turner@tnmd.uscourts.gov
```

1                          A P P E A R A N C E S:

2        For the Plaintiff:   Carrie Daughtrey
                              Lynne Ingram
3                             Assistant U.S. Attorneys
                              Nashville, TN
4
         For the Defendant:   Jennifer Thompson
5                             Attorney at Law
                              Nashville, TN
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        W I T N E S S E S:

2        SCOTT LEVASSEUR (Continued from 2/24/15)

3        Direct Examination by Ms. Daughtrey          Page  5

4        Cross Examination by Ms. Thompson            Page 34

5

6        (Voir Dire)

7        SCOTT LEVASSEUR

8        Examination by Ms. Thompson                  Page 56

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              P R O C E E D I N G S:

2      THE COURT:  Before we get started, I was informed by my

3 law clerk that there was a request related to some exhibits.  As

4 reflected in my orders setting trials and other matters, I would

5 request that counsel raise these matters in open court and not

6 send the request through my staff.

7      MS. DAUGHTREY:  I apologize for that, Your Honor.

8      THE COURT:  Any preliminary matters before we get

9 started?

10     MS. DAUGHTREY:  Your Honor, I did discover this morning

11 that there was an error in Exhibit 24.  It's not with regard to

12 the images that are there, but where the images were located.  I

13 have conferred with Ms. Thompson.  I have corrected that.  It's

14 Exhibit 24 that has not been entered into evidence, so the

15 jurors have not seen that yet.  And I would ask permission from

16 Your Honor to replace those exhibits in the jury books.  I think

17 it will take less than five minutes.  We have a number of people

18 here to help do that.

19     THE COURT:  Do you expect to get to Exhibit 24 during

20 the first session?

21     MS. DAUGHTREY:  Yes, I do.  Before the first break.

22     THE COURT:  I'm going to ask the Marshal to go into the

23 jury room, collect the exhibit books and bring them to the

24 courtroom, and allow you all to make the substitution.

25     MS. DAUGHTREY:  Thank you, Your Honor.

```
1          THE COURT:  We'll be in recess.
2          (Recess.)
3          THE COURT:  You may be seated.  All right.  Are you
4     ready?
5          Bring the jury in, Mr. Marshal.
6          (Jury in.)
7          THE COURT:  You may be seated.  Good morning, ladies
8     and gentlemen of the jury.  We will continue now with the
9     examination of this witness.
10          Counsel?
11    CONTINUED DIRECT EXAMINATION
12    BY MS. DAUGHTREY:
13          Q.    Good morning, Detective Levasseur.
14          A.    Good morning.
15          Q.    Yesterday there was a mention of whether
16    LimeWire still exists.  Can you tell us what you know about
17    that?
18          A.    LimeWire company was shut down by the United
19    States government a few years back.  You can still get versions
20    of LimeWire from the Internet that were already in production,
21    but LimeWire itself has been shut down.
22          Q.    Okay.  Is that also true of Morpheus?
23          A.    I don't know, ma'am.  I haven't heard anything
24    about that.
25          Q.    Okay.  I have put a couple of exhibits from
```

1    yesterday in front of you.  Turning to Exhibit 18, can you tell

2    us whether any of any of those file names include references to

3    minors?

4              A.    They do, ma'am, yes.

5              Q.    Okay.  And did you view those files to see if

6    they might actually contain minors?

7              A.    Yes, ma'am.

8              Q.    What did you find?

9         MS. THOMPSON:  Your Honor, I object at this point.

10        THE COURT:  Ladies and gentlemen of the jury, I'm going

11   to have to excuse you for a few minutes.  I'm sorry, this is one

12   of those pogo stick moments.  Please don't discuss the case

13   amongst yourselves until you receive all of the evidence, the

14   argument of counsel, and the charge of the Court.  It should be

15   a brief recess.

16        (Jury out.)

17        MS. THOMPSON:  Your Honor, whether or not these people

18   are minors is a question for the jury to decide.  And so I

19   object to Mr. Levasseur telling the jury whether or not these

20   people are minors.

21        MS. DAUGHTREY:  Your Honor, if I may, I believe his

22   answer is going to be that they are adults or that they are

23   difficult to tell.  I don't know if Ms. Thompson will still

24   object to that or not.

25        THE COURT:  I don't know the basis for this statement.

1    I don't know, did he -- is it based their appearance?  Is it

2    based upon prior information that this person on the screen is a

3    minor?  I mean, how does he know it?

4            MS. DAUGHTREY:  Right.  And he won't be testifying that

5    any of them are minors.  He will be testifying that they appear

6    to be adults.  Or difficult to tell.

7            THE COURT:  Whether they are a minor -- it seems to me

8    that it's more helpful if we provide a more specific or

9    quantitative basis upon which he makes the conclusion that they

10   are minors.  And I think that's more helpful and more probative

11   to the jury than to just him say, I looked at this and they are

12   minors.  We have -- how does he make that determination?

13           MS. DAUGHTREY:  Would it be objectionable to the

14   defense if I asked if any of these files contained adults?

15           MS. THOMPSON:  No, I don't -- I don't object to -- they

16   are clearly adults.

17           THE COURT:  Well, that --

18           Sir, when you looked at these images, how did you come

19   to any conclusion about the age of the persons on the images

20   that you saw?  How did you come to any conclusion about that?

21           THE WITNESS:  Just from my personal experience and

22   knowledge with viewing these files all the time and --

23           THE COURT:  I mean, did you make a determination based

24   upon their bodily appearance or what?

25           THE WITNESS:  Based on their -- what they appear to be.

1    Some of the files she is asking about in Exhibit 18 -- they are

2    obviously grown adults.  Some of the files are what we call age

3    difficult.  They could be 18 year olds or they could be 16 year

4    olds.  That's what we call difficult, and we don't include that

5    as child pornography.

6            THE COURT:  Well, why is this document in evidence?

7            MS. DAUGHTREY:  Your Honor, the document is in evidence

8    because these are file names that --

9            THE COURT:  Why is it relevant?

10           MS. DAUGHTREY:  It's relevant because the file names

11   have information about child pornography in them.  The file

12   names look like that.  What he's going to testify to is that he

13   often -- that people do download files, thinking they are child

14   pornography, and that they end up being adult pornography.

15           MS. THOMPSON:  Your Honor, I take back what I said a

16   minute ago about it's fine if he testifies some were adults.  I

17   feel uncomfortable him testifying as to any age, because that

18   might leave the jury with the impression that he knows for sure

19   who is an adult, and then the other ones he has expertly looked

20   at and they were children.  And I object to that.

21           MS. DAUGHTREY:  Okay.  I will withdraw the question.

22           THE COURT:  You can bring the jury back in.

23           (Jury in.)

24           THE COURT:  Once again, ladies and gentlemen of the

25   jury, please -- I apologize.  Please take any frustrations out

1    on me.

2            Counsel?

3            MS. DAUGHTREY:  Thank you.

4    BY MS. DAUGHTREY:

5            Q.    Detective Levasseur, yesterday you mentioned

6    that there was a user profile, an old user profile, on the prior

7    installation of Windows on that laptop computer.

8            A.    Yes, ma'am.

9            Q.    Can you explain what that means?

10           A.    Well, the last time before the new installation

11   of Windows occurred, the computer was in use, and it had folders

12   and files and had profiles.  And the profile name that I was

13   able to recover from unallocated space showed that the user

14   profile name was Seth.  In the new installation of Windows, it's

15   the default name that Windows gives if you don't actually type

16   in a user profile.  It just defaults to owner.

17           Q.    Did you find any files that were associated with

18   that profile of Seth that had been on the computer?

19           A.    I did.

20           Q.    Okay.  Your Honor, if I may approach the witness

21   and hand him Exhibit 21.

22           Do you recognize this?

23           A.    I do.

24           Q.    What it is?

25           A.    It's list of file fragment names, names of files

1   that I found on the laptop computer from a different

2   installation of Windows.  One where the user profile name was

3   Seth.  And I was able to recover a file path and a file name

4   which was -- the file path was Documents and Settings, Seth,

5   Desktop, New Folder.  So that means that there was a folder

6   called New Folder on the desktop.

7   And within that folder there was a file named

8   Girl_12_Year_Old_Fuck_With_Boy_13_Year_Old_In_Birthday_Party.avi

9   which would indicate it's a movie file.

10          The next file that I was able to recover from that

11  folder -- the file name I was able to recover from that folder

12  was Teacher_Seducing_Student.divx, which is another multi-media

13  file, a video file.  And then the third one was

14  Russian_Preteens.avi, which is a movie file.

15          MS. DAUGHTREY:  Your Honor, at this time I would ask

16  that Exhibit 21 be entered into evidence.

17          THE COURT:  It will be admitted.

18  BY MS. DAUGHTREY:

19          Q.    Were these pieces or file names -- were they

20  found all in the same place on the laptop computer?  Or did they

21  come from different places?

22          A.    They came from unallocated space.  And as far as

23  the physical location, I don't remember documenting that.

24          Q.    Okay.  Was this laptop computer used for things

25  other than pornography?

1      A.      Yes, ma'am.

2      Q.      And did you find any files related to any other

3  person other than Mr. Tummins on this computer?

4      A.      Yes, ma'am.

5      Q.      Can you tell us about that?

6      A.      Yesterday I said that after Windows was

7  installed that a whole mass of files were copied back over onto

8  the computer.  In the mass copying of all those files back onto

9  the computer, there -- there was a folder called -- the folder

10  was called Bryson.  And within that folder were a couple -- more

11  than 2,000 files and folders that appeared to belong to a man

12  called Bryson.  And from the documents it was all school-related

13  documents to do with -- a lot of school-related documents to do

14  with middle school.  It appears as though he was a teacher.

15      And copied in that folder was also a -- was also a

16  database file for email that would have come from a computer,

17  but I'm not sure which computer, because it was copied over to

18  this computer.  And it had emails from this Bryson man, dating

19  -- the last email in that email database file was in 2005.  So

20  that -- a lot of those files and stuff in that folder date back

21  to 2005.

22      Q.      And that's approximately how many years before

23  you seized the computer?

24      A.      I seized the computer in 2009.  So about four

25  years.

1    Q.    And were you able to tell whether or not there

2    was an individual named Bryson who used that computer?

3    A.    I searched for anything I could to try to find,

4    you know, any other documents on the computer as showing this

5    Mr. Bryson as using this computer, and I found none.

6    Q.    Did Mr. Tummins ever tell you that somebody else

7    had used that computer?

8    A.    No, ma'am.

9    Q.    Okay.  Did you find other documents that were

10   related to the defendant on that computer?

11   A.    I did.

12   Q.    If I may hand you Exhibits 22 and 23.  Do you

13   recognize those documents?

14   A.    I do.

15   Q.    And can you tell us what Exhibit 22 consists of?

16   A.    Exhibit 22 is a document that I found on the

17   computer, and it has to do with students' grades.  And it's

18   digitally signed J. S. Tummins.  And he's informing parents of

19   students' grades.

20   Q.    Okay.  And are the other documents similar

21   documents to that?

22   A.    The second document is -- has -- it's titled at

23   the beginning as Seth Tummins Education 5360 Final Exam, Dr.

24   McCanahan.  And then there is writing about the teaching.  And

25   the next image is -- it's titled Eight Images.  And it's

1    digitally signed on the bottom J. S. Tummins.  And it talks

2    about:

3        The premise of my work is to serve as an introduction

4    to one another, to our lands.  It appears to be some kind of

5    school, college document.

6        Q.    And were these -- is this information that you

7    found on the laptop computer?

8        A.    Correct.

9        Q.    Okay.  And Exhibit 23 -- just generally, what is

10   in that exhibit?  Do you recognize it?  And what is in it?

11       A.    Those are fragments of Hotmail being accessed

12   with the user name of Seth.  And another fragment of email with

13   SethTummins@Hotmail.com showing as email on the bottom.

14       MS. DAUGHTREY:  Your Honor, at this time I would like

15   to ask to enter Exhibits 22 and 23 into evidence and allow the

16   jurors turn to those tabs.

17   BY MS. DAUGHTREY:

18       Q.    Going back to Exhibit 23 -- I mean 22, I'm sorry

19   -- do you recall where you found those --

20       THE COURT:  Excuse me for a moment.  First of all,

21   Exhibits 22 and 23 are admitted.  I think it would be more

22   appropriate to have them admitted before you get into the

23   substance.

24       MS. DAUGHTREY:  I apologize to Your Honor.

25   BY MS. DAUGHTREY:

1        Q.      Detective Levasseur, can you tell us where those

2   documents were found on the computer, those three pieces out of

3   Exhibit 22?

4        A.      Exhibit 22, they were in the Owner Profile

5   folder.  And I believe in the My Documents folder.  I'm not a

6   hundred percent sure, but I believe in the My Documents folder.

7        Q.      Okay.  And Exhibit 23 -- where on the computer,

8   on the laptop, did you find these?

9        A.      I pulled these out of either unallocated space

10  or page file.sys.

11       Q.      Okay.

12       A.      Well, it's going to be unallocated space,

13  because the page file would not have existed for this user

14  profile on the current computer.  So it would be unallocated

15  space.

16       Q.      The bottom of Exhibit 23, the third item there

17  -- what is the nature of that?

18       A.      It appears to be a communication.  It starts

19  out:  Laura McMullin and Andrea Tummins.  This inside panel is a

20  good place to provide additional information.  If it's a musical

21  CD, you may want to list credits or give special thanks.  You

22  may also want to provide the date and location of the recording

23  or copyright information.  If your CD contains software, you may

24  want to provide installation instructions, system requirements,

25  or product information.  Produced in late December 2007 for

1    friends and family, Greetings from Tennessee, phone number --

2    and the phone number is listed -- and then email

3    SethTummins@Hotmail.com.

4          Q.    Do you know who Laura McMullin is?

5          A.    Do I know what, ma'am?

6          Q.    Do you know who Laura McMullin is?

7          A.    I believe that that's his wife's maiden name.

8          Q.    Did you find any other items or any evidence of

9    Laura McMullin Tummins on this laptop computer?

10         A.    I don't recall so, ma'am.

11         Q.    Did you find any evidence that she had used the

12    computer?

13         A.    I did not, ma'am.

14         Q.    You mentioned yesterday that you thought that

15    the reinstallation may have happened because why?

16         A.    The computer got a virus and it stopped working

17    or partially working.

18         Q.    Okay.  And is it possible that that virus could

19    be responsible for the files on the computer?

20         A.    I didn't find any evidence of that, ma'am.

21         Q.    Okay.  In your experience investigating child

22    exploitation cases and doing computer forensic exams, have you

23    ever run across a virus that can download child pornography to a

24    computer?

25         A.    No, ma'am.

1         Q.     We've talked a lot about the file names and

2 other information that was found on each of these computers.

3 And I would like to turn your attention now to the content of

4 some of those files. In examining these computers, were you

5 able to recover any files that involved sexual activity that

6 might include children under the age of 18?

7         A.     I was.

8         Q.     Okay. Were you able to recover any video files?

9         A.     I was.

10        Q.     And where were those video files located?

11        A.     In the recycle bin.

12        Q.     On which computer?

13        A.     In the tower, the Gateway tower.

14        Q.     Okay. And did you find any other images on the

15 computer?

16        A.     On the Gateway computer?

17        Q.     On either computer.

18        A.     I found a lot of images and videos on the

19 computers, yes.

20        Q.     Okay. If I may approach and hand you what has

21 been previously marked as Exhibit 24. Without going into any

22 detail about this exhibit, could you just look at it and see if

23 you recognize the exhibit.

24        MS. THOMPSON: Your Honor, may I approach?

25        THE COURT: Yes.

1    (Whereupon, a bench conference was held, out of the

2    hearing of the jury, to wit:)

3    MS. THOMPSON:  Several of the jurors have already

4    turned the page and are already looking at these exhibits before

5    they have been introduced.  And I would also, while we're up

6    here, like to renew my objection to still photographs of videos

7    being introduced instead of the video.

8    THE COURT:  For the reasons stated earlier, the

9    objections are overruled.  The jurors having notebooks with all

10   of the exhibits is something that was agreed to earlier.  They

11   asked if they could do that ahead of the schedule and look at

12   exhibits before they were entered into evidence.  That was

13   agreed to earlier.

14   (Conclusion of bench conference.)

15   BY MS. DAUGHTREY:

16   Q.    Sorry if I have already asked this question.  Do

17   you recognize -- ?

18   A.    I do.

19   Q.    And where did those -- what does that exhibit

20   contain?

21   A.    It contains -- the first two pages contain

22   images that were thumbnails that I recovered off of the laptop.

23   And the other pages are screen captures that I created of the

24   video files that I recovered off of the desktop.

25   Q.    Okay.

1    MS. DAUGHTREY:  Your Honor, at this time I would ask

2    that Exhibit 24 be entered into evidence and that the jurors be

3    allowed to turn to that tab.

4    THE COURT:  It will be admitted.  And ladies and

5    gentlemen of the jury, I'm going to ask you, please avoid, if

6    you can, getting ahead in the exhibit book.  Let's just wait

7    until it's actually admitted.  I know there is a temptation to

8    just get ahead of schedule and see what's coming up, but if you

9    could, try and avoid that.

10   BY MS. DAUGHTREY:

11        Q.    Looking on the first page, at the very top there

12   is a file name.  Can you tell us what that file name is?

13        A.    It's a file name.  It's preceded by thumbs DB,

14   which is what the system -- that thumbs brackets 146215.db is

15   issued by Windows software.  But the actual file name of the

16   image was with -- well, the image was a video file.  It was

17   My_Nine_Year_Old_Cousin_Sucking_My_Cock.mpeg.  And then you have

18   brackets with numbers.jpeg.  That's a Windows function.  Windows

19   is making a jpeg, an image, of the video file frame.  So it's

20   got two extensions.

21        Q.    Okay.  So the original file name that was

22   originally on the computer before Windows and Thumbs.db added on

23   things to it -- what was that the original file name?  What did

24   it begin with?

25        A.    My.

1       Q.     And what did it end with?

2       A.     Mpg.

3       Q.     Okay.  So it's that portion in the middle?

4       A.     Correct.

5       Q.     Okay.  And you testified earlier that you found

6 this on the Compaq laptop computer?

7       A.     Correct.

8       Q.     Where was it on that computer?

9       A.     It was in the thumbs database file that was

10 within the LimeWire Save folder.

11       Q.     And did you find -- you indicated before that it

12 was --

13       A.     Let me correct that.  I'm thinking of another

14 image in that location that I gave.  Give me just a second.  I'm

15 going to have to say that I don't recall which folder I got that

16 out of.

17       Q.     Okay.  Did you -- in the course of your

18 examination, did you prepare a report in this case?

19       A.     I did.

20       Q.     All right.  And do you have that report with

21 you?

22       A.     Let me check my report, ma'am.  That thumbnail

23 would have come from Documents and Settings/Owner/My

24 Documents/Morpheus Shared/Downloads.  So it would have been in

25 the downloads folder that was inside of the Morpheus shared

folder, which was in the My Documents folder.

Q.    Okay.  How would this thumbnail have gotten to that folder?

A.    Morpheus downloads the files to the file that it's directed to.  And apparently this one was the Morpheus Shared/Downloads folder.  And once the video file is downloaded to that folder and then viewed, a thumbnail is created by Windows to show the representation of the file to the user.  So Windows makes the thumbnail file from the video file.  And it resides there.  And it's like I described yesterday.  It's in the database file.  And even though the file is deleted, that image of the video still stays there.

Q.    Do you recognize this image?

A.    I do.

Q.    And does it belong to a specific series that you know of through your investigation and work?

A.    It does.

Q.    What is the name of that series?

A.    The Vicky series.

Q.    Turning to Page 2.

THE COURT:  Of what exhibit, please?

MS. DAUGHTREY:  Of Exhibit 24.

BY MS. DAUGHTREY:

Q.    Can you tell us what the file name is in this case?

1          A.     It's a -- the original file name I do not have.

2   I just -- you just have Thumb Cache-961416.db.  And that's going

3   to be -- the location of that file is going to be a mistake on

4   my part.  The file name I told you that it was located on the

5   laptop.  That file name is indicative of Windows Vista because

6   of the underscore 96 in the file name that I didn't look at

7   earlier.  And that file name is going to be indicative of Vista.

8   So I was incorrect when I said that file was located on the

9   laptop.  And I told that you earlier wrongly.

10         Q.     Okay.  Do you have a pen with you?

11         A.     No, ma'am.

12         Q.     If I may approach.  Could you cross out the

13  location on that and put your initials by it.

14         THE COURT:  If would you date it.  Date the change.

15         (Witness complies.)

16         THE WITNESS:  I'm vapor locked.  What's the date?

17  BY MS. DAUGHTREY:

18         Q.     I believe it's February the 25th.  Can you tell

19  us why it is that this file name does not have the original file

20  name in it?

21         A.     Windows XP and Windows Vista and Windows 7 --

22  they act differently, and they handle these files differently.

23  In Windows XP, the thumbnail database file resides in the folder

24  where the files were.  So it's very easy to correlate as to

25  where those files actually were, even though they were deleted.

1    In Windows Vista and Windows 7, the thumbnails database file is

2    in a Windows folder and not in the folder of where the file was.

3    And it stopped giving us location of the actual file name and

4    just gave us what you are looking at on the paper, more or less.

5         Q.    Turn to Page 3 of Exhibit 24.  Can you explain

6    what this series of images is?

7         A.    These are screen captures that I took from a

8    video file that was in the recycle bin.  When I recovered it,

9    the original file name to that file was

10   Family_Sex-13YO_Brother_Fucks_11YO_Sister_and_Sperm_Inside.mpeg.

11        Q.    So were you able to recover the whole video?

12        A.    I was.

13        Q.    And how long was that video?

14        A.    Ma'am, this exhibit that I have is incorrect.

15   The location on my exhibit is saying that it came from the

16   laptop.  And I know that we -- it was on a desktop.  I don't

17   know if all of the exhibits are like that.

18        Q.    Okay.  If you could again take your pen and

19   cross out the incorrect portion and initial and date it.

20        A.    (Witness complies.)

21        Q.    All right.  So which computer was this?

22        A.    This came off of the tower.  This is the same

23   video file that I downloaded on my undercover operation.

24        Q.    Okay.  And is this one of the ones that you

25   downloaded -- on what date?

1          A.      The 21st of April, I believe it was.

2          Q.      Okay.  And how long is this video?

3          A.      This video is approximately five minutes and 55

4   seconds long.

5          Q.      And where -- what is this initial frame?  What

6   does that mean?

7          A.      The initial frame, the screen capture -- well,

8   that would be the thumbnail of the video file.  It's the initial

9   frame of the video.  And it's depicting somebody appears to be

10  laying down in panties.

11         Q.      Where did the other additional frames come from?

12         A.      I -- I played the video, and paused it and took

13  screen captures of the screen to make these exhibits.

14         Q.      And these exhibits -- are they all in the first

15  few frames of the file, over the whole file?  Or what parts of

16  the file or the video file did they come out of?

17         A.      On the first few frames you see, of course, I

18  started with the first frame.  And then they were the beginning

19  of the video file, the next couple.  And it's a progression

20  through the movie file.  The next two.  And then the final two

21  are the ending of the video file.

22         Q.      Okay.  And the final two -- what page are those

23  on in this exhibit?

24         A.      Page 4.

25         Q.      Okay.  And can you explain what that last screen

1    shot is from the video?

2              A.    It appears to be a --

3              MS. THOMPSON:  Your Honor, I object to him describing

4    the picture.  The picture --

5              THE COURT:  Would counsel approach the bench?

6              (Whereupon, a bench conference was held, out of the

7    hearing of the jury, to wit:)

8              THE COURT:  Yes, ma'am.

9              MS. THOMPSON:  I object to him describing the picture

10   and what it appears to be.  The picture is in front of the jury.

11   They can make their own decision regarding the content.

12             THE COURT:  What is this testimony going to be?

13             MS. DAUGHTREY:  That it's a picture of a girl on a bed.

14             MS. THOMPSON:  Well, even just saying the word, girl.

15   It could be a woman on a bed.  I object to him describing the

16   picture.

17             THE COURT:  Is he going to provide any basis for which

18   he says it's a girl as opposed to a woman?

19             MS. DAUGHTREY:  Your Honor, I will withdraw the

20   question.

21             (Conclusion of bench conference.)

22   BY MS. DAUGHTREY:

23             Q.    Turning to Pages 4 and 5 of Exhibit 24, on what

24   computer did you find this?

25             A.    I found them on the tower, the Gateway tower.

1    Do you want me to make the correction?

2            Q.    Yes, if you could, please.  And initial and date

3    it.

4            A.    (Witness complies.)

5            Q.    And where on the Gateway computer did you find

6    the file?

7            A.    The recycle bin.

8            Q.    And this file end that's at the very top -- what

9    is that?

10           A.    The file end at the very top is a file name

11   given by Windows Operating System to the file when it's

12   introduced into the recycle bin.

13           Q.    Okay.  And the original file name -- where does

14   that come from?

15           A.    The original file name comes from the data

16   within the recycle bin.

17           Q.    And how long is this particular video?

18           A.    This video is approximately 32 minutes and 16

19   seconds.

20           Q.    Okay.  And is this -- how did you go about

21   creating these images?

22           A.    I played the -- again, the initial frame of the

23   movie file, which would also be the thumbnail, is the first one.

24   And then I played the video in a Media Player, paused it, took a

25   screen capture, and moved it off to Word Document.  Off -- yeah,

1    off the Word Document.

2          Q.    So all of these images that are on these two

3    pages come from that video?

4          A.    Correct.

5          Q.    And is that true of the previous set as well?

6          A.    Correct.

7          Q.    Is this one of the ones that you downloaded?

8          A.    This is.

9          Q.    And turning to the final two pages.  And tell us

10   what computer you found this on.

11         A.    This was also located on the Gateway tower.  Do

12   you want me to make the change?

13         Q.    Yes, please.  And how long is this video?

14         A.    This video is approximately 16 minutes and four

15   seconds long.

16         Q.    And I'm sorry if I already asked you.  Where on

17   the Gateway computer was this found?

18         A.    In the recycle bin.

19         Q.    Did you create these images in the same way you

20   did on the previous four pages?

21         A.    I did.

22         Q.    Okay.  If I may approach and hand you

23   Government's Exhibit 25.  Do you recognize that CD?

24         A.    Yes, ma'am.

25         Q.    Have you viewed the content of that CD?

1    A.    Yes, ma'am.

2    Q.    How do you know?

3    A.    I did it this morning, and I initialed the disk.

4    Q.    And what is on that disk?

5    A.    It contains video files that are in the -- from

6  what I took screen captures from.

7    Q.    So this Exhibit 24 -- the video files are on

8  that disk?

9    A.    Correct.

10    MS. DAUGHTREY:  Your Honor, at this time I would ask

11  that that be entered into evidence.

12    THE COURT:  Exhibit 25 will be admitted.

13  BY MS. DAUGHTREY:

14    Q.    Is it possible that these files were

15  accidentally downloaded to this computer?  Or these computers?

16    A.    No, ma'am.

17    Q.    Based on what you found on these computers, do

18  you have an opinion on whether or not a user of the computer was

19  trying to view child pornography?

20    A.    Yes, ma'am.

21    Q.    What is your opinion about that?

22    A.    It's my opinion --

23    MS. THOMPSON:  Your Honor, I object.

24    THE COURT:  Ladies and gentlemen of the jury, we are

25  going to have to excuse you for a few minutes.  Please don't

1    discuss the evidence until you receive all of the evidence, the

2    argument of counsel, and the charge of the Court.

3             (Jury out.)

4             THE COURT:  You may be seated.

5             MS. THOMPSON:  Yes, Your Honor.  I object.  She is

6    asking him in his opinion does he believe -- she is asking him

7    to go to the intent of Mr. Tummins when he downloaded this

8    pornography, if he did.  And Your Honor, I would state that the

9    ultimate question of intent is specifically listed in the

10   evidence rules.  She may not ask him to comment on Mr. Tummins'

11   intent.  Just because she substitutes the name of the user

12   instead of Mr. Tummins, she is asking him to comment on the

13   specific intent of downloading these files.  That's an ultimate

14   question for the jury to decide.  I object to him answering this

15   question.

16            MS. DAUGHTREY:  Your Honor, the question was whether or

17   not the user of the computer, not Mr. Tummins.

18            THE COURT:  Yeah, but all of your other questions --

19   all of the other evidence you have elicited from this witness is

20   that it had to be Mr. Tummins.  And that Tummins was the only

21   one using these computers.  That's all of the evidence you have

22   been eliciting.  You have been excluding everybody else.  If

23   anybody else's name shows up, you say, any evidence that they

24   used this computer?  So I don't think that is a legitimate

25   distinction.

1       MS. DAUGHTREY:  Okay.

2       THE COURT:  Anything else?

3       MS. DAUGHTREY:  No.

4       THE COURT:  Further response to the objection?

5       MS. DAUGHTREY:  No, Your Honor.

6       THE COURT:  No, her response to your objection.

7       MS. DAUGHTREY:  I'm sorry.  I withdraw the question.

8   I'm sorry.

9       THE COURT:  Okay.  The question is withdrawn.

10      MS. THOMPSON:  Your Honor, since the question has

11  already been asked, could the Court please instruct the jury to

12  disregard the question?

13      THE COURT:  I will instruct them that the question has

14  been withdrawn.

15      (Jury in.)

16      THE COURT:  Once again, I apologize, ladies and

17  gentlemen of the jury.  The question asked of the witness was

18  withdrawn.

19      You may ask your next question.

20  BY MS. DAUGHTREY:

21      Q.      Detective Levasseur, I asked you questions

22  yesterday about talking with the defendant on May 18 of 2009.

23  Who is it that you interviewed?

24      A.      I interviewed Mr. Jeremy Seth Tummins, sitting

25  over there.

1        Q.     And what is he wearing in the courtroom today?

2        A.     He is wearing a blue shirt and a gray jacket.

3        MS. DAUGHTREY:  Your Honor, may the record reflect that

4 he has identified the defendant.

5        THE COURT:  The record will so reflect.

6 BY MS. DAUGHTREY:

7        Q.     And where is it that this interview took place?

8        A.     At Mr. Tummins' residence.

9        Q.     Is that located in the Middle District of

10 Tennessee?

11        A.     It is.

12        Q.     Did you record that interview?

13        A.     I did.

14        Q.     Why?

15        A.     I record all my contacts with suspects and when

16 I do search warrants.  That's just what I do.

17        Q.     Is that something that other law enforcement

18 officers in your agency typically do?

19        A.     Yes, ma'am.

20        Q.     Okay.  Did you tell him you were recording the

21 interview?

22        A.     No, ma'am.

23        Q.     Why not?

24        A.     I didn't have any reason to.

25        Q.     Is that something that other law enforcement

```
1   officers in your agency do?
2           A.      Yes, ma'am.
3           Q.      How long is that recording?
4           A.      I think it's over two hours.
5           Q.      Okay.  Did you listen to that interview in
6   preparation for this trial?
7           A.      I did.
8           Q.      When did you listen to it?
9           A.      On Monday.
10          Q.      Okay.  Were you tough on Mr. Tummins when you
11  were interviewing him?
12          A.      I was.
13          Q.      Why?
14          A.      I felt he wasn't being honest to me.  He wasn't
15  -- after he initially confessed that he was the one that
16  downloaded the child pornography, my questions --
17          MS. THOMPSON:  Your Honor, I have an objection.
18          THE COURT:  Would counsel approach the bench.
19          (Whereupon, a bench conference was held, out of the
20  hearing of the jury, to wit:)
21          MS. THOMPSON:  I object to whether -- he's giving an
22  opinion as to whether or not my client was honest in what he
23  stated.  The jury can listen to interview, and the government
24  can put the interview on.  But I object to him giving an opinion
25  about whether or not my client was honest.  And I object to him
```

1  calling it a confession at this point.  A confession has certain

2  specific legal requirements and he has not been set up to

3  testify to that.  So I object to that.

4  MS. DAUGHTREY:  Your Honor, he is just testifying to

5  what he believed and why he was being hard on him.  Certainly

6  the other things are subject to cross examination if the defense

7  wants to do that.  I don't feel it's necessary to play a two

8  hour tape for the jury.  I think his answering questions about

9  that -- if Ms. Thompson wants to back and play that tape, that's

10  fine.  But I'm not going to ask the jury to sit through two

11  hours of it.  I think a summary of it is fine.

12  THE COURT:  The question wasn't designed to elicit a

13  summary.  It was designed to give an opinion on something that I

14  don't know that there is a predicate for.  I mean, he is

15  characterizing something nobody has heard.

16  (Conclusion of bench conference.)

17  THE COURT:  Ladies and gentlemen of the jury, we're

18  going to take our morning recess.  Please don't discuss the case

19  amongst yourselves until you receive all of the evidence, the

20  argument of counsel, and the charge of the Court.  It will be

21  about a 15 minute recess.

22  (Jury out.)

23  THE COURT:  We'll be in recess.

24  (Recess.)

25  THE COURT:  You be may be seated.  The objection to the

testimony eliciting the opinion of the officer on whether the defendant was truthful in the interview, the Court notes a series of cases citing <u>United States v. Wright</u>, 464 Fed. App. 475, beginning at Pages 479 and continuing over to 480. Of particular note, the Sixth Circuit cited one of its earlier opinions in <u>United States v. Warshak</u>, 631 F.3d 266, that testimony that the defendants took actions with certain intent violated Rule 704(b) but noted in that case the error was harmless.

And then in <u>United States v. Garcia</u>, -- I'm sorry, <u>United States v. Grenard</u>, which is another case cited approvingly, an agent's interpretation of phone calls, including some the jury had not heard, usurped the jury's function. They noted also that the general rule was that determining the weight to be given evidence is ordinarily a question before the jury. So I'm going to sustain the objection to the question.

Bring the jury back in.

(Jury in.)

THE COURT: All right, ladies and gentlemen. The Court is going to instruct you that the objection to the last question was sustained, and you are to ignore the question.

BY MS. DAUGHTREY:

Q. Detective Levasseur, you indicated in earlier testimony that you listened to the recording in preparation for testimony; is that correct?

1          A.     I did.

2          Q.     And is your testimony today and yesterday

3   consistent with that recording to the best of your recollection?

4          A.     It is.

5          MS. DAUGHTREY:  That's all the questions I have.  Thank

6   you.

7          THE COURT:  You may cross examine.

8          Ladies and gentlemen, the Court is going to instruct

9   you to disregard the last question and the last answer.  You may

10  cross examine.

11  CROSS EXAMINATION

12  BY MS. THOMPSON:

13         Q.     Good morning, Detective Levasseur.

14         A.     I can't hear you, ma'am.

15         Q.     Okay.  Good morning, Detective Levasseur.  How

16  are you?

17         A.     Good.  Good morning.

18         Q.     I want to start off with asking you some

19  questions about the restrictions on child pornography.  Under

20  the law, --

21         MS. DAUGHTREY:  Your Honor, --

22         THE COURT:  Sustained.

23  BY MS. THOMPSON:

24         Q.     Under the law, I am not --

25         THE COURT:  This man is not qualified as a lawyer.  if

1    you want to ask him questions about his experience, you may do

2    so.

3           MS. THOMPSON:  Okay.

4    BY MS. THOMPSON:

5           Q.     In your experience, is a defense attorney

6    allowed to have a copy of these images in question that might be

7    child pornography?

8           MS. DAUGHTREY:  Objection, Your Honor.

9           THE COURT:  Sustained.

10          Ladies and gentlemen of the jury, I'm going to have to

11   excuse you again.  Please don't discuss the evidence amongst

12   yourselves until you receive all of the evidence, the argument

13   of counsel, and the charge of the Court.

14          (Jury out.)

15          THE COURT:  Just for clarity of the record, I struck

16   the last question and answer because the witness was testifying

17   on a matter about his own credibility on substance that is not

18   before the jury, and the jury has no basis upon which to

19   challenge the defendant's characterization of his prior

20   statements.

21          You are asking him about discovery matters, what you

22   are entitled to.  I don't think that is a proper question to

23   this witness.  So what is the purpose of this line of

24   examination?

25          MS. THOMPSON:  I want to elicit from this witness the

1   fact that I cannot go in and do Google searches or image

2   searches on these different words, because if I were to happen

3   to come across child pornography, then I would be in possession

4   of unauthorized or illegal content.

5        THE COURT:  I don't think that's even relevant.  What

6   is the relevance of that?  I don't understand the relevance of

7   that.

8        MS. THOMPSON:  Well, one of the things he testified to

9   is that he has special training and knowledge as to what these

10   different words mean, what these different search terms mean,

11   such as the Vicky series.  I want to question him about the

12   Vicky series and the fact that I, or my investigators, other

13   people that are not in law enforcement, are not allowed to view

14   this Vicky series or search it, Google search it, and see what

15   even comes up.  That we have to depend solely on his opinion.

16        THE COURT:  Are you saying that the defendant's

17   computer was not available for your inspection?

18        MS. THOMPSON:  I am saying that when --

19        THE COURT:  I mean, if there is a reference to the

20   Vicky material in his report of what saw, are you saying you did

21   not have access to the computer to look at it?

22        MS. THOMPSON:  Yes, I had access to my client's --

23        THE COURT:  Then I don't see what the problem is.  I

24   don't see what the purpose of this is.

25        MS. THOMPSON:  He testified that my client -- and it's

an exhibit, searched on the word Masha, M-a-s-h-a.  So it would

be important to know, if you searched on the word Masha, what

kind of words come up are.  Is it only child pornography?  Or to

other images come up that one would not be put on notice that

it's child pornography?  I cannot go in and do the search on the

word Masha, because if I were to bring up child pornography --

          THE COURT:  Yeah, but that's not the point about what

you could do on another computer.  The question is whether you

could search his computer and see what the Sasha image revealed.

          MS. THOMPSON:  How can I cross examine him on the fact

that Masha is a term for child pornography?  I have no

information about what Masha means, and my hands are tied.  This

was one of my objections initially in my motion in limine.  He

says Masha means child pornography.  I have no way of testing

whether or not his information is accurate or true.  And he says

PTHC is child pornography.

          THE COURT:  Did you ask the government to produce all

of the films in his report as being found on the defendant's

computer?  Did you ask him just to produce them?

          MS. THOMPSON:  I have a copy of all of the films

produced on my client's computer.

          THE COURT:  Do you have a basis, then, to challenge him

on whether those involve child pornography or not?

          MS. THOMPSON:  I thought most of the videos on my

client's computer were of adults.

1    THE COURT:  Well, but you can ask him if -- I don't see

2    why you can't ask him what it is on this particular film that he

3    justifies for his conclusion that it's child pornography.

4    MS. THOMPSON:  I want to specifically ask him about the

5    phrase Masha, and how did he come up with the idea that Masha is

6    a phrase used for child pornography.

7    THE COURT:  You can ask him that question.

8    MS. THOMPSON:  But what I also want to establish in

9    front of the jury is -- I can't cross examine him effectively

10   about whether he is right or wrong about what Masha --

11   THE COURT:  That's what I'm trying to get to.  If he

12   referred to this as a file name on the defendant's computers,

13   did you ask the government to produce all of the files or the

14   video for the file names that are on the defendant's computer?

15   MS. THOMPSON:  There are no files named Masha on my

16   client's computer.  He pulled it out of search terms only.

17   THE COURT:  Well, if it's on search terms.  Anything

18   related to the -- that they contend is child pornography or

19   evidence of child pornography, did they produce the film that

20   reflects the basis for it?  Did you ask for it?

21   MS. THOMPSON:  I asked them specifically to do a search

22   on the word Masha.  I asked the government that, yes.

23   THE COURT:  Well, did you ask for any video or images

24   that will reflect Masha or Sasha is -- constitutes child

25   pornography?

1    MS. THOMPSON:  I have asked for those things in the

2  past, and I was told the Vicky series I asked -- I was told that

3  that the government cannot show me child pornography images that

4  were not specifically on my client's computer.  So one of the

5  things --

6    MS. DAUGHTREY:  That's not what the government said,

7  Your Honor.

8    THE COURT:  Well, if you don't mind letting her finish.

9  I will give you a chance to be heard.  Really, I will.

10    MS. THOMPSON:  So one of the things I want to attack is

11  the government came up with search terms that were found from

12  LimeWire on my client's computer.  The government doesn't say

13  what they equaled.  The government just said, he put in these

14  search terms, and they are indicative of child pornography.  And

15  he testified that Desi -- Dee & Desi is a known term for child

16  pornography series of videos and photographs.  And so I -- they

17  didn't testify that they found Dee & Desi on my client's

18  computer.  But the government has put into evidence that a

19  search term for Dee & Desi is indicative of looking for child

20  pornography.

21    Now, if I want to cross examine him about this and

22  about what exactly comes up about Dee & Desi, I cannot do that

23  effectively because I do not know what comes up when you do a

24  Google search term for Dee & Desi.  And therefore, I cannot

25  cross examine him about, isn't he wrong?  Isn't Dee & Desi also

1    the name of a soft drink or a radio song?  Because if I were to

2    type in Dee & Desi, I could be myself getting child pornography

3    on my computer or my expert's computer, whoever is trying to

4    type in this search word, and challenge the government's

5    contention.

6              THE COURT:  Well, that's why I was asking, did you ask

7    the government for it?  If they were going to rely upon it, did

8    you ask the government to produce the underlying information

9    that would establish these terms as child pornography?  Did you

10   ask for it?

11             MS. THOMPSON:  I have asked at some point.  I'm not

12   sure how -- I have asked -- I think it was in another case that

13   was very closely related.

14             THE COURT:  Let's only deal with the case that's before

15   me.  Did you ask for it in this case?

16             MS. THOMPSON:  I asked to see -- I put it in a pleading

17   that I wasn't able to see it.  That I didn't know what the Vicky

18   series --

19             THE COURT:  That's not my question.  Did you ask for

20   it?

21             MS. THOMPSON:  I cannot specifically remember if I

22   asked for it.

23             THE COURT:  We'll take a recess, and you look through

24   your papers and see if you made a request from the government

25   for all -- for the data upon which they relied that references

1   these as child pornography.

2          MS. THOMPSON:  Yes.

3          (Recess.)

4          THE COURT:  You may be seated.

5          Yes, ma'am.

6          MS. THOMPSON:  Yes, sir.  Yes, Your Honor.  I made a

7   specific request in writing in a pleading that I filed, Document

8   Number 100, that was part of my motion in limine.  And it's

9   Issue Number 9, or it's Paragraph Section 9.  And in this I

10  objected to the government putting on testimony about a

11  particular photograph or video series belongs to a -- or a

12  particular photograph or video belongs to a series of child

13  pornography such as the Vicky series or the Baby Jane series.

14         And I specifically asked that the government not be

15  allowed to testify to the fact that a picture belongs to this

16  series.  And then in the alternative, I stated that -- I asked

17  to be allowed to review any other child pornography photographs

18  that the government intends to reference during trial that are

19  not in evidence in this case.  I had specifically asked that,

20  Your Honor.

21         So the government has been allowed to testify that

22  these photographs -- that this photograph -- it's called My Nine

23  Year Old Cousin Sucks My Cock, something like that -- was part

24  of the Vicky series.  I have not seen the Vicky series.  And I

25  cannot cross examine him effectively on whether or not it really

1    is part of the Vicky series.

2         THE COURT:  Well, the arrangement that was made when we

3    discussed this motion was that they would provide you a computer

4    that you could -- you and your expert could view, as you

5    requested, shortly before or shortly after each of those

6    proceedings, so it would give you an opportunity to view

7    whatever films they were referring to.

8         MS. THOMPSON:  I think that was to review the

9    pornography that's alleged to be pornography on my client's

10   computer, Your Honor.  This Vicky series, these other pictures,

11   were not on my client's computer.

12        THE COURT:  No, you make reference to computer files it

13   intends to offer into evidence at trial.  And these are file

14   names.  Paragraph one of your motion.  And that was the whole

15   purpose of telling the government to make a computer available

16   to you so you could do what it is we're discussing.

17        MS. THOMPSON:  No, because even if they make that

18   computer available to me, Your Honor, other photographs of this

19   Vicky series are not on that computer.  They are out there in

20   the Internet, or they are on Scott Levasseur's one million

21   images at his office.  But they are not on my client's computer.

22        THE COURT:  Okay.  Bring the jury in, Mr. Marshal.

23        MS. DAUGHTREY:  Your Honor, may I respond before the

24   jury comes in?

25        THE COURT:  Oh, yes, ma'am.

1    MS. DAUGHTREY:  Thank you, Your Honor.

2    Your Honor, with regard to his identifying the Vicky

3  series, I thought we had dealt with that as part of the

4  defendant's expert opinion.

5    THE COURT:  No, ma'am.  The problem is, he is making

6  references -- giving testimony and giving conclusory references

7  without a predicate for it.  He is saying, based on my

8  experience that this is a child porn website.  Well, he provides

9  us no basis for it, other than the fact that he has been working

10  in this field.

11    MS. DAUGHTREY:  Your Honor, think that's not correct.

12  I think he testified that he learned about the fact that Dee &

13  Desi and Masha were child pornography series in his training

14  through ICAC and through other -- well, through ICAC.

15    THE COURT:  The training materials aren't available.

16  She has no basis to which to really meaningfully challenge that

17  statement.  And if the films themselves aren't available to

18  provide a check on whether that's true or not, she is having

19  difficulty challenging this witness's statements and

20  characterization of these websites.

21    MS. DAUGHTREY:  I understand that.  But my

22  understanding was that Detective Levasseur offered for her to

23  come to his lab to do the searches that she wanted as well.  And

24  particularly, I think she was talking to me about Masha.

25    THE COURT:  That is completely new.  That's the first

1    time it has come up.

2         MS. DAUGHTREY:  Well, it's an offer that was made

3    before the trial began.  That was my understanding.

4         MS. THOMPSON:  I disagree with the characterization of

5    that, Your Honor.  I had specifically asked, and I was told no.

6    I asked again on Monday afternoon.  And so Mr. Levasseur never

7    invited me to come to his shop.  And I specifically was asking

8    about these Masha photographs.  And so I disagree that I was

9    given any an opportunity to view that.  It was kind of a

10   run-around.  He said ask Carrie.  Carrie said, that's between me

11   and Levasseur.  Levasseur said he would talk to Carrie and see

12   what she said.

13        THE WITNESS:  I didn't say that.

14        THE COURT:  Anything else?

15        MS. DAUGHTREY:  No, Your Honor.  The government can

16   provide those images and can provide information from the

17   National Center for Missing and Exploited Children that Masha

18   and the Desi & Dee series are a known child pornography series.

19   Detective Levasseur didn't testify to anything other than he

20   knows that those terms are associated with that.  He didn't

21   testify that the defendant knew that, or that the defendant was

22   using it for that purpose.  Just that he is aware through his

23   training and experience about that information.

24        And I would certainly be willing to take a recess and

25   allow Ms. Thompson to see that information that NCMEC has about

that.

       MS. THOMPSON:  They put those search terms in to show
intent of my client to look up child pornography.  He didn't
just say, I had training on this subject.  He said, these terms,
Google search on his computer, looking for child pornography, I
know what that means.

       THE COURT:  You can bring the jury in.

       (Jury in.)

       THE COURT:  Ladies and gentlemen of the jury, I really
do hate to do this, but I'm going to have to declare a recess
for today.  An issue has arisen that the Court believes requires
an extended period of time.  And rather than having you all
twiddling your thumbs in the jury room, I just think it's better
to send you all home for the day.  We were also concerned about
this weather pattern that's supposed to be coming through a
little bit later today and whether that posed any personal
safety issue for any members of the jury as well as others.

       So I'm going to send you home for the day, ask you to
come back at 9:00 in the morning, and we'll try and get started
promptly.

       Once again, please do not discuss the case with anyone
else, including your fellow jurors, family or friends, until you
receive all of the evidence, the argument of counsel and the
charge of the Court.  Please do not conduct any electronic
research of any kind concerning any of the issues or matters or

1    persons involved in this lawsuit.

2         If you will hand your exhibits to the Marshal, he will

3    take custody of them until you return.  If you will come back at

4    9:00 in the morning.  Thank you.

5         (Jury out.)

6         THE COURT:  All right.  I'm going to require the

7    government to produce any file requested by the defense, file

8    name, search name, that was -- that this witness testified and

9    that the defense wants to see, any supporting underlying data of

10   whatever sort, to support the characterization of those sites or

11   those words as child pornography files.  And they will be made

12   available to the defense counsel and the defense counsel's

13   expert.  And they are to be made available immediately.

14        We're in recess until nine in the morning.

15        (Recess.)

16        THE COURT:  Before we get started, there is no court

17   reporter present, but I have my recording system from my days as

18   a magistrate judge.  And given that this is a conference and not

19   proof, we will proceed on that basis unless there is an

20   objection.  The court reporter can make a transcript from this

21   on the request of any party.  Without objection.

22        MS. THOMPSON:  I think, Your Honor, I do not believe

23   that the government is going to be able to give me what I have

24   requested, because it was my understanding from the way that

25   Mr. Levasseur spoke that when he said he had had training on the

Vicky series, I understood that to mean that he had already seen
a series of photographs at one of his trainings or conferences.
Somewhere it had been laid out in front of him a lot of
photographs or videos and said this is part of the Vicky series.

I think what IT turns out to be, that if he at sometime
in his work has run across a photograph, he sends a hash value
in, it comes back and says, that picture has been identified as
one of the Vicky series. But he is sending that on a hit or
miss basis, just as he gets feedback over time. He has never
seen the entire series.

And also, he doesn't have with him the ability to pull
these pictures up by a known name. So even though may have a
million child pornography photographs or I'm paths, videos in
his lab, they have been stripped of all their names that they
came with. And so he can't go in there and do a search for
these videos by name.

And the NCMEC database that is head of all this, and
really categorizes everything, never sends out videos. So at
this point I could -- I'm not going to be able to look at these
pictures, the Dee & Desi and the Masha pictures. They might be
able to find for me one or two examples, but it's my
understanding that these are coming from Scott Levasseur's
memory. He doesn't keep any of his NCMEC reports, and he
doesn't have names that he has filed. So it would have to be
from his personal memory as to whether or not one of these

1  pictures fits in.

2      And at this point, Your Honor, I feel like this has

3  really tainted the jury.  He has testified that he had training

4  in this area.  Apparently when he goes to these ICAC training

5  sessions, they never even show photographs.  They just talked

6  about numbers and techniques to get things off the computer.  So

7  he has been certified as an expert in child --

8      THE COURT:  No, he wasn't.  He was permitted to testify

9  as a person with specialized knowledge.

10     MS. THOMPSON:  Okay.  Okay.  But apparently he

11 hasn't --

12     THE COURT:  Daubert does not literally apply to

13 specialized knowledge as it does to expert testimony.

14     MS. THOMPSON:  Okay.  I object to what has already been

15 said to the jury now, Your Honor, because I think that it has

16 tainted the jury.  And I think he gave the impression that he

17 had seen these pictures and was familiar with this whole series.

18 He also testified about Masha and Dee & Desi.  And the --

19 something he said was Russian, Lolita something.

20     Your Honor, at this point I'm asking for a mistrial

21 with prejudice.

22     MS. DAUGHTREY:  Your Honor, the specialized knowledge

23 that Detective Levasseur has is based on his -- both his

24 training and his experience.  I think all of this information

25 that Ms. Thompson is talking about is perfectly appropriate for

cross examination.  But we sat and we tried to --

THE COURT:  Is there any dispute to her characterization that he has actually never seen any of the videos associated with these files and search terms?

MS. DAUGHTREY:  There is absolutely no truth to that. What he can get -- I can have him get on the stand and explain to Your Honor.  What happens in these cases is that when he's doing these undercover examinations, what he will do is he will run across these very long file names.  And one of them, for example, might have the name Masha in it.  And he sees a particular person in that file.  And then as he continues with his investigations.  He sees Masha coming up again and again. And he sees that that's the same person that was in the other file.  And it becomes -- it's something that it's not like an official series name, but it's what everybody begins to know this particular person as in both the files, both the people who are downloading them for law enforcement purposes and for nonlaw enforcement purposes.

This is all sort of over time in his experience.  And he has seen images of these different individuals.  What he doesn't have is a database that says, this is the Masha series, and these are the images that are related to it.  Because how this works is he goes out and he gets a computer that has suspected child pornography on it.  And he sends the hash values of all these images up to an organization known as NCMEC, which

1   is the National Center for Missing and Exploited Children. They

2   are the ones who have a centralized database. And their

3   database consists of -- these are all the hash values of

4   potential child pornography or known child pornography that we

5   know of. These over here in this corner have been identified as

6   including the child Masha in it.

7       And if Scott Levasseur sends up a hash value that's

8   equivalent to one of those, then NCMEC is going to send him

9   information and say, this is from a series known as Masha, this

10  is the investigator that did this case, here's his contact

11  information.

12      And so he has over time both seen it through his

13  investigations but also gotten these reports back from NCMEC

14  that say, yes, this is a child known as being associated with

15  this Masha series.

16      So the problem is, they don't -- they can't -- they

17  don't save their files. They only save the hash values. What

18  they do have that Scott Levasseur didn't rely on but that I am

19  working on trying to get right now, is they have information

20  about each of the series that they know about. So, for example,

21  they will have -- they will have some information up there that

22  I can -- that I am working trying to get for Ms. Thompson that

23  says there is a known series by the name of Masha, and here's

24  what this series looks like. And they will give you a written

25  description of that series, along with who the investigator is.

1        So that's probably the best database that we can give

2    to her in terms of files that she wants.  We have also offered

3    that she and her expert can go to Scott Levasseur's lab and do

4    whatever research that they want to do on that computer.  The

5    problem is, it depends on what day you are doing the research on

6    what you are going to find.  If you are doing research on Masha,

7    you may find a child pornography file that is of Masha or isn't

8    of Masha.  The only way to tell if it is, is to send that file

9    up to NCMEC, ask them if it's the same hash value as something

10   they have connected with that series, and that takes time to do.

11       So that's the reason why there is not really any

12   information that can be directly provided.  It's not like Scott

13   Levasseur has, you know, a very organized database that says,

14   you know, this is the Masha series.  This is something that he

15   has learned over time in his experience both doing the work and

16   talk talking to other law enforcement and understanding from

17   training how this kind of thing works.

18       I would respectfully suggest that a mistrial is totally

19   inappropriate.  She can certainly cross examine him on this

20   information, where he got his specialized knowledge, ask him if

21   he has seen every single series picture that's there, that kind

22   of thing.  And I'm happy to provide the NCMEC information today

23   if I can find it and to allow them to do whatever search they

24   want to on his computer.

25       I don't think -- and I think even Ms. Thompson's expert

has admitted that doing that is probably not going to be very
beneficial. What Jennifer wants -- what Ms. Thompson wants is
something that's just really not available out there.

MS. THOMPSON: So as I understand things, not even the
NCMEC database has images in it. And so in terms of knowing
what is out there, nobody can get me any images of any of these
series of child pornography that have been referred to. All
they have is some numbers hash values that sometimes match
pictures.

But I do believe that it's accurate to say that
Levasseur, Mr. Levasseur, has not sat and seen a series or been
presented with pictures and been told then that these match
NCMEC. Or sorry, and that this is what the Vicky series is.

As the government even said, it just a happens to be
when he sees a picture with the name Masha, and then he begins
to refer to it as the Masha series. Well, the picture he
identified as being the Vicky series in this didn't even have
the name Vicky in it. It was something about my nine year old
cousin.

But there is no misunderstanding that when he testified
about these series that he gave the distinct impression that
through his training and his information, he had known what
these series are. And now it's really just a lot more about
kind of over time assuming that these names go with these
pictures and we know that they have come back with hits.

1          I specifically asked the government for the NCMEC

2     information that goes with the photographs in this case, and I

3     was told that they don't ever give out NCMEC information.  But

4     now I question whether or not this picture actually -- the

5     picture that they have identified as the Vicky series thumbnail

6     ever actually came back from the NCMEC with a matched hash

7     value.

8          Your Honor, we cannot undo this with the jury.

9     These jurors do not like being in a child pornography trial.

10    They are -- everybody's quick to think that is a bad thing.

11    They have a much harsher judgment than they would on a different

12    type of case or drug case.  The government cannot undo this now

13    by just simply letting me cross examine him.  They need to say

14    that what he said before was inaccurate and gave the wrong

15    impression.  I'm asking for a mistrial with prejudice.

16         MS. DAUGHTREY:  Your Honor, there was not a NCMEC

17    report in this case.  Ms. Thompson asked for the contact

18    information of the investigator that we have coming to testify

19    in the Vicky series.  We provided that information to her.  He

20    is here.  And that information was provided to her.

21         With regard to -- we can go back and look, but I don't

22    think that Detective Levasseur said, I know these search terms

23    are child pornography or that this particular name Masha is a

24    known child pornography series because I learned it from an ICAC

25    training.  We can go back and look at the --

1    THE COURT:  Yeah, but I mean that was the whole

2  predicate to allow him to even give that testimony.

3    MS. DAUGHTREY:  Well, I think the predicate for it was

4  both his experience and his training.  I think that's the

5  predicate for it.  He has specialized knowledge.

6    THE COURT:  The last description you have you gave me

7  is that he talked to other people who say, yes, this is a sex

8  file.  So that's not training or really experience.  That's just

9  what somebody else told him.

10    MS. DAUGHTREY:  Well, these are other law enforcement

11  officers that discuss it as part of his experience, Your Honor.

12  People begin to recognize the same person over and over and over

13  again.  And that's how we identified this particular Vicky

14  thumbnail.  Went up to NCMEC and they didn't hit on it.  But he

15  recognized the girl in there as being Vicky.  Just like he's

16  doing this over the course of time and begins to recognize the

17  same images and or the same videos or the same child that's in

18  here.

19    All of this is something that's subject to cross

20  examination.  There has been no misleading of the jury at this

21  point.  We certainly haven't gotten into the kind of detail that

22  they were talking about here about how he knows it with the

23  jury, and I think that's perfectly legitimate cross examination.

24  There is no misleading that has happened in this case.

25  Anything Ms. Thompson wants to ask him on cross examination,

1    that's the whole purpose of cross examination is to get into

2    those details that she wants to get into.

3         THE COURT:  Well, Daubert doesn't apply -- it's not --

4    Daubert does not apply in toto or literally to specialized

5    knowledge testimony.  That does not mean that Daubert's factors

6    are not to be considered on specialized knowledge testimony.

7    And the linchpin of both the Supreme Court cases is indicia of

8    trustworthiness.  And the experience and the opinions can be

9    subject to some level of scrutiny to test the reliability of the

10   opinions expressed.

11        I'll tell you what.  I will ask counsel to put him on

12   to testify on the actual predicate bases for his expressions --

13   for his opinions that several of the file names and several of

14   the search terms that he described as child pornography are, in

15   fact, are the basis for those opinions.

16        MS. DAUGHTREY:  Thank you, Your Honor.

17        Before we get started, I don't really mean to sound

18   preachy, and I don't like to, but that was the purpose -- what

19   we're doing now was the purpose of the earlier out of court

20   hearing, to allow defense counsel an opportunity to voir dire on

21   the witness's qualifications as either an expert or a person

22   with specialized knowledge.  But given the fact that there are

23   subsequent representations about what is -- what information, in

24   fact, is available or was made available and what the training

25   of the witness actually is, and the bases for the witness's

opinion testimony, what those bases are, the Court decided to
hold this hearing on whether the witness's opinions have an
adequate basis as measures or measures of reliability to be
admitted.  So I will allow you to recall the witness and do your
voir dire.

        MS. THOMPSON:  Yes, Your Honor.

        THE COURT:  If the witness will come around.  You are
still under the oath you have been administered.

EXAMINATION

BY MS. THOMPSON:

        Q.    So I'd like to go back again to your training
that you had in terms of child pornography and the
identification of child pornography.  Let me ask you again, we
have referred to a curriculum vitae that you prepared in
preparation for today's testimony.  And in that you had listed
your training that you have in this area.  So in -- can you give
me a general overview of the type of training you have had in
identifying child pornography?

        A.    I had no training in identifying child
pornography.

        Q.    Okay.  So when you use the -- there's two
different databases, I believe, that you have been referring to.
One was the NCMEC database; is that correct?

        A.    One is the what, ma'am?

        Q.    NCMEC database.

57

1          THE COURT:  Can you spell out the acronym for the court

2     reporter?

3     BY MS. THOMPSON:

4          Q.    It stands for the National Center for Missing

5     and Exploited Children; is that correct?

6          A.    I refer to that, yes.

7          Q.    Okay.  And in this database, it is correct that

8     they keep hash numbers?

9          A.    Hash values.

10         Q.    Hash values.  And these are a number or a value

11    that has been given to individual pictures; is that correct?

12         A.    Correct.

13         Q.    Now, when we were talking outside the courtroom,

14    you said that the NCMEC database never sends you photographs or

15    videos in response to a request.  Is that right?

16         A.    Correct.

17         Q.    So what happens is you send in a photograph, or

18    a number, a hash value, off of one of these pictures to NCMEC,

19    and it returns a result to you; is that correct?

20         A.    No, ma'am.  I actually send the actual file, be

21    it an image or a video file, to NCMEC.  And then they return

22    back to me with any known hits.

23         Q.    I thought you said earlier when we were talking

24    that you just send them a hash value?

25         A.    I didn't say that.  Somebody else in the circle

Case 3:10-cr-00009   Document 149   Filed 04/13/15   Page 57 of 87 PageID #: 1314

1   said that.  I didn't.

2           Q.    So you send them a digital file?

3           A.    I send them either CDs or DVDs with the files on

4   them.  Or if there's a whole lot of them, you can send an

5   external hard drive to them.

6           Q.    Okay.  And then they send you back a report; is

7   that right?

8           A.    Correct.

9           Q.    Okay.  And then there is another way that your

10  -- there is another database you are using, and that's the ICAC

11  database; is that correct?

12          A.    For what purpose, ma'am?

13          Q.    Suspected child pornography files?

14          A.    No, ma'am.  I don't have access to that

15  database.  The software that I use in peer-to-peer

16  investigations has access to that database, but it doesn't

17  present us with files.

18          Q.    Okay.  So can we go back through your training,

19  then, as to your training that you have had in the child

20  pornography area.  You said you have had no training on

21  identifying pictures of child pornography?

22          A.    The only training that I have had through ICAC

23  that pertains to child pornography is peer-to-peer

24  investigations.

25          Q.    So they told you how to use software to contact

other people and download files; is that right?

A.      They taught you everything that you needed to
know about the networks, how the networks work, the software
that you are going to use, how to operate the software.  They
instruct you with how to make a case, how to work your case, how
to make your case all the way through to the prosecution.  They
instruct you with key words to use to search for child
pornography.

And then you actually in the classroom get on, using
your software, connect to the Gnutella network, and make
downloads from other people out in the world on the network as
part of your training.

Q.      Okay.  And so in those cases, then, you are
simply working with software, and they have trained you on
connecting to other people that are out in the Internet cloud;
is that right?

A.      On the Gnutella network; yes, ma'am.

Q.      So in this period of peer-to-peer training, they
would have explained to you what a torrent is and how a bit
torrent works?

A.      That would be a particular class.  Bit torrent
class is a totally separate training from Gnutella training, the
same way that Aries network, Aries training.  It's peer-to-peer.
And Bit Torrent is peer-to-peer, but it's totally separate
training.

1        Q.    But when I was referring to torrent, I was

2  referring to the word that means how this data is transferred

3  from peer-to-peer network station, not a particular software.

4  It's transferred in torrents; isn't that correct?  Blocks of

5  data that are sent from one computer to the other?

6        A.    No, ma'am.  Not on the Gnutella network.

7        Q.    Okay.

8        THE COURT:  Let me see if I understand your

9  explanation.  Your training, then, is really just on how to

10  search computers that may contain child pornography, and also

11  training on how information is shared on that computer with

12  other computers.

13        THE WITNESS:  How to locate people that are

14  trafficking, and then how to receive the child pornography files

15  from them and build your case.  As far as child pornography, I

16  have had no specific training where they showed you pictures.

17        THE COURT:  So you have not received any training on

18  identifying images that you capture as to whether they are

19  children or not?

20        THE WITNESS:  No, sir.

21        THE COURT:  Have you received any training on -- by

22  experience -- how extensive has been your experience in

23  identifying whether an image that you may see is associated with

24  a file that has been determined to be child pornography?

25        THE WITNESS:  In my years of doing this, every time

1    that I do a forensic exam on a computer, when I collect the

2    child pornography files, I send them to NCMEC.  And NCMEC

3    returns a report with a series name and then the hash values

4    related to the files that I sent them of known children,

5    children that have been identified as actual victims, and --

6              THE COURT:  Yeah, but you don't do the determination of

7    the hash value?

8              THE WITNESS:  The hash value is irrelevant, really.

9    It's just something for them --

10             THE COURT:  That wasn't my question.  My question was,

11   do you determine the hash value of an image?

12             THE WITNESS:  There's a hash value to every file; yes,

13   sir.

14             THE COURT:  I got that part.  But your training doesn't

15   involve you making that -- assigning that value, does it?

16             THE WITNESS:  No, sir.

17             THE COURT:  Somebody else does that.  And then they

18   tell you whether it's a match or not?

19             THE WITNESS:  Correct.

20             THE COURT:  And a match is only based on hash value?

21             THE WITNESS:  It only matches a known hash value; yes,

22   sir.

23             THE COURT:  All right.  Any further questions?

24   BY MS. THOMPSON:

25             Q.    Yes, sir.  When you are talking about matching

1    hash values, there were no NCMEC hash values matched in this
2    case; is that correct?
3            A.      Correct.
4            Q.      And so when you are talking about even detecting
5    suspected child pornography, you are using a database that
6    individual law enforcement officers have made for themselves; is
7    that correct?
8            A.      In the ICAC.
9            Q.      ICAC is like a group of people that are all
10   members of this ICAC organization; is that right?
11           A.      Task force; yes, ma'am.
12           Q.      So when you, yourself, run across a picture that
13   you think looks like child pornography, you will upload it to
14   your personal ICAC database; is that right?
15           A.      It's not an ICAC database.
16           Q.      It's your personal child pornography database?
17           THE COURT:  Well, let him explain what it is.  That
18   helps me.  What is it?  What is the ICAC base?  What is it?
19           THE WITNESS:  The ICAC -- the only law enforcement
20   officers authorized to do child pornography investigations are
21   members of the ICAC Task Force.  And you have to be licensed
22   through ICAC in order to operate and use this software for child
23   pornography.  They have a server.  ICAC has a server.  And at
24   this time the server was based in Wyoming with the law
25   enforcement in Wyoming.  And they had all of the Shaw values of

all of the known child pornography values out there. Images or videos of children that had been identified. And they were called known files. And then they had a list of suspected child pornography files. Children who were, in our terms, were obviously children, but they were not identified. Nobody knew who they were.

So they kept that database. So when we would do investigations, we would automatically load that server, that computer server in Wyoming, with data of IP addresses, computers that were trafficking in known or suspected child pornography files.

So when we say the database, it's actually just a big server that belongs to the Wyoming ICAC.

THE COURT: So what comes off of that server is either a file that is suspect or a file that has a Shaw value?

THE WITNESS: All of the files have Shaw values, but they are identified as either known or suspected.

THE COURT: So the Shaw value doesn't provide you any basis to determine whether it is child pornography or not?

THE WITNESS: That's the thing. They have the Shaw value, and they say that this Shaw value is child pornography. In my lab, I have a database that has all of the child pornography files that I dealt with that has the Shaw values. I can look at the ICAC's Shaw value, go into my database and pull up that Shaw value, look at the file, and know that the Shaw

```
1   values are the same, so it's the same file that they have, and I
2   have it here.  And that's to prevent from having to transport.
3          THE COURT:  Yes, but some of the files -- if they all
4   have Shaw value, some files have Shaw value that are only
5   suspects; right?
6          THE WITNESS:  That are not known -- that are not
7   identified children; correct.
8          THE COURT:  They don't know whether they are children
9   or not, but they have a Shaw value?
10         THE WITNESS:  Correct.
11         THE COURT:  So just because you have something with a
12  Shaw value, and Wyoming has a Shaw value, that does not
13  establish that the people -- that the images are children?
14         THE WITNESS:  That's why as an investigator working
15  these crimes, you have to view the file and make your
16  determination on if it fits as being a child.
17         THE COURT:  Okay.  Now, what is your -- I thought you
18  said earlier you did not have any training in determining
19  whether the image on the picture on the image was a child or
20  not.
21         THE WITNESS:  There is no classroom training on
22  identifying child pornography.  The only training that I have is
23  my daily work experience from viewing these files.  It's -- when
24  you look at a prepubescent child, it's obviously a child.  So
25  even though it's not known, the victim is not known, as a human,
```

1    you know --

2         THE COURT:  Well, why would there be unknown files in

3    there, suspect files?

4         THE WITNESS:  Because a lot of child pornography comes

5    from different countries.  And these cases were never worked,

6    the children were never identified, so we don't know who they

7    are.  And that's why we submit -- like, I could make a child

8    pornography file -- movie file today.  Let's just say I went

9    home and I filmed my daughter doing sexual activity and loaded

10   it on the LimeWire and shared it.  Then the police did a search

11   warrant, got the guy's computer, and looked at the file, and

12   it's an obvious child.  Well, it's not known.  It's in no

13   database anywhere, because nobody has come across it before, and

14   the child is not identified.

15   BY MS. THOMPSON:

16        Q.    So these pictures are not subject to peer

17   review; is that right?  If you look at something --

18        A.    Yes, ma'am.  When you submit -- when -- if I

19   submit them to the ICAC server --

20        Q.    Yes.

21        A.    -- they look through them and make their

22   determination whether they want to add them on.  But again,

23   that's their opinion.

24        Q.    Okay.  But if they decide if they want to --

25   when you say they, who is they?

1          A.      People who work in that department.

2          Q.      So it could be one person or multiple people?

3     You don't know?

4          A.      Correct.

5          Q.      And so when this mysterious "they" entity

6     reviews it, nobody goes back behind the "they" entity and makes

7     sure they didn't make a mistake, do they?

8          A.      That's why you are trained in the training --

9          THE COURT:  Answer the question first.  Restate your

10    question.

11    BY MS. THOMPSON:

12         Q.      Nobody goes behind the "they" entity --

13         A.      I don't know.

14         Q.      -- to double check?

15         THE COURT:  Let already finish the question?

16         THE WITNESS:  I just -- I don't know if somebody goes

17    behind.

18         THE COURT:  It would be helpful, sir, if you would

19    allow her to finish the question, answer the question as asked.

20    If there is any need to answer anything else, your lawyer can

21    get up and ask a question, okay?  So let's try it one more time.

22         Ask your question.

23    BY MS. THOMPSON:

24         Q.      So when the "they" entity adds a picture to this

25    database, there is nobody that double checks to make sure they

1    -- that the "they" entity didn't make a mistake?

2        A.    I don't know, ma'am.

3        Q.    Okay.  And so if it turns out that something got

4    uploaded, and later it's discovered that it was uploaded in

5    error, and later it's discovered that that file, in fact, is an

6    adult, you don't know of any method to correct an error entry in

7    the ICAC database?

8        A.    Yes, ma'am.  If I discover a file that I don't

9    think is a child on the -- that they are listing, I have a

10   method to contact the ICAC administrators up there and say,

11   review this file.

12       Q.    Okay.  So but this is just based on your

13   personal opinion.  And you would contact them and say, I don't

14   think this is a child?

15       A.    Correct.

16       Q.    And you don't know what method they use to

17   determine whether they are going to remove the picture from the

18   collection or not?

19       A.    I don't.

20       Q.    And so your opinion -- you have developed your

21   knowledge of child pornography simply by experience of just

22   looking at a lot of photographs over time?

23       A.    Correct.

24       Q.    Okay.  But with no feedback as to whether you

25   are making correct decisions or incorrect decisions?

1           A.    I don't guess so.

2           THE COURT:  Have you had any training on distinguishing

3    whether there has been any digital manipulation of an image?

4           THE WITNESS:  I have not, sir.

5           MS. THOMPSON:  No further questions.

6           THE COURT:  Any further questions of this witness?

7    EXAMINATION

8    BY MS. DAUGHTREY:)))

9           Q.    Detective Levasseur, how is a hash value created

10   from a file?

11          A.    It's an algorithm that's run against the file.

12   And it -- I mean, --

13          Q.    Is it something that somebody -- a person does?

14   Or is it an automatic type of thing?

15          A.    It's in the software.  Like --

16          THE COURT:  Did your computer training allow you to

17   determine the hash value of an image?

18          THE WITNESS:  Through my --

19          THE COURT:  Through your training.

20          THE WITNESS:  Through my training?

21          THE COURT:  Can you determine, independent of what some

22   other places do, can you determine a hash value -- do you have

23   the skill set to determine a hash value?

24          THE WITNESS:  Yes, sir.

25   BY MS. DAUGHTREY:

```
1        Q.      And when you are talking about known hash values
2   and suspected hash values -- I'm not sure it's clear -- what is
3   the difference between known -- what does known mean?
4        A.      Known means that the child in the image has been
5   identified and has been positively identified as being underage.
6        Q.      Okay.  How many of those kind of files have you
7   seen in the course of your work doing this?
8        A.      Thousands upon thousands.
9        Q.      And the known child pornography or the known
10  hash values, those are in both the database -- the ICAC database
11  and NCMEC; is that correct?
12       A.      Correct.
13       Q.      Okay.  So they are the same?
14       A.      Correct.
15       Q.      Okay.  They may not have all of each one, but --
16       A.      Correct.
17       Q.      But they can be in either or both.  The
18  suspected child pornography -- is that something that you all
19  use as a tool?  Or are you expecting to use that in a court of
20  law?
21       A.      We use it as a tool.  I will download suspected
22  child pornography files to view them.  And if they are
23  obviously, to me, prepubescent children, I will include them as
24  part for the case.
25       Q.      All right.  I want to take you back to something
```

1    we were talking about this morning that was of concern after the

2    jury was dismissed.  You testified just a few minutes ago that

3    in your training to do peer-to-peer investigations, that you are

4    instructed on key words that you use to search for child

5    pornography.

6         A.    Correct.

7         Q.    I would like to ask to pull Exhibit 9, please,

8    and ask that that be handed to the witness.  In that Exhibit 9,

9    from that list, what search terms did you learn in your ICAC

10   training -- what search terms on that page did you learn or were

11   told were key words to use to search for child pornography?

12        A.    I specifically remember being taught to use

13   Mafia Sex, Years, Dee & Desi, PTHC, pedo, LSM.  I specifically

14   remember those terms.

15        Q.    What about Preteen?

16        A.    Oh, I missed that one.  Yes, Preteen.

17        Q.    And what specifically were you told about those

18   words when you were in your ICAC database training?

19        A.    You have a good likelihood of returning child

20   pornography hit results.

21        Q.    Okay.  Were you ever formally taught that these

22   search terms were associated with a particular child or

23   children?

24        A.    No, ma'am.

25        Q.    As part of your training, were you ever

1    instructed, this is a list of child pornography series names?

2            A.      No, ma'am.

3            Q.      Do you remember the first time that you heard

4    the term Mafia Sex when you were trained on it?

5            A.      Yes, ma'am.

6            Q.      Had you ever heard that term before?

7            A.      Had not.

8            Q.      Did you know what it meant at that time?

9            A.      Before seeing the file name, no, I didn't.  But

10   in the training, I learned what it --

11           Q.      Okay.  Did you ever use it as a search term

12   looking for child pornography?

13           A.      Numerous times.

14           Q.      And what happened when you used it?

15           A.      I would always get back some child pornography

16   hits.

17           Q.      Okay.  Were they similar in nature ever, the

18   hits that you got?

19           A.      A lot of the files were of the same children in

20   different movies or different images.  But in the same respect,

21   I would get files back that weren't the same children at all.

22   Different altogether.

23           Q.      Is that term, Mafia Sex, informally known by

24   people who work these cases as being a series?

25           A.      It is.

1    Q.    What do you mean by series?

2    A.    A series is just a bunch of different pictures

3  or videos of the same child or children.  And it's just a term

4  we use to correlate them altogether as saying instead of a

5  collection, the term just was being used in ICAC, a series.  And

6  it just means that the same victims are in these different

7  videos and different images.

8    Q.    We've talked about NCMEC.  When you send your

9  child pornography up to NCMEC, do you ever get information back

10 from them that corresponds with the series in your

11 investigations?

12   A.    Sometimes I do.

13   Q.    Give us an example.

14   A.    For example, in the Vicky series I recall

15 getting results back on that series.

16   Q.    How many different series -- I mean, do you see

17 one or two from NCMEC?  Or do you see more than that?

18   A.    I don't know how many series there are in the

19 NCMEC database.  There's a lot.  But I'm pretty familiar with

20 eight, ten series.

21   Q.    Were you familiar with the Vicky series at the

22 time that you investigated this case?

23   A.    Yes, ma'am.

24   Q.    And did you see an image on Mr. Tummins'

25 computers that you believed to be from that series?

1        A.       Yes, ma'am.

2        Q.       And what did you do to verify that?

3        A.       Because I see the child that's in that Vicky

4    series in almost every examination that I do for child

5    pornography.  It's very widely traded.  I knew that she was a

6    known child, and I searched my records and found contact

7    information for the agent that worked the case.  And I called

8    him and asked him if he would -- if I sent him a picture if he

9    would identify it for me, if it was his victim that he worked

10   from the Vicky series.  And I sent it to him, and he responded

11   back that he knew who she was.

12       Q.       So you even in your investigation will go as for

13   as to verify known children; is that correct?

14       A.       Could you say that again, ma'am?

15       Q.       In your investigations, you verify known

16   children?

17       A.       Yes.

18       MS. DAUGHTREY:  Okay.  I believe that's all I have.

19   Thank you.

20       THE COURT:  Did I understand you to testify earlier

21   that when you get hash values, that there is no way to determine

22   from the hash value whether it's suspect or a known?  Is that

23   right?

24       A.       The ICAC is the ones that determines -- not

25   ICAC, excuse me, NCMEC, National Center --- they determine --

1  they make the determination on if it's a known child or if it's

2  a suspected child pornography.  So when they send back their

3  report, they are not going to send me the images.  So instead of

4  sending the images, they send the hash value.

5          THE COURT:  I got that part.  But is there anything in

6  the hash value that you get back to reflects it's known or

7  unknown?

8          THE WITNESS:  No, sir.  Not in the hash value.

9          THE COURT:  Not in the hash value.  Do you know what

10  the hash value represents?

11          THE WITNESS:  It's a digital fingerprint for that

12  particular file.

13          THE COURT:  Is it a result of the examination of the

14  image?

15          THE WITNESS:  Could you say that again, sir?

16          THE COURT:  It is a result of the examination of the

17  image?

18          THE WITNESS:  It's just an algorithm that's run against

19  the file.  I make my own hash value when I do my computer

20  forensic exam.

21          THE COURT:  What are you measuring with the hash value?

22  What is it that you are measuring?

23          THE WITNESS:  The algorithm is gathering all the data

24  within the file.  And it's making a value for that file that's

25  unique to that file.  The numbers in that hash value, the

1    letters in that hash value, are totally random if look at them.

2    They don't hold any information as to file name or what it is.

3    It's just a value that's given to the file.

4         THE COURT:  I got the part that it's a value.  I

5    understand that.  What I'm asking you is, what is it that it's

6    measuring to come up with an assigned value?  What it is that

7    they are measuring?

8         THE WITNESS:  I don't know how the algorithm works.

9    It's extremely complex.  It's a mathematical algorithm that does

10   it.  And I'm not smart enough to tell you how it works.

11        THE COURT:  Anything else?

12        MS. DAUGHTREY:  Yes, I would like to ask one follow-up

13   question.

14   BY MS. DAUGHTREY:

15        Q.    So it's clear that the hash value itself doesn't

16   tell you this is or isn't child pornography?

17        A.    Correct.

18        Q.    If you have a hash value for a file, how do you

19   figure out whether or not it's known child pornography or

20   suspected child pornography or something entirely different?

21        A.    We're relying -- me as an investigator, I'm

22   relying on NCMEC and ICAC databases that are saying that that

23   hash value represents a child pornography file.  So I download

24   that file.  But then I have to view that file and determine

25   whether it is child pornography or not.

1    Q.    So are you comparing the hash value of the file

2    that you have with the hash value of the file over here in the

3    NCMEC database?

4    A.    Correct.

5    Q.    Is it possible for one file to have more than

6    one hash value?

7    A.    No, ma'am.

8    Q.    Okay.  If two files have the same hash value,

9    does that show that they are --

10    A.    They are the same file.

11    Q.    -- they are the same file.  Okay.  Thank you.

12    MS. THOMPSON:  I have some more questions, Your Honor.

13    FURTHER EXAMINATION

14    BY MS. THOMPSON:

15    Q.    So as I understand your testimony today, you are

16    saying that when you went to these classes and they trained you

17    on how to search for child pornography, and they gave you these

18    search terms, that they trained you to use to type in, so that

19    -- I think you said earlier so you could find child pornography.

20    Is that what you said?

21    A.    Correct.

22    Q.    Okay.  They told you search on the term Mafia

23    Sex; is that right?

24    A.    Correct.

25    Q.    But it's your testimony today that at this class

1  they never told you why?

2        A.    I testified that they told me that it would

3  return child pornography files.

4        Q.    But they didn't give you any other background

5  information except that Mafia Sex will give you child

6  pornography?

7        A.    Correct.

8        Q.    And it's your testimony today that they never

9  trained you that Mafia Sex was a well-known series of child

10 pornography?

11       A.    I've never had any training on a particular

12 series or what images are in series.  I've had discussions at

13 trainings with other officers about different series.  But as

14 far as PowerPoint on this is this, this is that; no, ma'am.

15       Q.    So when you had training with other officers

16 about different series, no one pulled out pictures and said,

17 these pictures represent this series?

18       A.    No, ma'am.

19       Q.    Okay.  And so you testified before the jury that

20 this Mafia Sex is a search term you put in, and that's a

21 well-known series of child pornography?

22       A.    Correct.

23       Q.    But you didn't get that information from any of

24 your training?  Is that what you're saying?  That to type --

25 that's why you would type in that search term?

1         A.     Could you say that again?

2         Q.     You weren't -- your training didn't tell you,

3 type in Mafia Sex because it's a search term that represents a

4 well-known series of child pornography?

5         A.     No.  The training taught us to type in Mafia Sex

6 to get child pornography.  And in my interaction with other ICAC

7 officers, we know that Mafia Sex is a series.

8         Q.     But to be clear, you know what you think that

9 series represents.  And other people know what they think Mafia

10 Sex series represents.  But you have never all gotten together

11 to make sure you are talking the same series of pictures;

12 correct?

13         A.     There has never -- no, ma'am.  There has never

14 been any training like that.

15        MS. THOMPSON:  Okay.  No further questions.

16        THE COURT:  Of the files, of the search terms that you

17 identified in your direct testimony, how many of those search

18 terms have you previously confirmed as known child pornography

19 -- as known children?  Pornography involving known children?

20        THE WITNESS:  The search terms that are in this report?

21        THE COURT:  Uh-huh.

22        THE WITNESS:  Every one of them that I just named off

23 here off this paper, I've gotten known child pornography from

24 those search terms.

25        THE COURT:  Okay.  But did I also understand you to say

1    that there are images in the Mafia series that do not contain

2    child pornography?

3           THE WITNESS:  Could you say that again, sir?

4           THE COURT:  Did I understand you to testify that there

5    are images in the Mafia series that are not known to contain

6    child pornography?

7           THE WITNESS:  Correct, sir.  A search term --

8           THE COURT:  The fact that it's a Mafia search term

9    doesn't automatically mean it's child pornography?

10          THE WITNESS:  Correct.

11          THE COURT:  Could be or could not be?

12          THE WITNESS:  It could be adult porn.  It just -- when

13   you do the search term to get the files, you may get all kinds

14   of different files, not necessarily all child porn.

15          THE COURT:  So in the earlier description of search

16   terms, it wouldn't be accurate to say that every time you use

17   those terms, you will get child pornography.  That's not

18   accurate, is it?

19          THE WITNESS:  That would be an accurate term, because

20   when you search for it, you're getting a whole list of files.

21          THE COURT:  Well, you are getting a list of files to

22   investigate further, is what you're getting, isn't it?

23          THE WITNESS:  Correct.

24          THE COURT:  So, but until you investigate them, you

25   don't know whether, in fact, they are adult or children?

1          THE WITNESS:  Correct.

2          THE COURT:  So the only certainty is, is that you've

3     gotten something to pursue further?

4          THE WITNESS:  To look at; correct.

5          THE COURT:  To look at, as opposed to saying that that

6     is, in fact, child pornography?

7          THE WITNESS:  Correct.

8          THEH COURT:  Now, on these file names that you

9     identified as child pornography files, does the same explanation

10    apply to those as well?  That this is a file that you can search

11    for child pornography, but it remains to be investigated

12    whether, in fact, it is child pornography?

13         THE WITNESS:  Correct.

14         THE COURT:  So that really is your testimony as to the

15    earlier files and search terms that you described?

16         THE WITNESS:  Correct.

17         THE COURT:  Anything further?

18         MS. DAUGHTREY:  I do have one question.

19    FURTHER EXAMINATION

20    BY MS. DAUGHTREY:)))

21         Q.    The hash values -- those are also used by the

22    peer-to-peer?

23         A.    Software; yes, ma'am.

24         Q.    And in your forensic software?

25         A.    Correct.

1       Q.      So this is something that's common that's done

2  with these -- ?

3       A.      Yes, ma'am.  Hash values are common throughout

4  all computer stuff.

5       MS. DAUGHTREY:  All right.

6       MS. THOMPSON:  And I have one more question after that.

7  FURTHER EXAMINATION

8  BY MS. THOMPSON:)))

9       Q.      But the hash values are based on different

10  number bases.  Gnutella may use base 16.  Somebody else uses

11  base 32 or 64.  So you can't necessarily compare one hash value

12  to a whole another program that's in hash values?

13       A.      That is correct in some respect.  Like the

14  LimeWire Gnutella network will use one standard of hashing,

15  where like in my computer forensics, I use a different standard

16  of hashing.  They are both hash values.  They are just different

17  algorithms.

18       THE COURT:  Anything further of this witness?

19       MS. DAUGHTREY:  Not from the government, Your Honor.

20       THE COURT:  You may step down, sir.

21       THE COURT:  Any further argument, either side?

22       MS. DAUGHTREY:  Your Honor, I think it's clear yet

23  again that this detective has specialized knowledge in

24  peer-to-peer investigations from his testimony about his

25  training.  He didn't testify -- if you look at the transcript,

1    and we were looking at it earlier, he didn't testify that those

2    search terms in Exhibit 9 were automatically going to mean that

3    this defendant possessed or received child pornography.

4         THE COURT:  That was the distinct impression that his

5    testimony left.  That the file names and the search terms would

6    yield child pornography.  And that's something I think that --

7    that is my distinct recollection of the whole focus of that

8    testimony.  Investigating child pornography is what he has just

9    said, not that they are known producers of child pornography.

10        And since the Supreme Court's decision in <u>Ashcroft v.</u>

11   <u>Free Speech Coalition</u>, 535 U.S. 234 (2002), the Court held

12   unconstitutional subparagraph (b) of 2286(8) that deemed to be

13   contraband an image appears to be of a minor engaging in

14   sexually explicit conduct as unconstitutional.

15        So it seems to me that the reliability factor has to --

16   has to increase.  And what was presented earlier as expertise is

17   now striking the Court as really just investigative techniques.

18   Here's how you go about identifying leads to determine whether

19   something is, in fact, child pornography.

20        MS. DAUGHTREY:  Well, but he's not being charged with

21   violation of the law for having those search terms.  What he's

22   charged with is violation of the law for having child

23   pornography.

24        THE COURT:  Yes, but the testimony of this witness --

25   my distinct recollection of it was to show that if these search

1    terms are found on your computer, then there is possession of

2    child pornography, you are in possession of child pornography.

3    Whereas what he really is saying is that this will lead me

4    further to examine whether there is child pornography.  And to

5    me, that is a quantitative difference.

6             Anything further?

7        MS. DAUGHTREY:  Your Honor, I would submit that, you

8    know, the government has to prove intent.  And one of the things

9    in his experience of doing this is that he uses these terms to

10   find child pornography.  And I think that that's an important --

11       THE COURT:  I don't think there is any problem with

12   that.  There is no problem with that.  I mean, that's legitimate

13   technique.  But it was posed to the witness that, by virtue of

14   him finding these terms, that there is child pornography on the

15   defendant's computers.  That's how it was cast to the jury.

16       MS. DAUGHTREY:  Well, the point that the government --

17   the reason that the government brought that in was to show that

18   he did have an intent to do that, Your Honor.  I'm not sure that

19   the testimony --

20       THE COURT:  If you say he has the intent by virtue of

21   the existence of the search terms or the names, then you really

22   don't know that until you first determine whether what's there

23   is actually child pornography or not.  If it's not child

24   pornography, then those terms are meaningless.

25       MS. DAUGHTREY:  Well, but the other government's other

1 proof shows that there was child pornography on it.  We're not

2 completely done with our proof at this point.

3    THE COURT:  I don't know what the other proof is.  The

4 question I have before me is the reliability of the opinion

5 testimony that this witness gave on direct examination that

6 these search terms and these file names reflect that he had

7 child pornography on his computer.

8    MS. DAUGHTREY:  Your Honor, I don't think that's what

9 he testified to.  And I would like to be able to look at the

10 transcript to verify that.  I think what he testified to was

11 these are known child pornography search terms.

12    THE COURT:  That was the whole point that you were

13 saying.  These terms are shown to show his intent.  So that had

14 to be the purpose of the witness's testimony, was to say that he

15 intended to possess these because these file names and these

16 search terms were on his computer.  I mean, that's what you just

17 said.  You had to prove intent.  And these search terms are to

18 show intent.  So that had to be the purpose of his testimony,

19 was to establish that the existence of these search terms and

20 the existence of these file names means he intended to have

21 child pornography.

22    MS. DAUGHTREY:  And I think the government is entitled

23 to show the jury what file names were there and what search

24 terms he used.

25    THE COURT:  Well, that's showing the factual

1    background.  But that's not how you posed this witness.  You

2    posed this witness as an expert on child pornography.

3          MS. DAUGHTREY:  I think he was posed as an expert in

4    peer-to-peer investigations, is what we came down to in the end.

5          THE COURT:  Well, peer-to-peer investigations is how

6    computers operate to share information.

7          MS. DAUGHTREY:  Right.

8          THE COURT:  But you were asking his opinions on, does

9    that show -- what does that site reveal?  That site reveals

10   child pornography.  And it may on some occasions, and it may not

11   on others.

12         MS. DAUGHTREY:  Your Honor, we didn't talk about any

13   sites or any -- I would like to go back and look at the

14   transcript, if possible, because I don't think he testified that

15   it meant that he had child pornography on his computer.  I don't

16   think that -- the testimony was that he was intending to look

17   for child pornography.  But that's different than saying that he

18   is guilty of it.  I think it's just one part of the proof, that

19   those search terms -- and I think that's what he testified.

20   Those search terms are known terms for child pornography.

21         THE COURT:  Anything else?

22         MS. DAUGHTREY:  No, Your Honor.

23         THE COURT:  For the defense?  Anything else?

24         MS. THOMPSON:  No, Your Honor.

25         THE COURT:  We're in recess.

1          (Recess.)

2          THE COURT:  I think the best approach to this is to get

3     a record of the actual testimony.  I'm advised by the court

4     reporter that this will be a rough draft.  If are there any

5     particular areas of contention, she can get a certified portion

6     of that.  I do think that it would be helpful to the Court to

7     reexamine the testimony before taking any other matters or

8     acting on the defendant's motion.

9          Any other matters?  I understand that the court

10    reporter can provide a complete rough draft within about 15

11    minutes.

12         (Conclusion of proceedings of 2/25/15.)

13                          *  *  *  *  *

14

15

16

17

18

19

20

21

22

23

24

25

1                        REPORTER'S CERTIFICATE

2

3           I, Peggy G. Turner, Official Court Reporter for

4  the United States District Court for the Middle

5  District of Tennessee, with offices at Nashville, do

6  hereby certify:

7          That I reported on the Stenograph machine the

8  proceedings held in open court on February 25, 2015, in the

9  matter of USA v. JEREMY SETH TUMMINS, Case No. 3:10-00009; that

10  said proceedings in connection with the hearing were reduced to

11  typewritten form by me; and that the foregoing transcript, Pages

12  1 through 85, is a true and accurate record of said proceedings.

13         This the 9th day of April, 2015.

14

15

16

17                    *Peggy G. Turner*
                      S/Peggy G. Turner, RPR

18                      Official Court Reporter

19

20

21

22

23

24

25