```
 1              IN THE UNITED STATES DISTRICT COURT

 2          MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION

 3      ------------------------------------------------------------

 4      UNITED STATES OF AMERICA,     )

 5                   Plaintiff,       )

 6                                    )

 7      v.                            )  CASE NO. 3:10-00009

 8                                    )

 9      JEREMY SETH TUMMINS,          )

10                   Defendant.       )

11      ------------------------------------------------------------

12

13                     TRANSCRIPT OF PROCEEDINGS

14                          VOLUME III

15      ------------------------------------------------------------

16      DATE:             February 26, 2015

17      TIME:             9:00 A.M.

18      BEFORE:           HONORABLE WILLIAM J. HAYNES, JR.

19                        And a Jury

20      ------------------------------------------------------------

21

22

23      COURT REPORTER:   PEGGY G. TURNER
                          OFFICIAL COURT REPORTER
24                        801 BROADWAY, ROOM A-837
                          NASHVILLE, TENNESSEE 37203
25                        PHONE:  (615)726-4893
                          Peggy_Turner@tnmd.uscourts.gov
```

```
 1                    A P P E A R A N C E S:

 2      For the Plaintiff:   Carrie Daughtrey
                             Lynne Ingram
 3                           Assistant U.S. Attorneys
                             Nashville, TN
 4
        For the Defendant:   Jennifer Thompson
 5                           Attorney at Law
                             Nashville, TN
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                        W I T N E S S E S:

2     JOSHUA FINDLEY
      Direct Examination by Ms. Ingram              Page   11
3     Cross Examination by Ms. Thompson             Page   14
      Redirect Examination by Ms. Ingram            Page   18
4
      TAMMY KENNEDY (Jury out)
5     Examination by Ms. Thompson                   Page   35
      Examination by Ms. Ingram                     Page   39
6
      TAMMY KENNEDY (Jury in)
7     Direct Examination by Ms. Thompson            Page   51
      Cross Examination by Ms. Ingram               Page   54
8
      JAMES KEMPVANEE
9     Direct Examination by Ms. Thompson            Page   58
      Cross Examination by Ms. Daughtrey            Page   75
10    Redirect Examination by Ms. Thompson          Page   84
      Recross Examination by Ms. Daughtrey          Page   88
11
      JOSHUA FINDLEY (Jury out)
12    Examination by Ms. Ingram                     Page   92
      Examination by Ms. Thompson                   Page   95
13
      JOSHUA FINDLEY (Jury in)
14    Direct Examination by Ms. Ingram              Page  108
      Cross Examination by Ms. Thompson             Page  115
15

16

17

18

19

20

21

22

23

24

25

26
```

1           P R O C E E D I N G S:

2           THE COURT:  You may be seated.  Are there any

3   preliminary matters, either side? Any further argument on behalf

4   of the government?

5           MS. DAUGHTREY:  No, Your Honor.  I apologize for the

6   late filing, but the government said everything in that that its

7   position is.

8           THE COURT:  Anything further from the defendant?

9           MS. THOMPSON:  No, Your Honor.

10          THE COURT:  First, I want to clarify.  I know the

11  transcript is a rough draft, but in the interest of making sure

12  that it reflects the Court's ruling, there is a question posed

13  by government counsel to a witness about the interpretation of

14  the interview.  The Court sustained the defense objection.  And

15  among cases cited was United States v. Grinage, 390 F.3d 746

16  (2nd Cir. 2004).  And in that case, the Court held that the

17  agent's interpretation of phone calls, including some the jury

18  had not heard, usurped the jury's function.  And that is what

19  counsel's question to the agent was doing in this case, because

20  none of the interview had ever been presented to the jury.

21          As to the expert testimony of this witness, the report

22  that was provided in this case is a 2009 report that principally

23  lists websites and result of the search.  Under Rule 16(a)(1)(G)

24  of the Federal Rules of Criminal Procedure, an expert report is

25  required to provide all of the factual bases upon which the

expert relies for the expression of the opinions given in a case.  In this case, the expert report didn't provide any of that.  There is no basis provided for the other images that the expert compared.  The images were not provided.  The Court made an attempt to cure that.  Now it appears that that effort to cure that has been unsuccessful.

Upon the Court's review of the record, questions were asked whether the files reflected child pornography, and the expert expressed -- the witness expressed an opinion on that.

The Court believes that the appropriate remedy in this case is to instruct the jury that they are to disregard any testimony of this witness expressing opinions on whether any files are child pornography.  The Court is going to instruct the jury, based upon the witness's testimony to the Court, that all of these -- that what the witness has described are essentially investigative techniques that agents use to further investigate whether images are, in fact, child pornography, and that the government has the burden of proving beyond a reasonable doubt that the images at issue in this case are, in fact, child pornography, and that it would be a miscarriage of justice if the jury were to consider any opinions of the witness given during his examination -- it would be a miscarriage of justice if they considered those opinions in their deliberations.

And for those reasons, the motion to dismiss or motion for a mistrial, either with or without prejudice, is denied.

1          Yes, ma'am.

2          MS. THOMPSON:  Your Honor, based on this, may I have a

3 few minutes before we resume cross examination so I can review

4 my cross examination questions so that I do not enter into this

5 territory?

6          THE COURT:  All right.  We'll be in recess.

7          (Recess.)

8          THE COURT:  You may be seated.  All of the jurors are

9 here now.  I wanted to add one additional point that the defense

10 made concerning their inability to independently conduct

11 searches of these files for child pornography.  That contention

12 was rejected by the Sixth Circuit in United States v. Paul that

13 is cited in United States v. Lance, 2009 Westlaw, 1107708 at

14 Page 5 (Southern District of Ohio, April 22, 2009).

15          All right.  You can bring the jury in.

16          (Jury in.)

17          THE COURT:  Good morning, ladies and gentlemen of the

18 jury.  You may recall in my earlier instructions that I told you

19 that there may be occasions where the Court instructs you to

20 disregard evidence or strike evidence or that evidence is to be

21 considered only for a limited purpose.  In this case you have

22 previously heard the testimony of an agent expressing an opinion

23 on whether certain files are pornography or not.  The Court

24 instructs you that you are to disregard that testimony in its

25 entirety.  The government bears the burden of demonstrating a

1   basis for the expression of expert opinion.  And in this case
2   the government has failed to meet the standards required for
3   that.
4        The Court instructs you that you are to consider any
5   testimony concerning files, whether they might be pornographic
6   or not, are to be considered only as investigative techniques to
7   discover further whether those images are, in fact, child
8   pornography.
9        The government is required to prove whether any image
10  concerned in this case is a pornographic image beyond a
11  reasonable doubt.  And it would be a miscarriage of justice if
12  you considered the testimony of the agent or the opinion
13  testimony of the agent as -- on whether any file is pornographic
14  or not, it would be a miscarriage of justice if you considered
15  that testimony in your deliberations.  The agent can be
16  considered as a person having specialized knowledge on computer
17  matters.
18       The witness may resume the stand.
19       MS. THOMPSON:  I have no further questions, Your Honor.
20       THE COURT:  You may step down, sir.
21       You may call your next witness.
22       MS. DAUGHTREY:  No further questions for this witness.
23       THE COURT:  You may call your next witness.
24       MS. DAUGHTREY:  Our next witness is Joshua Findley.
25       THE COURT:  Mr. Findley, if you will come around,

1　please, sir.

2　　　　MS. DAUGHTREY:  Your Honor, may we approach?

3　　　　THE COURT:  Yes.

4　　　　(Whereupon, a bench conference was held, out of the

5　hearing of the jury, to wit:)

6　　　　MS. INGRAM:  I expected that we would either have a

7　mistrial or we would be proceeding with cross examination.  The

8　witness can be here in ten to 15 minutes.  He is across the

9　street.  I expected we would have cross examination this

10　morning.

11　　　　THE COURT:  Oh, okay.

12　　　　MS. THOMPSON:  Just as an another, Your Honor.  I have

13　not seen any report from this witness or any CV or any

14　investigative report.  I don't have any Jencks material from

15　this witness.

16　　　　THE COURT:  Well, Jencks material usually comes after

17　completion of direct examination.  Is this witness an expert?

18　　　　MS. INGRAM:  No, Your Honor.  He is simply going to

19　testify to one of the images being a known victim that he was

20　involved in the investigation.

21　　　　MS. DAUGHTREY:  He knows the child.

22　　　　MS. THOMPSON:  Do they have any other report, though,

23　or anything else?

24　　　　THE COURT:  So he is testifying on personal knowledge?

25　　　　MS. INGRAM:  Yes, sir.  And no report exists as to

that.  He has shown up, looked at the image, and said, yes, I
know her from my investigation.  There is no report on this.

        MS. THOMPSON:  Is he going to testify that he has seen
this video in the past?  Or he knows this to be a Vicky series
or anything like that?  If so, I want the information he is
going to base that on.  If he is just going to say, I know who
this person is, and this is a picture of her, then that's
different.

        MS. INGRAM:  Your Honor, I can stay away from all of
that.  He is going to identify her based on his personal
knowledge and his investigation of the case.  And the case
involved her being exploited.

        THE COURT:  Is the image going to be presented as part
of his testimony?

        MS. INGRAM:  It's already admitted into evidence.

        MS. THOMPSON:  I would like, outside the presence of
the jury, a chance to just ask him as to how he knows the
witness.  Because once he says he knows her, that will be very
prejudicial.  And so that we can avoid any further mishaps in
front of the jury, I'd like an opportunity to question him
first.

        THE COURT:  Did he personally talk to the victim?

        MS. INGRAM:  He knows her through his investigation.
He has known her for many years as the victim.

        THE COURT:  Has he actually talked to her?

1      MS. INGRAM:  Yes, sir.  He knows her well.

2      MS. THOMPSON:  Okay.

3      (Conclusion of bench conference.)

4      THE COURT:  Ladies and gentlemen of the jury, it's

5 another pogo moment.  It should be a short recess.  Please don't

6 discuss the evidence amongst yourselves until you receive all of

7 the evidence, the argument of counsel, and the charge of the

8 Court.  Hopefully it will be a brief recess.  Okay?  Thank you.

9      (Jury out.)

10      THE COURT:  We're in recess.

11      (Recess.)

12      THE COURT:  You may be seated.  Just for completeness

13 of the record, the Court reviewed the latest submission by the

14 government on the issue of that witness's testimony.  And as

15 reflected in that latest submission, there was no supplemental

16 report beyond the 2009 report.

17      You may bring in the jury.

18      (Jury in.)

19      THE COURT:  You may be seated.  All right, ladies and

20 gentlemen of the jury.  We'll continue with the presentation of

21 the government's proof.

22      You may call your next witness.

23      MS. INGRAM:  The United States calls Joshua Findley.

24      THE COURT:  Mr. Findley, come around and be sworn,

25 please, sir.

1          (Witness sworn.)

2          THE CLERK:  Have a seat.  Please state your name and

3     spell it for the record.

4          THE WITNESS:  My name Joshua Findley, F-i-n-d-l-e-y.

5     DIRECT EXAMINATION

6     BY MS. INGRAM:

7          Q.     Where are you employed?

8          A.     I'm a Special Agent for the Department of

9     Homeland Security in Portland, Oregon.

10         Q.     How long have you been with the Department of

11    Homeland Security?

12         A.     I have been with Homeland Security since its

13    inception in 2003.

14         Q.     How long have you been in law enforcement?

15         A.     18 years.

16         Q.     What are your current duties at the Department

17    of Homeland Security?

18         A.     Currently I'm assigned as a Special Agent

19    assigned to our Portland Police Drugs and Vice Division.  Prior

20    to that, I was Special Agent assigned to working sexual

21    exploitation investigations.

22         Q.     How long were you in that division?

23         A.     Eight years.

24         Q.     During that time, did you investigate a case

25    that involved an individual referenced as Vicky?

1      A.     I did.

2      Q.     May I hand the witness what has been previously

3   admitted as Exhibit 24, the first page, please.

4          Have you had an opportunity to look at the first page

5   of Exhibit 24?

6      A.     I have, ma'am.

7      Q.     And do you recognize that?

8      A.     I do.

9      Q.     What is it?

10     A.     That is a --

11     MS. THOMPSON:  Your Honor, I have an objection.

12     THE COURT:  Would counsel approach the bench?

13         (Whereupon, a bench conference was held, out of the

14   hearing of the jury, to wit:)

15         MS. THOMPSON:  I would like him to lay a foundation

16   before he can identify this person or give this person a name.

17   I would like him to lay some type of foundation as to how he

18   would have known this person.

19         THE COURT:  I don't see the problem with this.

20   Overruled.  I think it's appropriate.  Overruled.

21         (Conclusion of bench conference.)

22   BY MS. INGRAM:

23     Q.     What is the first page of Exhibit 24?

24     A.     That is a photograph of a child investigation I

25   worked, and it depicts her being sexually abused.

1      Q.      And when you were involved in that investigation
2  -- well, let me ask you, how old was this child in that
3  photograph?
4      A.      She was either ten or eleven years old.
5      Q.      And have you had an opportunity to meet with
6  this minor victim?
7      A.      Yes, I have.
8      Q.      And do you know her well?
9      A.      Yes.
10      Q.      Have you been involved in communicating with her
11  throughout the inception of this investigation?
12      A.      Yes.
13      Q.      And do you remain in contact with her?
14      A.      Yes.
15      Q.      And were you specifically the agent handling the
16  case during -- in the beginning of the investigation?
17      A.      Yes, ma'am.
18      Q.      Did you follow the investigation to its
19  conclusion?
20      A.      I did.
21      MS. INGRAM:  May I have just a moment?
22      THE COURT:  Yes.
23      MS. INGRAM:  I have nothing further.
24      THE COURT:  You may cross examine.
25      MS. THOMPSON:  Yes, Your Honor.  At this time I would

1    like to request any report or other matter that this witness has

2    produced, Jencks material.

3         MS. INGRAM:  Would you like us to approach?  Or I can

4    address it now.  They don't exist, Your Honor.

5         THE COURT:  There are none.

6         MS. INGRAM:  In relation to this specific testimony, no

7    reports exist.

8         MS. THOMPSON:  Okay.

9    CROSS EXAMINATION

10   BY MS. THOMPSON:

11        Q.    So did you prepare any report in investigating

12   this matter and these photographs that you are testifying to

13   today?

14        A.    Yes, ma'am.  Not that I provided to the

15   government in reference to this case, no.

16        Q.    No, but in reference to your identifying this

17   person in this photograph, you prepared reports on that

18   investigation, did you not?

19        A.    Yes, ma'am.

20        Q.    And you prepared reports on how you would have

21   known this person or what it was that you discovered regarding

22   this person; is that right?

23        A.    Yes, ma'am.

24        MS. THOMPSON:  Your Honor, I would ask that I be

25   allowed to see those reports.

1    THE COURT:  Ladies and gentlemen of the jury, we're

2    going to have to excuse you for a few minutes.  Please don't

3    discuss the case amongst yourselves until you receive all of the

4    evidence, the argument of counsel, and the charge of the Court.

5         (Jury out.)

6         THE COURT:  You can be seated.

7         What was the outcome of the case?  What was the result

8    of the case you had?

9         THE WITNESS:  The result was a conviction in both state

10   and federal court, and the subject was sentenced to 50 years in

11   prison.

12        THE COURT:  And the specific offense for which the

13   defendant was found guilty?

14        THE WITNESS:  He was found guilty on state sexual abuse

15   charges.  He was found guilty on federal charges of production

16   of child pornography, transporting a minor across interstate

17   lines for the intent of producing child pornography, and a

18   parent or guardian using a minor in producing child pornography.

19        THE COURT:  Has that case been finally concluded?

20        THE WITNESS:  It has, Your Honor.

21        THE COURT:  Request denied.

22        MS. THOMPSON:  Your Honor, if he has prepared reports,

23   he says he thinks --

24        THE COURT:  Whatever the report prepared, if there has

25   been a judgment of conviction finding that this child was a

1    victim -- was involved in child pornography, I don't see that

2    the reports are really relevant.  Otherwise, you would be trying

3    to retry the case on whether this person was, in fact, a child.

4    The case has been concluded.

5         MS. THOMPSON:  I'm trying to establish some information

6    as to how it is that he has his knowledge.  And if he has

7    prepared reports about --

8         THE COURT:  You can ask him questions about how he

9    acquired information about her age.  You can ask him that.  I

10   don't think the reports are necessary for that.  Anything else?

11        MS. THOMPSON:  No, Your Honor.

12        THE COURT:  You can bring the jury back in,

13   Mr. Marshal.

14        MS. INGRAM:  Your Honor I was staying way from those

15   questions the Court just asked.

16        THE COURT:  I know, but I mean, I don't know how else

17   we can resolve them unless we can establish that that proceeding

18   was concluded.

19        MS. INGRAM:  I agree, but may I ask whether there can

20   be an instruction to the jury?  Or if I may ask questions

21   related --

22        THE COURT:  I will allow to you ask a question in light

23   of what she has raised.

24        MS. THOMPSON:  Your Honor, I am not going to ask any

25   further questions of this witness.

1    THE COURT:  Yes, but the last question before the jury

2    was for documents.  And there is a need, I think, now to explain

3    to the jury why those -- why that request is being denied.  I

4    think the way -- the posture of the matter is that the jury

5    needs to now know that in light of what you have raised.

6    MS. THOMPSON:  But those documents exist, but the Court

7    has determined that, because there has been a final conclusion

8    on those -- on that case and that charge, that the defense is

9    not entitled to review those documents.

10    THE COURT:  No, the Jencks material refers to

11    statements prepared for the case before the Court.  And you are

12    trying to expand it to cases that have been concluded.  And it

13    has been concluded on an issue for which you seek to explore.

14    MS. THOMPSON:  I thought the Jencks is if he has

15    prepared reports on the subject to which he is testifying.  So,

16    such as if Scott Levasseur prepared a report for state court,

17    and then he is here in federal court, that report still applies.

18    He is testifying on a subject that he has prepared reports on.

19    THE COURT:  If the matter had not been concluded, I may

20    agree with you.  But it has been concluded.  It has been

21    determined.  The judgment is final.

22    You can bring the jury in.

23    (Jury in.)

24    THE COURT:  You may be seated.  Once again, I

25    apologize, ladies and gentlemen of the jury.  But take your

1    frustrations out on me.

2          Counsel?

3          MS. THOMPSON:  No further questions, Your Honor.

4          THE COURT:  Any redirect of this witness?

5          MS. INGRAM:  Yes, Your Honor.

6    REDIRECT EXAMINATION

7    BY MS. INGRAM:

8          Q.    You discussed briefly about this investigation

9    you were involved in with a minor child that you looked at the

10   photograph, the Page 1 of Exhibit 24?

11         A.    Yes, ma'am.

12         Q.    And you mentioned that you had been involved to

13   the conclusion of that case?

14         A.    Yes, ma'am.

15         Q.    Can you please tell the jury what the conclusion

16   of the case was?

17         A.    The conclusion of the case was the arrest,

18   indictment and a conviction of the individual who abused that

19   child.  And he was sentenced to 50 years.  And that was about

20   six years ago.

21         Q.    What were the convictions for?

22         A.    He was convicted of a state charge in Washington

23   of sexual abuse of a minor.  He was convicted of federal charges

24   in both the Eastern District of Washington and the District of

25   Oregon of production of child pornography, of a parent or

1    guardian using a minor in the production of child pornography,

2    and in Oregon for the transportation of a minor across state

3    lines with the intent to produce child pornography.

4            MS. INGRAM:  Nothing further.

5            THE COURT:  Any recross?

6            MS. THOMPSON:  No, Your Honor.

7            THE COURT:  You may step down, sir.

8            You may call your next witness.

9            MS. INGRAM:  That's the United States' proof.

10           THE COURT:  Any proof on behalf of the defendant?

11           MS. THOMPSON:  Yes, Your Honor.  Our witness is across

12   the street, Your Honor.

13           THE COURT:  All right.  Ladies and gentlemen, we're

14   going to have to take a brief recess again.  Please don't

15   discuss the evidence amongst yourselves until you receive all of

16   the evidence, the argument of counsel, and the charge of the

17   Court.

18           (Jury out.)

19           THE COURT:  We're in recess.

20           (Recess.)

21           THE COURT:  You may be seated.

22           Any preliminary matters before we get started?  If

23   not, --

24           MS. THOMPSON:  I have a motion, Your Honor.

25           THE COURT:  All right.

1    MS. THOMPSON:  I would like to make motion for judgment

2    of acquittal at this time, Your Honor.  We have -- in this

3    matter, I believe that the government has failed to make their

4    case in chief, that in terms of showing that my client had the

5    intent to download pornography or child pornography in this

6    matter, Your Honor.  I believe that they have failed to show

7    that the -- my client was in possession.

8        The only picture that they were able to identify as

9    being a possible person under the age of 18 was a picture that

10   the -- that was a hidden file that the officer testified that

11   people would not normally be -- a normal user could not see.

12   And the other pictures they have not offered any proof to

13   indicate that those are, in fact, people under the age of 18.

14   They are not able to identify who those people are.

15       And so, Your Honor, in addition, although they showed

16   that some of these files were found and they showed that

17   searches had been done in LimeWire, the files that they are

18   showing in this case, I think the majority of them were in the

19   recycle bin, Your Honor, on the Gateway tower computer.  The

20   laptop computer had one image.  It was located in the Morpheus

21   shared folder.  But it was in the hidden database.  The image

22   itself was gone.  And they don't have a log showing that that

23   particular image had been downloaded, Your Honor, through

24   Morpheus.

25       And the witness testified that there's other ways that

files could possibly be moved around, that people can set different settings and move things around. So they certainly do not have proof of receipt of child pornography. And then they have failed to prove that my client was in knowing possession of child pornography.

And so I would ask that this case be -- that judgment be made by the Court of a finding of not guilty and the case be dismissed.

MS. DAUGHTREY: Your Honor, in determining this, the Court is to look at the evidence in a light most favorable to the government. And the government's position is that it has proven the element in this case.

Starting with intent, there is evidence in Exhibit Number 7 wherein the defendant signed a statement admitting that he had been downloading child pornography files. He stated in that that he did it out of curiosity. The intent is also shown with search terms that he used in LimeWire, search terms such as -- search terms such as school girl, teen, preteen boys, pedo, high school cheerleader nudity, young teen sex, high school underage, and young sex. Those are all terms that he used in searching LimeWire and Morpheus, which are file-sharing programs.

Additionally, intent can be shown with the names of the files that he chose to download. There was testimony that for each and every file that you download from a file-sharing

1    network or an using a file-sharing program, it has been

2    uncontroverted that you actually have to -- you see the file

3    name, and you have to download the file itself.

4            And just as an example, there are file names that were

5    found on his computer such as My nine year old cousin, and I

6    won't go into -- s-u-c-k-i-n-g my c-o-c-k.  There are other file

7    names that are more descriptive than that.  Those file names can

8    be found in multiple exhibits, including Exhibit 10, Exhibit 11,

9    Exhibit 13, Exhibit 14, Exhibits 17, 18, 19, 20 and 21.

10           So there are many file names that are directly

11   associated with downloads using file-sharing programs that were

12   -- that are indicative, just with the names of the files, of

13   child pornography.

14           There is a case that the government cited in its most

15   recent filing in which, particularly the case United States v.

16   Mantz from the 10th Circuit, in which the Court found that

17   evidence was sufficient for a rational jury to find that the

18   defendant was guilty of receipt and attempt to receive child

19   pornography based on Internet searches by the defendant and

20   based on the file names themselves.  So I would submit that that

21   intent element has been met.

22           In terms of whether or not he actually possessed child

23   pornography, there is a -- there is testimony about the

24   particular child in the first page of Exhibit 24 being either

25   ten or eleven years old.  Clearly, that image showing her

1    performing oral sex on a male meets the definition of child

2    pornography under federal law.  And there are additional

3    exhibits, one of another thumbnail, and then three videos that

4    were found on the defendant's computer.  And that is a question

5    for the jury to make a decision about, whether or not those are

6    actual children that are in those -- in that exhibit in those

7    videos and the pictures.

8            Those files, the testimony was that the three video

9    files were found in a recycle bin, and they were found to have

10   been associated with LimeWire, having been downloaded with

11   LimeWire.  The defendant admitted he downloaded using LimeWire.

12   And therefore, the government suggests that there is more than

13   ample proof for the case to go to the jury for decision.  Thank

14   you.

15           THE COURT:  Your motion.  You get the last word.

16           MS. THOMPSON:  No, Your Honor.

17           THE COURT:  Considering the evidence in a light most

18   favorable to the government, as required on this type of motion,

19   given the defendant's admissions, the existence of the

20   description of search terms and files, and the testimony of the

21   agent concerning the victim Vicky, the Court denies the motion.

22           MS. THOMPSON:  Your Honor, I have another matter also.

23   And that is at some point after we finish our other witness, I

24   need to have a meaningful conversation with my client regarding

25   whether or not he testify.  We have had these conversations

1    before, but in light of the fact that there have been some

2    developments with Officer Levasseur and his testimony, I believe

3    I need at least a 30 or 45 minute conversation with my client

4    regarding proof that has come in and whether or not he chooses

5    to testify in this matter.

6            THE COURT:  Does the government have something?

7            MS. INGRAM:  Not as to that, Your Honor.

8            THE COURT:  Well, does the government have something

9    else?

10           MS. INGRAM:  Yes, sir.  The United States was just

11   provided at the break four print-outs with multiple pornographic

12   images that have personal identifying information that was

13   apparently downloaded off the Internet of pornographic websites

14   and three videos that were also confirmed, according

15   investigator for the defense, as pornography that does not

16   involve minors, because the investigator went online and made

17   sure that it says that they are adults.

18           We oppose this, any of this, coming in as not relevant

19   to the case at hand, and extremely inflammatory to this jury.

20   And if Your Honor would like, I'm happy to hand this forward.

21           THE COURT:  Well, let me hear what their response is.

22           MS. THOMPSON:  Your Honor, in this case, there are --

23   there is a real question as to four of these images that were

24   found on the computer.

25           THE COURT:  Where did these images come from?

1          MS. THOMPSON:  These images are from movies,

2     pornography movies, that are sold legally from Hustler of

3     Hollywood.

4          THE COURT:  Well, are any of the images derived from

5     any of the files that have been referred to or any of the videos

6     that have been referred to in the government's proof?

7          MS. THOMPSON:  They are not, Your Honor.

8          THE COURT:  Well, what is the relevance of them?

9          MS. THOMPSON:  It's very relevant, Your Honor, in that

10    the government says that these particular images are child

11    pornography, and it is up to the jury to decide --

12         THE COURT:  Have they said that the images that you are

13    going to introduce are child pornography?

14         MS. THOMPSON:  The government is claiming that Exhibit

15    24, Collective Exhibit 24 of the government's proof, is child

16    pornography.  And Your Honor, in this case it's up to the jury

17    to look at these photographs that they have provided, still

18    photographs, and determine whether or not those pictures are, in

19    fact, child pornography.  Your Honor, it's a real question as to

20    whether or not my client intended to download child pornography

21    or whether he was looking for adult porn.

22         And Your Honor, it is then imperative that the

23    government -- or that the defense be allowed to put forth

24    pictures that are known to be people over the age of 18, Your

25    Honor, and that are not minors, but that have been made to look

1    like minors.

2        THE COURT:  Well, do they -- do the images have a file

3    name that bears any resemblance -- is suggestive of someone

4    under the age of 18?

5        MS. THOMPSON:  Yes, Your Honor.  The video titles of

6    the series have names that indicate they might be people under

7    the age of 18.

8        THE COURT:  What are they?

9        MS. THOMPSON:  What?

10       THE COURT:  What are the titles?

11       MS. THOMPSON:  Teens Love Huge Cocks, Jizzed Teens, and

12   Born Flirty.  And also that people on the covers are wearing

13   high school jackets, they've got braces on.  There is another --

14   where is the other video?

15       THE COURT:  Now, these are titles of movies?

16       MS. THOMPSON:  They are titles of DVDs, copyrighted

17   movies, yes, Your Honor.  There is one fourth one, and it is

18   titled Little chicks with Tiny Tits.  And it has a pictures on

19   the cover of a woman who looks to have a very young body.  And

20   these are all legal, and they all are certified, they are

21   copyrighted images, and they are all certified under U.S. -- 18

22   U.S.C. 2257, which is a law also contained in the same chapter

23   under which my client is charged, that says anyone that's making

24   a movie must get the identification and verify the age of any

25   and all people that perform in such a movie.  And Your Honor, it

1   is relevant.

2       THE COURT:  What does the government say about these

3   titles that contain the word Teen?

4       MS. INGRAM:  Our first position is that there has been

5   minimal verification.  By looking on the Internet and seeing a

6   list identifying the person as a certain age is insufficient.

7   The investigator has not spoken with any of these people

8   portrayed in any of these videos or photographs.  So the

9   verification is simply something they found on the Internet.  I

10  don't know whether these are child pornography or not.  All we

11  know is that they are saying that it's not, on the Internet.

12      THE COURT:  That's what I was trying to get to.  To me,

13  all of -- the focus has been on what's on the Internet.  Not

14  necessarily what's in some store.  That's why I'm failing to see

15  a fit to this case.

16      MS. INGRAM:  Additionally, Your Honor, in any of our

17  file names or photographs that we have submitted for purposes of

18  this case, we're submitting them as child pornography.  There is

19  no photograph or video that has been identified by the United

20  States or that the defense has reviewed that they are bringing

21  forward today to present to the jury that was on the defendant's

22  computer for purposes of non-pornographic or adult pornographic

23  material.

24      THE COURT:  Anything else?

25      MS. INGRAM:  No, sir.

1    MS. THOMPSON:  Your Honor, it is relevant for the very

2    fact that, whether it's found on the internet or found on a DVD

3    in a store, they are both pornography.

4    THE COURT:  I mean, there is no evidence, for example,

5    that any DVDs were received other than that downloaded to the

6    computer.

7    MS. THOMPSON:  The difference, Your Honor, is that I

8    can go into a store and find DVDs with the name Teens whose

9    bodies look very much like children.  I cannot do my own

10   independent searches on the Internet to see what's out there

11   that might be downloaded with the name of Teen and not myself

12   risk --

13   THE COURT:  But you said earlier that for these DVDs,

14   under the law there had to be some verification that the persons

15   were of a certain age.

16   MS. THOMPSON:  It's on the back of the DVD.

17   THE COURT:  Well, that's what I'm saying.  If you went

18   to the store and you wanted to be sure about age, you could go

19   to the store and get something that had been verified as not

20   involving under the age of 18.

21   MS. THOMPSON:  Yes, Your Honor.

22   THE COURT:  That's what it shows to me.  It doesn't

23   show me that -- I don't see how it tends to disprove that any of

24   these images at issue involved adults.

25   MS. THOMPSON:  Well, it goes to show that there can be

adults with very child-like looking bodies, Your Honor.  These
pictures of these people have very child-like bodies.  This
picture that's on the cover of Little Chicks With Tiny Tits,
this is a picture that looks very similar to the government's
picture of a person lying on the bed that they call 11 Year Old
Fucked by Brother 13 With Sperm Inside, some variation of that
title.

          This is a very similar looking picture, still picture,
of a woman with a very tiny chest, tiny little hips, and all her
pubic hair has been removed, Your Honor.  These pictures were
picked out to look very similar to the government's exhibits.

          THE COURT:  Well, what does the government say to the
image on the DVD that is similar to the image in one of its
exhibits?

          MS. INGRAM:  I certainly understand the defense's
argument, but we stand by our inability to effectively verify
that these are actual adults.

          THE COURT:  Well, the question is that to be sold in a
store requires a verification that they are adults.

          MS. INGRAM:  It says that on the back of the video.  I
have not done any investigation on this matter, Your Honor.  I
have not looked into it.  Additionally, this sound like cross
examination or closing arguments.  However, exposing the jury to
unnecessary pornography of any kind is a 403 --

          THE COURT:  I was talking about -- you introduced an

image.  She's got a different image.  I think if it comes in, it would only be the image that comes in.  It wouldn't be the film.

MS. INGRAM:  Our position is it's not relevant to the case at hand that it was on.

THE COURT:  Generally, I agree with you.  But if it's in any way comparable to what the government introduced, it's an image comparable to what the government introduced, then at that point it may be of relevance, I think.

MS. INGRAM:  May I have just a moment?

THE COURT:  Yes, ma'am.

Is there going to be a defense witness who is going to testify as to these certifications that you referred to?

MS. THOMPSON:  She's going to be able to testify that the movies are -- we have a receipt that the movies were purchased at Hustler of Hollywood, and that the movies all have on the back side --

THE COURT:  Who is this witness?

MS. THOMPSON:  She is a private investigator, Your Honor.

THE COURT:  Yes, but if there is an issue about -- I don't know.

MS. THOMPSON:  Well, Your Honor, I have tried to get someone from Hustler of Hollywood to come and testify.  I tried to get several -- you know, employees over there.  They are prohibited by their corporate counsel.  I tried to get a local

1    film photographer to come testify.  He is unwilling.  There are

2    just not a lot of people, Your Honor, that want to come to

3    federal court and testify regarding --

4            THE COURT:  Well, does anybody in the government

5    administer this program of certification?

6            MS. THOMPSON:  No, Your Honor.  I believe the way that

7    the law handles it is that there are individuals that must be

8    appointed by a company, they give the name and address of

9    somebody that would be responsible for the database.

10           THE COURT:  Yes, but do you have any witness who is

11   going to testify as to what this certification means other than

12   the fact that I picked this out of a store, and here's what it

13   says on the back?

14           MS. THOMPSON:  I believe that the Court can take

15   judicial notice of that law, Your Honor, and what the law

16   specifically requires of any pornography that has been made -- I

17   believe it's post-2001.  The government has put in a lot of

18   proof to show intent of my client, Your Honor, that this was his

19   intent.  I have found some proof that I believe is reliable that

20   shows that just because a picture looks like this, it's not

21   proof of intent, and that there can be people that have pictures

22   that are with bodies that look like they are young, and they are

23   over the age of 18.  And secondly, that there is legal

24   pornography for sale that has titles that imply it might be

25   somebody underage.  Or families.  I have one that has a family

1  title.  And that's legal.  I have one that's called Tabu Family

2  Fantasies.

3          THE COURT:  Anything else?

4          MS. INGRAM:  None of these say that they are underage

5  individuals.  They don't have reference to 13 year olds or nine

6  year olds or 11 year olds.  We stand by our previous position.

7  If the Court is inclined to permit this video or an image of the

8  video for purposes of what the defense is asking, we would

9  request that we be allowed to go into rebuttal evidence as far

10  as expertise on analyzing these types of things by an

11  investigator who has done these things for many years, one of

12  the two witnesses that has previously testified, after hearing

13  the testimony, that she is opening the door.

14          MS. THOMPSON:  I am not -- Your Honor, my witness has

15  no expertise whatsoever in judging people and people's ages.

16          THE COURT:  No, it's not a question about your

17  witness's qualifications.  It's what issues you open by

18  introducing proof of what a person could discern as to whether

19  they are underage or not.

20          MS. THOMPSON:  Well, the government did put in that

21  looking for 10 and 8, the number 1, 8, and then the word Teen

22  connected to it, that that was a search word that my client used

23  to show that he was, in fact, interested.  And it was an

24  investigative tool.  Also that he had Daughter, Incest, Family,

25  or Son, something like that.  That that was an investigative

1    tool that they used to show what he intended to do.  They put in

2    a lot of file names besides just the few file names that my

3    client's files said.  They put in a lot of other file names,

4    Your Honor.  And now, when I want to put in some names of some

5    legal pornography that is similar, suddenly I'm opening the door

6    to them calling their witness back in.

7         That is not correct, Your Honor.  I'm just trying to

8    counter proof that's already in the record with something else.

9    These CDs or DVDs are legal, Your Honor.  These people are

10   certified to be overage.  And just as the government has been

11   allowed to put in photographs that they cannot certify the age

12   on, I want to be able to put in still photographs where the

13   people are certified by the copyright material to be of this

14   age.

15        And I believe, Your Honor, that there were even some

16   questions about whether or not the --

17        THE COURT:  Well, the only thing I'm going to consider

18   as possibly relevant would be an image that is comparable to an

19   image introduced by the government, and a name that is tied to a

20   name -- a file name in the government's files.  Those are the

21   only two that I could consider would be possibly relevant.  But

22   let me think that about that some more.

23        Any other matters?  How long is the next witness going

24   to be?

25        MS. THOMPSON:  She is just going to be a few minutes,

1    Your Honor.

2         THE COURT:  I think the jury is a little tired of

3    jumping up and down.  Let me consider this other question first.

4    Anything further on this question?

5         MS. INGRAM:  No, Your Honor.

6         THE COURT:  We're in recess.

7         (Recess.)

8         THE COURT:  You may be seated.  The government's

9    objection is going to be granted in part and denied in part.  I

10   will deny it as to the image of the person that could be argued

11   could be a minor, and a reference to the title of the one, the

12   Teen movie.  I think that the testimony of the government by the

13   agent about images that he saw that these were children, and the

14   search terms used that included terms like Teen, would make

15   these relevant and responsive to the government's proof.  I

16   don't think the other videos are.  So I will allow those two

17   images in.

18        I think once we finish this witness, the best we could

19   do is probably just take an early lunch.

20        MS. THOMPSON:  I would like to call my investigator,

21   Your Honor, to do an offer of proof as to what the other items

22   would have been.

23        THE COURT:  Call your witness.

24        (Witness sworn.)

25        THE CLERK:  Please state your name and spell it for the

```
 1    record.
 2              (Jury is out.)
 3    EXAMINATION
 4    BY MS. THOMPSON:
 5         Q.    Would you state your name?
 6         A.    Tammy Kennedy.
 7         Q.    Ms. Kennedy, what do you do for a living?
 8         A.    I'm a private investigator.
 9         Q.    Are you licensed for that?
10         A.    Yes, ma'am.
11         Q.    Just tell us your background.  How long have you
12    been licensed?
13         A.    Well, I've been a criminal investigator for 19
14    years now.  I worked with the State of Tennessee for 16 years
15    representing death row inmates in the appellate process.  And
16    then I did mitigation work for two years.  And I presently work
17    for Barry Walts Investigations.
18         Q.    And in this matter, have you been hired to do
19    some investigative work?
20         A.    Yes, ma'am.
21         Q.    And what is it that you have been working on?
22         A.    I have been reviewing DVDs that were bought at
23    Hustler, pornographic DVDs.
24         Q.    And there are -- I would like to pass up a
25    receipt to you, if I could, please.  Do you recognize that
```

1    receipt?

2         A.    Yes, ma'am.

3         Q.    And what it is a receipt from?

4         A.    It's from Hustler, and it's regarding the --

5    some of the DVDs that I reviewed, pornographic DVDs.

6         Q.    Have you checked to make sure that the numbers

7    on the DVDs that you reviewed -- I guess it's the little scan

8    number -- that it matches the receipt?

9         A.    Yes, ma'am; I did.

10         Q.    Okay.  And I would like to then ask you some

11    questions about these DVDs.

12         You watched -- well, let me pass the DVDs up to you.

13    Will you please read the title of those DVDs?

14         A.    Uh-huh.  The first one is called Born Flirty.

15    The second one is Little Chicks With Tiny Tits.  The third is

16    Teens Love Huge Cocks Volume II.  The fourth is Just Teens.  And

17    the last one is Tabu of Family Fantasies.

18         Q.    Say that last one again, please.

19         A.    Tabu of Family Fantasies.

20         Q.    okay.  Let me start with the first one you read.

21    What was the name of the first?

22         A.    Born Flirty.

23         Q.    Were you able to get some pictures off of that

24    disk?

25         A.    Yes, ma'am; I did.

1     Q.     And when you were getting pictures off that

2  disk, did the people -- well, can you describe what the people

3  on that disk looked like -- the women?

4     A.     The women that were on this DVD appeared to be

5  very young, in my opinion.  They looked younger than 18.

6     Q.     But you have no personal experience, just

7  day-to-day life, as to the age somebody would be; is that right?

8     A.     No, ma'am.

9     Q.     And then let's go to the one that's calls Jizzed

10  Teens.

11     A.     Uh-huh.

12     THE COURT:  If we could -- to save time, I have already

13  said the titles of the Teens could come in.

14     MS. THOMPSON:  Okay.

15  BY MS. THOMPSON:

16     Q.     I want to pass up a photograph to you, please,

17  if I can find it.  It is --

18     MS. INGRAM:  You provided me a copy of all of that, I

19  presume?

20     MS. THOMPSON:  Yes.

21  BY MS. THOMPSON:

22     Q.     I would like to pass up an image to you, please.

23  And can you describe that image?

24     A.     It's a young girl with a penis in her face and

25  semen all over her face.

1    Q.    Okay.  And are there any features about the
2    young girl's face in particular that you took note of?
3    A.    Well, it appears that she has braces.
4    Q.    Okay.  Very good.
5    MS. THOMPSON:  So Your Honor, this sheet that the
6    investigator is holding is an image that I would want to submit
7    as being very similar to the image of Vicky that the government
8    has already introduced.  And then --
9    THE COURT:  What movie does this come from?
10   THE WITNESS:  Jizzed Teens.
11   BY MS. THOMPSON:
12   Q.    And then I have some other pictures for you.  I
13   would like to pass some more photographs to you.  Do you
14   recognize those photographs?
15   A.    Yes, I do.
16   Q.    And can you tell us what movie those photographs
17   are from?
18   A.    Yes.  Just a moment.  Little Chicks With Tiny
19   Tits.
20   MS. THOMPSON:  And Your Honor, I would want to submit
21   those pictures to match the photographs from the government's
22   file from Cash_96.  And from the government's exhibit -- it's
23   the 13 Year Old Brother Fucks 11 Year Old Sister and Sperm
24   Inside.  I'm just going to pass up the two government exhibits
25   that I would want to match that with.

1              And that is it, Your Honor, for the matching exhibits.

2              THE COURT:  Any questions by the government?

3      EXAMINATION

4      BY MS. INGRAM:

5              Q.      When did you purchase these videos?

6              A.      I didn't purchase the videos.

7              Q.      Do you know who did?

8              A.      Yes, ma'am.  Ms. Thompson.

9              Q.      Do you know when they were purchased?

10             A.      I can look at the receipt.  February 6, 2015.

11             Q.      And did you watch each one of these videos?

12             A.      I did.

13             Q.      The entire video for each one?

14             A.      The entire videos.

15             Q.      Have you spoken with anyone at Hustler of

16     Hollywood?

17             A.      No, I have not.

18             Q.      Have you attempted to?

19             A.      No, I have not.

20             Q.      So you don't know what their verification

21     process is when they are purchasing their items?

22             A.      I only know what it states on the video, the

23     DVD, ma'am.

24             Q.      Have you spoken with anyone that's involved or

25     any of the actors portrayed in any of these videos?

1          A.      I haven't had time.

2          Q.      So you have not?

3          A.      No, ma'am.

4          Q.      Have you spoken to anyone who is responsible for

5    producing any of these videos?

6          A.      No, ma'am.

7          Q.      So you don't know what their verification

8    process is?

9          A.      No, ma'am.

10          Q.      Have you spoken to anyone involved in any of

11    these companies that manage any of this material?

12          A.      No, ma'am.

13          Q.      So you have no idea what requirements are

14    involved in the verification of these individuals other than

15    what's on the back of that video, or those videos?

16          A.      Well, also I've looked it up on the Internet,

17    and it tells the requirements; yes, ma'am.

18          Q.      Okay.  What are you talking about?

19          A.      There are websites you go to, and then it pulls

20    up these actors that are in the DVDs, and it tells the age, it

21    tells how many movies they have made, when they started making

22    movies.

23          Q.      Sometimes it doesn't even say where they are

24    born, does it?

25          A.      It does.

1    Q.    Okay.  Do you have Clare Hart in front of you?

2    A.    I don't have her in front of me.

3    Q.    May I hand the witness what will be marked as

4    Government's Exhibit 27.  Have you looked at that one?

5    A.    I have.

6    Q.    And is that from a video?

7    A.    It is.

8    Q.    That you reviewed?

9    A.    Yes, ma'am.

10   Q.    Does that indicate where that individual's birth

11   place is?

12   A.    It doesn't have data for a birth place.

13   Q.    Okay.  And sometimes there is no -- there is no

14   real actual name, it only says aliases for all of these

15   actresses; right?

16   A.    Right.

17   Q.    So we don't have any way to verify the

18   information other than you getting it off of the Internet and it

19   saying it's so.  Is that right?

20   A.    Right.

21   Q.    Did you follow up with the website that it

22   mentions on these various profiles that you have looked at?

23   A.    I don't understand what you mean.

24   Q.    If you will look at one of those documents that

25   has a profile, at the bottom there is a reference to a website

1    at the bottom of their information.  Do you see that?

2          A.     Uh-huh.

3          Q.     Have you followed up on any of those websites?

4          A.     No, I haven't had time.

5          Q.     Have you done any sort of age verification other

6    than printing these documents off from the various websites?

7          A.     No, ma'am.

8          Q.     And have you done any follow-up as far as the

9    statutes on the back of the videos?

10         A.     No, ma'am.

11         Q.     And you have no specific training in pornography

12    of any kind?

13         A.     No.

14         Q.     Or age identification or verification of any

15    kind?

16         A.     Just through my -- my work.

17         MS. INGRAM:  That's the United States' questions.

18         THE COURT:  Anything further?

19         MS. THOMPSON:  No, Your Honor.  I have some further

20    argument.  Nothing further from this witness.

21         THE COURT:  Well, I think it would be helpful, as I

22    asked earlier, for people to premark exhibits so we can identify

23    which ones will be marked for identification only and which ones

24    the Court will admit.  Would you mind doing that?

25         MS. THOMPSON:  Yes.

1    MS. THOMPSON:  I do have one follow-up.

2    THE COURT:  Ma'am, if you will just premark them first.

3    No, ma'am.  I will ask if you will identify each

4    exhibit by your exhibit number, and we'll go over it again with

5    the government.  If the government would stand and go over these

6    exhibits with -- what is the first exhibit?

7    MS. THOMPSON:  Yes, Your Honor.

8    THE COURT:  What is your first exhibit?

9    MS. THOMPSON:  Exhibit Number 1 is a collection of

10   several pages regarding Alania Kastar (ph).  And it includes

11   some biography information and then two still photographs.

12   THE COURT:  And what is the relevance of this exhibit?

13   MS. THOMPSON:  These still photographs of this woman's

14   body would match what I have marked as Exhibit 6 and Exhibit 5,

15   which are part of Government's Exhibit --

16   THE COURT:  What is Exhibit 5?

17   MS. THOMPSON:  Pardon?

18   THE COURT:  What is Exhibit 5, please, ma'am?

19   MS. THOMPSON:  It is a picture of Government's Exhibit

20   24, but it's one particular picture.  And that is a thumb cash

21   underscore 96.  And it's a still picture of what appears to be a

22   female's torso, breasts and vaginal area.

23   THE COURT:  What is Exhibit 6?

24   MS. THOMPSON:  Exhibit 6 is two pages of Government's

25   Exhibit 24.  It's Pages 3 and 4.  And it is seven pictures.  And

1    it's the file labeled Family Sex, 13 Year Old Brother Fucks 11

2    Year Old Sister and Sperm Inside.

3         THE COURT:  The material that you say precedes the

4    images of the -- of -- for Exhibit Number 1, where did those

5    materials come from?

6         MS. THOMPSON:  They came from a movie, Your Honor, that

7    I will independently mark as Exhibit Eight.

8         THE COURT:  And what is the name of the movie on

9    Exhibit 8?

10        MS. THOMPSON:  It is Little Chicks With Tiny Tits.

11        THE COURT:  Now, the pages are -- are they pages that

12   were part of the video disk?  Or there are references to pages

13   coming off the computer sites.  Which is it?

14        MS. THOMPSON:  Well, the biography comes from a

15   computer website, Your Honor.  But there are two pictures that

16   are still photographs from the video, DVD disk.

17        THE COURT:  Any further objection beyond those relating

18   to this film, this particular title?  For the government?

19        MS. INGRAM:  I don't know that I specifically made a

20   hearsay objection, but the verification, our objection is

21   hearsay.  Nothing additional, Your Honor.

22        MS. THOMPSON:  The next set --

23        THE COURT:  Hold on.  I will allow the images and the

24   title to the video.  I will sustain the objection on lack of

25   verification concerning the other pages.

1          MS. THOMPSON:  And again, my witness --

2          THE COURT:  No, ma'am.  We're just going to go through

3    the exhibits now.  What's your next exhibit?

4          MS. THOMPSON:  It is -- I have another page that's --

5          THE COURT:  Just give me the exhibit number, if you

6    would, please, ma'am.

7          MS. THOMPSON:  Exhibit Number 2.

8          THE COURT:  What is Exhibit 2?

9          MS. THOMPSON:  It is a picture of a female torso with

10   breast and vaginal area, and a man, it appears that his penis is

11   inside her.

12         THE COURT:  Where does this come from?  Where is this

13   image from?

14         MS. THOMPSON:  This also comes from the same Exhibit 8

15   disk, Little Chicks with Tiny Tits.

16         THE COURT:  Any additional objections beyond those

17   expressed earlier?

18         MS. INGRAM:  No, Your Honor.

19         THE COURT:  That will be admitted.  What's your next

20   exhibit, please?

21         MS. THOMPSON:  My next exhibit is Exhibit Number 3.

22   And it is an exhibit of woman's face being ejaculated on.  There

23   is a penis in the picture.  And she appears to have braces.

24         THE COURT:  That will be excluded.

25         MS. THOMPSON:  And this picture is -- would have been

1    submitted to show a resemblance to the Government's exhibit.

2    It's called Thumbs 146215, My Nine Year Old Cousin Sucking My

3    Cock.  And I have it marked as Exhibit 4, but it's part of the

4    Government's Collective Exhibit 24, Page 1.

5            THE COURT:  What is your exhibit number?

6            MS. THOMPSON:  I have marked it as Exhibit 4.

7            THE COURT:  All right.  Exhibit 4 will be marked for

8    identification only.

9            MS. THOMPSON:  Then I have some additional --

10           THE COURT:  If you will just give me the exhibit

11   number, ma'am.  We've got the jury sitting out there.  They have

12   been out a good while.  And I asked you to premark all this

13   stuff before trial so we wouldn't have gaps in time like this.

14           MS. THOMPSON:  I have Exhibit Number 7.  It's a video

15   that is Tabu Family Fantasies.  That's the name of the DVD.

16           THE COURT:  It will be marked for identification only.

17           MS. THOMPSON:  I have Exhibit Number 10.  It is a video

18   called Teens Love Huge Cocks, Volume II.

19           THE COURT:  The cover will be admitted only.

20           MS. THOMPSON:  I have Exhibit Number 11.  And it is

21   titled Jizzed Teens.  It's a DVD video.

22           THE COURT:  The cover will be admitted only.  And that

23   last exhibit number was?

24           MS. THOMPSON:  That was Exhibit Number 11.  And then I

25   have Exhibit Number 12.  And it is called Born Flirty.

1    THE COURT:  It will be marked for identification only.

2    MS. INGRAM:  Your Honor, the government marked Exhibit

3    27.  We're not asking it be admitted, the Clare Hart's data and

4    her attached photographs for the video.  For the record.

5    THE COURT:  Well, 27 is already in evidence, isn't it?

6    MS. INGRAM:  No, sir.  This was the next one up.  We

7    got through 26, I think.  This is the next one.  And we're not

8    asking that it be admitted.

9    THE COURT:  Okay, 27 is withdrawn.

10   MS. INGRAM:  Thank you.

11   MS. THOMPSON:  And I also have Exhibit Number 8, which

12   is a receipt, Your Honor, from the purchase of the videos.

13   THE COURT:  Are the other titles on the -- names with

14   the title on the receipt?

15   MS. THOMPSON:  There are abbreviations, yes, on of all

16   the titles, Your Honor.  Including one title we haven't

17   mentioned.

18   THE COURT:  That will it have to be redacted.  Or could

19   we get a stipulation that these videos that were purchased were

20   from a store in Nashville, from the government?  How does the

21   government want to treat that?

22   MS. INGRAM:  Absolutely, Your Honor.

23   THE COURT:  You've got a stipulation on that?

24   MS. INGRAM:  Yes, sir.

25   THE COURT:  I don't think the receipt ought to come in,

1  because I'm concerned about matters getting into evidence that

2  the Court excluded.  Is that it?

3          MS. THOMPSON:  Yes, Your Honor.

4          THE COURT:  If you will pass up the exhibits as they

5  were admitted.  I want you to collect the exhibits that were

6  admitted.  I want government counsel to review that these

7  exhibits were admitted.  I want to make sure that nothing

8  slipped through that we did not intend to admit.  That the Court

9  did not admit.

10         MS. INGRAM:  Would you like me to do that now?

11         THE COURT:  Yes, ma'am.

12         MS. INGRAM:  Yes, sir.

13         THE COURT:  We'll be in recess for a minute.

14         (Recess.)

15         THE COURT:  You may be seated.

16         Are we ready?

17         MS. INGRAM:  No, sir.

18         THE COURT:  I will have the clerk call off the names of

19  the exhibits that were admitted.

20         THE CLERK:  Part of Exhibit 1.

21         THE COURT:  Exhibit 1 was the cover and the two images

22  only.

23         THE CLERK:  Exhibit 5.

24         THE COURT:  Defense Exhibit 5.  The next exhibit?

25         THE CLERK:  The next exhibit was Exhibit 6.

1         THE COURT:  The next exhibit?

2         THE CLERK:  Eight.

3         THE COURT:  Eight.  The DVD cover only, not the DVD.

4         The next exhibit?

5         THE CLERK:  Two was admitted.  Three was excluded.

6         THE COURT:  Just the ones that were admitted.

7         THE CLERK:  Four for ID only.

8         THE COURT:  Not admitted.  Four is not admitted.

9         THE CLERK:  Ten, the cover.

10        THE COURT:  Ten, DVD cover only.

11        THE CLERK:  11, DVD cover.

12        THE COURT:  11, DVD cover.  That's it.

13        MS. INGRAM:  For clarification on the one, Your Honor,

14  were you excluding the biography information?

15        THE COURT:  Yes, I sustained your objection on lack of

16  authentication.

17        MS. INGRAM:  So it's just the images?

18        THE COURT:  Just the images.

19        MS. THOMPSON:  Yes, sir.  And the DVD covers?

20        THE COURT:  And the DVD covers.

21        MS. THOMPSON:  Yes, sir.

22        THE COURT:  Bring the jury in.

23        Ma'am, if you will step down.  You will be called again

24  and resworn.

25        MS. INGRAM:  May I inquire whether this will open up

1    the ability to offer rebuttal proof on this issue, Your Honor?

2         THE COURT:  Yes.  I mean, it has been offered and it's

3    the government proof, so you will be allowed to rebut.

4         MS. THOMPSON:  I'm sorry, Your Honor.  I'm not

5    understanding what it is she is going to be able to rebut.

6         THE COURT:  We'll see what it is when you get there.

7    Right now I'm concerned about the jury that has been out

8    sitting, twiddling their thumbs for a long time.

9         MS. THOMPSON:  Just to be clear, the cover does have

10   images on it, Your Honor.

11        THE COURT:  The covers of the DVDs I admitted.

12        MS. THOMPSON:  Yes.  Okay.

13        (Jury in.)

14        THE COURT:  You may be seated.

15        Ladies and gentlemen of the jury, once again, I

16   apologize for these long delays, but it's the nature of this

17   lawsuit that they involve highly sensitive matters.  And the

18   Court wants to make sure that we minimize the possibility of

19   making a mistake that would require this whole process to be

20   repeated all over again.

21        You may call your witness.

22        MS. THOMPSON:  Yes, Tammy Kennedy, please.

23        THE COURT:  If you would come around, Ms. Kennedy, and

24   be sworn.

25        (Witness sworn.)

1          THE CLERK:  Please state your name and spell it for the

2     record.

3          THE WITNESS:  Tammy Kennedy.

4     DIRECT EXAMINATION

5     BY MS. THOMPSON:

6          Q.    And would you please state what it is that you

7     do for a living?

8          A.    I'm a private investigator.

9          Q.    Okay.  And in this case, have you been hired in

10    this case to perform a cursory review on some pornography?

11         A.    Yes, ma'am.

12         Q.    And let me pass up a cover to a DVD.

13         THE COURT:  If you will identify the exhibit.

14         MS. THOMPSON:  It's identified as Exhibit 8.

15         THE COURT:  All right.

16         MS. THOMPSON:  With permission.

17         THE COURT:  You can pass it to the Marshal.

18         MS. THOMPSON:  Okay.

19    BY MS. THOMPSON:

20         Q.    And do you recognize -- what is the name of that

21    DVD?

22         A.    It's Little Chicks With Tiny Tits.

23         Q.    Okay.  And do you recognize the that is a DVD

24    that you have watched?

25         A.    Yes, ma'am.

1    Q.    Okay.  And did you watch the entire DVD?

2    A.    Yes, ma'am.

3    Q.    Okay.  I would like to pass you up some images.

4    THE COURT:  Exhibit number, please.

5    MS. THOMPSON:  They are -- two are Collective Exhibit

6    2.  I have another one, I'm sorry.  And then there is another

7    one, Exhibit Number 1.

8    BY MS. THOMPSON:

9    Q.    Do you recognize those pictures?

10   A.    Yes, ma'am.

11   THE COURT:  What exhibits is the witness referring to?

12   Which exhibits?

13   THE WITNESS:  Exhibit 1 and 2.

14   THE COURT:  All right.

15   BY MS. THOMPSON:

16   Q.    Do you recognize these pictures?

17   A.    Yes, ma'am.

18   Q.    And where do you recognize the pictures from?

19   A.    From the DVD that I reviewed.

20   Q.    And obviously, these are not moving pictures.

21   How did they come to be?

22   A.    As I watched the DVD, I would pause it and take

23   snapshots of certain images.

24   Q.    Okay.  And so you did that personally?

25   A.    Yes, ma'am.

1          Q.      And then do you have knowledge as to where that

2    DVD was purchased?

3          A.      Yes, ma'am.  It was purchased at Hustler here in

4    Nashville.

5          Q.      Now, I would like to pass up additional --

6    Exhibit 10.  Do you recognize that?

7          A.      Yes, ma'am.

8          Q.      And what is that?

9          A.      It's a DVD that I reviewed and that's called

10   Teens Love Huge Cocks, Volume II.

11         Q.      Let me pass up another DVD cover.  It's Exhibit

12   Number 11.  And what is that?

13         A.      About it another DVD that I reviewed, and it's

14   called Jizzed Teens.

15         Q.      And you watched all of these movies you have

16   reviewed?  You watched them -- the entire movie?

17         A.      Yes, ma'am.

18         MS. THOMPSON:  Your Honor, at this time I would like to

19   move that those be admitted into evidence.

20         THE COURT:  Defense Exhibits 1, 2, 8, 10, and 11.

21         MS. INGRAM:  Same objections, Your Honor.

22         THE COURT:  With the objections noted.

23         MS. THOMPSON:  No further questions.

24         THE COURT:  You may cross examine.

25   CROSS EXAMINATION

BY MS. INGRAM:

Q.     You didn't purchase any of these videos?

A.     No, ma'am.

Q.     But you have watched all of them?

A.     Yes, ma'am.

Q.     And the pictures that were admitted into evidence just a moment ago -- I believe that was 1 and 2?

A.     Uh-huh.

Q.     Were screen shots that you took of one of the videos?

A.     Yes, ma'am.

Q.     Do you have any specialized training in age verification of individuals?

A.     No, ma'am.  Just my job that I do.

Q.     Your job, you are trained to identify specific ages of individuals?

A.     Well, no, but I --

MS. THOMPSON:  Your Honor, --

THE COURT:  Overruled.

BY MS. INGRAM:

Q.     You are not trained?

A.     Not -- I've been a criminal investigator for 19 years, and so I -- in the field, you kind of learn the ages of people.  You kind of learn to guess.  You can guess.

Q.     So you have had -- have you had any training on

```
 1    age verification?

 2         A.     Not a specific course.

 3         Q.     Have you been hired in the past to analyze a

 4    specific age of a person?

 5         MS. THOMPSON:  Your Honor, I object.

 6         THE COURT:  Overruled.

 7         THE WITNESS:  No.

 8    BY MS. INGRAM:

 9         Q.     You have never been asked to determine whether

10    someone was a minor or not; is that right?

11         A.     I don't think so.

12         Q.     And in this investigation, you were provided

13    with videos and asked to watch them; is that right?

14         A.     Yes, ma'am.

15         Q.     Did you speak with anyone at Hustler about the

16    process they go through when they are ordering or purchasing

17    items to sell at their store?

18         A.     No, ma'am.

19         Q.     Did you speak with anyone who was portrayed in

20    any of these videos as far as age verification for the people

21    portrayed?

22         A.     No, ma'am.

23         Q.     Did you talk to anyone who produced any of --

24         A.     No, ma'am.

25         Q.     -- these videos -- Please let me finish.  Did
```

```
1    you speak with anyone who produced these videos about their age
2    verification process?
3              A.    No.
4              Q.    Did you speak with anyone at the companies who
5    produced these videos about their age verification process?
6              A.    No, ma'am.
7              Q.    Have you -- let's talk about DVD Exhibit 8.  Do
8    you know if that exhibit of one of those videos was located on
9    the defendant's computers?
10             A.    No, ma'am.
11             Q.    Do you know if the DVD 11 was -- or 10, excuse
12   me, Exhibit 10, was anywhere on the defendant's computers?
13             A.    I do not know.
14             Q.    Do you know if the DVD 11 was located anywhere
15   -- Exhibit 11 -- was located on anywhere on the defendant's
16   computers?
17             A.    I do not.
18        MS. INGRAM:  I pass the witness.
19        THE COURT:  Any redirect of this witness?
20        MS. THOMPSON:  No, Your Honor.
21        THE COURT:  You may step down.
22             Ladies and gentlemen of the jury, we're going to go
23   ahead and take a lunch break and give you an extended lunch
24   break, ask you to come back at one o'clock.  And you can give
25   your pads to the Marshal.  He will take custody of them until
```

1    you return.  Please do not engage in any discussion in this case

2    with anyone else, including your fellow jurors, until you

3    receive all of the evidence, the argument of counsel and the

4    charge of the Court.  Please do not engage in any type of

5    electronic research or communication of any kind concerning any

6    of the parties or witnesses in this case.

7           If you will come back shortly before 1:00, we'll do our

8    best to start promptly.  Thank you.

9           (Jury out.)

10          THE COURT:  Any other matters before we recess?

11          Any further proof on behalf of the defendant?

12          MS. THOMPSON:  Yes, Your Honor.

13          THE COURT:  Okay.  We'll be in recess.

14          (Recess.)

15          THE COURT:  You may be seated.

16          Any preliminary matters before we bring the jury in?

17   Just for completeness of the record, the Court overruled the

18   defendant's objection to the cross examination of the last

19   witness because the witness selected images from videos that are

20   being offered for the purpose of showing images that could be

21   teens.  Therefore, any cross examination on her qualifications

22   to do so was appropriate.

23          You may bring the jury in.

24          (Jury in.)

25          THE COURT:  You may be seated.  Good afternoon, ladies

1    and gentlemen of the jury.  We'll continue now with the

2    presentation of the defendant's proof.

3             You may call your next witness.

4             MS. THOMPSON:  Yes, Your Honor.  I would like to call

5    Mr. James Kempvanee.

6             (Witness sworn.)

7             THE CLERK:  Please state your name and spell it for the

8    record.

9             THE WITNESS:  James Kempvanee, K-e-m-p-v-a-n-e-e.

10   DIRECT EXAMINATION

11   BY MS. THOMPSON:

12        Q.    And Mr. Kempvanee, how are you currently

13   employed?

14        A.    I'm the Director of Digital Forensics at Logic

15   Force Consulting here in Nashville.

16        Q.    Okay.  And what kind of business is Logic Force

17   Consulting?

18        A.    There are several parts of the company, but the

19   part of the company that I oversee is digital forensics.  So we

20   do forensic examinations on pretty much anything digital --

21   computers, phones.  I even did one on a wristwatch.

22        Q.    Okay.  And how long have you been with this

23   company?

24        A.    I started with Logic Force in 2004.  Prior to

25   that, I worked for the State of -- I'm sorry, 2009.  Prior to

1    that, I worked for the State Attorney General's Office.  Prior

2    to the State Attorney General's Office, I was a police officer

3    in California.

4         Q.    Okay.  And can you tell us a little bit about

5    your education, background and training?

6         A.    I have attended about 2,000 hours of specialized

7    training specific to digital forensics from several of the

8    vendors -- EnCase, FTK, Cellebrite.  Pretty much the standard

9    platforms that are out there in the forensics community.

10         And I apologize for bending down.  I'm just trying to

11    plug things in.

12         Q.    So do you have any certifications?

13         A.    I do.  I'm a certified digital forensic examiner

14    through EnCase or through guidance software.  The certification

15    is called an ENCE.  Also I have an A certification, which is

16    another forensic certification through Access Data.  And also a

17    certification for mobile cellular devices through Cellebrite.

18         Q.    How many hours of investigative training have

19    you received?

20         A.    I would estimate about 2,000 hours altogether

21    through various sources, from my law enforcement career to the

22    career that I have now on the civilian side.

23         Q.    What kind of formal education do you have?

24         A.    I have a bachelor's degree in criminal justice.

25         Q.    Where is that from?

1          A.      Kaplan University.

2          Q.      Have you provided expert testimony in any other

3     state or federal courts?

4          A.      I have.  I have testified in the Middle District

5     of Tennessee, been accepted as an expert.  Also been accepted as

6     an expert in several of the state courts here in Tennessee, and

7     also state court in California.

8          Q.      Have you ever been involved in any kind of

9     speaking engagement or any other education that you might do to

10    other people?

11         A.      Yes.  I was a -- I taught at ITT Technical

12    Institute for a couple of years.  I've done continuing education

13    training for lawyers here in Tennessee, spoken at several of the

14    associations for lawyers on matters related to digital evidence

15    and e-discovery, which is a civilian process of producing

16    evidence on civil cases.

17         Q.      And what type of conferences have you attended

18    in the past?

19         A.      My most recent conference was in Myrtle Beach,

20    South Carolina last year.  It had to do with mobile devices.  I

21    have attended several -- several different ones through the

22    years.  EnCase has one that they do every year on the West Coast

23    -- or the East Coast.  I always try to catch the East Coast

24    version.  I think the last I went to was two or three years ago.

25              And basically it's just a way of learning new

1    methodologies, learning technologies, talking with other

2    examiners, understanding what the industry standards are.

3         Q.    Okay.  Have you had any training on peer-to-peer

4    networks?

5         A.    I have had a little training on peer-to-peer

6    networks.

7         Q.    Okay.  And have you had training on data

8    recovery?

9         A.    Yes.

10        Q.    And peer-to-peer networks -- your training that

11   you had in that, how would -- strike that for right now.

12        Are there any other certifications, specialized

13   training that you can think of, that would qualify you to give

14   testimony in a computer case or a case involving computer

15   forensics?

16        A.    No, ma'am.  I've been involved in digital

17   forensics since about 1999.  I created the first digital

18   forensics lab for the Ceres Police Department -- that's

19   C-e-r-e-s Police Department -- in California.  Like I said, I

20   worked for the State Attorney General's Office, working on their

21   digital forensics before I became employed with Logic Force.

22   And now I'm the director over other examiners for that private

23   company.

24        Q.    And have you produced any publications related

25   to this area?

1          A.     Yeah, I wrote an article for just a local

2     newspaper regarding sexual predators and making sure your kids

3     are secure online.

4          MS. THOMPSON:  Your Honor, at this time I would like to

5     have this witness qualified as an expert witness in the area of

6     computer forensics.

7          MS. DAUGHTREY:  No objection from the government, Your

8     Honor.

9          THE COURT:  He will be so certified.

10     BY MS. THOMPSON:

11          Q.     Let me direct your attention to the case in this

12     matter.  Were you able to review any of the computer evidence in

13     the case with Mr. Jeremy Seth Tummins?

14          A.     I was.

15          Q.     Can you tell the jury just a little bit about

16     how that came to be?

17          A.     I was hired by private counsel.  Through the

18     court process, I was allowed access to the forensic images of

19     both the laptop and the desktop that you were -- that were

20     discussed earlier.  With the one caveat that certain files were

21     -- the content of certain files were redacted because there were

22     some regulations that prohibit a private examiner from

23     possessing child pornography.  So we went through some

24     procedures with the federal government to reduce or remove the

25     actual file content of those child pornography files so I

1    wouldn't be in possession of the child pornography files, but I

2    would still have access to the rest of the information that

3    would be going on on the computer.  So my information is based

4    off of that what I would call a redacted version of the

5    evidence.

6          Q.    And were you also give an opportunity to look at

7    the files in question, the files that were redacted?

8          A.    Yes.  I was allowed access, full access, to

9    those files while at the Federal Prosecutor's office.  They have

10   made those available to me, yes.

11         Q.    And after your review of the -- how many

12   computers was it you looked at?

13         A.    In this case?

14         Q.    Yes.

15         A.    Two.  A laptop and a desktop.  And I only looked

16   at the forensic image.  I didn't actually examine the devices

17   themselves.  A forensic image is basically like the other person

18   up here had explained, it's copy of the hard drive.  It's very

19   common for examiners to transmit those images.  And it's looking

20   at basically the same information.  I found nothing that would

21   indicate that what I was looking at was anything other than what

22   had been on the computer, less the pornography that I was

23   involved in, with physically removing.

24         Q.    Okay.  And then let me ask you some questions

25   about a thumbnail sketch or a thumbnail file image.  Would you

1    please explain how it is that a thumbnail comes to be?  Do the

2    contents of a video file need to be watched in order for the

3    thumbnail to be created?

4          A.    Okay.  I heard a couple of questions there, so I

5    will try to answer them all.  And I'll try to make it easy for

6    you.

7          Basically, there's two main platforms when it comes to

8    the Windows operating system and as it relates to thumbnails.

9    One is the Windows XP system, and the other is Vista and beyond.

10   So Windows 7, 8, et cetera.  Obviously, this is a 30,000 foot

11   view.  But it will help you to understand what's going on.

12         In Windows XP, there is a little file that's created.

13   It's hidden.  It's a system directory.  So the computer

14   automatically creates that file.  It's called a thumbs.db file.

15   That file is created in the directory where the videos or

16   pictures reside.

17         The reason behind that is it makes the computer operate

18   faster.  So when you go out and you take a whole bunch of

19   pictures at an Easter gathering, and you've got videos of the

20   children, you don't have to go and look at every one of the

21   pictures to figure out which picture it is you want to send to a

22   relative, or you want to see the video of only a nephew.  You

23   can go in, and you can look at it in the thumbnail view.  So it

24   takes all of the pictures of the directory, and it gives you a

25   little tiny frame of what that file contains.

That's all system artifact.  That's what the system
does to create it to make it more efficient for the user on an
XP system.  Again, that the file is hidden from a normal user.
You don't even know it exists.  It's there just to simply make
things work faster.

In Vista and XP, it changed a little bit so that file
doesn't reside in the directory where the videos were.  It
resides elsewhere in the operating system.  It still basically
serves the same function, but if you were to go and sit down and
look at an XP computer versus a Windows Vista computer, you will
see there are some additional things that are available to you
on Vista.  So you can look at small, medium or large icons.  So
all that does is changes the size of the icon.  That's not
available with XP, which is what we would be talking about here,
which is the thumbs.db.

Q.     Okay.  There were two computers in this case.
Do you recall which computer was running which software?

A.     I believe the laptop was running XP, and the
desktop was running Vista.

Q.     Okay.  So in this case, the government put in an
exhibit, and I believe it's a thumb exhibit.  And it has an
underscore 96 as part of the name in the Government's Exhibit
24.

Q.     What would an underscore 96 indicate?

A.     That would be viewing the thumbnails in a medium

thumbnail view on Vista or higher.  So where we had the

thumbs.db files in XP, there's thumb cache files.  And there's

three of them -- 32, 96 and 128, I believe.  And that's just the

size of the thumbnail.  So that 96 represents a thumbnail that

would have been from a computer that's XP or higher.

Q.     Okay.  And what about a thumbnail that's in

Windows XP?  What size would a thumbnail in Windows XP be?

A.     The maximum size is 96 by 96 pixels.  The actual

size can vary, but that's the maximum size.

Q.     Okay.  And a pixel -- do you know what a pixel

per -- what's the size of a pixel?

A.     You're beyond my expertise there.  I can tell

you about computers, but I'm not a video guy.

Q.     Okay.  And this is for the laptop.  The laptop

includes an automatic screen with the computer; is that right?

A.     I'm sorry, I didn't understand your question.

Q.     A laptop comes with its own screen?

A.     Yes.

Q.     In this case, do you remember reviewing the

laptop and what screen came with this model Compaq laptop?

A.     I did look that up.  I want to say it was 1280

by 800.  And it was like a 15.4 inch screen.  I'm doing that

from memory, but it was in that area.

Q.     Also from what you looked up, it's not one of

these new fancy high definition screens, was it?

1        A.       In this case, in 2009, I don't know if that even

2   existed.

3        Q.       So back to the thumbnails issue again, I didn't

4   hear exactly.  When is it that a thumbnail image is created for

5   a video file?

6        A.       Sure.  For a video file, if the user goes in and

7   looks in that directory where all those family pictures are, or

8   the family videos, for example, if they open that up and look at

9   it in the thumbnail view, that's when the thumbnails are

10  created, is when that user does that.  So if you never looked at

11  it in a thumbnail view, then you would never have a thumbs.db

12  file.  The computer would have no reason to make that.

13       Q.       Okay.  But that's only if you open the folder

14  that this image would be stored in?

15       A.       Yes, ma'am.  We actually call folders

16  directories in our art.  But yeah, if you open that directory,

17  then there would be thumbnails created for those items that are

18  currently in there.

19       Q.       Okay.  And so because a thumbnail is created,

20  it's not indicative of whether or not a video -- the contents of

21  a video was watched?

22       A.       The thumbs.db file has nothing to do with double

23  clicking on it and having the Media Player pull up and you can

24  watch the whole video.  That's not what that file does.  That

25  file simply makes a small thumbnail so it's easy to find those

1    pictures, whether it be family pictures or whatever it is.

2         Q.    And I believe -- well, you tell me.  It's

3    created when any portion of that the file is showing in a

4    directory on the screen; is that correct?

5         A.    I wouldn't go that far.  I have had some issues

6    with saying that it's only if it pops up on the screen.  I'm not

7    comfortable saying it's only if it pops up on the screen.  I

8    would be more comfortable saying, if it's in the directory and

9    somebody has looked at it in thumbnails, you are more than

10   likely to have created a thumbnail.  Whether that has 800 videos

11   and pictures, and the person has scrolled all the way down, I

12   couldn't tell you.  I would have to independently test that or

13   rely on someone else's research, and I have not done that work.

14        Q.    Okay.  So let's go back to the present case.

15   You had an opportunity  -- the hard drive copies that you made

16   -- do you have those with you?

17        A.    I do.

18        Q.    And would you -- is it two different disks?  How

19   do you have it stored?  Your copies?

20        A.    I just have a hard drive that has the images on

21   it.

22        Q.    So you have two saved to one hard drive; is that

23   right?

24        A.    Yeah, I -- the evidence files are contained --

25   well, they are basically self-contained.  And I have those in

1      separate directories.  So I have one for what I call LP 01,

2      hence, laptop 01; and PC 01 for personal computer 01.  So PC 01

3      is the desktop.  Laptop 01 is the laptop.  So i can keep them

4      separate.  But even if I mixed those files together, I could

5      still open them separately, because they are self-contained.

6           Q.     And you were present for the testimony of

7      Mr. Scott Levasseur; is that correct?

8           A.     Yes.

9           Q.     So after he had testified, did you go back and

10     review some of the video files that remained on Mr. Tummins'

11     computers?

12           A.     I did.

13           Q.     Okay.  And what kind of -- did you have software

14     that would allow you to search on terms located in the file

15     names?

16           A.     Yes.

17           Q.     Okay.  Does your copy show you what the original

18     file names were?  Your copy of Mr. Tummins' hard drives.  Do

19     they show you what the file names were and what they would have

20     been displayed as on his computers?

21           A.     Yes.

22           Q.     When you look at these files, and you go in and

23     observe them, does it change the data on the hard drive?  Such

24     as, does it update the time or day the file folder was opened?

25           A.     Okay.  That's kind of a tricky question.  Let me

1    explain.  What she asked me was if it changes on the hard drive.
2    Absolutely, it changes on this hard drive.  It doesn't change
3    within the forensic image.  So if I go in and access files that
4    were once residing on Mr. Tummins' computer, it's very much like
5    what Detective Levasseur had said.  The whole goal of this is to
6    not change the evidence.  So we can go in and see what the dates
7    and times were.  That type of information doesn't change.  It's
8    all within the self-contained evidence file, which is one of the
9    purposes of having the evidence file and then also reviewing it
10   through forensic software, not just what a normal user would
11   look at when they look at a computer.
12        Q.    So did you, in fact, do some searches after
13   hearing Mr. Levasseur's testimony regarding files that were on
14   Mr. Tummins' computer?
15        A.    I did.  I did those searches actually during
16   lunch.
17        Q.    Okay.  And what words did you search on?  Well,
18   what words do you have files for that you searched on?
19        A.    I searched for Teen, Lolita and Young.
20        Q.    And were you able to pick out a sample of files
21   from Mr. Tummins' computer?
22        A.    I was.  And I need to clarify a couple of
23   things.  She used the word "search".  I didn't really search in
24   the terms of what a computer forensic examiner does.  In
25   forensics, we can index the entire hard drive and see things in

unallocated space, much like the detective talked about earlier.
What I did is simply search by the file names.  If the file name
is there, I was only looking for the words that were in the file
names.

And to answer your question, yes, I have about 14
videos that have one of those three terms in the title.

Q.    May I pass up a list to you.  So as you review
your list, how many files are on this list?

A.    There's 14.  And they are all video files.

Q.    Okay.  And were you able to view these video
files?

A.    I was.  And all of these originated from
Mr. Tummins' laptop.

Q.    Okay.  So just one of the computers?

A.    That's -- yeah, absolutely.  I searched both,
but the results came only from the laptop.

Q.    Okay.  And these videos -- were you able to
watch a brief portion of each of these videos?

A.    Yes.

Q.    And so that means that the video material is
there in addition to the name of the file?

A.    Yes.

Q.    And of course, if you were able to watch them,
then that means these are not some of the videos that were
redacted when the government gave you a copy; is that right?

1          A.     That's correct.  I can see those file names, but

2     those file names I excluded because it does me no good.  The

3     content is excluded.

4          Q.     And then were you able to put those files on a

5     disk?

6          A.     I did.

7          Q.     And the disk that I am passing up to you is --

8          A.     Ms. Daughtrey, I'm going to put it in if you

9     wanted to see the contents.

10         Q.     Just check it and make sure that that's the disk

11    that you made earlier, if you would, please.

12         A.     It is.  And I titled the disk Tummins.

13         Q.     Okay.  And there is something else on that disk

14    also, isn't there?

15         A.     In addition to the 14 video files, a copy of

16    this pdf document is at the root of that directory, yes.

17         Q.     I've passed you up a copy of the pdf document.

18    Let me pass you one that has been marked now.

19         THE COURT:  What's the exhibit number?

20         MS. THOMPSON:  14.

21    BY MS. THOMPSON:

22         Q.     And you recognize that as the spreadsheet that

23    you made from the file names?

24         A.     Yes, ma'am.  My signat-- or my name is on the

25    bottom right-hand corner.

1    MS. THOMPSON:  And I would like to at this time, Your

2    Honor, ask that that be moved into evidence as Defendant's

3    Exhibit Number 14.

4    MS. DAUGHTREY:  No objection.

5    THE COURT:  Without objection, Defendant's Exhibit 14

6    will be admitted.

7    BY MS. THOMPSON:

8    Q.    And then if I could have the -- the DVD -- is

9    that something that if the jury chose to watch those videos,

10   that they would be able to watch them on a computer?

11   A.    Yes.  By opening it up and simply clicking on

12   each one of those files.  Each of those files, the file name is

13   there, with the one caveat that some of these files names are

14   really long, so the back end is truncated to be able to put it

15   on the disk.  It's a matter of how the operating system works.

16   But the first part is all there.

17   Q.    By truncated, do you mean chopped off?

18   A.    Yes.

19   Q.    If I could have that disk and the cover.

20   And Your Honor, at this time we would ask that the disk

21   be admitted into evidence as Defendant's Exhibit Number 15.

22   THE COURT:  Without objection, it will be admitted.

23   MS. THOMPSON:  If I could have just one more minute,

24   Your Honor.

25   BY MS. THOMPSON:

1    Q.    One of the things I would like to ask you, do

2  you still have a copy of the list of the files.  Or did you send

3  it back to me?

4    A.    I've got a copy.

5    Q.    If you would look at the list of those files for

6  me, please.  Can you just read the names of these lists.

7    THE COURT:  Is he reading from an exhibit?

8    MS. THOMPSON:  Strike that, then.

9  BY MS. THOMPSON:

10    Q.    Let me ask you this.  These files, were they --

11  where did you find them on the laptop?  Were they hidden files

12  anywhere?

13    A.    No, these are all undeleted, allocated files

14  within the My Documents directory.  There's two subdirectories.

15  One is the shared directory.  And the other one is the Morpheus

16  shared.  And then another subdirectory of downloads.  So it's

17  one of those two.

18    Q.    Okay.  But none of them were deleted?

19    A.    No.

20    MS. THOMPSON:  No further questions.

21    THE COURT:  You may cross examine.

22    MS. DAUGHTREY:  Thank you, Your Honor.

23    I would like to get, if possible, Exhibits Number 9,

24  12, 13, 16 and 19.  Here's a list.

25    THE COURT:  Are those all defense exhibits?

1        MS. DAUGHTREY:  No, those would be the government's

2  exhibits.  Thank you, Your Honor.

3  CROSS EXAMINATION

4  BY MS. DAUGHTREY:

5        Q.    Mr. Kempvanee, I apologize in advance if I have

6  mispronounced your name.  I have never quite gotten it correct.

7        A.    You will do fine, I'm sure.

8        Q.    How many child exploitation cases have you been

9  asked to investigate?  In terms of computer forensics

10  investigation?

11        A.    The first one I was ever involved in was in 1999

12  when I was in law enforcement.  I would say probably about 75

13  through the years.  And like I said, that's an estimate.  I

14  haven't sat down and done the calculation on it.

15        Q.    Okay.  And you indicated in your testimony

16  earlier that you believe the forensic copy that you got was --

17  except for the excluded files, was an exact copy.  You have no

18  reason to believe that it wasn't accurate?

19        A.    That's correct.

20        Q.    There is nothing unusual about what you

21  received?

22        A.    Only that I was involved in redacting them, but

23  the rest of the data, I believe that the integrity of it is just

24  fine.

25        Q.    Okay.  Great.  You talked a lot about thumbs.db.

What is the purpose of a thumbnail from the perspective of a
user?

     A.    Like I explained earlier, it makes it a lot
easier to be able to find what you are looking for.  So if you
went to Easter, and you took a bunch of pictures or videos, but
you want to find that video of your niece or nephew, instead of
having to open up every one of those videos and go through it
and look, you can skim through it until you see the one of your
niece or nephew, and then you know that's probably the one you
are looking for.  So it's just to make it easier for the user to
locate files.

     Q.    Sure.  So they are big enough for users to be
able to look at, to identify this is or isn't the file I want?

     A.    That's the whole purpose of them; yes, ma'am.

     Q.    All right.  And the fact that these thumbnails
that you mentioned earlier from Exhibit 24, Page 1 and Page 2,
the fact that they existed means that he at some point opened
that file folder that contained those videos; is that correct?

     A.    With one caveat.

     Q.    What's that?

     A.    Somebody did.

     Q.    Somebody did.

     A.    I can't say that it was him.

     Q.    Fair enough.  I would also like to get, if I
could, Exhibit 24.

```
1              THE COURT:  Government Exhibit 24?

2              MS. DAUGHTREY:  Yes, Your Honor.  Thank you.

3    BY MS. DAUGHTREY:

4         Q.    Turning to Page 3 of Exhibit 4 -- I mean, excuse

5    me, Government's Exhibit 24.  You heard the testimony of

6    Detective Levasseur that that first picture there is the initial

7    frame from the video; is that correct?

8         A.    That's what he testified to, yes.

9         Q.    Okay.  And that would have been the thumbnail on

10   the computer; correct?

11        A.    More than likely not.

12        Q.    Why is that?

13        A.    Because the thumbnail is generally about five

14   seconds into the video.  It's not usually the first frame.

15        Q.    Okay.  And where did you learn that information?

16        A.    I can show it to you on my computer if you like,

17   but I've seen it over the years.

18        Q.    Have you viewed these files that are in this

19   exhibit?

20        A.    My independent recollection, I don't recall this

21   one specifically, but I was allowed to view a disk that had what

22   the government was claiming -- that I couldn't see, the ones

23   that were redacted.  So if it was part of that disk, then yes, I

24   would have seen that at the federal prosecutor's office.

25        Q.    You have no reason to believe that's not the
```

1    first frame of those videos that are in those exhibits?

2        A.    I don't know if it is or not, ma'am.

3        Q.    You mentioned something about you searched for

4    this list -- Defense Exhibit Number 14, you searched for that

5    list using three terms:  Teen and Young and Lolita?

6        A.    Yes.

7        Q.    And Teen and Young don't necessarily mean

8    underage, do they?

9        A.    I don't know that any of them necessarily mean

10   that.

11       Q.    Well, where do you come up with Lolita?

12       A.    I've seen it over the years.  Very similar to

13   what Detective Lassiter, or -- Lassiter -- Levasseur had

14   explained earlier, that as you do things, you just kind of know

15   terms that you see all the time.

16       Q.    Right.  And you know that term as being

17   associated with child pornography; correct?

18       A.    I know I've seen it a lot.

19       MS. THOMPSON:  Your Honor, --

20       THE COURT:  Well, he can answer the question.

21   BY MS. DAUGHTREY:

22       Q.    I'm sorry, I didn't hear your answer.

23       A.    I said, I know I've seen that term a lot.

24       Q.    Associated with child pornography?

25       A.    On a lot of the files that I've looked at

1   through the years, yes, Lolita is a term I see frequently in

2   filings.

3           Q.      In these files that you have here, and that were

4   introduced as Exhibit 15 on the CD and are listed in Exhibit 14

5   -- those are all files that were not excluded from that

6   computer; right?

7           A.      That's correct.

8           Q.      Okay.  So those are files that you have been

9   allowed to have throughout?

10          A.      Yes.

11          Q.      And he is not charged with those files; is that

12  correct?

13          A.      That's correct.

14          Q.      You indicated that you are familiar with

15  file-sharing networks; correct?

16          A.      I am.

17          Q.      And did you see the testimony of Detective

18  Levasseur when he talked about the fact that file-sharing

19  networks are -- don't have a server, but they are just all

20  interconnected, you can get on anybody's computer around the

21  world, with their permission, it's sort of a loose network?

22          A.      I understand that network, yes.

23          Q.      Yes.  So if I'm logging into a file-sharing

24  network, I don't have any control over somebody else's computer,

25  do I?

1          A.      I don't know what you mean by having control

2   over somebody else's computer, because technically you can go

3   into a directory and see things and view things if you could --

4          Q.      Sure.  But I can't be assured that what they say

5   is in a file is actually in a file?

6          A.      No.

7          Q.      Okay.  So it's possible I might search for

8   Lolita and find adult pornography; correct?

9          A.      You could find an album from Waylon Jennings.

10  It -- yeah.

11         Q.      So you don't know what you're going to get until

12  you download it; right?

13         A.      Yes, ma'am.

14         Q.      You don't know if you are going to get child

15  pornography, adult pornography or something entirely different?

16         A.      That's correct.

17         Q.      I asked that several exhibits be given to you.

18  I'm going to start with Exhibit Number 9.

19         THE COURT:  Is this Government's Exhibit Number 9?

20         MS. DAUGHTREY:  Government's Exhibit Number 9.

21  BY MS. DAUGHTREY:

22         Q.      Have you seen this exhibit?

23         A.      I have, yes.

24         Q.      And do you have any reason to believe that this

25  is not an accurate list of search terms that were found on the

1    Gateway tower?

2            A.      I haven't gone through all of them.

3            Q.      Okay.

4            A.      I didn't review them and compare them to what I

5    had found a couple of years ago when I looked, so --

6            Q.      Okay.  And there's a variety of different search

7    terms on there; is that correct?

8            A.      What do you mean by variety?

9            Q.      There's a number of search terms on there?

10           A.      Yeah, absolutely.

11           Q.      So if you were to take one of these search terms

12   and put it into LimeWire and do a search, would you be

13   guaranteed that you would have a file that contained that

14   information?

15           A.      No.

16           Q.      Okay.  You could get anything, like you said

17   before?

18           A.      That's correct.

19           Q.      Okay.  Are you familiar with PTHC?

20           A.      I know what that represents, yes.

21           Q.      What does that represent?

22           A.      Preteen hard core.

23           Q.      All right.  In your experience as a forensic

24   examiner, would you expect that if somebody typed that in, that

25   they could get child pornography?

1          MS. THOMPSON:  Your Honor, I object to this line of

2     questioning.

3          THE COURT:  Overruled.

4          THE WITNESS:  Yes.

5     BY MS. DAUGHTREY:

6          Q.    And there are other terms similar to that on

7     this list, aren't there?

8          A.    Yes, ma'am.

9          Q.    Like pedo?

10         A.    Yes, ma'am.

11         Q.    And school girl?  And preteen?

12         A.    Those aren't the well-known ones, if you want to

13    call it that.  I imagine that you could.  Child pornography

14    could show up on anything, just as adult pornography could show

15    up on anything.

16         Q.    Well, let me ask you this.  Are you aware of

17    anybody searching on adult pornography terms and getting child

18    pornography in a file?

19         MS. THOMPSON:  Your Honor, again, I object.

20         THE COURT:  Overruled.  He can answer, if he knows.

21         THE WITNESS:  I haven't done any research on it.  I

22    never had a case that had that.

23    BY MS. DAUGHTREY:

24         Q.    But you have had it the other way around?

25    Somebody searching for child pornography, and they get adult?

1          A.      I see it all the time.

2          Q.      Okay.  I would like to turn your attention to

3    Government's Exhibit Number 13.  And there is another one,

4    Government's Exhibit 19, that's very similar.

5          A.      Yes, ma'am.

6          Q.      Those represent files that the computer user

7    actually viewed; is that correct?

8          A.      I have to go with what Detective Levasseur had

9    said on how these were produced.  But I also looked for Windows

10   Media Player files, and I found very similar results.  I haven't

11   personally gone through these and compared them to what I found

12   years ago.  But I don't have a reason to --

13         Q.      To believe they are any different?

14         A.      Yes.

15         Q.      Okay.  So assuming they are exactly the same as

16   the ones that you looked for several years ago, these would be

17   the last files that somebody on that computer looked at?  The

18   last eight video files?

19         A.      Not necessarily.  And I will explain why.  She

20   is right in one respect.  It's the last files that somebody

21   looked at using the Windows Media Player.  But as we all know,

22   you could have five or six different Media Players on a

23   computer.  So all I can say off of this is, for the Windows

24   Media Player, this was the last eight.  But it doesn't mean that

25   it was the last eight that were ever watched.

1          Q.     Fair enough.  Thank you.

2          MS. DAUGHTREY:  If I may have just a moment.  I believe

3    that's all the questions I have.

4          Thank you very much.

5          THE COURT:  Any redirect of this witness?

6          MS. THOMPSON:  Yes, Your Honor.

7    REDIRECT EXAMINATION

8    BY MS. THOMPSON:

9          Q.     So you are familiar with the -- she had asked

10   you about the peer-to-peer software.  And you said you were

11   familiar with it?

12         A.     I am.

13         Q.     That can also be used to download other types of

14   files such as movies and music; isn't that right?

15         A.     Yes, ma'am.

16         Q.     And you were able to review several of the

17   search terms that were found in LimeWire on Mr. Tummins' PC 01,

18   that you called it; is that right?

19         A.     Yes, I looked for search terms on both of the

20   computers.  Which one I found, LimeWire versus Morpheus, as I

21   sit here now, I don't remember.  But yes, I found a bunch of

22   search terms.  More than what was presented here.

23         Q.     Okay.  But you have a way on your computer,

24   sitting there, that you could go in and look at different search

25   terms that were used for LimeWire; is that right?

1          A.      Yes.  There's a search methodology that you

2    could use to find files that would be likely related to that.

3          Q.      And so Mr. Tummins -- as you look at the

4    fragments left in the LimeWire and Morpheus directories, there

5    had been quite a few searches that were done in those -- using

6    those peer-to-peer searches for all kind of items that had

7    nothing to do with pornography at all.  Would you agree with

8    that?

9          A.      Kind of.  She said that the searches are held

10   within the directory.  That's not the case.  The searches are

11   fragmented throughout the hard drive.  So there is a process

12   that occurs to be able to find those, cull those down, and to

13   review them to see if they are false positives or actual

14   searches.  But by doing that, I did find there were many, many

15   searches for things that didn't have to do with pornography.

16         Q.      So there were a lot of searches for things --

17   for movies, for example.  Isn't that right?

18         A.      As I sit here today, I don't remember what the

19   other searches were.  There were definitely searches that had

20   nothing to do with pornography.  I think there were some

21   searches for music and the like.

22         Q.      Do you have the ability to look -- was there a

23   search done for the word Rihanna?

24         A.      I don't remember a search for Brihanna.  I had a

25   spreadsheet that I had created during part of my process of my

1    examination that has some rough information on it.

2         Q.    If you looked at that, would that refresh your

3    memory?

4         A.    Yes, ma'am.

5         Q.    Okay.

6         A.    Which computer do you want me to look at?

7         Q.    PC 01.

8         A.    Yes, ma'am.  I have a tab here that I named

9    LimeWire Searches.

10        Q.    Okay.  And in that, do you see that there was a

11   search for Rihanna?

12        A.    Is it Brihanna or Rihanna?

13        Q.    It's R-i-h-a-n-n-a.

14        A.    I'm sorry, it's R-i -- ?

15        Q.    R-i-h-a-n-n-a.

16        A.    Yes.  And that was found in the page file.sys.

17        Q.    Okay.  And how about Every Day I'm Hustling?

18        A.    Yes.  Found on the page file.sis.

19        Q.    Okay.  How about a search for the words Iron

20   Man?  The word Ironman.

21        A.    Yes.  Iron and man, there is a space in between.

22   It was for videos.

23        Q.    Okay.  How about the search for What a Feeling?

24        A.    Yes, page file.sys.

25        Q.    So would you say there are over a thousand

1    search terms that are listed there?  Did you come up with over a

2    thousand possible search terms in LimeWire?

3            A.      What I've got here is approximately 1,055

4    entries -- actually, it's 54, because the first line is a title

5    line.  And these are rough hits, so there very well may be

6    duplicates.  So I couldn't say that there's over a thousand

7    because I didn't do any de-duplication other than the initial

8    looking for the potential key words.

9            Q.      Okay.  As you scroll through some of those, do

10   they appear to be names of songs?  Or names of singers or music

11   groups?

12           MS. DAUGHTREY:  Your Honor, I'm going to object to the

13   leading at this point.

14           THE COURT:  I think that's harmless.  Overruled.

15           THE WITNESS:  I'm looking at one, it's called Radio

16   Song.  That's an audio file search.

17   BY MS. THOMPSON:

18           Q.      Okay.  And if you were to switch to the other --

19   the laptop 01.

20           A.      Yes, ma'am.

21           Q.      And in your search there, did you see evidence

22   -- did you see evidence there of people searching on things such

23   as Fantasy Football?  In the Internet history?

24           A.      In the Internet history?

25           Q.      The Internet history.

1          A.     Okay.  (Respite.)

2          Q.     Maybe it would just be -- if I just strike that

3     question.

4          A.     I have a search for online.com for Fantasy -- or

5     Football Fantasy Sports, yahoo.com.

6          MS. THOMPSON:  No further questions.

7          THE COURT:  Any recross of this witness?

8          MS. DAUGHTREY:  Just very briefly, Your Honor.

9     RECROSS EXAMINATION

10    BY MS. DAUGHTREY:

11         Q.     Mr. Kempvanee, you have looked at Exhibits 9, 12

12    and 16 that list the search terms that were found on both the

13    laptop and the desktop computer?

14         A.     I have seen both of them, yes.  I didn't go over

15    them in-depth or anything.

16         Q.     You don't know of any other pornography or

17    sex-related search terms that are not on those lists, do you?

18         A.     I didn't looking for other sex-related things.

19         Q.     And many of those thousand searches, or however

20    many, are for pornography or sex-related things, aren't they?

21         A.     Say that again?

22         Q.     Many of the searches he did on his computer were

23    for sex or pornography type?

24         A.     Yes.

25         MS. DAUGHTREY:  Yes.  Thank you.  That's all I have.

THE COURT:  Any further examination of this witness?

MS. THOMPSON:  No, Your Honor.

THE COURT:  You may step down, sir.

You may call your next witness.

MS. THOMPSON:  We have no further witnesses, Your Honor.

THE COURT:  Any further proof on behalf of the government?

MS. DAUGHTREY:  Your Honor, may we approach?

THE COURT:  Yes.

(Whereupon, a bench conference was held, out of the hearing of the jury, to wit:)

MS. DAUGHTREY:  Your Honor, I just want to verify that the defendant has made an independent decision on his own not to testify in this case.

THE COURT:  That's something we'll take up outside the presence of the jury.

MS. DAUGHTREY:  I understand.

THE COURT:  Any other proof?

MS. INGRAM:  We do request at this time that we be permitted to put on rebuttal proof by an expert who has training in age verification, and he has previously testified for purposes of that one photograph.  He will testify to his training and experience and his qualifications as far as age verification.  And I wanted him to look at the copies of the

1    videos, the covers, that will be going back to the jury, and

2    based on his training and experience, say whether he thinks that

3    that's child pornography or not.  I don't people expect him to

4    go through exhibits that are currently before the jury and the

5    government's exhibits.

6            THE COURT:  Wait a minute.  Is he just going through

7    the defense exhibits or the government's exhibits?

8            MS. DAUGHTREY:  Just the defense exhibits.

9            MS. THOMPSON:  I object, Your Honor.  I didn't put on

10   any proof at all regarding age.  I didn't have anyone testify

11   regarding age.

12           THE COURT:  Yes, but the whole focus for the admission

13   of those items that you introduced, images that you introduced,

14   were to show that there could be confusion as to whether a

15   person was a teen or an adult.  That was the whole purpose of

16   admitting those exhibits.  And that was the purpose for which

17   you were going to argue it to the jury.

18           MS. INGRAM:  We would be educating the jury on what you

19   are looking for when you are trying to determine if you are

20   looking at child pornography or not.

21           MS. THOMPSON:  What's the basis for his information?  I

22   don't even know what the basis for his --

23           THE COURT:  I will allow to you voir dire the witness.

24           (Conclusion of bench conference.)

25           THE COURT:  Ladies and gentlemen of the jury, we're

1  going to have to take a recess.  Please don't discuss the case

2  amongst yourselves until you receive all of the evidence, the

3  argument of counsel, and the charge of the Court.  Hopefully it

4  won't be a lengthy recess.

5            (Jury out.)

6            THE COURT:  Before we voir dire the government's

7  rebuttal witness, Mr. Tummins, it has been earlier represented

8  to the Court that you were having discussions with your counsel

9  as to whether to testify or not.  And given the statement by

10  your defense counsel that there is no further proof, the Court

11  finds from that that you have decided not to testify.  Is that

12  right?

13            MR. TUMMINS:  Yes, Your Honor.

14            THE COURT:  And you understand that you have the right

15  not to testify.  Do you understand that?

16            MR. TUMMINS:  Yes, sir.

17            THE COURT:  Okay.  Thank you.

18            You can call your witness.

19            MS. INGRAM:  The United States calls Joshua Findley.

20            THE COURT:  Mr. Findley, come around, please.

21            I think he testified earlier.  He will be under the

22  oath administered to him earlier.  Assuming it's the same

23  witness.

24            MS. INGRAM:  Yes, Your Honor.

25            THE COURT:  Step around, sir.  You are under the oath

1    administered to you earlier.

2    EXAMINATION

3    BY MS. INGRAM:

4         Q.    You testified earlier that you were previously

5    assigned to the Child Sexual Exploitation Unit?

6         A.    Yes, ma'am.

7         Q.    At the Department of Homeland Security?

8         A.    Yes, ma'am.

9         Q.    When were you in that unit?

10        A.    I was in that unit from 2004 until 2012.

11        Q.    And prior to that, did you have any specific

12   training and experience in child sex abuse cases?

13        A.    Yeah, prior to that I was a Special Agent for

14   Army Criminal Investigation Division, and I was signed to

15   investigate child abuse, generally, which included child sexual

16   abuse.

17        Q.    And when was that?

18        A.    That would have been from 1997 to 2000.

19        Q.    Have you had any specialized training in age

20   verification?

21        A.    Yes, ma'am.

22        Q.    Can you tell the Court about that?

23        A.    Age verification -- I attended training at the

24   Federal Law Enforcement Training Center that detailed the

25   progression of development among adolescents, and using that to

1  determine what images of children -- or what images would

2  constitute violations of federal law.

3      Q.    And have you had any experience, based on that

4  training, in implementing that?

5      A.    Yes.  So I've reviewed hundreds of thousands, if

6  not millions, of images, many of which were child pornography.

7  I've worked investigations that involve approximately 25

8  different real children, that I consulted with pediatricians and

9  medical doctors on those cases.

10     Q.    What type of information were you obtaining and

11 learning during your interactions over these 25 different cases

12 with the pediatricians and the live examinations?

13     A.    We documented a lot of different things.  But

14 one of the things that we would need to do would be document the

15 development of -- to try to determine when the abuse occurred

16 with a certain child.  We would also document any physical

17 identifying marks on children, and then any physical injuries.

18     Q.    Are you familiar with the National Victim

19 Identification Program?

20     A.    Yes, ma'am.

21     Q.    Did you help create that?

22     A.    Yes.  The Victim Identification Program for

23 child pornography in Homeland Security was developed by myself

24 and another agent who was currently assigned to our headquarters

25 who implements that program.

1     Q.     And what is the purpose of that program?

2     A.     Throughout the course of these investigations,

3  we identify thousands of images of children that we send to the

4  National Center for Missing and Exploited Children, and they

5  don't register, they haven't been seen by NCMEC before.  So the

6  purpose of this program is to -- once we identify that that's a

7  child based on the image, then we search for clues in the images

8  -- backgrounds, wall plugs, bedspreads, T-shirts, those kind of

9  things, to try to identify the location of the victim so we can

10  focus a specialized search in that area to try to identify the

11  child that's being abused.

12     Q.     Have you specifically been tasked with

13  determining whether there are minor victims in child pornography

14  -- or minor victims in pornography?  Videos and images?

15     A.     Yes.  Throughout my career I have been tasked

16  with reviewing thousands of images to determine which images

17  violate federal law and selecting those for purposes of

18  submitting them to the Court.

19     Q.     And where have you been trained to draw the

20  line, if you will, as to adult versus child pornography?

21     A.     Generally speaking, when we refer something and

22  we charge that image is child pornography, we generally do not

23  charge anything that's post-pubescent.  Even though some

24  children can enter puberty at 10 and 11 years old, generally it

25  doesn't happen until the early teens.  But generally, that's

1    where we would draw the line as the chargeable images, is we're

2    going to look at that post -- or prepubescent.

3         Q.    Based on your training and experience, are you

4    able to explain -- and I'm not asking to you explain -- are you

5    able to explain various developmental stages when you are

6    looking at an image or a video to determine whether it is, in

7    fact, child pornography?

8         A.    Yes, ma'am.

9         MS. INGRAM:  I pass the witness.

10        THE COURT:  You may question.

11   EXAMINATION

12   BY MS. THOMPSON:

13        Q.    When did you say you began with your training on

14   being able to age children from photographs?

15        A.    2004, ma'am.

16        Q.    And so what was your first training that you

17   received in that area?

18        A.    Age verification.

19        Q.    Where did you receive age verification?

20        A.    At the Federal Law Enforcement Training Center.

21        Q.    And is that the name of the course precisely,

22   Age Verification?

23        A.    I believe so.

24        Q.    Okay.  How many hours is that course?

25        A.    Four hours.

1          Q.     Do you have any -- do you have any of the

2     materials you received at that time?

3          A.     No, ma'am.

4          Q.     So four hours.  Were there any breaks in this

5     four hours?

6          A.     Yes, ma'am.

7          Q.     How many breaks?

8          A.     I'm estimating two breaks.

9          Q.     Okay.  How long were the breaks each?

10         A.     Ten minutes.

11         Q.     So then you received three hours and 40 minutes

12    worth of training?

13         A.     Yes, ma'am.

14         Q.     Okay.  What did you learn in that training?

15         A.     I learned about the developmental stages of

16    adolescents and children.

17         Q.     What about the developmental stages of children?

18         A.     Well, at infancy you have a different set --

19         Q.     Female or male?

20         A.     Both.

21         Q.     Okay.

22         A.     Okay.  So children generally develop the same.

23    And they have layers of fat like when they are infants, and that

24    then sheds off at, you know, the toddler stage.  You get muscle

25    development, puberty, all sorts of things.

1    Q.    Okay.  So what sheds off in toddler stage?  Fat?

2    A.    Yes.

3    Q.    Fat from where?

4    A.    All over the body.  Cheeks, arms, legs, all

5    sorts of things.

6    Q.    And what age do you call the toddler stage?

7    A.    I call the toddler stage anywhere between one

8    and three.

9    Q.    So how can you tell the difference in a baby

10   based on what fat they have lost at toddler stage?

11   A.    So you would use that to differentiate a two

12   year old versus a five year old.

13   Q.    But I thought we were doing infants to one.

14   Baby to toddler.

15   A.    No, I was talking about that whole developmental

16   -- toddler stage is when that occurs.

17   Q.    Okay.  So you can't tell the difference between

18   an infant, a newborn, and a toddler.  Is that what you are

19   saying?

20   A.    No, you definitely can.

21   Q.    Okay.  So what the difference between an infant

22   and a toddler?

23   A.    Well, you're going to have muscle development

24   where the child has, you know, been crawling, walking.  Whereas

25   the infancy stage you wouldn't have that.  You will have

1    creasing in the arms and legs that you wouldn't have necessarily

2    in an infant.

3         Q.    So you're saying that if a child, then, is

4    developmentally delayed and they are not walking, you won't be

5    able to tell the difference between a newborn and a one year

6    old?

7         A.    That's definitely possible with, you know,

8    potential medical defects in the child that you wouldn't be able

9    to tell.  But you would definitely be able to tell the

10   difference between that and a 12 year old.

11        Q.    Okay.  So let's just skip straight to puberty.

12   How can you tell the difference in the stages of puberty?

13        A.    The difference?

14        Q.    In stages of puberty.  You said you can tell

15   prepubescent versus post-pubescent.

16        A.    Yeah.  In the male or a female?

17        Q.    Let's try a female.

18        A.    Okay.  In a female you have the vulva, the labia

19   majora, the labia minora.  The labia -- or the vulva is more

20   pronounced as the younger the child is.  Then as you go through

21   puberty, the labia majora and minora become more developed and

22   visual, that you can actually see it from the outside.

23        Q.    Okay.  And so at what age does this occur?

24        A.    It varies from -- depending on the child.

25        Q.    And would you say some people's -- when you say

1    the labia develop, what exactly do you mean the labia develop?

2         A.    So the -- in a prepubescent child --

3         Q.    Let me also clarify.  We're still talking about

4    your first four hour class that you received?

5         A.    No, ma'am.  Now we're talking about my

6    collective experience over my career.

7         Q.    I want to focus on that first four hour class.

8    What did you learn in that first four hour class?

9         A.    Ma'am, I couldn't specify what I learned in that

10   and differentiate it from the things that I have learned

11   throughout my career.

12        Q.    So are you saying you don't have any specific

13   memory what you learned in that class?

14        A.    No, I'm saying that I can't differentiate any

15   specific memories from my collective memories of investigating

16   these cases over eight years.

17        Q.    And that was in 2004; is that right?

18        A.    Yes, ma'am.

19        Q.    What percentage of that three hours and 40

20   minutes in 2004 would you have focused on female children and

21   aging female children?

22        A.    I could not tell you, ma'am.

23        Q.    So you don't have a specific memory of that?

24        A.    No, I do not.

25        Q.    Well, then let's just talk about your -- have

1    you had any intensive training regarding telling people's ages

2    by their sex parts?

3           A.    I guess could you clarify your question of

4    intense training?

5           Q.    Have you had a two week class on aging people by

6    their labia?

7           A.    No, ma'am.

8           Q.    What's the longest one-time continuous study you

9    have had on aging people by labia?

10          A.    By labia?

11          Q.    Yes.

12          A.    I couldn't tell you that.  Every class that I

13   have ever had has been more inclusive than just dealing with the

14   labia.

15          Q.    Okay.  So let's just take your -- well, tell me

16   all of the classes, as you remember them, that you have had to

17   differentiate ages by -- to differentiate the ages between

18   children, adults and different stages in between.

19          A.    I couldn't name all of the classes, ma'am.

20          Q.    Okay.  Name the ones you can remember best,

21   please.

22          A.    I've been to several different studies at the

23   Crimes Against Children conference in Dallas.  The National

24   Conference run by the Department of Justice.  All these courses

25   you have a multitude of classes that you can attend.  I've

1    attended several that deal with examining images of child

2    pornography to determine age and who the victim is.  But I

3    couldn't name the specific course titles.

4         Q.    Okay.  So how many hours have you spent in

5    Dallas at these national conferences?

6         A.    I probably spent six weeks there.

7         Q.    Okay.  So what else?  Anything else significant

8    that you can remember about your training?

9         A.    About my training?  No, ma'am.

10        Q.    Okay.  Are there other classes you have that had

11   you think you cannot remember them?

12        A.    I've definitely had other training that has

13   aided in doing this, whether it be dealing with my own daughter

14   and the medical doctor or other training, you know, prior to

15   this about just physical abuse and those kind of things.

16        Q.    Okay.  So you're saying some of this is just

17   personal experience?

18        A.    Yes, ma'am.

19        Q.    Okay.  So let just talk about breasts.

20        A.    Yes, ma'am.

21        Q.    How can you age a person by breast size?

22        A.    You can't.

23        Q.    What can you tell about a breast that will tell

24   you what somebody's age is?

25        A.    Well, there can be an adult female who has

1   little to no breast development.  However, you can tell what the

2   breasts are useful for is to indicate puberty and to indicate

3   that someone is an adolescent or an adult.  So the lack of

4   breasts doesn't necessarily mean it's child, whereas the

5   development of breasts really negates the potential of it being

6   a prepubescent child.

7           Q.    And so how do you tell the development of

8   breasts?  What does that mean?

9           A.    I don't understand your question.

10          Q.    What do you mean when you say development of

11  breasts?

12          A.    That -- well, in younger children, many times

13  you will have a swelling behind the areola.

14          Q.    The what?

15          A.    The areola will be kind of puffy and the nipples

16  less pronounced.  As the breast develops, the nipples become

17  more pronounced, the puffiness of the areola goes away.  And

18  then you develop the mammary stages of the female anatomy.

19          Q.    What are the mammary stages?

20          A.    Well, the breasts become enlarged and capable of

21  producing milk.

22          Q.    So when you say the breasts become enlarged,

23  what does that mean?

24          A.    Well, they become pronounced, a female's

25  breasts.  I don't -- I guess I don't understand what it is that

1    you don't get about what I'm saying.

2         Q.    You said that the nipples are puffy.  No, you

3    said at first the breast areola is puffy?

4         A.    Yeah.  At the beginning stages of puberty, a lot

5    of times you will see like puffiness in the areola.  Whereas as

6    the breast develops, that puffiness goes away, the nipple

7    becomes more pronounced.

8         Q.    What is the difference between a puffy nipple

9    and an enlarged nipple?

10        A.    The puffiness in the areola?

11        Q.    Yes.

12        A.    And the development of the nipple?

13        Q.    Yes.

14        A.    Well, they are two separate parts of the breast

15   -- the nipple and the areola.

16        Q.    What's the difference between the nipple and the

17   areola?

18        A.    I guess I don't understand your question.

19        THE COURT:  Neither do I.  Have you got something else?

20   BY MS. THOMPSON:

21        Q.    So when you say -- how can you tell the

22   difference between a person, a developed woman, that is very

23   flat-chested and has no breast tissue, and somebody that has

24   just begun going through puberty?  And a female that is going to

25   have large breasts but has just begun puberty?

1    A.    Right.  And what I tried to explain earlier was,

2    the existence of large breasts are indicative that someone is

3    post-pubescent, and they are either an adolescent or an adult.

4    The lack of breasts isn't a definitive statement that if

5    somebody doesn't have breasts that they are a child.  Does that

6    make sense?

7    Q.    So just because someone is flat-chested, you

8    cannot tell whether or not they have gone through puberty?

9    A.    Not based solely on that.

10    Q.    But what I heard you say is the lack of breasts

11    -- you can't tell at all whether or not someone has gone through

12    puberty?

13    A.    What I'm saying is that, just based on a picture

14    of a female chest that does not have the development of breasts,

15    you could not state that that is definitively a child.  However,

16    with the existence of breasts with that same image, you could

17    tell whether that was an adolescent or an adult.  So in most

18    images that we review, it's never just of a breast.  Just a

19    picture of a breast doesn't constitute child pornography under

20    federal law.  So it's the totality of the picture.  You are

21    going to look at other things that are in the image.

22    Q.    So to be clear, you can tell nothing from

23    breasts alone, except someone that has really big breasts has

24    already gone through puberty?

25    A.    Yes, ma'am.

1    Q.    Okay.  So let's just talk about --

2    THE COURT:  I think we covered his qualifications.

3    Anything else?

4    BY MS. THOMPSON:

5    Q.    Yes.  I want to ask about the Tanner scale.

6    A.    The Tanner stages?

7    Q.    The Tanner stages.  Are you referring to Tanner

8    stages when you say you can tell the development of the labia?

9    A.    No, ma'am.  That's a tool that was used probably

10   prior to 2000.  And generally, in the child sexual exploitation

11   community, they have moved away from the definitive use of that

12   scale.

13   Q.    So what are you saying you can tell that's

14   different from a Tanner scale?  What do you know that is

15   different from a Tanner scale?

16   A.    What do I know that's different from it?

17   Q.    Yeah, how do you tell a labia and how old a

18   labia is, that the Tanner scale didn't use?

19   A.    Well, the Tanner scale sets specific ages.  And

20   they are not always correct.  So to use that as a definitive

21   method of determining age has been moved away from.

22   Q.    So what you're saying is you cannot look -- go

23   ahead tell me.  What are you saying?

24   A.    No, I'm saying that the physical characteristics

25   used in the Tanner scale are still accurate, physical

1    characteristics that talk about the development of children and

2    adolescents.  How much, it is too narrow and definitive to only

3    go on that and say that is a hundred percent correct all the

4    time.

5              So those same stages of physical development are still

6    used; however, that's not definitive scale that would be used

7    and referred to when determining age.

8         Q.    So what would be the definitive scale?

9         A.    There is no definitive scale.

10        Q.    So what you're saying is you can estimate

11   whether or not somebody has gone through puberty?

12        A.    Yeah, you can estimate age based on the physical

13   character of the human body.

14        Q.    But I thought you just said that it's not

15   definitive because the Tanner scale was ruled out.

16        A.    The Tanner scale too narrowly defines the ages

17   based on the development.

18        Q.    So you're saying you would use the same factors

19   in the Tanner scale, you are just going to more broadly define

20   the age.  Is that what you're saying?

21        A.    Yes, ma'am.

22        THE COURT:  I think we've had enough on qualifications.

23   Anything further?

24        MS. THOMPSON:  No, Your Honor.

25        THE COURT:  Any redirect?

1    MS. THOMPSON:  I highly object.

2    THE COURT:  I got that part.  Anything further?

3    MS. INGRAM:  No, Your Honor.

4    THE COURT:  The Court finds the defendant (sic) is a

5    person with specialized knowledge, given his training, education

6    and experience.

7    You can bring the jury in.

8    You can step down, Agent.  We'll call you back.

9    MS. INGRAM:  Your Honor, before we bring the jury in,

10   may I have him look at the exhibits?  He hasn't had an

11   opportunity to do so.

12   THE COURT:  Okay.  I will let him do that.  We're in

13   recess for a few minutes.

14   (Recess.)

15   THE COURT:  You may be seated.

16   MS. THOMPSON:  Your Honor, as a --

17   (Jury in.)

18   THE COURT:  You may be seated.  The government may call

19   its next witness.

20   MS. INGRAM:  The United States recalls Joshua Findley.

21   THE COURT:  Mr. Findley, if you will come around.  You

22   are under the oath administered to you earlier.

23   THE COURT:  Ladies and gentlemen of the jury, what you

24   are about to hear is rebuttal proof.  Rebuttal proof is evidence

25   offered to contend any proof that was offered by the defense.

DIRECT EXAMINATION

BY MS. INGRAM:

        Q.      Agent Findley, you previously testified that you
were assigned to the Child Sexual Exploitation Unit with
Homeland Security?

        A.      Yes, ma'am.

        Q.      And when was that?

        A.      From 2004 to 2012.

        Q.      And did you have any previous experience in
child exploitation or abuse?

        A.      Yes, I was previously a Special Agent with the
Army Criminal Investigation Division.  I was also a local police
officer and dealt with child abuse cases, including child sex
abuse.

        Q.      And when was the -- when did you do that?

        A.      I was with the Army Criminal Investigation
Division from 1997 to 2000.

        Q.      And when were you a police officer?

        A.      2000 to 2001.

        Q.      Have you had any specialized training in age
verification?

        A.      Yes, ma'am.

        Q.      And when was that?

        A.      That was in 2004.  I received a course in age
verification at the Federal Law Enforcement Training Center.

1    Q.    And how long was that course?

2    A.    Four hours.

3    Q.    What happened during that course?

4    A.    We evaluated images and talked about the

5    developmental stages of children and how to identify,

6    differentiate, images of adult pornography versus images of

7    child pornography.

8    Q.    And you mentioned that was in 2004, so that was

9    at the beginning of you --

10   A.    Working these kinds of investigations; yes,

11   ma'am.

12   Q.    Have you had any experience working with

13   pediatricians?

14   A.    Yeah.  I estimate that I probably had cases that

15   involve at least 25 minor victims and dealing with their medical

16   evaluations to not only determine the time that the abuse would

17   have occurred based on their development at the time that we

18   identify the children, but also to identify any marks on their

19   body that would prove that that child was the victim depicted in

20   images, and then as well as any physical injuries to the child.

21   Q.    How many cases have you handled involving your

22   determination of whether an image or video constitutes child

23   pornography?

24   A.    Hundreds.

25   Q.    How many have you reviewed?

1          A.       How many images?

2          Q.       Yes.  How many videos?

3          A.       Hundreds of thousands, if not up to a million.

4          Q.       And what happens if you have identified a child

5     pornography victim that you believe to be child pornography, and

6     the National Center for Missing and Exploited Children doesn't

7     have a known image?  What do you do?

8          A.       So in those cases we look at what we can glean

9     from the image.  Myself and another agent started a program

10    which is our Child Victim Identification Program, which is

11    looking at clues in the image not only of the child, but in the

12    background, bedspreads, sheets, clothing, outlet plugs, chips,

13    you know, anything that we can use to try to identify the

14    location of that child so we can rescue the child and get it out

15    of -- get them out of that situation.

16         So in that, it's very important that we know that the

17    person in the image is a child before we spend that time and

18    evidence to go and identify the person.

19         Q.       And did you and your colleague help develop,

20    based on your program, the National Victim Identification

21    Program?

22         A.       Yes, ma'am.

23         Q.       How do you determine whether the image or a

24    video presented to you is child pornography or not?

25         A.       Well, the first and most important part is that

you have to establish that the individual in the image is a
child.  And then have you to establish if a sex act is
occurring, or there is any sadistic or masochistic violence
against the child.

Q.    How do you determine if it's a child?

A.    You look at a lot of different things.  You are
going to look at muscle development, facial structure, pubic
development, skeletal development.  All those sorts of things in
identifying whether or not it's a child.

MS. INGRAM:  Your Honor, I move that this witness has
specialized knowledge in the area of child identification.

THE COURT:  He will be so certified.

BY MS. INGRAM:

Q.    I am handing you what has been admitted as
Defense Exhibits 1 and 2.

A.    I have 1 and 2 here.  I also have another
document that's not marked.

Q.    I think it's part of Exhibit 1.

A.    Thank you, ma'am.

Q.    If you can look at Exhibit 1, please.

A.    Yes, ma'am.

Q.    And looking at that, are you able to determine
whether that's a child or not?

A.    Definitively, no.  But I would say that that is
a post-pubescent individual based on the development of the

1    labia and how it is more pronounced than the vulva.  The length

2    of the thighs and calves in relationship to the body are all

3    indicative of that that is an individual that is postpubescent.

4              Q.    Looking at Exhibit 2, are you able to determine

5    whether that's a child or not?

6              A.    Again, definitively, no, because by federal

7    statute anyone under the age of 18 is a child.  So could I

8    definitively say that this person wasn't 17?  No.  I can say

9    that, based on my experience and the investigations that I have

10   worked in determining what is child pornography, if something is

11   relatively not discernible on age, that that wouldn't be an

12   image that would be submitted for prosecution.

13             Q.    Why not?  What are you looking at in Exhibit 2?

14             A.    In Exhibit 2, you are looking at, again, the

15   labia, the length of the thighs and the arms in relationship to

16   the development of the person appears to be postpubescent.  The

17   size of the individual's hand in compared to the other hand

18   depicted in the image are, you know, relative.  So that would

19   not be an image on its own that I would be submitted, unless it

20   was part of a known series where this was an identified 16 year

21   old or something to that nature.  Just based on this picture, I

22   would not say that that was child pornography.

23             Q.    And what about Exhibit 1?  Would you say the

24   same thing?

25             A.    Yes, ma'am.

1    Q.    If I can hand you what has been admitted as

2    Defense Exhibits 8, 10 and 11.  If you can look at Defense

3    Exhibit 8, please.

4        A.    Yes, ma'am.

5        Q.    And if you can open up the folder and pull it

6    out because I think the sticker is covering it up.  If you look

7    at that, can you make a determination whether that's child

8    pornography or not?

9        A.    Based on these images, I would say that you

10   cannot.  One of the things -- you know, each individual develops

11   at a different rate.  So some females could be fully developed

12   by, you know, 13.  So just because someone is fully developed

13   doesn't necessarily mean that they are adult.  But for the

14   purposes of our job, it is a potential that that is a fully

15   developed 15 year old or a 20 year old.  So in the case of these

16   images, I would not say that any of them were child pornography.

17       Q.    What are you looking at to make that

18   determination?  Why are you saying that?

19       A.    Again, on the front page, there is clearly pubic

20   development.  You can see the pubic hair has been shaved.  You

21   can see the length of the -- from the hips to the knee is

22   probably a fully developed -- it's not going to be -- she is not

23   going to be growing anymore.  You can look at her teeth.  She

24   has all adult teeth.  So again, this is someone who is, you

25   know, past the stages of -- absent any other information that

1    would indicate that they were under 18.  But would not be

2    identified as a prepubescent child or something that, absent

3    other factors, would be considered child pornography.

4            Q.    Please look at Defense Exhibit 10.  And if you

5    can take that out of the holder as well.

6            A.    Yes, ma'am.

7            Q.    And looking at that, can you make a

8    determination whether that's child pornography or not?

9            A.    None of these images appear to be child

10   pornography.

11           Q.    Why not?

12           A.    Again, the development of the -- you know,

13   hands, faces, breasts, of the individuals depicted here --

14           Again, you know, is it potentially possible that one of

15   these individuals is under 18?  Yes, that is -- you know, it is

16   a possibility.  However, I don't see anything that would clearly

17   stand out as child pornography.

18           Q.    Would you submit that to the National Center for

19   Missing and Exploited Children?

20           A.    No.

21           Q.    Moving to Defense Exhibit 11.  Can you make a

22   determination whether that's child pornography or not?

23           A.    This -- the individual depicted on the front

24   cover and the middle of the back cover, you know, she would be

25   someone that I would definitely say appeared to be a teenager.

1    Absent any other factors, I wouldn't be able to say that, you

2    know, she was an 18 year old or a 16 year old.  But she appears

3    younger than a lot of the other individuals.

4         Q.    Why do you say that?

5         A.    Based on her breast development on the back

6    cover.  She -- it appears that she has a -- you know, a more

7    pronounced areola than nipple, which is something that happens

8    over the female body, that the areola becomes less puffy and the

9    nipple becomes more pronounced.  But absent anything else, I

10   would not define that as child pornography or vaginal

11   development is clearly in post-pubescent.

12        Q.    Would you submit that to the National Center for

13   Missing and Exploited Children?

14        A.    Based on this, no.  There is potential that if

15   you gave me other factors that I may then.

16        MS. INGRAM:  Your Honor, I pass the witness.  But may

17   this witness put those back in their correct jacket?  Thank you,

18   Your Honor.

19        THE COURT:  You may cross examine.

20        MS. THOMPSON:  Yes, Your Honor.

21   CROSS EXAMINATION

22   BY MS. THOMPSON:

23        Q.    Now, just to review, you have had extensive

24   training in being able to identify the ranges of ages of people

25   from their sexual body parts; is that correct?

1          A.     I would say I have had extensive experience in

2     doing that.  I would not describe my training as extensive.

3          Q.     So your experience is extensive; is that right?

4          A.     Yes, ma'am.

5          Q.     And you have had some training in the area; is

6     that right?

7          A.     Yes, ma'am.

8          Q.     And as a matter of fact, you were certified as

9     an expert in this area earlier?

10          A.     Yes, ma'am.

11          MS. THOMPSON:  No further questions.

12          THE COURT:  Any redirect of this witness?

13          MS. INGRAM:  No redirect, Your Honor.

14          THE COURT:  You may step down, sir.

15          MS. INGRAM:  The United States has no additional

16     rebuttal proof.

17          THE COURT:  Any rebuttal proof on behalf of the

18     defendant?

19          MS. THOMPSON:  No, Your Honor.

20          THE COURT:  Ladies and gentlemen of the jury, that

21     concludes the proof in this case.  The next stage of the

22     proceedings will be closing arguments.  But before closing

23     arguments, there are some matters that the Court has to go over

24     with counsel.  You have been sitting quite a while today, and so

25     what the Court is going to do is let you go home for the day,

1    ask you to come back at 9:00 in the morning.  We'll try and get

2    started promptly.  Once again, please don't discuss the case

3    amongst yourselves until you receive all of the evidence, the

4    argument of counsel, and the charge of the Court.  Please do not

5    engage in any type of electronic communication or research or

6    communicate any of the facts, circumstances or persons involved

7    in the case.

8         If you will hand your tablets to the Marshal, he will

9    take custody of them until you return.  If you will return to

10   the jury area shortly before 9:00, we'll try and get started

11   promptly.

12        (Jury out.)

13        THE COURT:  Counsel, there were no jury instructions

14   prepared as is presented -- proposed jury instructions

15   presented.

16        You all can have a seat.

17        Proposed jury instructions that have been presented by

18   the parties.  We have been working on them.  They are complete.

19   This is not an area where I have gone over jury instructions

20   before.  So I don't know how long this is going to take.  But if

21   you will hold on, you will have a chance to review the jury

22   instructions, then you all let me know when you are ready, and

23   we'll see whether there are any objections or not.

24        MS. THOMPSON:  A housekeeping matter, Your Honor.  I

25   had earlier put in as marked Exhibit 8 a receipt from Hustler

1    Hollywood, and I would like to rename it 13 and put it in for

2    the identification.

3         THE COURT:  No, that was matter we took up earlier.

4    That receipt has other information on it concerning videos that

5    the Court excluded.  There was no dispute that the videos were

6    purchased at the Hustler score.  That's what your investigator

7    testified to.

8         MS. THOMPSON:  I'm sorry, Your Honor.  I was just

9    putting it in for identification for the record, to go along

10   with my proffer.

11        THE COURT:  For identification only.  It will be marked

12   for ID only.  Defense Exhibit 13 for identification only.  We're

13   in recess.

14        (Recess.)

15        THE COURT:  You may be seated.

16        Before we get to the specific objections of the

17   parties, the Court caught a couple of things I wanted to share

18   with you.  On Page 1, second line.  First paragraph, second

19   line, it says the lawyer for the defendant.  I think the last

20   instruction we had a pro se defendant.

21        On Page 4, the first complete paragraph, second line.

22   Again, we change the lawyer for the defendant.  If you go down

23   to the seventh line, it will say:  Occasionally make comments to

24   the lawyers.  Instead of parties.  And I think that's it.  All

25   right.  Any objections by the United States?

1    MS. DAUGHTREY:  Your Honor, I have conferred with

2    Ms. Thompson, and if I could just go through the corrections

3    that we agree on, subject to Your Honor's agreement.

4         On Page 9, it talks about impeachment by prior

5    inconsistent statement not under oath.  And because the

6    defendant didn't testify, and there wasn't any other

7    inconsistent statement, I think that needs to be struck.

8         THE COURT:  With agreement, Page 9 will be deleted.

9         MS. DAUGHTREY:  On Page 13, the parties both agree that

10   the stipulation -- there was no stipulation.  There was an offer

11   of proof, but no stipulation ultimately.

12        THE COURT:  Well, you agreed to stipulate, but it

13   didn't get executed.  So that's coming out.

14        MS. DAUGHTREY:  Right.  Thank you.  Turning next to

15   Page 20.  The parties both agree that in the third element that

16   "or affecting" should be removed from that.  And that would

17   track the language of the indictment.

18        THE COURT:  All right.  It will be deleted.

19        MS. DAUGHTREY:  Jennifer, did you have an objection to

20   the "any"?

21        MS. THOMPSON:  No.

22        MS. DAUGHTREY:  Also on that page, the second line,

23   first word, "any".  The parties agree that needs to be struck.

24        THE COURT:  I'm sorry, where are you?

25        MS. DAUGHTREY:  I'm sorry, Page 20, second line.  The

1    first word "any" needs to be struck.  And that's also true

2    under --

3         THE COURT:  First, received child pornography.

4         MS. DAUGHTREY:  Right.  And it's also in the -- up in

5    that first sentence on that same page.

6         THE COURT:  I will just put "a" instead of "any".

7         MS. DAUGHTREY:  I think just leaving "any" out would be

8    sufficient.  We didn't talk about "a".

9         THE COURT:  I don't care.  I will leave it out.

10        MS. DAUGHTREY:  I do have another matter on that page

11   that I will come back to.  The next thing that the parties

12   agreed to is on Page 21.  The second to the last paragraph.  We

13   agree that that should be struck.  The phrase "affecting

14   interstate commerce".

15        THE COURT:  All right.

16        MS. DAUGHTREY:  Turning to Page 22, the first line.

17   The parties agree that "any" should be struck.

18        THE COURT:  All right.

19        MS. DAUGHTREY:  And the third element, again, this is

20   the affecting interstate commerce, the parties agree that the

21   phrase "or in or affecting interstate commerce" should be

22   struck.  And that's consistent with the language in the

23   indictment.

24        THE COURT:  All right.

25        MS. DAUGHTREY:  And then in the second to the last

paragraph, there is another reference to the phrase "affecting interstate commerce". The parties agree that should be struck.

That's the -- those are the corrections that the parties agree to.

Turning to something that the government is requesting, on Page 20, I believe that it should say "receiving or attempting to receive".

THE COURT: Which paragraph?

MS. DAUGHTREY: I'm sorry. The first line on that page. Count One in the indictment charges the defendant with receiving or attempting to receive.

THE COURT: And what is it that you want to delete?

MS. DAUGHTREY: I'm sorry?

THE COURT: What is it that you want to change?

MS. DAUGHTREY: Oh, I think the "and" should be changed to "or". And I know that Ms. Thompson objects. I would like to be able to pull case law overnight to support the government's position.

MS. THOMPSON: I only objected, Your Honor, because in the indictment it says "and".

THE COURT: Why shouldn't the indictment control?

MS. DAUGHTREY: Your Honor, the way that indictments are written is different than what the proof goes on. And I'm sorry, the conjunctive/injunctive stuff, that's why I'm asking for overnight to get -- to pull the case law on that. But I

1    believe there is case law that says that that should be termed

2    that way.  And if I may just have --

3         THE COURT:  All right.  We'll look at it.  We'll have

4    to decide it tomorrow.

5         MS. DAUGHTREY:  There is also one more related to that.

6    Under the first element, it should also include "attempted to

7    receive".  And there we have the issue of the "and" or "or".  So

8    it would read that "the defendant knowingly received and/or

9    attempted to receive child pornography."

10        THE COURT:  All right.

11        MS. DAUGHTREY:  Thank you, Your Honor.

12        THE COURT:  For the defense?

13        MS. THOMPSON:  Yes, Your Honor.  Your Honor, I would

14   ask, first of all, that the Court's instruction to the jury

15   regarding Scott Levasseur, that the Court gave first thing this

16   morning be repeated in the jury instructions.

17        THE COURT:  No, ma'am.  I try and avoid commenting on

18   the evidence in the jury instructions.

19        MS. THOMPSON:  I just had concerns that the jury may

20   not have heard the entire statement that the Court said.  It's

21   very complicated as to what exactly they were to do.

22        THE COURT:  Well, no, I think it was fairly simple.  It

23   would be a miscarriage of justice.  I think that probably stuck

24   with them.

25        MS. THOMPSON:  Then in the section under theory of the

1  defense, Your Honor, I would add --

2      THE COURT: We didn't have any. We usually -- we

3  include the indictment. We usually include the theory of the

4  defendant. But there was none, so --

5      MS. THOMPSON: I would like to add there an instruction

6  on an affirmative defense, Your Honor, of having possessed fewer

7  than three child pornography images, three or fewer, and then

8  those were deleted, Your Honor.

9      THE COURT: You will have to provide me a case cite for

10  the assertion you are making. And if you want to type out your

11  theory of the case and e-mail it to my law clerk, we'll include

12  your theory of the case. But if you are going to an affirmative

13  defense, you are going to have to provide a citation for that.

14      MS. THOMPSON: The affirmative defense would be cited

15  in the --

16      THE COURT: Well, if I refer to it as an affirmative

17  defense in your theory of the case, then the jury needs guidance

18  or instruction on what the law is concerning that affirmative

19  defense. So it may be in your theory of the case, but it's got

20  -- I've got to have some authority for the assertion that you

21  are making.

22      MS. THOMPSON: Yes, Your Honor. And then the final

23  thing, Your Honor, was on Page 27 in the very last paragraph of

24  final instructions. The second line of the very last paragraph

25  reads: Question to writing, signed by the foreperson. And I

1  would ask that the signed by the foreperson be removed and it

2  simply says, reduce your message or question to writing.

3        THE COURT:  No, ma'am.  I tell them that the foreperson

4  is in charge of their deliberations.  And that's my practice and

5  custom.  Not only me, but I think of everybody else I know.

6        Anybody -- if there are in other objections, we'll take

7  up the and/or, the Defendant's theory and the Defendant's

8  assertion about an affirmative defense.  We'll just have to take

9  that up in the morning.  If not, we will be -- we're in recess.

10                   (Recess.)

11                      *  *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     REPORTER'S CERTIFICATE

2

3          I, Peggy G. Turner, Official Court Reporter for

4     the United States District Court for the Middle

5     District of Tennessee, with offices at Nashville, do

6     hereby certify:

7          That I reported on the Stenograph machine the

8     proceedings held in open court on February 26, 2015, in the

9     matter of USA v. JEREMY SETH TUMMINS, Case No. 3:10-00009; that

10    said proceedings in connection with the hearing were reduced to

11    typewritten form by me; and that the foregoing transcript, Pages

12    1 through 124, is a true and accurate record of said

13    proceedings.

14         This the 11th day of April, 2015.

15

16

17

18                    *Peggy G. Turner*
                      S/Peggy G. Turner, RPR
19                    Official Court Reporter

20

21

22

23

24

25